## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) | MEGAN CAPEL, Administratrix of the Estate of Terral Brooks Ellis II, Deceased, | ) ) ) |
| (2) | TERRAL B. ELLIS, SR., and | ) |
| (3) | SHELLY BLISS, | ) ) |
| | Plaintiffs, | ) ) |
| | v. | ) ) |
| (1) | OTTAWA COUNTY BOARD OF COUNTY COMMISSIONERS, | ) ) |
| (2) | JEREMY FLOYD, SHERIFF OF OTTAWA COUNTY, in his Official Capacity, | ) ) ) |
| (3) | TERRY DURBOROW, | ) |
| (4) | THERESA HORN L.P.N., | ) |
| (5) | JENNIFER GRIMES, | ) |
| (6) | KENT WILLIAMS, | ) |
| (7) | BAPTIST HEALTHCARE OF OKLAHOMA, LLC d/b/a INTEGRIS MIAMI EMS; | ) ) ) |
| (8) | OFFICER JEFFREY HARDING, | ) |
| (9) | OFFICER BRAY, and | ) |
| (10) | OFFICER CHARLES SHOEMAKER, | ) ) |
| | Defendants. | ) ) |

Case No.:  17-cv-00325-JED-FHM

ATTORNEY LIEN CLAIMED
JURY TRIAL DEMANDED

## COMPLAINT

**COMES NOW**, the Plaintiffs, Megan Capel ("Plaintiff"), as the Administratrix of the Estate of Terral Ellis II ("Mr. Ellis"), deceased, Terral Ellis, Sr. and Shelly Bliss by and through their attorneys of record, in the above styled case, and for their causes of action against the Defendants, allege and states as follows:

## INTRODUCTORY STATEMENT

1.     This lawsuit is brought against Defendants for negligence, wrongful death and violations of Mr. Ellis' constitutional rights, that caused his prolonged pain, suffering and untimely death while in the custody of the Ottawa County Sheriff's Department ("OCSD").

## JURISDICTION AND VENUE

2.     The jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth Amendment and/or Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

3.     The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and the laws of the United States, particularly the Eighth Amendment and/or Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

4.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case and controversy arising under the United States Constitution and federal law.

5.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

6.     Plaintiff Megan Capel ("Plaintiff Capel") is the duly appointed Administratrix of the Estate of Terral Ellis ("Mr. Ellis"), deceased.  Plaintiff Capel is also the mother of Mr. Ellis' minor child.

7.      Plaintiff Terral B. Ellis, Sr. ("Plaintiff Ellis, Sr.") is the father of the deceased.

8.      Plaintiff Shelly Bliss ("Plaintiff Bliss") is the mother of the deceased.

9.      Defendant Terry Durborow ("Former Sheriff Durborow" or "Defendant Durborow") was at times relevant hereto, the Sheriff of Ottawa County, Oklahoma, residing in Ottawa County, Oklahoma. Defendant Durborow, as Sheriff and head of the Ottawa County Sheriff's Department at times relevant hereto, was responsible for ensuring the safety and well-being of inmates detained and housed at the Ottawa County Jail, including the provision of appropriate medical care and treatment to inmates in need of such care, pursuant to 57 Okla. Stat. § 47. In addition, Defendant Durborow was, at times pertinent hereto, responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of the Ottawa County Sheriff's Department and the Ottawa County Jail, including the policies, practices, procedures, and/or customs that violated Mr. Ellis's rights as set forth in this Complaint. Durborow retired from his position as Sheriff, effective December 31, 2015. Defendant Durborow is sued in his individual capacity.

10.     Defendant Jeremy Floyd ("Sheriff Floyd" or "Defendant Floyd") is the current Sheriff of Ottawa County, Oklahoma, residing in Ottawa County, Oklahoma. Sheriff Floyd is sued purely in his official capacity.  A claim against a state actor in his official capacity, such as Sheriff Floyd, "is essentially another way of pleading an action against the county or municipality" he represents and is considered under the standard applicable to § 1983 claims against municipalities or counties. *Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010). *See also see Kentucky v. Graham,* 473 U.S. 159, 166 (1985)

("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). As the elected Sheriff, Sheriff Floyd is, in essence a governmental entity. Sheriff Floyd is being sued purely in his official capacity.

