IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1)  ROBBIE EMERY BURKE, et al.    )
    )
         Plaintiffs,    )
    )
v.    )    Case No.  CIV-17-325-JED-FHM
    )
(1)  JEREMY FLOYD, SHERIFF OF    )
    OTTAWA COUNTY, in his    )
    official capacity, et al.,    )
    )
         Defendants.    )

---

## DEFENDANT FLOYD'S MOTION AND BRIEF FOR SUMMARY JUDGMENT

---

Ambre C. Gooch, OBA No. 16586
COLLINS, ZORN, & WAGNER, P.C.
429 N.E. 50th Street, Second Floor
Oklahoma City, OK  73105-1815
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
E-mail: acg@czwlaw.com

ATTORNEY FOR DEFENDANT
JEREMY FLOYD

December 13, 2019

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii - iii

LIST OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv - v

LCvR 56.1(b) STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STANDARD OF REVIEW FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.      PLAINTIFF CANNOT ESTABLISH MUNICIPAL
        LIABILITY AGAINST SHERIFF FLOYD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.      No Personal Participation by Sheriff Durborow . . . . . . . . . . . . . . . . . . . . . . . . 12

        B.      No Unconstitutional Custom, Policy, or Practice . . . . . . . . . . . . . . . . . . . . . . . 13

        C.      No Failure to Train . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITY

**PAGE**

## CASES

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Barney v. Pulsipher*, 143 F.3d 1299 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Board of County Commissioners of Bryant County, Oklahoma v. Brown*,
520 U.S. 397, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175 (10th Cir. 2010) . . . . . . . . . . 14

*Carter v. Morris*, 164 F.3d 215 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Celotext Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Cf Connick v. Thompson*, 131 S. Ct. 1350, 179 L.Ed.2d 417 (2011) . . . . . . . . . . . . . . . . . . 17, 18

*Church v. City of Huntsville*, 30 F.3d 1332 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*City of Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) . . . . . 17, 18

*City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985) . . . . 13

*Conaway v. Smith*, 853 F.2d 789 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . 11

*Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) . . . . . . . . . . . . 18

*Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Jett v. Dallas Independent School District*, 491 U.S. 701,
109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Lankford v. City of Hobart*, 73 F.3d 283 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Lopez v. LeMaster*, 172 F.3d 756 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Lytle v. Doyle*, 326 F.3d 463 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658,
98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Pembaur v. Cincinnati*, 475 U.S. 469, 106 S. Ct. 1291, 89 L. Ed. 2d 425 (1986) . . . . . . . . . . . 13

*Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464 (D. Colo. 1996) . . . . . . . . . . . . . . . . . . . 11

## **STATUTES**

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14, 17, 18, 19

## **RULES**

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

LCvR 56.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**<u>EXHIBITS TO DEFENDANT FLOYD'S MOTION FOR SUMMARY JUDGMENT</u>**

Ex. 1          Booking sheet, medical intake, and property intake pages for T. Ellis

Ex. 2          Progress Notes for T. Ellis     (SEALED)

Ex. 3          Excerpts of the Deposition of Jeff Harding taken on November 15, 2019

Ex. 4          Excerpts of the Deposition of Theresa Horn taken on October 8, 2019

Ex. 5          Lawson's incident report re T. Ellis

Ex. 6          Bray's incident report re T. Ellis

Ex. 7          Excerpts of the Deposition of Johnny Bray taken on November 20, 2019

Ex. 8          EMS Records re T. Ellis     (SEALED)

Ex. 9          First Responders Report dated October 21, 2015   (SEALED)

Ex. 10         Excerpts of the Deposition of Jennifer Grimes taken on April 13, 2018

Ex. 11         Excerpts of the Deposition of Charles Shoemaker taken on November 21, 2019

Ex. 12         Inmate Welfare Check Sheet re T. Ellis

Ex. 13         OCJ Policy re Surveillance of Holding Cells     (SEALED)

Ex. 14         Derwin's supplemental report re T. Ellis

Ex. 15         Excerpts of the Deposition of Derek Derwin taken on September 25, 2019

Ex. 16         Bray's incident report #2 re T. Ellis

Ex. 17         Shoemaker's incident report re T. Ellis

Ex. 18         INTEGRIS Records re T. Ellis   (SEALED)

Ex. 19         ME Report re T. Ellis    (SEALED)

Ex. 20         OCJ Policy re Health Appraisal    (SEALED)

Ex. 21         OCJ Policy re Medical Services    (SEALED)

Ex. 22          OCJ Policy re  Non-Emergency Care & Medical Complaints   (SEALED)

Ex. 23          OCJ contract with A. Fox for July 2015 to July 2016

Ex. 24          OCJ Policy re Emergency Medical Care   (SEALED)

Ex. 25          Excerpts of the Deposition of Terry Durborow taken on November 18, 2019

Ex. 26          OCJ Policy re Staff Training   (SEALED)

