IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1) MEGAN CAPEL, Administratix,
of the Estate of Terral Brooks
Ellis, II, Deceased,
(2) TERRAL B. ELLIS, SR., and
(3) SHELLY BLISS,
        Plaintiffs,

Vs.

                        CIV-17-325-JED-FHM

OTTAWA COUNTY BOARD OF COUNTY
COMMISSIONERS, et al,
        Defendants.


VIDEO DEPOSITION OF
JEFF HARDING


DATE:  NOVEMBER 15, 2019

REPORTER:  MARISA SPALDING, CSR, RPR


Spalding Reporting Service, Inc.
1611 South Utica Avenue, Box 153
Tulsa, Oklahoma 74104
(918) 284-2017

EXHIBIT 3

```
1      A    No.

2      Q    Okay.  Or in -- when I say in custody

3  deaths, meaning someone died in a hospital that

4  was taken from the jail.  Have you ever done any

5  investigations into those?

6      A    No.

7      Q    Okay.  In 2014 when you took over the --

8  as jail administrator role, what steps did you

9  take to review the medical delivery system that

10 was happening in the Ottawa County Jail?

11     A    The...

12     Q    The way the medical was being delivered

13 in the Ottawa County Jail?

14     A    Just everything -- however it was set up

15 in policy was how it was...

16     Q    How it -- kind of talk me through that.

17 When you took over in 2014, a couple of years

18 ago, what was your understanding of the jail

19 medical, the way it would operate?

20     A    We --

21          MS. GOOCH:  Well, 2014 is more than

22 a couple of years ago.

23          THE WITNESS:  There was the nurse,

24 Theresa Horn, and she was responsible for the

25 medical care of the inmates.  And she had a
```

1  physician's assistant that she worked with, and

2  they were -- in conjunction of them, they took

3  care of the medical issues.

4      Q   (By Mr. Smolen)  Okay.  When you say

5  that Nurse Horn was responsible for the medical,

6  what do you mean by that?

7      A   Just the day-to-day medical issues that

8  would arise in the jail.

9      Q   Okay.

10     A   The delivery of medications, things like

11 that.

12     Q   Did you understand that ultimately the

13 sheriff was responsible for the inmates that

14 were in that jail?

15             MS. GOOCH:  Object to the form.

16             THE WITNESS:  Yes.

17     Q   (By Mr. Smolen)  Okay.  And you

18 understood Nurse Horn to be there to provide

19 medical -- types of day-to-day medical issues?

20     A   Correct.

21     Q   Okay.  And she worked there during the

22 entire time that you were the jail

23 administrator, correct?

24     A   Yes.

25     Q   Okay.  Were you her direct supervisor?

1    A    The only interaction I had was I spoke

2  with the nurse, and she advised she was letting

3  him make a phone call to set up a chiropractic

4  appointment.

5    Q    Okay.  And that's the only recollection

6  you have from having any involvement in any way

7  with Terral Ellis?

8    A    Yes.

9    Q    Do you recall talking to Nurse Horn

10  after Mr. Ellis' death in the jail?

11    A    No.

12    Q    Do you know if the undersheriff or the

13  sheriff ever spoke with her about it?

14    A    I do not know.

15    Q    Who filled out the jail inspection -- or

16  the jail investigation division records, the

17  reports for the jail inspection division?

18    A    Like the reports that went to the State

19  Health Department?

20    Q    Yeah.

21    A    I did the report after the end of --

22  after that one.

23    Q    Okay.  And you didn't need to talk to

24  Nurse Horn prior to filling out that report?

25    A    And it was just let them make -- it was

1   Q   Did the Ottawa County Sheriff's Office

2   ever have a health care plan, to your knowledge,

3   regarding the jail?

4   A   Policy?

5   Q   A facility health care plan as defined

6   by the jail standards?  Did you know of the

7   Ottawa County Sheriff's Office having such a

8   thing as defined in Subsection 1 of 310:675-8?

9   A   No.

10   Q   Let's look at Subsection 2, okay?

11   Intake screening shall be performed on all

12   inmates immed -- immediately upon admission to

13   the facility and before being placed in the

14   general population or housing area.  An inmate

15   -- let -- let's stop there, okay?  Did that

16   happen when you were employed at the Ottawa

17   County Sheriff's Office?

18   A   Yes.

19   Q   I want you to generally describe to me

20   -- take that back.  I want you to specifically,

21   as much as possible, describe to me what that

22   process was, okay?

