Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1) MEGAN CAPEL, Administratix,
of the Estate of Terral Brooks
Ellis, II, Deceased,
(2) TERRAL B. ELLIS, SR., and
(3) SHELLY BLISS,
        Plaintiffs,

Vs.

CIV-17-325-JED-FHM

OTTAWA COUNTY BOARD OF COUNTY
COMMISSIONERS, et al,
        Defendants.

VIDEO DEPOSITION OF
THERESA HORN

DATE:  OCTOBER 8, 2019

REPORTER:  MARISA SPALDING, CSR, RPR

Spalding Reporting Service, Inc.
1611 South Utica Avenue, Box 153
Tulsa, Oklahoma 74104
(918) 284-2017

EXHIBIT 4

1     Q   (By Mr. Smolen)  I'm sorry?  No?  I

2   forgot to tell you.  You might remember this

3   from the last deposition.  There's a group of

4   lawyers in here that might object to the form of

5   my question.  You still need to answer until Jim

6   tells you not to answer, okay?

7     A   Okay.

8     Q   You indicated no one was ever critical

9   of any of the help that you had offered --

10    A   Not --

11    Q   -- to the inmates?

12    A   -- that I was aware of.  Oh, I'm sorry.

13         MS. GOOCH:  Let him finish the

14   question.

15         THE WITNESS:  Okay.

16         MS. GOOCH:  Object to the form of

17   that question.

18    Q   (By Mr. Smolen)  To your knowledge, has

19   anyone at the Ottawa County Sheriff's Office

20   ever expressed to you concerns that they had

21   with your delivery of medical at the jail?

22         MS. GOOCH:  Object to the form.

23         MR. GIBBS:  You can answer.

24         THE WITNESS:  Not that I was aware

25   of, no.  Nobody said anything to me.

1      Q    Uh-huh.

2      A    I wasn't.

3      Q    Okay.  Have you been on pain medication

4   for that?

5      A    Just right after surgery.

6      Q    When was your surgery?

7      A    May 10th.

8      Q    Of what year?

9      A    This year.

10     Q    What do you have to do to stay

11  registered as an LPN with the State of Oklahoma?

12     A    You have to just keep your license

13  renewed.

14     Q    And what's that process?

15     A    Every two years you have to go online

16  and just -- they just up -- upgrade it for the

17  next two years.

18     Q    Are you required to do any continuing

19  education?

20     A    No.

21     Q    Have you done any continuing education

22  in the area of being an LPN since -- let's say

23  2013?

24     A    I went to jail school.

25     Q    Went to jail school.  When did you go to

Page 15

1    jail school?

2        A    Every year.

3        Q    And what is jail school?

4        A    It's the school the State puts on that's

5    state required for every jailer or whoever works

6    back in the jail to take every year.

7        Q    And where did that take place at?

8        A    Usually at the courthouse.

9        Q    And are there sign-in sheets?

10       A    Yes.

11       Q    Who administers that yearly review?

12       A    It varied from the jail administrator to

13   the undersheriff.  It just varied every year.

14       Q    And was that specific to the Ottawa

15   County Jail?

16       A    No, it was specific to the state --

17   every jail in the state.

18       Q    And so would the jail administrator from

19   the Ottawa County Jail be holding that?

20       A    He has in the past.  They have a

21   curriculum they have to -- we have to go by --

22   or they did.

23       Q    Beyond doing the yearly jail school,

24   have you had any other additional training or

25   education in the area of being an LPN?

Page 40

1    they had an emergency hours that I could fax the

2    order to them.  But like I said, we may not get

3    that medication that night.  It may be the next

4    morning.  If it was something that was a matter

5    of life or death, I would send them to the ER to

6    get that medication.

7        Q   (By Mr. Smolen)  You had indicated there

8    wasn't a set time that Aleta Fox would come, but

9    she would come at your request and, generally,

10   it would be maybe once or twice a week --

11       A   Uh-huh.

12       Q   -- that you called, correct?

13       A   Correct.

14       Q   And was that just for her to see

15   specific inmates that you wanted her to see?

16       A   The process of her seeing an inmate was

17   if they -- they would fill out a sick call slip

18   and -- and/or they had gotten into a fight that

19   day or anything that had happened.

20       Q   An acute injury?

21       A   Yes, then I would call her and she would

22   come over.

23       Q   Okay.  Would you call her for every sick

24   call slip?

