Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

MEGAN CAPEL, et al,            )
      Plaintiffs,          )
                           )
vs.                            ) Case 17-cv-00325-JED-FHM
                           )
OTTAWA COUNTY BOARD OF         )
COUNTY COMMISSIONER, et al,    )
      Defendants.          )


DEPOSITION OF
JENNIFER DILLINGER


DATE:  APRIL 13, 2018

REPORTER:  MARISA SPALDING, CSR, RPR


Spalding Reporting Service, Inc.
1611 South Utica Avenue, Box 153
Tulsa, Oklahoma 74104
(918) 794-6399
(918) 284-2017

EXHIBIT 10

Page 17

1      Q     You were?

2      A     I had just gotten my paramedic license.

3      Q     Okay. And was Kent your supervisor?

4      A     Yes.

5      Q     Is that what you said? Why don't you just tell me before we get into the documents what you recall from that day in October when you were called to see Mr. Ellis at the jail.

9      A     We were paged out for a seizure. We left the station like normal, went to the jail, went into through the sally port like we typically always do through the jail. He was held in a pod directly to the right of the door.

All of the inmates were cleared out except for him and he was laying on a mattress in the floor of the pod. There were several jailers. I don't recall exactly how many. And the first responders were there as well.

19      Q     Okay.

20      A     He was awake and talking at this point. If I'm not mistaken, he was sitting up at this point talking. We went ahead and I -- since I was on paramedic orientation, I made patient contact. And as I always do, I walk up to my patient and introduce myself to the patient and ask him what his name is.

Page 18

```
 1   And, typically, I will ask somebody, do you mind if I
 2   check your pulse?
 3        And I checked his pulse as he's talking to me
 4   cause that gives me a very good estimation of his
 5   ABC's, which is his airway, breathing, and circulation
 6   at that point.
 7    Q   How did you check his pulse?
 8    A   By reaching out and holding his wrist.  I use
 9   the radial pulse check.
10    Q   Okay.
11    A   He was alert and oriented times four, which
12   means he knew where he was at, what was going on, his
13   date of birth, that type of thing.  He was able to --
14   he was coherent.  He said that he had had a seizure,
15   and he did not appear to be postictal at that time.
16   We continued through and asked him several questions.
17   We never could get a direct answer from him.
18        He kind of avoided questions.  He -- we took his
19   blood pressure and he told us that he felt like he was
20   dehydrated so we had taken it sitting down, so we
21   allowed him to stand up and gave him a minute to catch
22   his bearings and took his blood pressure again, which
23   is called an orthostatic test and he was negative.  He
24   did not show a drop in blood pressure from sitting to
25   standing position.
```

Page 19

```
 1        And he had a few other complaints but never really
 2   continued with the same complaint throughout.  He was
 3   getting agitated and the jailers had told him that he
 4   could not call his grandfather, which is what his main
 5   concern was throughout the call was calling his
 6   grandfather.  And they gave him the option of whether
 7   to stay at the jail and stay in a holding jail or to
 8   go with us and he chose to stay in a holding cell.
 9        Q    Who's they?
10        A    The jailers.
11        Q    Okay.
12        A    Yeah.
13        Q    What's a pre-hospital care report?
14        A    That would be an EMS report that we do for
15   our patient contact because we are considered
16   pre-hospital care.
17        Q    Okay.  And when you show up to the scene, how
18   do you fill out your -- is there a chart that you
19   start?
20        A    We have a computer that we start a run ticket
21   on it.
22        Q    Okay.  And are you documenting information
23   contemporaneously with the visit or do you do that at
24   a later time?
25        A    We do that at a later time.
```