11.     Defendant Board of County Commissioners of Ottawa County ("BOCC") is a statutorily created governmental entity. In Oklahoma, any tort action against the state or its political subdivisions must name that entity as defendant. *See* 51 O.S. § 163(C). Under Oklahoma's Governmental Tort Claims Act ("GTCA"), the governmental entity "assumes liability for loss resulting from the torts of its employees acting within the scope of their employment and such liability is exclusive and in place of all other liability of an employee at common law or otherwise." *Shephard v. CompSource, Oklahom*, 209 F.3d. 288, 294 (Okla. 2009). BOCC is a proper governmental Defendant in this action and is vicariously liable for the torts of OSCD personnel acting within the scope of employment.

12.     Defendant Theresa Horn ("Defendant Horn" or "Nurse Horn") is a Licensed Practical Nurse and is, and was at all times relevant hereto, the Jail Nurse for the Jail. Theresa Horn is the only Jail Nurse at the Jail and is on staff only five days a week, otherwise she is on call. Defendant Horn is sued in her individual capacity.

13.     Defendant Jeffrey Harding ("Defendant Harding" or "Officer Harding") was, at all times relevant hereto, employed by the OCSD and stationed in the Jail. Defendant Harding is sued in his individual capacity.

14.     Defendant Charles Shoemaker ("Defendant Shoemaker" or "Officer Shoemaker") was, at all times relevant hereto, employed by the OCSD and stationed in the Jail. Defendant Shoemaker is sued in his individual capacity.

15.     Defendant Bray ("Officer Bray") was, at all times relevant hereto, employed by the OCSD and stationed in the Jail. Defendant Bray is sued in his individual capacity.

16.     Defendant Jennifer Grimes ("Defendant Grimes") was, at all times relevant hereto, an EMT-Paramedic employed by INTEGRIS Miami EMS. Defendant Grimes was assigned as the Secondary Patient Caregiver for Mr. Ellis when the INTEGRIS Baptist Regional EMS ambulance was dispatched to attend to and transport Mr. Ellis. Defendant Grimes is sued in her individual capacity.

17.     Defendant Kent D. Williams ("Defendant Williams") is an EMT-Paramedic and was, at all times relevant hereto, employed by INTEGRIS Baptist Regional EMS.  Defendant Williams was assigned as the Primary Patient Caregiver for Mr. Ellis when the INTEGRIS Baptist Regional EMS ambulance was dispatched to attend to and transport Mr. Ellis. Defendant Williams is sued in his individual capacity.

18.     Defendant Baptist Healthcare of Oklahoma, LLC, is an Oklahoma Domestic Limited Liability Company doing business under a variety of trade names, including INTEGRIS Miami EMS ("Defendant INTEGRIS" or "INTEGRIS"). Defendant INTEGRIS is an emergency medical services company, conducting business in Miami, Oklahoma. Defendant INTEGRIS is vicariously liable for the torts of its employees that occur within in the scope of employment.  Defendant INTEGRIS, at all times relevant hereto, employed Defendant Grimes and Defendant Williams (collectively "Paramedic Defendants") as paramedics.

## FACTUAL ALLEGATIONS

19.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 18, as though fully set forth herein.

20.     Beginning in early October of 2015, Mr. Ellis was under the custody of the Ottawa County Sheriff's Department ("OCSD") at the Ottawa County Jail ("Jail").

21.     Upon arriving at the Jail, Mr. Ellis started a daily exercise routine and was in good health.   Unfortunately, however, his health began to decline and serious and obvious health needs began to materialize.

22.     Mr. Ellis died October 22, 2015 while in custody at the Jail.

23.     For many days prior to his death, Ellis had exhibited a serious medical need, and/or complained to detention staff and medical staff, including Nurse Horn, of seizures, convulsions, uncontrollable sweating, dehydration, and the inability to walk, along with pain in his back, ribs and internal organs.   These were symptoms of an emergent and life-threatening condition, requiring immediate hospital-level care.   Yet, detention and medical staff at the Jail, including Nurse Horn, disregarded the obvious, known and substantial risks to Mr. Ellis' health by failing to send him to a hospital or otherwise provide appropriate care treatment or evaluation.

24.     Mr. Ellis was clearly sick and in pain, so much so that a fellow inmate had to hand feed and water Mr. Ellis -- when he was able to eat at all -- and had to give him cups to urinate in and then dump them out for him.   While fellow inmates attempted to assist Mr. Ellis, detention and medical staff, including Nurse Horn, failed and refused to provide him with assistance.