Ex. 27          OCJ Jailer Training Records for 2015    (SEALED)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) ROBBIE EMERY BURKE, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. CIV-17-325-JED-FHM |
| | ) | |
| (1) JEREMY FLOYD, SHERIFF OF | ) | |
| OTTAWA COUNTY, in his | ) | |
| official capacity, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT FLOYD'S MOTION AND BRIEF FOR SUMMARY JUDGMENT

Decedent Terrall Ellis was incarcerated in the Ottawa County Jail from October 10-22, 2015. He died at Integris Baptist Regional Hospital in Miami, Oklahoma, following his transport there from the Ottawa County Jail. Plaintiff Estate has sued multiple Defendants, some are current or former employees or elected officials of Ottawa County, others are medical providers associated with Integris Baptist Regional Hospital. Defendant Floyd is the current elected Sheriff and he is sued in his official capacity for municipal liability associated with the medical delivery system in the Jail. Defendant Floyd requests that the Court enter summary judgment in his favor pursuant to Fed. R. Civ. P. 56, for the reasons stated in the following Brief:

## LCvR 56.1(b) STATEMENT

Pursuant to LCvR 56.1(b), Defendant Floyd asserts that there is no genuine dispute as to the following material facts:

1. On October 10, 2015, Decedent Terral Ellis was booked into the Ottawa County Jail ("OCJ"). At time of his booking, a medical history was taken for Ellis in which he disclosed that he had asthma for which he took albuterol, but no other current medical conditions, medical

treatments, or injuries. He did not have asthma medication in his possession (Ex 1, Booking sheet, medical intake, and property intake pages for T. Ellis).

2.      On Saturday, October 17, 2015, OCJ Nurse Theresa Horn received a call from the jail advising that Ellis was complaining that he thought he had broken his back. The jailer asked Ellis what had happened and Ellis stated he thought it was from sleeping on a hard bunk. Ellis was mobile and denied having fallen or receiving any other injuries. Horn advised the jailer to give Ellis ibuprofen and that she would check on him the following Monday. (Ex. 2, Progress Notes for T. Ellis).

3.      On Monday, October 19, 2015, Elis was brought to the Nurse's office. Ellis advised Horn that he had pain in the middle of his back and he thought it might be kidney stones. Horn examined him and noted tenderness on the left side of his spine at T-3/T-4 with a slight protrusion at T-4. Horn advised Ellis that it appeared to be a dislocated rib. Horn allowed Ellis to call his grandfather to see if he would pay for a chiropractor appointment. Horn advised Jail Administrator Jeffrey Harding that she was allowing Ellis to make this call. There was no response from Ellis's grandfather so Ellis left a message. Horn gave Ellis two tablets of Ibuprofen and advised him that she would make an appointment for him to see the physician assistant. (Ex. 2, Progress Notes for T. Ellis; Ex. 3, Harding Depo., p. 45:1-7; Ex. 4, Horn Depo., p. 105:1-21; p. 108:1-11).

4.      On October 21, 2015, at approximately 4:30 p.m., Jailers Johnny Bray and Curtis Lawson responded to a call from housing unit D of inmate experiencing a medical condition. When they arrived, they found Ellis, who appeared to be having a seizure. Lawson attempted to speak to Ellis to get him to respond and supported his head so he would not bang it on the ground. Bray notified the dispatcher to contact Horn and advise her of the situation. Horn

instructed the jailers to call EMS. Bray then ordered the other inmates in the pod to relocate to the recreation yard to provide space and safety for the EMS crew to work. (Ex. 2, Progress Notes for T. Ellis; Ex. 5, Lawson's incident report re T. Ellis; Ex. 6, Bray's incident report re T. Ellis; Ex. 7, Bray Depo., p. 66:22 – p. 68:14; p. 69:10-12).

     5.     EMS was called to the jail at approximately 4:37 p.m. to respond to a possible seizure. When EMS arrived, Ellis was alert and advised the EMS techs that he had had two seizures. Ellis further advised them that he was having some pain in his ribs on his right side. When Ellis voiced his concern that his ribs might be broken, the EMS techs advised him that there was really nothing which could be done for broken ribs besides wrapping them. The EMS techs took Ellis's vital signs twice, noted no apparent acute medical concerns, and advised the jailers that Ellis was in stable condition, that no treatment was required, and that they were not going to transport him. At that time, Jail Administrator Jeffrey Harding, acting on the advice of Horn via telephone, instructed Bray and Lawson to place Ellis in holding cell H-1 and to monitor him for any further symptoms. (Ex. 8, EMS Records re T. Ellis; Ex. 9, First Responders Report dated October 21, 2015; Ex. 6, Bray's incident report re T. Ellis; Ex. 3, Harding Depo., 102:6-13; p. 103:4-10, p. 104:4 – p. 105:13; p. 108:12-16; p. 135:23 – p. 136:12; Ex. 10, Grimes's Depo., p. 17:9 – p. 18:25; p. 37:3 – p. 39:23; p. 42:8-11; p. 108:19 – p. 109:13; p. 110:1-5; Ex. 11, Shoemaker Depo., p. 207:1-4; p. 207:24 – p. 208:6).