23   A   At the intake, of course, any kind of

24   visible injury or anything like that would be

25   documented.

1    Q   So documentation of physical injuries?

2    A   Correct, anything vis -- anything that

3  would indicate some sort of suicidal thoughts or

4  something like that from -- that would -- that

5  would be noted and -- and then asking, you know,

6  any kind of major medical issues that they had

7  had, any kind of recent surgeries, medications

8  that they were on.

9    Q   Medical history?

10   A   Correct.

11   Q   Okay.  And who's doing that?  Who's

12  taking down that information?

13   A   The -- the staff member who's booking

14  the -- the person in.

15   Q   Okay.  Booking officer?

16   A   Correct.

17   Q   Okay.  And that's the point that we

18  talked about in the beginning of the deposition,

19  right, that they're filling out?  Remember that

20  being in the deposition we talked about?

21   A   That the -- the medical forms were part

22  -- the medical forms were part of the booking

23  process, but they weren't part of the

24  information that went to the office manager.

25   Q   Okay.  So that's why I want to kind of

1   flush that out a little bit, okay?

2       A    Okay.

3       Q    The medical records were not then used

4   to create the jail file?

5       A    No.

6       Q    Okay.  Do you know why that the medical

7   records were not being made part of the jail

8   file?

9                MS. GOOCH:  Object to the form.

10               THE WITNESS:  The medical records --

11  the medical screening -- the initial medical

12  screening that they did was -- was provided to

13  the nurse.

14      Q    (By Mr. Smolen)  Okay.  Walk me through

15  that process.  What -- what did you understand

16  that process to be?

17      A    If there was -- if there was a, like I

18  said, an immediate issue that the nurse would be

19  called and, you know, it would go from there.

20  If there was no immediate issue, then she was

21  given copies of their -- she was actually given

22  the medical screening that we did.

23      Q    Okay.  And how would she be given that?

24      A    She had a box or under the door or

25  something like that.

1    Q    Put it in a box or slide it under the
2  door?
3    A    Yeah.
4    Q    Okay.  And how were jail staff trained
5  to recognize whether the condition was of an
6  immediate medical concern?
7    A    There were -- in the policy, it stated,
8  you know, bleeding, burns, things of that
9  nature.  I mean, that's what -- that was
10 immediate.
11   Q    Okay.  Let's look at -- when you said
12 immediate, you're talking about emergent medical
13 care?
14   A    Exactly.
15   Q    Okay.  I just want to make sure we're on
16 the same page.  I'm going to hand what you we're
17 going to mark as Exhibit 31.
18              (Plaintiff's Exhibit No. 31
19               marked for identification)
20              MS. GOOCH:  Is that Bates 282 and
21 283?
22              MR. SMOLEN:  Uh-huh.
23              MS. GOOCH:  When I say Bates, I'm
24 talking about these numbers down here.
25              THE WITNESS:  Okay.

1    Q    (By Mr. Smolen)  We were talking about

2    the booking process when we started, okay, and

3    we talked about the intake screening and I --

4    you were saying, hey, if there's something

5    emergent during the screening process, then

6    they've -- they've got to notify somebody about

7    that, right?

8    A    Correct.

9    Q    Okay.  Were you referring to the

10   emergency medical care plan?  You said it was

11   laid out in policy, and -- and I was wondering

12   if that's where it says emergency definition, if

13   that's what you're speaking of?  You said severe

14   bleeding?

15   A    Yes.

16   Q    Severe bleeding, unconsciousness,

17   serious breathing difficulties, head injuries,

18   severe burns, suicide attempt, sudden onset of

19   bizarre behavior or health or life-threatening

20   situations and emergency dental care?

21   A    Yes.

22   Q    Okay.  And if any of those things were

23   identified by the booking officer, there was a

24   policy that dictated that they send that person

25   out for emergent medical care, correct?