25       A   No.

Page 41

1    Q   Okay.  How would you decide which ones

2   to call her on and which ones not to?

3    A   Well, I did kind of like a triage

4   procedure.  I would have them come to my office.

5   And then if it was something that I needed her

6   to see for, I would call her and she would come

7   over.

8    Q   And -- and how -- I want you to walk me

9   through that triage process and what would lead

10   you to make that decision to call Ms. Fox.

11    A   Well, if they had something that I could

12   not manage in the scope of my licensed nurse --

13   licensure -- I would call her.

14    Q   Okay.  Now are you allowed to make a

15   diagnosis as an LPN?

16    A   No.

17    Q   Okay.  So if you're not allowed to make

18   a diagnosis as an LPN, how are you ruling out

19   who to call Ms. Fox for and who not to call Ms.

20   Fox for?

21        MR. GIBBS:  Object to the form.

22        THE WITNESS:  Well, that would only

23   be for the inmates that would come in and would

24   tell me they have these issues.  If they had no

25   outward signs of this medical condition, then I

Page 42

```
 1    -- after -- I would call their physician to get

 2    the -- her -- their PI-- PHI -- or I would call

 3    Aleta and they would come -- she would come

 4    over.

 5        Q   (By Mr. Smolen)  You're saying if they

 6    had no outward signs of their medical condition?

 7        A   Right, if they wasn't exhibiting any --

 8    any out -- like somebody had asthma or something

 9    along that line because...

10        Q   So let's use the asthma examples.

11    Someone comes in and they've got asthma, there's

12    no outward sign of a medical condition --

13        A   Uh-huh.

14        Q   -- you would call her?

15        A   Well, if they needed an inhaler.  Most

16    usually, I would have them -- I would let them

17    call their family or I would call their

18    pharmacist and they would deliver their meds or

19    I would go get them.

20        Q   Okay.  But the triage process, I mean,

21    that's a specific example you gave where someone

22    comes in and they've got asthma and they need an

23    inhaler and you know they've got a prior --

24        A   Uh-huh.

25        Q   -- history of asthma?
```

Page 43

1        A    Uh-huh.

2        Q    What about with the sick calls, though?

3    When you're going through and you're assessing

4    the sick call notes, can you walk me through the

5    process as to how you decide which ones to call

6    Ms. Fox on and which ones you wouldn't?

7        A    If it was something that I couldn't --

8    that was outside the realm of my licensure then

9    --

10       Q    Let -- okay, then let's -- let's define

11   --

12              MR. GIBBS:   Hang on.   Were you done

13   with your answer?   I want her to finish her

14   answer.   Go ahead.

15              THE WITNESS:   Then I would call her.

16       Q    (By Mr. Smolen)   Okay.   Let's -- let's

17   define what you understood your scope to include

18   as an LPN.

19       A    That's hard to say working in a jail

20   facility.   I don't know how to answer that.

21       Q    Well, I just want you to tell me what

22   you understood your scope as an LPN to be?

23       A    Well, if they had something that they

24   needed -- like a staff infection or an abscess,

25   I could not do that.   If they came in and

Page 44

1   presenting a fractured limb from prior to being

2   arrested, I would call her.

3       Q   But you're triaging the sick calls

4   before Ms. Fox ever sees them, correct?

5       A   Uh-huh.

6       Q   Yes?

7       A   Yes.

8       Q   And how would you assess a sick call as

9   to whether or not a person needed to see a

10   doctor or not without making a diagnosis?

11              MR. GIBBS:  Object to the form.  Go

12   ahead.

13              THE WITNESS:  I don't know how to

14   answer that one.

15       Q   (By Mr. Smolen)  I mean, at some level,

16   you're having to make a diagnosis when you are

17   triaging the sick calls as to whether or not an

18   inmate needs to see a physician or not, correct

19   or --

20              MR. GIBBS:  Object --

21       Q   (By Mr. Smolen)  -- a physician's

22   assistant?

23              MR. GIBBS:  Object to the form.

24              THE WITNESS:  No, I'm not making a

25   diagnosis because I'm not allowed to do that.

Page 105

1       Q    Just what you recall about Mr. Ellis,

2    like we did with the other --

3       A    Okay, I don't --

4       Q    We talked about some of the other

5    inmates.

6       A    Right.  He had complained of back pain

7    one time -- once -- and he wanted to go to a

8    chiropractor because he said he had been to a

9    chiropractor before, I think is what he said.