Page 27

1  and charting information when you see a patient?
2     A   Just so you can get an accurate -- accurate
3  description of the patient's condition and what
4  happened on the call.
5     Q   And are you trained that it's important to
6  make sure that all of the information is accurate?
7     A   Yes.
8     Q   And why is it important to make sure that you
9  have accurate information in your reports?
10    A   Because you don't know what happened two
11 years ago. And if it's not in your narrative, then it
12 did not happen.
13    Q   Okay.
14    A   It's what we're taught in school.
15    Q   And that if you do document something, that
16 it needs to be the truth and accurate?
17    A   Yes.
18    Q   In your narrative that you wrote after you
19 were asked to do it the next day, you indicate that --
20 I am down here towards the bottom where it says:  One
21 of the guards then stated that he would be put into a
22 holding cell in view of the guard desk and checked on
23 every 15 minutes and if anything changed with the
24 patient, that EMS would be called back immediately,
25 correct?

Page 28

```
 1     A    Yes.
 2     Q    Do you recall being told that?
 3     A    Yes, I do.
 4     Q    If Mr. Ellis continued to suffer from
 5  seizures, would you have expected a phone call based
 6  on that conversation?
 7     A    Yes.
 8     Q    Did you ever receive a phone call?
 9     A    No.
10     Q    Did anyone at Integris, to your knowledge,
11  ever receive a phone call after you left the jail
12  regarding Mr. Ellis?
13     A    No.
14     Q    Have you had an opportunity to review the
15  jail surveillance video?
16     A    Yes.
17          MR. PAUL:  Just when she was there.
18          THE WITNESS:  Yeah, just only when I was
19  present at the jail.
20     Q    (By Mr. Smolen)  What do you -- okay.  During
21  -- what do you mean?  Explain that to me.
22     A    The time of -- I was present at the jail with
23  Mr. Ellis is the only time I reviewed.
24     Q    What did you review?
25     A    Just the events that occurred like as he had
```

Page 32

1     A    Okay.

2              MR. SMOLEN:  And it's about 20 minutes
3     long so whatever -- however you guys want to best set
4     it up to do it, we can.  So what I'm going to do is
5     I'm just going to let you guys review it and then I'm
6     going to go through and ask you about some certain
7     things, okay?

8              (Video playing)

9              (Off the record)

10             DIRECT EXAMINATION (Cont.)
11    BY MR. SMOLEN:
12    Q    Looking back at your Exhibit 5, the document,
13    your narrative that you wrote the next day when you
14    found out that Mr. Ellis became very ill, are you
15    looking at that?
16    A    Yes.
17    Q    Okay.  You state that patient was -- I'm at
18    the bottom here.  Patient was told by the guard that
19    he couldn't call his grandpa.  Patient got visibly
20    agitated at this time taking off the blood pressure
21    cuff and throwing it and getting up off the stretcher.
22    I didn't see that in the video.  Do you recall seeing
23    that in this video?
24    A    Not in the video.
25    Q    Okay.  In fact, it looks like the blood

Page 33

1  pressure cuff is taken off of him?

2      A    If you look closely, you can see when he sits

3  down on the stretcher, he does have it on his -- it

4  would be his left arm.

5      Q    Uh-huh.

6      A    And then when he stands up, he no longer has

7  it on.

8      Q    Is it your testimony that he threw the blood

9  pressure cuff sometime before that?

10     A    Yes, he was sitting on the side of the

11 stretcher when he took it off and threw it on the

12 ground.

13               (Video playing)

14               MR. SMITH:  Dan, while we're waiting, do

15 we just want to make a statement on the record about

16 the video being a zoomed in version?

17               MR. SMOLEN:  Sure.  It's a zoomed in

18 version from an AVI export feature off of the camera

19 itself.

20     Q    (By Mr. Smolen)  Why don't you scroll and

21 show me where you think that you guys were taking his

22 blood pressure for the second time.

23     A    It would be right there.  As you look

24 closely, my partner and I both are looking at the

25 monitor watching the blood pressure.