25.     When Nurse Horn finally saw Mr. Ellis, she failed to send him to the hospital or refer him to a physician for an assessment, despite the fact that Mr. Ellis was sweating profusely, in severe pain and no longer eating or drinking.

26.     On or about October 21, 2015, Mr. Ellis and his fellow inmate continued to beg detention staff and medical staff for medical attention. During this time period, Mr. Ellis continued to exhibit symptoms of a serious and life-threatening illness, including seizures, convulsions, uncontrollable sweating, dehydration, and the inability to walk, along with severe pain in his back, ribs and internal organs.  When Mr. Ellis and the other inmate requested medical attention, the detention staff and Nurse Horn responded by telling Mr. Ellis that he needed to stop faking it and to lay down and serve his time. Mr. Ellis and the other inmate repeatedly asked detention staff for medical assistance for Mr. Ellis, but were told that there was nothing they could do.  At one point, Mr. Ellis asked, "What are you going to tell my 2 year-old child when I die in here?" The detention officer and Nurse Horn replied by telling Mr. Ellis to lie back down. Overall, his symptoms were disregarded by detention and medical staff, including Nurse Horn.

27.     Also on or about October 21, Mr. Ellis told the inmate, as well as the detention staff and medical staff, including Nurse Horn, that he was in the worst pain that he had ever experienced, and that he needed to go to the hospital.  Again, detention staff and medical staff, including Nurse Horn, ignored Mr. Ellis' pleas for help.

28.     At this time, on or about October 21, Mr. Ellis turned to the fellow inmate and asked, "They're really not going to help me, are they?" Mr. Ellis commented, "I think I'm going to die" in here.  The inmate helped Mr. Ellis to his bunk and Ellis began

to have a seizure.  Detention officers entered the pod and snapped ammonia sticks under Mr. Ellis' nose until the seizure ended, then detention officers left as if nothing had happened.  They provided no medical care.  They did not call a doctor or nurse.  They did not call an ambulance.  They were deliberately indifferent to his serious medical needs.

29.     After the detention officers left, on or about October 21, Mr. Ellis was "begging for his life… he was begging for help".  Several other inmates joined in, demanding that detention staff provide Ellis with some help.  They did nothing.  Mr. Ellis then had another seizure.  After this seizure, detention officers and Nurse Horn came to the pod.  The inmates in the pod were complaining and inquiring as to why Ellis was not getting any medical attention.  In response to the inmates' complaints, detention staff moved the inmates into the "rec yard".

30.     On or about the afternoon of October 21, after Mr. Ellis had multiple seizures, the Paramedic Defendants, employed by Defendant INTEGRIS, arrived in the pod.  In deliberate indifference to Mr. Ellis' serious and obvious medical needs, Officers Shoemaker, Harding, Bray (collectively referred to as "Officer Defendants") told the Paramedic Defendants that Mr. Ellis was *"faking"* his illness and that the County was not going to "foot the bill" for his care at the Hospital.  Mr. Ellis reported to the Paramedic Defendants that: (1) he had had a seizure, despite no history of seizures; (2) he was "severely dehydrated"; (3) he was having pain in his ribs; and (4) he had been urinating in a cup because he was unable to walk to the toilet.  Nevertheless, despite these serious and concerning symptoms and history, the Paramedic Defendants failed, in violation of the duty of care owed to Mr. Ellis, to take him to the hospital.  Indeed, prior to leaving Mr. Ellis at the Jail, the Paramedic Defendants did not even secure Mr. Ellis' signature to

document any refusal of treatment.  On information and belief, detention and/or medical staff prevented and obstructed Mr. Ellis from signing the INTEGRIS Miami EMS refusal of treatment form.

31.     Paramedic Defendants' negligent failure to transport Mr. Ellis to the hospital to secure medical evaluation and treatment for Mr. Ellis was a proximate cause of his continuing physical and mental pain, anguish, suffering and death.  And Defendant INTEGRIS is vicariously liable for the Paramedic Defendants' negligence and the damages resulting from that negligence.

32.     No physician ever came to the Jail to assess Mr. Ellis's condition.  Indeed, at the time of Mr. Ellis' incarceration, as a matter of policy and practice, OCSD did not provide access to *any* physician at the Jail for *any* inmate.  Rather, OSCD only maintained a contract with a part-time physician's *assistant.*  Nevertheless, despite his obvious symptoms of a serious medical condition, it is believed that Mr. Ellis was never seen by the physician's assistant.