     6.     Ellis advised that the nurse had given him Ibuprofen for his pain and had let him call his grandpa. Ellis stated that he wanted to call his grandpa and, if he could call his grandpa, he wanted to be left alone. The jailer advised the EMS techs that Ellis would be placed in a holding cell in view of the booking desk and checked on every 15 minutes and that, if his

condition changed, EMS would be called back immediately. (Ex. 8, EMS Records re T. Ellis; Ex. 10, Grimes's Depo., p. 27:18 – p. 28:3).

7.      The jailer told Ellis that he could not call his grandpa. Ellis then became visibly agitated, throwing down the blood-pressure cuff, getting up off the stretcher, and demanding the jailer to take him to the holding cell now. Ellis did not sign the EMS refusal paperwork. (Ex. 8, EMS Records re T. Ellis; Ex. 10, Grimes's Depo., p. 19:1-6; p. 32:17 – p. 33:12; p. 49:15 – p. 50:13; p. 58:13-21; p. 64:5-18; Ex. 11, Shoemaker Depo., p. 88:3-5; p. 207:1-4; Ex. 7, Bray Depo., p. 88:4-5; p. 91:9-10).

8.      No one at the jail told the EMTs that Ellis was faking and no one told the EMTs not to take him to the hospital. (Ex. 8, EMS Records re T. Ellis; Ex. 10, Grimes's Depo., p. 19:1-6; p. 32:17 – p. 33:12; p. 49:15 – p. 50:13; p. 58:13-21; p. 64:5-18; Ex. 11, Shoemaker Depo., p. 88:3-5; p. 207:1-4; Ex. 7, Bray Depo., p. 88:4-5; p. 91:9-10).

9.      Ellis was placed in holding cell H-1 for medical observation on October 21, 2015 at approximately 4:45 p.m. where he was supposed to be visually observed every 15 minutes. However, subsequent investigation determined that various jailers did not check on Ellis from 9:00 p.m. to 10:00 p.m. on October 21, 2015 and from 1:15 p.m. to approximately 1:45 p.m. on October 22, 2015, all in contradiction to what they noted on the observation log. (Ex. 12, Inmate Welfare Check Sheet re T. Ellis; Ex. 13, OCJ Policy re Surveillance of Holding Cells; Ex. 14, Derwin's supplemental report re T. Ellis).

10.     According to Jail video, on October 21, 2015, at approximately 8:18 p.m., Ellis was let out of his cell to use the bathroom. Under his own power, Ellis walks to the bathroom and then back to the cell with a cup in his hand. Ellis does not appear to have any difficulty walking and does not appear to be in any distress. (Ex. 15, Derwin Depo., p. 185:6 – p. 186:9).

11.    On October 21, 2015, at approximately 10:00 p.m., jailers Bray and Lawson responded to a call for assistance from Ellis. Ellis told them that he was having a hard time moving, that he was still in pain, and that he felt he was going numb form the waist down. Bray called Horn and told her about Ellis's complaints. Horn advised him that EMS had already been in to see him and that he needed to get up and move around and to utilize the bathroom himself. She further advised him that, if he needed anything for pain, to give him some over-the-counter pain relief and that she would be in to see him the following morning. (Ex. 16, Bray's incident report #2 re T. Ellis; Ex. 7, Bray Depo., p. 153:5 – p. 155:6).

12.    According to Jail video, on October 22, 2019, at approximately 1:37 a.m., Ellis was let out of his cell to use the bathroom. Under his own power, Ellis walks to the bathroom and then back to the cell with a cup in his hand. Ellis does not appear to have any difficulty walking and does not appear to be in any distress. (Ex. 15, Derwin Depo., p. 188:2 – p. 191:10).

13.    According to Jail video, on October 22, 2019, at approximately 3:23 a.m., Ellis was let out of his cell to use the bathroom. Under his own power, Ellis walks to the bathroom and then back to the cell with a cup in his hand. Ellis does not appear to have any difficulty walking and does not appear to be in any distress. (Ex. 15, Derwin Depo., p. 193:2 – p. 194:9).

14.    On October 22, 2019, between approximately 8:30 a.m. and 8:43 a.m., Ellis repeatedly called out for help and requested jailers to call the E.R. Shoemaker told him that they were not calling the E.R. (Ex. 11, Shoemaker Depo., p. 74:11 – p. 77;14).

15.    On October 22, 2019, at approximately 9:00 a.m., Ellis asked jailer Eads for a drink of water, and Eads said he would get him some water. However, Shoemaker told Eads that Ellis could get up and get it himself. Eads left the cell door open for Ellis to go get water if he wanted. (Ex. 11, Shoemaker Depo., p. 126:16 – p. 128:10).