1    A    The -- they were to -- if it was -- they

2  could call if -- if an EMS or something was

3  needed, they were -- they were able to call that

4  --

5    Q    Look at --

6    A    -- or the nurse.

7    Q    look at Subsection E, okay?

8    A    Uh-huh.

9    Q    Emergency instructions.  The facility

10  administrator, facility nurse or shift

11  supervisor on duty will give all medical

12  instructions, such as contact and ambulance to

13  transport the inmate to Baptist Regional Health

14  Center?

15    A    Uh-huh.

16    Q    Treat at the facility in accordance with

17  medical records from the nurse; 3, have a deputy

18  dispatched to the facility to transport the

19  inmate to Baptist Regional Health Center.  Those

20  were the things that were identified under

21  emergency instructions, okay?

22    A    Yes.

23    Q    We were talking about the booking

24  process?

25    A    Uh-huh.

1   consistent with the facility's policy and

2   identify need until the appropriate medical

3   evaluation has been completed, okay?

4       This says an inmate who's screening indicates

5   a significant medical problem, okay?  How were

6   the staff at the Ottawa County Sheriff's Office

7   trained to identify what's defined by the jail

8   standards as a significant medical problem?

9       A    The jail staff was informed of the

10  policies and procedures that went through the

11  jail standards training.

12      Q    Right, which would cover this?

13      A    Correct.

14      Q    And I'm just wandering how the staff

15  were trained on what a significant medical

16  problem was?

17      A    Such as like severe bleeding or burns or

18  --

19      Q    No, a significant medical problem?

20      A    That would just -- that would come from

21  if the -- if the person being booked in, if it

22  was a medical issue that they could see, they

23  could -- you know, that would be one thing.  But

24  if it was something that they would just have to

25  ask the inmate or the person being booked in and

1          marked for identification)

2     Q    Do you remember you had mentioned a --

3 you have mentioned a physician's assistant

4 earlier in your deposition.  Do you remember

5 that person's name?

6     A    Aleta Fox.

7     Q    Okay.  And do you know Aleta?

8     A    Yes.

9     Q    Okay.  And how do you know Aleta Fox?

10     A    She's a physician -- she was our

11 physician's assistant at the jail.

12     Q    During what time?

13     A    I know she was when I was the jail

14 administrator.

15     Q    Okay.  And you were the jail

16 administrator 2014 through when?

17     A    It would have been 20 -- the end of

18 2015.

19     Q    Okay.  The Ottawa County Sheriff's

20 Office Jail & Medical Treatment Contract.  It

21 says:  This contract is entered into the 30th

22 day of July 2015 between the Ottawa County

23 Sheriff's Office and Aleta Fox.

24     It is agreed that Fox will come to the jail

25 once a week on a spec -- on a specified day

1  agreed to by Fox and the Ottawa County Jail

2  administrator for inmate medical exams.  Fox

3  will also be on call at all times for any

4  medical emergency that the department nurse

5  might deem necessary.

6      The department agrees to pay Fox a flat rate

7  of a thousand a month for the above services.

8  This contract will be reviewed in six months by

9  both parties.  This contract will remain in

10 effect unless notified in writing 60 days in

11 advance by either party until July 31st of 2016.

12 Signed by Sheriff Durborow, correct?

13     A   Yes.

14     Q   Okay.  This document seems to indicate

15 that Ms. Fox starts at the Ottawa County Jail on

16 the 30th of July of 2015.  Is that consistent

17 with your memory?

18          MS. GOOCH:  Object to the form.

19          THE WITNESS:  That that's the day

20 she started?

21     Q   (By Mr. Smolen)  Uh-huh.

22     A   I'm not a -- I -- I don't know her exact

23 dates of employment there or...

24     Q   Well, she's not really employed there.

25 She's a contractor who's available?

1  Q   Okay.  There are situations above those

2  that are identified, though, that might not be

3  so apparent, agreed?

4              MS. GOOCH:  Object to the form.

5              THE WITNESS:  Correct.

6  Q   (By Mr. Smolen)  Okay.  For example, if

7  someone is having difficulty breathing, okay,

8  would you expect a jailer to immediately call an

9  ambulance or would you expect them to do some

10 kind of assessment on them?

11             MS. GOOCH:  Object to the form.

12             THE WITNESS:  It depends on -- I

13 guess on severity of the difficulty of breathing

14 and...

15 Q   (By Mr. Smolen)  And who would be making

16 that decision, I guess is what I'm curious

17 about?

18 A   Whoever was -- whoever was dealing with

19 the -- with the person.

20 Q   Whether that person be a jailer or a

21 nurse?