10   Then I -- I don't know if I let him call his

11   grandfather or we was going to call his

12   grandfather -- I don't remember that -- and he

13   was going to set him up an appointment and we

14   would take him.

15       And then I don't remember them calling me

16   about sending -- calling EMS but it's in my

17   notes, but I don't actually recall it.  And then

18   I remember coming to work the next day and he

19   was down in H1.

20       Q    Down in H1?

21       A    Yes.

22       Q    Now earlier in the deposition, you had

23   said that you had always preferred them to house

24   in H2.  We were talking about -- I think it was

25   about a suicide.  What was your preference

Page 108

 1   pertaining to that first visit?  You had

 2   mentioned the chiropractor, maybe call -- let

 3   him call his grandpa.  Anything else?

 4        A    Only what I documented.  I don't

 5   remember that day -- it's been so long ago --

 6   that he had a protrusion in the L1 or L2 or

 7   somewhere along the spine.  He said he had --

 8   and he told me that -- that he had frequently

 9   had his back to pop out of place and he wanted

10   to go -- he's the one that's suggested going to

11   the chiropractor.

12        Q    I'll hand you what we're going to mark

13   as Plaintiff's Exhibit No. 3.

14                  (Plaintiff's Exhibit No. 3

15                   marked for identification)

16        Q    Ma'am, do you recognize this document?

17        A    I recognize it as my writing.

18        Q    Okay.  And it's the progress notes

19   pertaining to Terral Ellis, correct?

20        A    Correct.

21        Q    And I noticed on the last note here you

22   signed that note, correct?

23        A    Yes.

24        Q    When did you complete your progress

25   notes?

Electronically signed by Marisa Spalding (401-062-868-9834)                                    a4c397d7-df85-4e91-9440-50ab83f15d71

Page 124

1    you?

2         A    No.

3         Q    Correct?

4         A    Correct.

5              MR. SMOLEN:   Let's watch the video

6    from the 22nd.

7         Q    (By Mr. Smolen)  You understood that

8    there was a jail video and jail audio at the

9    Ottawa County Jail outside of the medical unit,

10   correct, in what you've described as the holding

11   area?

12        A    Yes.

13        Q    And were you aware at the time that Mr.

14   Ellis was housed in there that it was video --

15   monitored by video and audio?

16        A    Yes.

17        Q    Okay.  I'm going to play some clips and

18   ask you some questions about those.

19             (Video playing)

20        Q    Can you describe to the jury what

21   they're seeing on the left -- top left-hand

22   corner?

23        A    The book-in desk.

24        Q    Okay.  And in the right -- top-hand

25   right, what are they seeing?

Electronically signed by Marisa Spalding (401-062-868-9834)                a4c397d7-df85-4e91-9440-50ab83f15d71

Page 125

1     A    Those are the holding cages.

2     Q    Okay.  And Mr. Ellis' holding cell, he's

3    not in the cage.  He's off to the right hand of

4    that, correct?

5     A    Yes, over there.

6     Q    And then we have the long hallway in the

7    bottom right, correct?

8     A    Correct.

9     Q    And then another angle shot of the

10   book-in desk, correct?

11    A    Correct.

12              (Video playing)

13    Q    Can you identify who that jailer is?

14    A    That's Charles Shoemaker.

15    Q    Okay.  Was he a supervisor?

16    A    He was the assistant jail administrator.

17    Q    Assistant jail administrator?

18    A    Yes.

19    Q    During 2015?

20    A    Yes.

21    Q    Was he your supervisor?

22    A    No.

23              (Video playing)

24    Q    You had an opportunity to review the

25   jail video and audio from at least this one

Page 126

1    encounter with Mr. Ellis, correct?

2        A    Uh-huh.

3        Q    Yes?

4        A    Yes.

5        Q    At one point in time during the

6    interaction, you told Mr. Ellis you were tired

7    of listening to his dumb ass; do you recall

8    hearing that?

9        A    No. Do you want to play it again?

10       Q    We'll play it again.

11       A    Okay.

12                   (Video playing)

13       Q    Did you hear that part there, I'm tired

14   of listening to your dumb ass?

15       A    No.

16       Q    Oh, I'm sorry, I'm tired of dealing with

17   your dumb ass?

18       A    I heard something about dumb ass but I

19   don't remember -- I don't recall saying that.

20       Q    Well, we can listen to that part again

21   real quick.