Page 37

1  lean back up with the cuff in his hand, correct?
2     A   Yes.
3     Q   Okay.  Let's look at paragraph -- well, it's
4  all one paragraph.  But about halfway down here you
5  said:  Patient was asked if he had been eating and
6  drinking like normal and he said that he had been.
7  Patient's lung sounds was oscillated at this time and
8  found to be clear and equal bilaterally.  Tell me how
9  you did that.
10    A   With a stethoscope.
11    Q   Okay.  And you were the only one that had a
12 stethoscope, right?
13    A   Correct.
14    Q   And where were you wearing your stethoscope
15 on you that day?
16    A   Around my neck is generally where I wear my
17 stethoscope.
18    Q   Okay.  And we see you with a stethoscope
19 around your neck when you walk into the facility,
20 correct?
21    A   Yes.
22    Q   So your report states that you checked his
23 breathing and his lungs bilaterally after he had had
24 his blood pressure taken for a second time, correct?
25    A   Uh-huh.

Page 38

```
 1    Q    And had been seated on the stretcher?
 2    A    Uh-huh.
 3    Q    Yes?
 4         MR. SMITH:  Is that a yes?
 5         THE WITNESS:  Yes.
 6    Q    (By Mr. Smolen)  Here's Mr. Ellis standing
 7  when you indicated he was having his blood pressure
 8  taken for a second time, right?
 9    A    Yes.
10    Q    And I'll let you just watch this and then you
11  can hit pause whenever you see yourself checking his
12  breathing with your stethoscope.
13    A    There was never even a clear time I could
14  really see the patient to tell you when.
15    Q    Right.  But I'm looking -- I've watched this
16  video, you can imagine, countless times and I don't
17  ever see stethoscope come away from your neck.
18    A    Okay.  Well, like I said, I can't see a clear
19  time because you can't really see the patient when
20  he's sitting on -- when he's on the stretcher.
21    Q    Right.  I'm not looking at the patient.  I'm
22  looking at the stethoscope around your neck, which I
23  don't ever see come off?
24         MR. SMITH:  Object to the form.
25         THE WITNESS:  Well, I can't see the
```

Page 39

1  video clear enough to tell you If it ever came off or
2  not.
3      Q   (By Mr. Smolen)  Okay.  But it's your --
4  still your testimony here under oath that you're
5  absolutely certain you took the stethoscope off and
6  listened to his breathing?
7      A   Yes, because he complained of rib pain from
8  a fall.  So, therefore, that could have caused a
9  traumatic injury, so I would have listened to breath
10 sounds on both sides to confirm that he had them.
11     Q   I don't know want to know what you would have
12 done or what you would have -- your normal protocol.
13 But as we sit here today, is it your testimony under
14 oath --
15     A   Yes.
16     Q   -- that you took your stethoscope --
17     A   Yes.
18     Q   Let me finish.  That you took your
19 stethoscope off and that you listened to his
20 breathing?
21     A   Yes.
22     Q   And it was completely normal?
23     A   Yes.
24     Q   I'll hand you what we're going to mark as
25 Exhibit 8 to your deposition.

Page 42

```
 1   his report.  Sounds were checked by paramedic.
 2                THE WITNESS:  Yeah, it does.
 3                MR. PAUL:  It does.
 4                MR. SMOLEN:  Well, let's see.  What
 5   pages are you at there?
 6                MR. GIBBS:  1674.
 7                THE WITNESS:  The fifth one down.
 8       Q    (By Mr. Smolen)  It says:  Jailer was told
 9   that patient was stable and nothing acute appeared to
10   be happening, correct?
11       A    In Kent's report, yes.
12       Q    Kent's report says:  Patient stated that he
13   was not having any trouble breathing, correct?
14   Patient did not appear to be in any respiratory
15   distress?
16                MR. PAUL:  Show her where you're looking
17   at.
18                THE WITNESS:  Yeah, I can't find it, I'm
19   sorry.
20       Q    (By Mr. Smolen)  Just go ahead and read the
21   narrative to yourself and I'll --
22                MR. PAUL:  The whole thing?
23                MR. SMOLEN:  Yeah.
24                MR. PAUL:  Okay.  Read it from the top.
25                THE WITNESS:  Do you want me to read it
```