33.     While the Paramedic Defendants were at the Jail, Mr. Ellis asked to call his grandfather about his condition, but the detention staff refused to let him do so.

34.     After the Paramedic Defendants left the Jail, the OSCD staff moved Mr. Ellis to a holding cell.  Responsible detention staff took Mr. Ellis out of the pod after the ambulance left and locked him down in H1, a segregation cell, alone and away from the inmates who were doing their best to take care of him in lieu of proper medical attention.

35.     The next day, October 22, 2015, the day of Mr. Ellis' death, Mr. Ellis was found in his cell in respiratory distress.  At about 1:50 p.m., an ambulance was again called to the Jail. This time a Quapaw Tribe EMS ambulance responded. Detention

and/or medical staff at the Jail told the Quapaw Tribe paramedics that Mr. Ellis was suffering from back pain.

36.     At 2:14 p.m. Mr. Ellis was finally taken to a Miami hospital, but it was too late. On October 22, 2015, less than an hour after being taken to the hospital, Mr. Ellis was declared dead.

37.     The Quapaw Tribe paramedics and the medical examiner's office were both told that Mr. Ellis was found alone in his cell with acute respiratory distress, and a bed sheet tied loosely around his neck. Yet, the medical examiner recorded no injuries to Ellis' neck and determined that Mr. Ellis died of sepsis and pneumonia. Sepsis is a life-threatening condition where the body's response to an infection causes damage to organs and tissue.

38.     It seems that the bed sheet was placed around Mr. Ellis' neck, by staff at the Jail, in an apparent attempt to portray his death as a suicide and to cover up the deliberate indifference to his serious and obvious medical needs.

39.     Jail staff never called Ellis' emergency contact or any family to tell them he was ill. The family was only notified after he was taken to the hospital where he died soon after arriving.

40.     When Mr. Ellis' body was viewed at the funeral home there were massive bruises on his torso.

41.     On information and belief, Sheriff Durborow and/or agents of Sheriff Durborow removed both the digital video recorders (DVRs) and the hard drives out of the Jail and replaced them with new ones after Mr. Ellis died in an apparent attempt to cover up and conceal the deliberate indifference to Mr. Ellis' serious medical needs.

42.     A few weeks after Ellis' death, journalists requested all records related to his custody, including the jail's incident report of his death.  Sheriff Durborow responded in a letter, writing that, "it is his opinion that no records held by the Ottawa County Sheriff's Department concerning the death of Terral Ellis, are subject to public inspection."

43.     Durborow announced his retirement less than two months later, in December 2015, at an Ottawa County Commissioners meeting.

44.     Following Durborow's retirement, the then-Interim Sherriff stated to the local paper that Mr. Ellis' death was "untimely" and that "maybe there's something else [the Sheriff's Department] could have done".

45.     The OCSD policies include a "Duty Station Description" for the position of Jail Nurse that states the following:

"Basically, a Correctional Facility Nurse does almost everything a trauma nurse does. It's just the type of patients that we deal with are different.

never let your guard down.

never turn your back to them.

**don't ever let them gain your trust**."*(emphasis added)*.

46.     In 2006, in the Ottawa County Jail, a female inmate, who was eight (8) months pregnant, complained she was not feeling good. Randall Lloyd, the Jail Administrator at the time, responded by having officers chain her to the concrete floor. This pregnant inmate could not stand up and screamed through the night. She was chained up for 16-17 hours and went into labor days later.

47.     In late October 2006, in the Ottawa County Jail, a female inmate had a

severe seizure that caused her head to slam against her cell wall. However, it was the policy at the Jail that the detention staff could not call 9-1-1 without Jail Administrator approval. The Jail Administrator, Randall Lloyd, was at a party and would not let Jail personnel call 9-1-1. Eventually the Jail Administrator arrived and stated "Goddamnit I was at a Halloween party about to get a fine piece of ass and I had to come here for this?" The inmate was initially treated as though she was faking her seizure disorder but eventually Jail personnel were allowed to call 9-1-1 for the inmate.