16.     On October 22, 2015, at approximately 10:45 a.m., Horn got into a heated exchange with Ellis. Ellis claimed that he could he not move his legs and asked Horn to look at his legs, claiming that they were turning black. Horn refused to look at his legs, yelled that they were not black, that there was nothing wrong with him, and that she was sick and tired of dealing with him. Horn also threatened to punish Ellis by chaining him to the D-ring in the floor of the cell if he kept complaining about his medical condition. (Ex. 4, Horn Depo., p. 124:5 – p. 127;17; p. 131:13 – p. 136:23; p. 137:1 – p. 138:25).

17.     Defendant Harding was not present at the time of the interactions in ¶¶ 9-16 between the jailers, Horn, and Ellis. (Ex. 3, Harding Depo., p. 192:3-15).

18.     Ellis was not deprived of the access to the restroom or deprived of water. (Ex. 15, Derwin Depo., p. 194:2-15).

19.     October 22, 2015, at approximately 1:45 p.m., jailer Shoemaker was conducting a check on Ellis and observed that his feet and hands were slightly discolored. Shoemaker opened the cell door to further check on him on noticed his arm was cold to the touch. Shoemaker immediately requested Horn to come to the cell to look at Ellis. She directed Shoemaker to call EMS. Horn found Ellis to be respiratory distress, but responsive. She was unable to obtain a blood pressure reading from either arm. (Ex. 17, Shoemaker's incident report re T. Ellis; Ex. 2, Progress Notes for T. Ellis; Ex. 11, Shoemaker Depo., p. 167:6-20).

20.     When EMS arrived, Ellis was awake and talking. At approximately 2:14 p.m., Ellis suddenly became unresponsive and went into asystole. The EMS techs gave him epinephrine, intubated him, and started chest compressions. EMS then transported Ellis to INTEGRIS Baptist Regional Health Center where he was pronounced dead. The manner of

Ellis's death was determined to be natural and caused by sepsis/septic shock due to acute bronchopneumonia. (Ex. 18, INTEGRIS Records re T. Ellis; Ex. 19, ME Report re T. Ellis).

21.    The OCJ has a policy requiring a preliminary health screening to be completed for each incoming inmate at the time of booking. The booking officer would go through some medical questions with the incoming inmate and take a medical history. The policy requires the inmate's health history to be filed in the inmate's medical file in the jail's medical office. (Ex. 20, OCJ Policy re Health Appraisal;  Ex. 3, Harding Depo., p. 64:23 – p. 66:25; p. 201:16 – p. 203:25).

22.    The OCJ has a policy which provides that inmates are entitled to health care comparable to that available to citizens in the surrounding community, and which prohibits jailers and other employees from ever arbitrarily or summarily denying an inmate's request for medical services. The policy further provides that a schedule for sick call will be established and published to the inmates, and that emergency medical care is available through the emergency room. (Ex. 21, OCJ Policy re Medical Services).

23.    The OCJ has a policy which provides that inmates are entitled to make medical complaints for review by qualified medical personnel to insure appropriate medical attention. The policy provides for the daily collection of inmate medical requests for referral to either the hospital emergency room as the jail nurse may deem appropriate or to the regularly scheduled sick call visit by the facility physician. (Ex. 22, OCJ Policy re Non-Emergency Care & Medical Complaints).

24.    At the time of Ellis's incarceration, the Ottawa County Sheriff's Office contracted with Certified Physician Assistant (PA-C), Aleta Fox to come to the jail once a week to conduct inmate medical exams and to remain on-call at all times for consultation for any inmate medical

emergencies. (Ex. 23, OCJ contract with A. Fox for July 2015 to July 2016; Ex. 3, Harding Depo., p. 38:23 – p. 39:3; p. 77:2 – p. 78:13).

25.     Horn was responsible for the day-to-day medical care of the inmates. She would see inmates with medical complaints first and, if she was unable to provide treatment, she would call PA-C Fox to come to the jail to see the inmate. (Ex. 3, Harding Depo., p. 38:23 – p. 39:20; Ex. 4, Horn Depo., p. 40:14 – p. 44:2).

26.     The OCJ has a policy providing that inmate emergency medical care is available 24 hours a day. The policy requires jailers to remain alert for emergency medical situations and to be trained to respond thereto, and defines medical emergency situations including unconsciousness, serious breathing difficulties, and health or life threatening situations. The policy requires jailers encountering inmate medical emergencies to immediately notify the supervisor on duty and request assistance in rendering first aid. The policy also requires the jailer to notify the nurse or to contact an ambulance if no nurse is on duty. Jailers were not required to contact a nurse before calling for an ambulance. OCJ policy further requires all jailers to be trained in first aid and CPR with update training annually. (Ex. 24, OCJ Policy re Emergency Medical Care; Ex. 21, OCJ Policy re Medical Services; Ex. 3, Harding Depo., p. 67:4-14; p. 68:1 – p. 69:6; p. 85:23 – p. 86:9; Ex. 25, Durborow Depo., p. 174:2-10).