22 A   Correct.

23 Q   Okay.  And a jailer could call an

24 ambulance; they didn't have to call the nurse,

25 did they?

1   A    No, they did not have to call the nurse.
2  They could call an ambulance.
3   Q    Okay.  Nothing prevented them from doing
4  that, correct?
5   A    Correct.
6   Q    You never told them, hey, don't call an
7  ambulance for an inmate without talking to the
8  nurse first?
9   A    No.  Also, I -- mental health issues and
10  things like that, I know that that was another
11  thing.  There was training for that involved
12  like suicidal observation and stuff.  I saw it
13  said during the behavioral observation or
14  whatever.  There was training involved with that
15  with the jail standards training.
16   Q    Okay.  No. 4:  Inmates are informed upon
17  admission to the facility about the procedures
18  for gaining access to medical and health care
19  services.  These procedures shall be posted in a
20  conspicuous place.  How did that happen?
21             MS. GOOCH:  Object to the form.
22             THE WITNESS:  They were -- they were
23  informed on the procedures to get in touch -- or
24  to communicate with the nurse if they had an
25  issue that they felt -- medical issue that they

102

1    administrator shall reassign him or her to a

2    regular cell upon a receipt of a written

3    request.  The request must be signed and dated

4    by the inmate, correct?

5        A    Yes.

6        Q    Mr. Ellis was in segregation at the time

7    of his death, correct?

8        A    Correct.

9        Q    Okay.  Tell me about the review process

10   that you had with respect to making the decision

11   to put him in administrative segregation.

12       A    He was placed into administrative

13   segregation on advice of the nurse.

14       Q    Okay.  And according to this policy

15   that's to be reviewed through you?

16       A    Correct.

17       Q    Was it?

18       A    Reviewed through me as in like official

19   documents or --

20       Q    I'm just -- I'm -- I'm wanting to know

21   if, in fact, this -- you said this policy was in

22   place and it was being followed at the time of

23   Mr. Ellis' death, correct?

24       A    Correct.

25       Q    And it requires that the re -- the

1   recommendation to segregate an inmate shall be

2   referred to the jail administrator.  Was it

3   referred to you?

4        A    To place Mr. Ellis into segregation?

5        Q    Yes.

6        A    Yes.

7        Q    Okay.  Who made that recommendation?

8        A    The nurse.

9        Q    Okay.  Nurse Horn?

10       A    Correct.

11       Q    Okay.  Subsection B says:  The decision

12   to place an inmate in administrative segregation

13   will be made by the administrator on the

14   following basis.  A request -- a request for

15   segregation by the inmate, correct?

16       A    Yes.

17       Q    2:  Observation or reports from a jail

18   -- jailer or persistently disruptive or

19   potentially disruptive behavior or abnormal

20   behavior which requires removal of the inmate

21   from general inmate population.  3:  A report

22   from the facility nurse, correct?

23       A    Correct.

24       Q    Okay.  Was there any written request

25   made by Nurse Horn regarding Mr. Ellis' or her

1    request for Mr. Ellis to be put in

2    administrative segregation?

3        A    Just verbal.

4        Q    Okay.  And what did she tell you?

5        A    To place -- that he should be placed in

6    administrative segregation and observed.

7        Q    She used the words administrative

8    segregation?

9        A    No.

10       Q    Okay.  That's what -- I want be real

11   careful about what you're testifying to, okay?

12   What did she specifically tell you about the

13   request for Mr. Ellis to be housed out of

14   general population?

15       A    I don't remember what she specifically

16   said.

17       Q    Okay.  How about generally what she told

18   you?

19       A    That he should be placed in segregation

20   and observed.

21       Q    Okay.  Placed in segregation and

22   observed?  That's what she told you?

23       A    Correct.

24       Q    Okay.  And did she tell you why?

25       A    He had a medical issue.

1    Q   Was it clear to you at the time that

2  Nurse Horn made a recommendation to you that he

3  be placed in administrative segregation that she

4  was aware that he had a medical condition?

5              MR. GIBBS:  Object to the form.

6              MS. GOOCH:  Same objection.

7              THE WITNESS:  Yes.

8    Q   (By Mr. Smolen)  Okay.  And did she

9  convey that to you?

10    A   Specifically, I don't recall.

11    Q   Okay.  But, generally, you believe that

12  she did?