22                   (Video playing)

23                   THE WITNESS:  He said dumb ass.

24       Q    (By Mr. Smolen)  Oh, you think it's him

25   saying dumb ass?

Page 127

1       A    It doesn't sound like my voice.

2       Q    We'll listen to it one more time.

3                  (Video playing)

4       Q    It seems pretty distinct to me --

5       A    Yes.

6       Q    -- that it was you?  Do you agree with

7    that?

8       A    I agree.

9       Q    Why don't you tell the jury after

10   watching this video what you told Mr. Ellis?

11            MR. GIBBS:   Object to the form.

12            THE WITNESS:   It was obvious what I

13   said but --

14       Q    (By Mr. Smolen)  I want you to tell the

15   jury.

16       A    I told him I was I'm tired of listening

17   to his dumb ass.

18       Q    You were tired of listening to his dumb

19   ass.  Now in the deposition earlier, I had asked

20   you about the conversations that you had had

21   with Mr. Ellis prior to this, and you had

22   indicated there was just the one conversation

23   where he told you about the back pain, correct?

24       A    Yes.

25       Q    Okay.  If that's the truth, then why

Page 131

1    regarding the alleged seizures?

2       A    I was just going by my observations.

3       Q    Well, you're -- you're threatening him.

4    You're saying, if you say you're having

5    seizures, you're going to be punished, correct?

6                MR. GIBBS:  Object to the form.

7                THE WITNESS:  You say a lot of

8    things when you work with inmates.

9       Q    (By Mr. Smolen)  Okay.  And that was one

10   of those things that you were telling Mr. Ellis

11   that day, correct?

12      A    It was on the video, yes.

13      Q    Why would you tell an inmate that if he

14   reports his medical condition that he's going to

15   be punished?

16               MS. GOOCH:  Object to the form.

17               MR. GIBBS:  Same objection.

18               THE WITNESS:  I can't answer that

19   because I don't know.

20      Q    (By Mr. Smolen)  You don't dispute

21   saying it, do you?

22      A    I can't.

23      Q    Right, we have the video of it?

24      A    Right.

25      Q    Why were you going to punish an inmate

Page 132

 1    --

 2        A    I wouldn't have punished an inmate.

 3        Q    -- for reporting a medical condition?

 4        A    I wouldn't punish an inmate.

 5        Q    Well, what did you tell him was going to

 6    happen to him if he started this seizure stuff

 7    up again?

 8        A    I don't recall.

 9                 (Video playing)

10        Q    You're going on that D ring and that's

11    where you're going to stay the whole fucking

12    time because I'm sick and fucking tired of

13    dealing with you.  Did you hear -- hear that?

14                 MR. GIBBS:  Object to the form.

15                 THE WITNESS:  Yeah.

16        Q   (By Mr. Smolen)  Okay.  Tell the jury

17    what a D ring is.

18        A    It's a metal ring that's cemented to the

19    floor.

20        Q    Okay.  So if Mr. Ellis kept complaining

21    about the fact that he was having trouble

22    walking, the fact that he was having seizures,

23    the fact that he was in pain, you were going to

24    chain him to the floor of the jail is what you

25    told him, yes?

Page 133

```
 1      A   Yes.

 2      Q   Do you think that telling an inmate

 3   who's complaining about medical conditions that

 4   you're going to chain them to the floor of the

 5   jail is an appropriate response?

 6      A   No.

 7      Q   But that didn't stop you from telling

 8   him that that day, did it?

 9      A   No, but I wouldn't have done it.

10      Q   You were just threatening him?

11      A   Sometimes you have to threaten those

12   inmates.

13      Q   Why?

14      A   Because that's -- they -- I mean, you

15   have to respond to them in a way that they will

16   understand.

17      Q   Okay.  And what was it that you were

18   wanting Mr. Ellis to understand?

19      A   That if he was faking -- I'm not saying

20   he was because I don't know -- I wasn't there --

21   that --

22      Q   You were there?

23      A   Not when he had the seizure -- or

24   supposedly the seizure that night -- the night

25   before that.
```

Page 134

1    Q   You told him that if any of these

2    medical conditions -- if he continues to

3    complain about them, he's going to be chained to

4    the floor, yes?

5    A   That's on there.  That's what I said.

6    Q   You said that you had talked to him that

7    way because sometimes you just have to talk to

8    inmates like that?

9    A   Sometimes.

10   Q   Was the jail always -- or was the jail

11   staff always okay with you talking to inmates

12   like that when you had to?