Page 49

```
 1     Q    (By Mr. Smolen)  Okay.  Because, yeah, you
 2  specifically state:  Patient -- this is your report.
 3  Patient sat down on the side of the stretcher and
 4  stated he was dehydrated.  Patient was asked if he had
 5  been eating and drinking like normal and he stated
 6  that he had been.  Patient's lung sounds and was
 7  osculated at the time, correct?  I mean, it
 8  specifically says at this time in your report?
 9     A    Yes, it says at this time.
10     Q    Okay.  But that report is inconsistent with
11  what we see in the video, correct?
12          MR. GIBBS:  Object to the form.
13          MR. SMITH:  Same.
14          THE WITNESS:  Correct.
15     Q    (By Mr. Smolen)  Okay.  You also put in your
16  report at the end:  Patient was told by the guard that
17  he couldn't call his grandpa.  Patient got visibly
18  agitated at this time taking off the blood pressure
19  cuff and throwing it and getting up off the stretcher
20  and stated to take him to the holding cell now.
21  Patient did not sign the refusal paperwork because of
22  being placed in a holding cell; is that true?
23     A    Yes, sir.
24     Q    That the patient didn't sign the paperwork
25  because he was in a holding cell?  That part of that
```

Page 50

```
 1   is true?
 2       A    Yes, he was -- we were told he was being
 3   placed in a holding cell.
 4       Q    I want to know -- you state:  Patient did not
 5   sign the refusal paperwork because of being placed in
 6   a holding cell?
 7       A    Yes, because we had to go back to the vehicle
 8   to get our computer for him to sign and we were told
 9   he was being placed in a holding cell.
10       Q    You would agree with me Mr. Ellis never
11   signed any paperwork refusing transportation to the
12   hospital, correct?
13       A    Yes.
14       Q    Who told you that he couldn't sign that?
15       A    He was going to a holding cell is why he was
16   not able to sign it.
17       Q    Okay.  How did -- why did you not think he
18   was able to sign it?
19       A    I can't tell you that.
20       Q    Okay.  Can you tell me why he didn't sign it
21   when you guys were packing up your stuff and leaving?
22       A    The computer was in the truck.
23       Q    What computer?
24       A    Our report computer that we write all of our
25   reports on.
```

Page 58

```
 1   been peeing in a cup and someone was emptying --
 2   emptying it for him.  At this time, a guard pulled me
 3   aside and stated the patient had been walking around
 4   all day and that right before his seizure-like
 5   episode, that he had walked up to the guard station
 6   and told them he would sue them for not letting him
 7   use the phone and for the fall the previous week
 8   because of plumbing?
 9        A    Yes.
10        Q    Okay.  What else do you recall being told
11   when you were pulled to the side by the guard?
12        A    That was it.
13        Q    Okay.  And it's your testimony under oath
14   that nobody there at the jail indicated that they
15   thought Mr. Ellis was faking?
16        A    No.
17             MR. SMITH:  Let me clarify that given
18   the way the question was posed.
19             THE WITNESS:  No one at the jail told me
20   that he was faking and no one at the jail ever told me
21   not to take him either.
22        Q    (By Mr. Smolen)  Do you think that the
23   individual that wrote this statement was just making
24   that up?
25             MR. GIBBS:  Object to the form.
```