48.     The acts and/or omissions of indifference as alleged herein, include but are not limited to: the failure to treat Mr. Ellis' serious medical condition properly; failure to conduct appropriate medical assessments; failure to create and implement appropriate medical treatment plans; failure to promptly evaluate Mr. Ellis' physical health; failure to properly monitor Mr. Anderson's physical health; failure to provide access to medical personnel capable of evaluating and treating his serious health needs;  unnecessary delays of treatment; obstruction of medical treatment for Mr. Ellis; a reckless assumption that Mr. Ellis was faking or malingering; and a failure to take precautions to prevent further injury to Mr. Ellis.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Cruel and Unusual Punishment in Violation of the Eighth and Fourteenth
Amendments to the Constitution of the United States
(42 U.S.C. § 1983)**

**A.     Allegations Applicable to Defendant Durborow, Sheriff Floyd, Defendant
Horn and Officer Defendants**

49.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 48, as though fully set forth herein.

50.     Mr. Ellis had obvious, severe and emergent medical needs made known to the Defendants prior to his death.

51.     Nonetheless, Defendants disregarded the known and obvious risks to Mr. Ellis' health and safety.

52.     Defendants failed to provide, *inter alia*, timely or adequate medical treatment and proper monitoring and supervision for Mr. Ellis while he was placed under their care, in deliberate indifference to Mr. Ellis' serious medical needs, health and safety.

53.     As a direct and proximate result of Defendants' conduct, Mr. Ellis experienced physical pain, severe emotional distress, mental anguish, loss of consortium, loss of life, and the damages alleged herein.

54.     As a direct and proximate result of Defendants' conduct, Mr. Ellis' heirs have suffered damages, including, but not limited to, pecuniary loss (including lost wages), funeral expenses, loss of consortium, grief, loss of companionship, pain and suffering.

**B.     Supervisor Liability (Applicable to Former Sheriff Durborow, in his individual capacity)**

55.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 54, as though fully set forth herein.

56.     There is an affirmative link between the aforementioned acts and/or omissions of Defendants in being deliberately indifferent to Mr. Ellis' serious medical needs and policies, practices and/or customs that Sheriff Durborow promulgated, created, implemented and/or possessed responsibility for.

Such policies, practices and/or customs include, but are not limited to:

a.    Severe limitation of the use of off-site medical and diagnostic service providers, even in emergent situations;

b.    Untimely medical examinations and treatment;

c.    Understaffing (i.e., no access to an on-site physician);

d.    Inadequate training (i.e., training and encouraging medical personnel and detention staff to assume that inmates are faking illness/injury or malingering);

e.    Fostering an atmosphere and a system of indifference to the serious health needs of inmates like Mr. Ellis; and

f.    Utterly inadequate medical supervision of staff and inmates.

57.    Sheriff Durborow knew and/or it was obvious that the maintenance of the aforementioned policies, practices and/or customs posed an excessive risk to the health and safety of inmates like Mr. Ellis.

58.    Sheriff Durborow disregarded the known and/or obvious risks to the health and safety of inmates like Mr. Ellis.

59.    Sheriff Durborow, through his continued encouragement, ratification and approval of the aforementioned policies, practices and/or customs, in spite of their known and/or obvious inadequacies and dangers, has been deliberately indifferent to inmates', including Mr. Ellis', serious medical needs.

60.    There is an affirmative link between the unconstitutional acts of his subordinates and Sheriff Durborow's adoption and/or maintenance of the aforementioned policies, practices and/or customs.

61.     As a direct and proximate result of the aforementioned policies, practices and/or customs, Mr. Ellis and Mr. Ellis' heirs suffered injuries and damages alleged herein.

**C.     Official Capacity Liability (Applicable to Sheriff Floyd, in his official capacity)**

62.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 61, as though fully set forth herein.

63.     Sheriff Floyd is the current Sheriff of Ottawa County, Oklahoma, and is sued *purely* in his official capacity. As the elected Sheriff, Sheriff Floyd is, in essence a governmental entity. A claim against a state actor in his official capacity, such as Sheriff Floyd, "is essentially another way of pleading an action against the county or municipality" he represents and is considered under the standard applicable to § 1983 claims against municipalities or counties. *Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010). *See also see Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

64.     No allegations are made against Sheriff Floyd in his individual capacity. Sheriff Floyd, as a representative of OCSD and Ottawa County, is liable for Mr. Ellis and Mr. Ellis' heirs injuries that resulted from unconstitutional acts by OCSD personnel that are affirmatively linked to OCSD's adoption and/or maintenance of unconstitutional policies, practices and/or omissions, including the unconstitutional policies, practices and/or omissions detailed *supra*.