27.     The OCCJ has a policy providing that the jail administrator may place an inmate in a holding cell if they suspect the inmate is in need of medical observation. The policy requires inmates placed in a holding cell for medical observation to be monitored more frequently, requiring visual observation of the inmate at least once every 15 minutes. (Ex. 13, OCJ Policy re Surveillance of Holding Cells).

28.     If jail staff believed that an inmate had become paralyzed, OCJ policy would require them to contact an ambulance for immediate emergency medical assistance. (Ex. 3, Harding Depo., p. 152:1-16).

29.     Upon hiring, new OCJ staff were given at least two days training on the OCJ's policies and procedures, including training on the OCJ's medical policies, and on the Oklahoma Jail Standards. Then they would be required to shadow a supervisor in performing jail duties for a period of time until they were adequately familiar with jail functions. Jail staff were also required to complete 20 hours of annual jail training on the Oklahoma jail standards, including training on supervision of prisoners, rights and responsibilities of inmates, emergency procedures, and First Aid & CPR. Jail Administrator Harding provided the jail staff training. (Ex. 26, OCJ Policy re Staff Training; Ex. 3, Harding Depo., p. 71:4-13; p. 86:9-15; p. 209:10 – p. 210:11; Ex. 25, Durborow Depo., p. 175:12 – 177:15; Ex. 4, Horn Depo., p. 14:24 – p. 15:22; Ex. 7, Bray Depo., p. 267:10 – p. 268:11).

30.     On June 17, 2015, Horn, Harding, Shoemaker, and Bray each completed their annual State Jail training for the year 2015. This included, among other things, training on supervision of prisoners, rights and responsibilities of inmates, emergency procedures, and First Aid & CPR. (Ex. 27, OCJ Jailer Training Records for 2015).

31.     Sheriff Durborow had no interactions with Ellis. (Ex. 25, Durborow Depo., p. 171:18-23; p. 174:11-13).

32.     At the time relevant to this case, Sheriff Durborow conducted weekly tours of the Jail to verify that it was being operated properly. (Ex. 25, Durborow Depo., p. 64:11-24).

33.     Prior to this incident, neither Sheriff Durborow nor Jail Administrator Harding had received notice of any substantial complaints about Horn's performance nor any reasons to

doubt that she was providing adequate medical care to inmates. Sheriff Durborow never had any cause to discipline Horn. (Ex. 3, Harding Depo., p. 204:22 – p. 206:23; p. 208:13-21; p. 211:10-15; Ex. 25, Durborow Depo., p. 171:11 – p. 172:24; Ex. 11, Shoemaker Depo., p. 210:5-9; Ex. 4, Horn Depo., p. 12:18-25; Ex. 7, Bray Depo., p. 274:15-18; p. 275:3 – p. 276:8).

34.     Prior to this incident, there had never been any complaints about Shoemaker's treatment of inmates or any reason to suggest that he may have been mistreating inmates. (Ex. 3, Harding Depo., p. 210:21 – p. 211:16; Ex.7, Bray Depo., p. 274:19-22; p. 275:3 – p. 276:8).

35.     Prior to this incident, Sheriff Durborow had never heard of any jail staff interacting with any OCJ inmates in a manner similar to which staff members interacted with Ellis. (Ex. 25, Durborow Depo., p. 174:14 – p. 175:11).

36.     Ellis was never chained to the D-ring. Prior to this incident, there is no evidence that D-ring had ever been used for the punishment of inmates. Sheriff Durborow had never approved use of the D-ring. (Ex. 3, Harding Depo., p. 213:13 – p. 215:1; Ex. 25, Durborow Depo., p. 109:5-20; p. 113:7 – p. 114:16; p. 147:6 – p. 148:5; Ex. 11, Shoemaker Depo., p. 106:16-18; p. 107:2-20; Ex. 7, Bray Depo., p. 77:2-25; p. 82:6-17).

37.     Prior to this incident, there were no indications that the procedures and practices in place for delivering medical care to OCJ inmates was inadequate or that OCJ inmates were not receiving adequate medical attention. (Ex. 25, Durborow Depo., p. 59:12-25; p. 61:15-21).

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is not a

disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court held that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." The Court further held that "if the evidence is merely colorable, or not significantly probative, summary judgment may be granted." *Id.* In addition, the *Anderson* Court stated that "the mere existence of a scintilla of evidence in support of a plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Id.* A movant's summary judgment burden may properly be met by reference to the lack of evidence in support of plaintiff's position. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 325).