13    A   Yes.

14    Q   Okay.  And what did the policy state

15  that if a -- an inmate had been placed in

16  administrative segregation because of a medical

17  condition and additional observation was

18  required, what -- what was the practice at the

19  jail?

20    A   For the observation?

21    Q   Yes, the --

22    A   Okay.  The inmate would be separated and

23  the jail staff that was working would be

24  responsible for conducting checks on the inmate.

25    Q   Did she specifically state what

108

1   was it all over the phone?

2       A    I don't recall speaking with her

3   face-to-face so --

4       Q    So you think it would have been over the

5   phone?

6               MS. GOOCH:  Well, hold on.  Okay

7   y'all are talking over each other, both of you

8   are, so -- so, Dan, please try to please let him

9   finish and you please let him finish his

10  question, too.

11              THE WITNESS:  Will do.

12      Q    (By Mr. Smolen)  Okay.  You believe that

13  somebody told Nurse Horn he had a medical

14  condition; that they called her at home and then

15  she called you?

16      A    Correct.

17      Q    Okay.  And, to your knowledge, did she

18  ever put it in writing?

19      A    No.

20      Q    Okay.  And wasn't it a requirement that

21  the person who observed the need to be put into

22  administrative segregation fill out a written

23  report?

24      A    Correct.

25      Q    And in this case, you believe it would

135

```
1   quote, they think this one is faking it, and
2   that if it's not life threatening, do not take
3   him.  They are not footing the bill.
4       Next, the medic checks his vitals signs.  And
5   to everyone's surprise, they did not take him.
6   The EMT left.  Then we overheard the jail
7   administrator say that the other inmates were
8   making such a stink that he thought it would be
9   better if they moved Terral to a single holding
10  tank up front away from everybody.  Did that
11  happen?
12      A    No.
13      Q    Okay.  And you are certain about that
14  before -- I just want to make sure you're
15  certain about it before we go and review the
16  video?
17      A    Yes.
18      Q    Okay.  What do you recall happening?
19      A    This?
20      Q    About this situation and your
21  involvement with the EMT's and statements that
22  you made?
23      A    The EMT's checked Mr. Ellis out and they
24  advised that they weren't going to transport
25  him.
```

136

```
1       Q    Okay.  Why did they tell you they
2   weren't going to transport him?
3       A    They just -- they just told me they
4   weren't going to transport him.  They didn't --
5   it wasn't they -- anything he needed transported
6   for is why.
7       Q    Okay.  So, I mean, the EMT's told you
8   they checked out Mr. Ellis and there was nothing
9   wrong with him?
10      A    I don't recall if that's what they said
11  but they -- they just -- they weren't going to
12  take him.
13      Q    Okay.  And did they explain to you why?
14      A    They just -- no.
15      Q    Okay.  And you don't ever recall making
16  any statements whatsoever about Mr. Ellis was
17  possibly faking?
18      A    I don't recall.
19      Q    It's possible that you did?
20      A    No.
21           MS. GOOCH:  Object to the form.
22      Q    (By Mr. Smolen)  Okay.  Any reason why
23  it would be in the video if -- I mean, did you
24  make any statements like that?
25      A    No.
```

1    Q   (By Mr. Smolen)   Okay.   If a jailer

2    believed that an inmate was paralyzed or became

3    paralyzed, what did the policy require that they

4    do?

5    A    They were to call the nurse or based on

6    the severity, EMS.

7    Q    I mean, if someone becomes paralyzed and

8    they believe a person is paralyzed, they're not

9    supposed to call the nurse; they're supposed

10   call for an emergency medical transport to a

11   hospital, correct?

12   A    Correct.

13           MS. GOOCH:   Object to the form.

14   Q   (By Mr. Smolen)   They're supposed to

15   notify the nurse that they did it?

16   A    Yes.

17   Q    Okay.   Did you ever see the jail staff

18   -- when Mr. Ellis asked for an ambulance to be

19   called after they acknowledged that they believe

20   he's paralyzed, did any jail staff call the

21   EMT's for emergency transport Mr. Ellis to a

22   hospital?

23   A    In that clip, no.

24   Q    Okay.   And let's look at -- okay.

25           MR. SMOLEN:   Okay.   Let's do -- the

192

      1      A    As I said before, I don't recall.

      2                    (Video playing)

      3      Q    Are all of them in your office again,

      4  Shoemaker and Horn, at 8:48 in the morning,

      5  agreed?