13          MR. GIBBS:  Object to the form.

14          THE WITNESS:  I don't know.

15   Q   (By Mr. Smolen)  I mean, did anyone ever

16   discipline you for talking to inmates like that?

17   A   No.

18   Q   Anyone tell you that it was outside

19   their accepted practices or procedures?

20   A   No.

21   Q   Anyone give you any kind of corrective

22   action?

23   A   No.

24   Q   Would the sheriff or jail administrator

25   tell you at times that you needed to talk tough

Page 135

1    like that to inmates?

2        A    No.

3        Q    That's something that you came up with

4    on your own?

5        A    It was just a way you had to do it

6    sometimes.

7        Q    Okay.

8        A    It's a jail facility.  It's a

9    correctional facility.

10       Q    And at least you understood that that

11   was an accepted practice because of the type of

12   facility in which the medical was being

13   delivered that you could do that?

14            MS. GOOCH:  Object to the form.

15            THE WITNESS:  No.

16       Q   (By Mr. Smolen)  Did anyone prevent you

17   from doing that when you would do it?

18       A    I --

19            MS. GOOCH:  I'm sorry, I couldn't

20   understand your question, Dan.

21       Q   (By Mr. Smolen)  Would anyone ever

22   prevent you from talking to inmates like that?

23            MS. GOOCH:  Object to the form.

24            THE WITNESS:  No.

25       Q   (By Mr. Smolen)  Okay.

Page 136

1      A    It wasn't normal practice for me.

2      Q    Okay.

3      A    I don't know why I did it.

4      Q    How many inmates had you chained to a D

5   ring before for complaining about medical

6   conditions?

7      A    None.

8           MS. GOOCH:   Object to the form.

9      Q    (By Mr. Smolen)  Excuse me?

10     A    None.

11     Q    Okay.  Why did you then make the

12  decision that day to make that statement to Mr.

13  Ellis?

14     A    I can't answer that.  I don't know.

15     Q    Why would you ever discourage an inmate

16  from disclosing their subjective complaints?

17     A    I wouldn't.  I didn't ever before.  I

18  don't know.  It's not a general practice I --

19  that I would do.

20     Q    Why did you do it with Mr. Ellis?

21     A    I can't answer that.

22     Q    Why can't you answer it?

23     A    I don't know.

24     Q    I want you to hear this other part here.

25          (Video playing)

Page 137

1      Q    All right.  Ain't a damn thing wrong

2    with you and that you were sick and tired of

3    dealing with his dumb ass.  How were you able to

4    make that diagnosis?

5      A    I didn't make a diagnosis.  It was my

6    observation.

7      Q    Your observation that there was nothing

8    wrong with him?

9      A    That he had -- was -- he had been up

10   walking, his legs were not black as he said they

11   were.  He had -- all morning long he had been up

12   eating breakfast.  He ate his breakfast.  He was

13   drinking.  He was going to the restroom.  It

14   wasn't an diagnosis.  It was an observation.

15     Q    Your observation was that there was

16   nothing wrong with him?

17     A    My observation was there was -- what he

18   was stating at the time was not true because his

19   feet were not purple.  They were not black at

20   that time.

21     Q    I mean, how is it that Mr. Ellis is

22   found and he's got black limbs a few hours

23   later, but at the time you're screaming at him,

24   he didn't?

25     A    That's something --

Page 138

 1              MR. GIBBS:  Object to the form.

 2              MS. GOOCH:  Object to the form.

 3              THE WITNESS:  That's something I

 4    can't answer.

 5      Q   (By Mr. Smolen)  I mean, do you think he

 6    could just see into the future that his legs

 7    were going to turn black?

 8              MS. GOOCH:  Object to the form.

 9              MR. GIBBS:  Object to the form.

10              THE WITNESS:  I can't answer that.

11      Q   (By Mr. Smolen)  When he told you that

12    his feet were black and you're screaming at him,

13    did you do any kind of other assessment?

14      A   I can't answer that.  I don't remember.

15      Q   When he told you that his legs were

16    numb, did you do any other kind of assessment?

17              MR. GIBBS:  Object to the form.

18              THE WITNESS:  No.

19      Q   (By Mr. Smolen)  I mean, he was

20    repeatedly telling you he couldn't feel his

21    legs, correct?

22      A   He said he couldn't move his legs.

23      Q   And when he told you that, did you do

24    any kind of medical to assess his condition?

25      A   No.