Page 64

```
 1      Q    All right.  Tell me exactly what he said to
 2   you, ma'am, and what you said to him.
 3      A    It's got profane language.
 4      Q    That's fine.
 5      A    He was talked to by the guards about whether
 6   he wanted to be placed in a holding cell or whether he
 7   wanted to go to the hospital, and he had asked to call
 8   his grandfather and that he just wanted to go to the
 9   hospital so he could call his grandfather.  And when
10   he was told he couldn't at the hospital, the patient
11   got visibly angry and said, Take me to my fucking
12   holding cell.  And took off the blood pressure cuff at
13   that time, which we have already discussed, and that
14   was the end of the conversation.
15      Q    So he did say he wanted to go to the
16   hospital?
17      A    No, he said he wanted to be taken to his,
18   curse word, holding cell.
19      Q    It's my understanding that you just testified
20   that he said that he wanted to be taken to the
21   hospital and then call his grandfather?
22      A    No, he wanted to call his grandfather when he
23   was at the hospital.
24      Q    Right.  So he wanted to go to the hospital?
25      A    But then when he was told he would not be
```

Page 108

1  that Mr. Williams put in this narrative was accurate
2  to your memory, correct?
3             MR. SMOLEN:  I'm going to object to the
4  form.
5             THE WITNESS:  Yes and no because my
6  narrative -- timelines don't -- like my narrative goes
7  in a different timeline than his does, but I would say
8  his is more accurate because it was done that day.
9             MR. SMOLEN:  Object to the form.
10 Speculation.
11    Q    (By Mr. Smith)  Other than timelines as to
12 treatment provided, is there anything else that you
13 read that strikes you as inaccurate --
14    A    No.
15    Q    -- or did not happen?
16    A    No.
17    Q    So let's go down to -- it looks like the
18 third last -- third to last line in that narrative
19 portion.  It starts with:  Jailer was told that
20 patient was stable and nothing acute appeared to be
21 happening; do you see that portion?
22    A    Yes.
23    Q    Is that portion of his report accurate?
24    A    Yes, the patient was stable.
25    Q    Do you remember who told a jailer that the

Page 109

```
 1   patient was stable?
 2       A    I do not recall.
 3       Q    But you don't have reason to disagree with
 4   Mr. Williams that a jailer was told that the patient
 5   was stable and nothing acute appeared to be happening?
 6                MR. SMOLEN:  Object to the form.
 7                THE WITNESS:  No, I do not.
 8       Q    (By Mr. Smith)  According to your assessment,
 9   the patient was stable, correct?
10       A    Correct.
11       Q    According to your assessment, the patient did
12   not show signs of any acute illness, correct?
13       A    Correct.
14       Q    So plaintiff's counsel asked you some
15   questions about the report template and how things
16   were phrased in the report.  But aside from the
17   template, based on your assessment, did you have any
18   opinion that Mr. Ellis was suffering from any serious
19   medical condition at the time of your visit?
20                MR. SMOLEN:  Object to the form.
21                THE WITNESS:  Per my assessment, no.
22       Q    (By Mr. Smith)  His vitals were normal,
23   correct?
24       A    Yes.
25                MR. SMOLEN:  Object to the form.
```

Page 110

1    Q    (By Mr. Smith)  Was there anything that
2    signaled to you that Mr. Ellis was in a dire medical
3    condition at that point in time?
4              MR. SMOLEN:  Object to the form.
5              THE WITNESS:  No.
6    Q    (By Mr. Smith)  So plaintiff's counsel asked
7    you if you ever arrived at a diagnosis.  Do you
8    remember that question?
9    A    Yes.
10   Q    I believe your testimony was, no; is that
11   right?
12   A    Yes.
13   Q    Explain what you meant by that.
14   A    As a paramedic, we do field impressions.  We
15   do not do diagnoses because we don't have labs and
16   x-rays and CT scans and all of that stuff.  We cannot
17   make a definitive diagnosis.  We can make an
18   impression.
19   Q    And so for the record, you meant that you did
20   not arrive at a definitive condition that you felt
21   Mr. Ellis to have at that point?
22   A    Yes.
23   Q    But you did have an impression of his
24   condition, correct?
25             MR. SMOLEN:  Object to the form.