### SECOND CLAIM FOR RELIEF

**Negligence/Wrongful Death
(Against Paramedic Defendants and INTEGRIS)**

65.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 64, as though fully set forth herein.

66.     As a matter of law, the Paramedic Defendants owed a duty to Mr. Ellis to use reasonable care to provide appropriate assessment, evaluation, treatment, and/or transport.

67.     Paramedic Defendants breached that duty by failing to provide Mr. Ellis with adequate assessment, evaluation, treatment and/or transport despite the obvious need.

68.     As a direct and proximate result of Defendants' negligence, Mr. Ellis experienced unnecessary and prolonged pain and suffering; worsening of his already serious condition, severe emotional distress, mental anguish, loss of his life and the damages alleged herein.

69.     As a direct and proximate result of Defendants' negligence, Mr. Ellis' heirs have suffered damages, including, but not limited to, pecuniary loss (including lost wages), loss of consortium, grief, loss of companionship, pain and suffering.

70.     As a direct and proximate result of Defendants' negligence, Plaintiffs Terral Ellis, Sr. and Shelly Bliss have suffered damages, including, but not limited to, grief and loss of companionship.

71.     INTEGRIS is vicariously liable for this tortious conduct by Paramedic Defendants, as it occurred within the scope of Paramedic Defendants' employment by, or agency with, INTEGRIS.

### THIRD CLAIM FOR RELIEF

**Violation of Article II § 9 of the Constitution of the State of Oklahoma
Cruel and Unusual Punishment and Deliberate Indifference**

**(Against Defendant BOCC)**

72.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 71, as though fully set forth herein.

73.     Article II § 9 of the Oklahoma Constitution prohibits the infliction of cruel and unusual punishment.   Under the Oklahoma Constitution's Due Process Clause, Article II § 7, the right to be free from cruel and unusual punishment extends to pre-trial detainees who have yet to be convicted of a crime (in addition to convicted prisoners who are clearly protected under Article II § 9).

74.     The Constitution of the State of Oklahoma, under Article II § 9 and Article II § 7, provides a private right of action for Mr. Ellis to be free from cruel and unusual punishment, which includes protection from the denial of needed medical care while in custody.

75.     As described herein, Mr. Ellis, while in the custody of OCSD in the Ottawa County Jail – under the care of Sheriff Durborow – was denied necessary medical treatment. Defendants violated Mr. Ellis' rights by failing to provide him with prompt and adequate medical assessment, evaluation, treatment and supervision despite the obvious need.

76.     At all times relevant, the Jail personnel described in this Complaint were acting within the scope of their employment and under the supervision of Defendant Durborow, the former Sheriff of Ottawa County.

77.     Defendants' denial of medical care and treatment to Mr. Ellis violated Article II §§ 7 and 9 of the Constitution of the State of Oklahoma and was a direct and

proximate cause of Mr. Ellis' prolonged pain, suffering and untimely death, as well as all other damages alleged herein.

78.     The Ottawa County Board of County Commissioners is vicariously liable for the violations of the Oklahoma Constitution by employees and agents acting within the scope of their employment.

**PUNITIVE DAMAGES**

79.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 78, as though fully set forth herein.

80.     Plaintiff Capel is entitled to punitive damages on her claims brought pursuant to 42 U.S.C. § 1983 as Defendants' conduct, acts and/or omissions alleged herein constitute reckless or callous indifference to Mr. Ellis' federally protected rights.

81.     Plaintiffs Capel, Terral Ellis, Sr., and Shelly Bliss are entitled to punitive damages on their negligence/wrongful death claims against the Paramedic Defendants as the Paramedic Defendants conduct, acts, and/or omissions alleged herein constitute gross negligence and/or recklessness.

**WHEREFORE**, based on the foregoing, Plaintiffs Capel, Terral Ellis, Sr., and Shelly Bliss pray that this Court grant them the relief sought, including, but not limited to, actual damages and compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing of suit, punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), reasonable attorney fees, and all other relief deemed appropriate by this Court

Respectfully submitted,

Smolen, Smolen & Roytman, PLLC

s/ Daniel E. Smolen
Daniel E. Smolen, OBA #19943
danielsmolen@ssrok.com
Robert M. Blakemore, OBA #18656
bobblakemore@ssrok.com
701 South Cincinnati Avenue
Tulsa, OK 74119
Phone:  (918) 585-2667
Fax:  (918) 585-2669

***Attorneys for Plaintiffs***