Furthermore, as described by the court in *Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 (10th Cir. 1994), "Even though all doubts must be resolved in (the nonmovant's) favor, allegations alone will not defeat summary judgment." *Cone* at 530 (citing *Celotex*, 477 U.S. at 324). *See also Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991); *Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464, 469 (D. Colo. 1996). Moreover, "(i)n response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

# I.   PLAINTIFF CANNOT ESTABLISH MUNICIPAL LIABILITY AGAINST SHERIFF FLOYD.

Plaintiff asserts a municipal liability claim against Defendant Floyd under 42 U.S.C. § 1983 for denial of Ellis's constitutional right to medical care. However, Defendant Floyd is entitled to summary judgment with regard to this claim. In order to establish municipal liability against Defendant Floyd in his official capacity under 42 U.S.C. § 1983, Plaintiff must show that the Decedent's constitutional right was violated AND that such violation was caused by a policy, practice or custom of the Ottawa County Jail or that an official with final policy-making authority for the Ottawa County Jail (*i.e.* former Sheriff Durborow) personally participated in the alleged constitutional violation(s).  *See Jett v. Dallas Independent School District*, 491 U.S. 701, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989) (municipality cannot be held liable under § 1983 unless the act complained of is that of a final policymaker or a custom or usage is shown).

## A. No Personal participation by Sheriff Durborow.

Here, as set forth in Defendant Durborow's summary judgment motion filed contemporaneously with this Motion, it is undisputed that former Sheriff Durborow had absolutely no personal participation with regard to the provision of medical care to Ellis in the OCJ. In fact, there is no evidence that Durborow was even aware of Ellis's presence in the OCJ prior to his death, much less that he was subjectively aware of Ellis's medical condition. Sheriff Durborow had no interactions with Ellis. (Fact No. 31). Moreover, as further set forth in Defendant Durborow's Motion for Summary Judgment filed contemporaneously with this Motion, there was no personal participation in the alleged violation of Ellis's constitutional rights based upon Durborow's supervisory status. As such, Plaintiff's § 1983 claim against Defendant Floyd must be premised on the existence of some policy, practice, or custom in place under former Sheriff Durborow.

### B.  No unconstitutional custom, policy, or practice.

Defendant Floyd cannot be held liable under § 1983 based upon the doctrine of *respondeat superior* or vicarious liability.  *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694-95, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  In *Monell*, the Supreme Court held that a governmental entity is only liable under § 1983 when the constitutional injury can fairly be said to have been caused by that entity's own policies and customs. *Id*. at 694.  The actions of the governmental entity must be the moving force behind the constitutional violation. *Id*.  The Supreme Court has held that governmental liability for a constitutional violation "attaches where - and only where - the entity makes a deliberate choice to follow a course of action from among various alternatives."  *Pembaur v. Cincinnati*, 475 U.S. 469, 483, 106 S. Ct. 1291, 89 L. Ed. 2d 425 (1986).

Defendant Floyd may not be held liable simply because he "employs a tortfeasor." *Board of County Commissioners of Bryant County, Oklahoma v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626 (1997).  Additionally, "[t]hat a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation." *Id.* at 406-07.  Rather, *Monell* requires Plaintiff to establish that a policy or custom of the Ottawa County Jail exists and that it caused the alleged constitutional violations. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821-22, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985); *see also Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (plaintiff must show that there is a direct causal link between the policy or custom and the injury alleged).

Furthermore, it is not enough for a §1983 plaintiff merely to identify conduct properly attributable to the municipality. *Brown*, 520 U.S. at 408.  The plaintiff must also demonstrate

that, through its *deliberate conduct*, the municipality was the "*moving force*" behind the injury alleged. *Id*. (emphasis added). Furthermore, "[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id*. at 405.

In sum, Plaintiff cannot show that a policy, practice, or custom of the Sheriff existed which caused any alleged violation of the Decedent's constitutional rights.

> Municipal liability may be based on a formal regulation or policy statement, or it may be based on an informal custom so long as this custom amounts to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010) (citations and internal quotation marks omitted).

In order for a municipality to be held liable for an un-official practice under § 1983, the practice must be "so permanent and well settled as to constitute a custom or usage with the force of law...In order to establish a custom, the actions must be persistent and widespread ... practices of [city] officials." *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996) (internal citations and quotation marks omitted). In determining what level of persistent and widespread conduct will be sufficient to establish municipal liability, it is clear that "normally random acts" and "isolated incidents" fall short. *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994). *See also Carter v. Morris*, 164 F.3d 215, 220 (4th Cir. 1999) (a "meager history of isolated incidents" is insufficient). Furthermore, the court in *Lytle v. Doyle*, 326 F.3d 463, 473 (4th Cir. 2003), required evidence of "'numerous particular instances' of unconstitutional conduct."

However, Plaintiff cannot demonstrate that the alleged violations of Ellis's constitutional rights were caused by any policy, practice or custom of the OCJ. To the contrary, the Sheriff had implemented policies and practices aimed at preventing the denial or delay of medical care to OCJ inmates. The OCJ has a policy requiring a preliminary health screening to be completed for each incoming inmate at the time of booking. The booking officer would go through some medical questions with the incoming inmate and take a medical history. The policy requires the inmate's health history to be filed in the inmate's medical file in the jail's medical office. (Fact No. 21). The OCJ has a policy which provides that inmates are entitled to health care comparable to that available to citizens in the surrounding community, and which prohibits jailers and other employees from ever arbitrarily or summarily denying an inmate's request for medical services. The policy further provides that a schedule for sick call will be established and published to the inmates, and that emergency medical care is available through the emergency room. (Fact No. 22).