      6              MR. GIBBS:  Object to the form.

      7              MS. GOOCH:  Object to the form.

      8              THE WITNESS:  10:48.

      9      Q    (By Mr. Smolen)  Yeah, I'm sorry, 10:48?

     10      A    Yes.

     11      Q    Thank you.  10:48?

     12      A    Yes.

     13      Q    Okay.  It's your testimony you're not in

     14  there?

     15      A    Correct.

     16      Q    Okay.

     17                    (Video playing)

     18      Q    If you had been in your office, okay,

     19  hearing and seeing what was going on, what would

     20  you have done?

     21              MS. GOOCH:  Object to the form.

     22              MR. GIBBS:  Same.

     23              THE WITNESS:  Hearing this?

     24      Q    (By Mr. Smolen)  Yeah.  I mean, this has

     25  been going on since 8:00 -- we know for sure as

1   running of the jail, dealing with the -- working

2   with like the district attorney and the courts

3   and things to calculate time, ordering things

4   for the jail, supplies that were needed, things

5   like that.

6       Q   Do you prepare work schedules --

7       A   Yes.

8       Q   -- for the staff?

9       A   Yes.

10      Q   Okay.  When an inmate -- or strike that.

11  And as jail administrator, you reported first to

12  the undersheriff and then to the sheriff; is

13  that correct?

14              MR. SMOLEN:  Object to the form.

15              THE WITNESS:  Correct.

16      Q   (By Ms. Gooch)  Okay.  When an inmate --

17  while you were jail administrator, at the time

18  that you were jail administrator, when an inmate

19  was being booked into the jail, is it during

20  that booking process that the medical questions

21  are asked of the inmate that you just discussed

22  earlier today?

23              MR. SMOLEN:  Object to the form.

24              THE WITNESS:  Yes.

25      Q   (By Ms. Gooch)  Can you explain the

202

1   process of asking those questions, please?

2       A    There was a -- a tab on the booking

3   software that there were certain questions there

4   you would go through, ask them any of the

5   medical issues that were listed on there and

6   then anything else that the inmate reported,

7   things like that.  You would list them on there

8   as well.

9       Q    And I realize we're in -- and it's

10  November 2019 now.  We're talking about things

11  that occurred four years ago, right?

12      A    Correct.

13      Q    So your memory is probably faded a

14  little bit since then?

15      A    Oh --

16      Q    Would you agree?

17      A    Yes.

18      Q    Okay.  The -- then the information that

19  you get from the inmate regarding their medical

20  information, what is done with that information?

21      A    The information was given to the nurse.

22              MR. SMOLEN:  Object -- go ahead.

23  Object to the form.

24              THE WITNESS:  Okay.

25      Q    (By Ms. Gooch)  And why was it given to

1  the nurse?

2      A    Because she was the medical -- she was

3  the one who would need to see it.  She was the

4  medical personnel.

5      Q    Okay.  If at the time of booking an

6  inmate provides information regarding their

7  medical condition that is not emergency, just

8  routine medical information --

9      A    Uh-huh.

10     Q    -- what is done with that information?

11             MR. SMOLEN:  Objection, asked and

12  answered.

13             THE WITNESS:  The -- it -- it's

14  given to the nurse.

15     Q    (By Ms. Gooch)  Okay.  And if -- if the

16  inmate providing information regarding his

17  medical condition that is -- or he appears, you

18  know, to have some life threatening -- he

19  appears badly injured or he appears -- reports

20  he's having some life-threatening incident at

21  the time of booking, how would that be

22  addressed?

23             MR. SMOLEN:  Objection, asked and

24  answered.

25             THE WITNESS:  EMS would be called

204

1   to...

2      Q    (By Ms. Gooch)  Okay.  While you were

3   the jail administrator -- or strike that.  You

4   had worked in the jail for a few years as a

5   jailer before becoming the jail administrator,

6   correct?

7      A    Yes.

8      Q    And do you recall that the -- the jail

9   physician's assistant Alisha -- is it Alisha or

10  Aleta?

11     A    Aleta.

12     Q    Okay, Aleta Fox.  She was the jail

13  administrator for a -- I mean, she was the

14  physician's assistant at the jail for a number

15  of years, correct?