The OCJ has a policy which provides that inmates are entitled to make medical complaints for review by qualified medical personnel to insure appropriate medical attention. The policy provides for the daily collection of inmate medical requests for referral to either the hospital emergency room as the jail nurse may deem appropriate or to the regularly scheduled sick call visit by the facility physician. (Fact No. 23). At the time of Ellis's incarceration, the Ottawa County Sheriff's Office contracted with Certified Physician Assistant (PA-C), Aleta Fox to come to the jail once a week to conduct inmate medical exams and to remain on-call at all times for consultation for any inmate medical emergencies. (Fact No. 24). Nurse Horn was responsible for the day-to-day medical care of the inmates. She would see inmates with medical

complaints first and, if she was unable to provide treatment, she would call PA-C Fox to come to the jail to see the inmate. (Fact No. 25).

The OCJ has a policy providing that inmate emergency medical care is available 24 hours a day. The policy requires jailers to remain alert for emergency medical situations and to be trained to respond thereto, and defines medical emergency situations including unconsciousness, serious breathing difficulties, and health or life threatening situations. The policy requires jailers encountering inmate medical emergencies to immediately notify the supervisor on duty and request assistance in rendering first aid. The policy also requires the jailer to notify the nurse or to contact an ambulance if no nurse is on duty. Jailers were not required to contact a nurse before calling for an ambulance. OCJ policy further requires all jailers to be trained in first aid and CPR with update training annually. (Fact No. 26). The OCCJ has a policy providing that the jail administrator may place in inmate in a holding cell if they suspect the inmate is in need of medical observation. The policy requires inmates placed in a holding cell for medical observation to be monitored more frequently, requiring visual observation of the inmate at least once every 15 minutes. (Fact No. 27). If jail staff believed that an inmate had become paralyzed, OCJ policy would require them to contact an ambulance for immediate emergency medical assistance. (Fact No. 28).

Clearly, these policies and practices of the OCJ did not cause the alleged violations of Ellis's constitutional rights. If they had been followed in this case, Ellis would not have been denied medical attention. However, the jailers' and Horn's actions with regard to the provision of medical care to Ellis was in violation of the OCJ's policies and procedures. Furthermore, Plaintiff cannot demonstrate that Sheriff Durborow was deliberately indifferent to a substantial risk that jailers or Nurse Horn might be likely to violate Ellis's constitutional right to medical

care. At the time relevant to this case, Sheriff Durborow conducted weekly tours of the jail to verify that it was being operated properly. (Fact No. 32). However, prior to this incident, Sheriff Durborow had not received notice of any substantial complaints about Nurse Horn's performance nor any reasons to doubt that she was providing adequate medical care to inmates. Durborow never had any cause to discipline Nurse Horn. (Fact No. 33). Prior to this incident, there had never been any complaints about Shoemaker's treatment of inmates or any reason to suggest that he may have been mistreating inmates. (Fact No. 34). Prior to this incident, there were no indications that the procedures and practices in place for delivering medical care to OCJ inmates was inadequate or that OCJ inmates were not receiving adequate medical attention. (Fact No. 37). As such, Plaintiff cannot show that Durborow was subjectively aware of a substantial risk that any other OCJ staff member might be likely to violate Ellis' constitutional right to medical care and failed to take action to reasonable action to abate it.

Moreover, Plaintiff has no evidence of any persistent and widespread pattern of denial of medical care to OCJ inmates that would support a claim of an informal unconstitutional custom or practice. *Cf Connick v. Thompson*, 131 S. Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (holding that a pattern of similar constitutional violations is typically necessary to prove deliberate indifference). Accordingly, Defendant Floyd is entitled to summary judgment to the extent that Plaintiff's § 1983 claims against him are premised upon allegations of the existence of unconstitutional policies, practices, or customs.

### C. No Failure to Train.

There are limited circumstances where inadequacy in training can be a basis for § 1983 liability. *City of Canton v. Harris*, 489 U.S. 378, 387, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns

on a failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011) (citation omitted). Inadequacy in training may serve as the basis for municipal liability under § 1983 "only where the failure to train amounts to deliberate indifference..." to inmate rights. *City of Canton*, 489 U.S. at 388. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality...can a city be liable for such a failure under § 1983." *Id.* at 389. To establish deliberate indifference to a need for training, Plaintiff must show that the County knew of and disregarded the substantial risk of inadequate training of its employees. *Canton*, 489 U.S. at 388. It isn't enough to "show that there were general deficiencies in the county's training program for jailers." *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999). Rather, a plaintiff must "identify a specific deficiency" that was obvious and "closely related" to his injury. *Id.* To establish deliberate indifference, Plaintiff must show that Sheriff Durborow knew of and disregarded a substantial risk to Ellis's safety and well-being. *See Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm...In most instances, notice can be established by proving the existence of a pattern of tortious conduct...

*Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998) (citations omitted).

Here, Plaintiff cannot demonstrate a specific deficiency in the training of OCJ employees which was obvious and closely related to the alleged violations of the Decedent's constitutional rights. To the contrary, the undisputed facts demonstrate that the training of the OCJ's staff was not constitutionally inadequate. Upon hiring, new OCJ staff were given at least two days training on the jail's policies and procedures, including training on the jail's medical policies, and on the Oklahoma jail standards. Then they would be required to shadow a supervisor in performing jail

duties for a period of time until they were adequately familiar with jail functions. Jail staff were also required to complete 20 hours of annual jail training on the Oklahoma jail standards, including training on supervision of prisoners, rights and responsibilities of inmates, emergency procedures, and First Aid & CPR. Jail Administrator Harding provided the jail staff training. (Fact No. 29). On June 17, 2015, Horn, Harding, Shoemaker, and Bray all completed their annually required jailer training for the year 2015 including training in supervision of prisoners, rights and responsibilities of inmates, emergency procedures, and First Aid & CPR. (Fact No. 30).

Moreover, there is no evidence in this case of any persistent pattern of violations of OCJ inmates' constitutional rights to medical care which would have put Sheriff Durborow on notice of the need for any additional or different training in that regard. At the time relevant to this case, Sheriff Durborow conducted weekly tours of the jail to verify that it was being operated properly. (Fact No. 32). However, prior to this incident, Sheriff Durborow had not received notice of any substantial complaints about Nurse Horn's performance nor any reasons to doubt that she was providing adequate medical care to inmates. Durborow never had any cause to discipline Nurse Horn. (Fact No. 33). Prior to this incident, there had never been any complaints about Shoemaker's treatment of inmates or any reason to suggest that he may have been mistreating inmates. (Fact No. 34). Prior to this incident, there were no indications that the procedures and practices in place for delivering medical care to OCJ inmates was inadequate or that OCJ inmates were not receiving adequate medical attention. (Fact No. 37). As such, Plaintiff cannot show that Durborow was deliberately indifferent to any lack of training by OCJ staff.

Consequently, Defendant Floyd is entitled to summary judgment to the extent that Plaintiff's § 1983 claims against him is premised upon allegations of inadequate training.

## CONCLUSION

Defendant Sheriff Jeremy Floyd in his official capacity in entitled to summary judgment in this case. Plaintiff cannot show that any delay or denial of medical care to Ellis was caused by any policy, practice, or custom of the OCJ. Nor can Plaintiff show that any such delay or denial was caused by inadequate training of OCJ staff.

Respectfully submitted,

s/ Ambre C. Gooch
Ambre C. Gooch, OBA No. 16586
COLLINS, ZORN, & WAGNER, P.C.
429 N.E. 50th Street, Second Floor
Oklahoma City, OK 73105-1815
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
E-mail: acg@czwlaw.com

ATTORNEY FOR DEFENDANT
JEREMY FLOYD

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Daniel E. Smolen, via electronic mail at: danielsmolen@ssrok.com
kendrarash@ssrok.com
Robert M. Blakemore, via electronic mail at: bobblakemore@ssrok.com
Bryon D. Helm, via electronic mail at: bryonhelm@ssrok.com
SMOLEN & ROYTMAN, PLLC
701 South Cincinnati Avenue
Tulsa, OK 74119
*Attorneys for Plaintiffs*

John R. Paul, via electronic mail at: john@paulandlackey.com
PAUL & LACKEY, P.C.
9 East Fourth Street, Suite 400
Tulsa, OK 74103

John David Lackey, via electronic mail at: johndavid@paulandlackey.com
Amy N. Bennett, via electronic mail at: amy@paulandlackey.com
PAUL & LACKEY, P.C.
20 East Fifth Street, Suite 1000
T7ulsa, OK 74103
***Attorneys for Defendants Baptist Healthcare of Oklahoma, LLC,***
  ***d/b/a Integris Miami EMS, Jennifer Grimes and Kent Williams***

Randall J. Wood, via electronic mail at: rwood@piercecouch.com
Carson C. Smith, via electronic mail at: csmith@piercecouch.com
Pierce Couch Hendrickson Baysinger & Green, L.L.P.
1109 N. Francis
Oklahoma City, OK 73106
***Attorney for Defendants Johnny Bray***
  ***and Charles Shoemaker***

James L. Gibbs, II, via electronic mail at: jgibbs@gphglaw.com
GOOLSBY, PROCTOR, HEEFNER & GIBBS, P.C.
701 N. Broadway Avenue, Suite 400
Oklahoma City, OK 73102-6006
***Attorney for Defendant Theresa Horn, L.P.***

                                    s/ Ambre C. Gooch
                                    Ambre C. Gooch