16     A    Correct.

17     Q    A number of years before you were the

18  jail administrator, correct?

19              MR. SMOLEN:  Object to the

20  form.

21              THE WITNESS:  Correct.

22     Q    (By Ms. Gooch)  Okay.  While you were

23  the jail administrator, do you recall having any

24  concerns in your mind about the attendance at

25  work of the jail nurse?

205

1      A    No.

2      Q    Do you recall seeing her on a regular

3  basis at work?

4      A    Yes.

5      Q    Interacting with her on a regular basis

6  at work?

7      A    Yes.

8      Q    Talking to her on a regular basis at

9  work?

10     A    Yes.

11     Q    Okay.  And would a regular basis be

12 daily during the week, Monday through Friday, so

13 to speak?

14     A    Yes.

15              MR. SMOLEN:  Object to the form.

16     Q    (By Ms. Gooch)  I recognize you've

17 indicated that sometimes you might have to work

18 on the weekends; is that correct?

19     A    Correct.

20     Q    And sometimes you may have worked in the

21 evenings beyond, you know, 5:00 or 6:00; is that

22 correct?

23     A    Correct.

24     Q    And did the jail nurse do that, also?

25     A    Yes.

```
 1        Q    Did any jail staff report to you or
 2   mention to you any concern about the jail nurse
 3   isn't here, she's not showing up for work?
 4        A    No.
 5        Q    Did any jail staff person indicate to
 6   you any concern that jail nurse isn't doing her
 7   job?
 8        A    No.
 9        Q    Or any -- any jail staff complain to you
10   that the jail nurse is not providing medical
11   attention to inmates who need it?
12        A    No.
13        Q    Did any inmate express any concern to
14   you that the jail nurse was not providing their
15   -- not meeting their medical needs in whatever
16   way?
17        A    No.
18        Q    Any family member of any jail -- any
19   person who had been in the jail express to you
20   any complaint or concern that the jail nurse,
21   Theresa Horn, had not attended to their family
22   member's needs while in Ottawa jail?
23        A    No.
24        Q    While you were jail administrator, was
25   there an individual employed by the State
```

208

1  leading.

2       Q    (By Ms. Gooch)   You can answer.

3       A    Yes.

4       Q    Okay.  Was it your understanding that

5  she was -- or the jail inspector was familiar

6  with or aware of --

7            MR. SMOLEN:  Objection, leading.

8       Q    (By Ms. Gooch)   -- for example, the

9  medical intake questions that were being asked

10  by jail staff?

11           MR. SMOLEN:  Objection, leading.

12           THE WITNESS:  Yes.

13      Q    (By Ms. Gooch)  Was it your

14  understanding that the jail inspector was

15  familiar with the medical delivery system at the

16  jail?

17      A    Yes.

18      Q    Did the jail inspector ever express any

19  concern with you about the medical care delivery

20  system at the jail?

21      A    No.

22      Q    Or about the software that the jail had,

23  the booking intake, medical intake questions

24  that the jail asked?

25      A    No.

209

1    Q    As jail administrator, did you conduct

2  or -- the annual training of jail staff?

3    A    Yes.

4    Q    And when I say jail staff, does that

5  include the jail nurse as well?

6    A    Yes.

7    Q    Did she participate and take the annual

8  jail training?

9    A    Yes, ma'am.

10    Q    Could you explain, please, when an

11  individual is hired at the jail to be a jail

12  employee, what is the initial training they

13  receive, if any?

14    A    Once they were hired, they spent at

15  least two days on the policies and procedures

16  and the jail standards, and that was conducted

17  by Randall Lloyd.  And then after that, they

18  would go with a supervisor -- a jail supervisor

19  and observe.  And the jail supervisor from there

20  would let us know after they had been -- I don't

21  want to say trained -- but after they had been

22  -- they had gotten their feet wet in the jail.

23    Q    Okay.  Have you heard of jail school?

24    A    Yes.

25    Q    What is that?

1    A    Jail school was -- what we called it was

2    the -- it was the -- the state jail standards

3    and that's -- that's what I recall jail school

4    being.

5    Q    And was that provided -- did new

6    employees have to go to jail school?

7    A    Yes.

8    Q    Where was jail school held?

9    A    Jail school was generally held here or

10   -- yes, here in town either at the courthouse or

11   some other place.

12   Q    Do you recall when Terry Durborow took

13   office?

14   A    Yes.

15   Q    When?

16   A    It would have been 2005 or '06.

17   Q    Backing up a minute.  Some of the same

18   questions I asked you about the nurse a moment

19   ago, I want to ask you about Shoemaker.

20   A    Okay.

21   Q    While you were employed at the jail, did

22   anyone -- any staff express any concern or

23   complaint to you about Charles Shoemaker?

24   A    No.

25   Q    Complain to you about how he treated

1  inmates?

2      A    No.

3      Q    Any inmate express any complaint or

4  concern to you about how Charles Shoemaker

5  treated inmates?

6      A    No.

7      Q    The video and audio that you watched and

8  listened to today, did it bother you?

9      A    Yes.

10     Q    Had you heard from jail staff or inmates

11 -- or family members of inmates anything along

12 the lines of what you've heard today on the

13 audio or video as far as how Charles -- Charles

14 Shoemaker or Nurse Hearn -- Nurse Horn treated

15 inmates?

16     A    No.

17     Q    If you had been within earshot of Terral

18 Ellis on October 22nd, 2015 -- 21st, 22nd, 2015

19 and heard then what you heard today, what would

20 you have done?

21     A    We would have called the medical

22 personnel, the EMS.

23     Q    Would you have gone and checked on him?

24     A    Absolutely.

25     Q    In terms of the efficiency of the

1   physician's assistant, Aleta Fox?

2       A   No.

3       Q   Do you recall seeing her in the jail?

4       A   Yes.

5       Q   Did Nurse Horn ever indicate to you she

6   was frustrated with Aleta Fox's responsiveness

7   to her requests?

8       A   No.

9       Q   Did Nurse Horn ever express to you

10  frustration in Aleta Fox in her job duties and

11  assistance that she provided at the jail?

12      A   No.

13      Q   The D ring.  Did you ever lock an inmate

14  down on the D ring?

15      A   No.

16      Q   Did you ever observe someone do that?

17      A   No.

18      Q   While you were employed, did you ever

19  hear that somebody had done that -- another

20  staff member had done that?

21              MR. SMOLEN:  Object to the form.

22  Asked and answered.

23              THE WITNESS:  No.

24      Q   (By Ms. Gooch)  Do you have an

25  understanding as to what the D ring was used for

214

1  before your time -- or before your employment at

2  the jail?

3     A   Yes.

4     Q   What's your understanding of what the D

5  ring was used for before you began your

6  employment at the jail?

7             MR. SMOLEN:  Objection.  Asked and

8  answered.

9             THE WITNESS:  Control of inmates.

10     Q   (By Ms. Gooch)  Was it used for

11  discipline?

12     A   No.

13             MR. SMOLEN:  Objection to the form.

14  Asked and answered.

15     Q   (By Ms. Gooch)  Can you -- what do you

16  understand discipline to mean?

17     A   I understand discipline to mean that

18  someone had done something and gotten in trouble

19  and that was a punishment.

20     Q   Okay.  So -- and -- and to use your

21  explanation, was there ever an occasion to your

22  knowledge while you were employed at the jail

23  that an inmate was put on the D ring as

24  punishment?

25             MR. SMOLEN:  Objection.

1              THE WITNESS:  No.

2              MR. SMOLEN:  Misstates his

3  testimony.

4      Q   (By Ms. Gooch)  Okay.

5              MS. GOOCH:  That's all I have.

6                 REDIRECT EXAMINATION

7  BY MR. SMOLEN:

8      Q   Do you know how long Mr. Ellis was in

9  the Ottawa County Jail?

10     A   Approximately a week-and-a-half, two

11 weeks.

12     Q   If his booking sheet indicates that he

13 was booked in on October the 10th -- let me just

14 make sure that's accurate, okay?  October the

15 10th is what the record reflects his booking

16 dates to be.  Is that consistent with your

17 memory?

18     A   Yes.

19     Q   Okay.  And you understand that he died

20 on October the 22nd, correct?

21     A   Correct.

22     Q   Okay.  You would agree with me that had

23 you followed the contract that Sheriff Durborow

24 had in place with respect to Ms. Fox and you had

25 actually set a time weekly for her to be there,