```
           IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1) MEGAN CAPEL, Administratix,
of the Estate of Terral Brooks
Ellis, II, Deceased,
(2) TERRAL B. ELLIS, SR., and
(3) SHELLY BLISS,
        Plaintiffs,

Vs.
                               CIV-17-325-JED-FHM

OTTAWA COUNTY BOARD OF COUNTY
COMMISSIONERS, et al,
        Defendants.
```

VIDEO DEPOSITION OF
CHARLES SHOEMAKER

DATE:  NOVEMBER 21, 2019

REPORTER:  MARISA SPALDING, CSR, RPR

Spalding Reporting Service, Inc.
1611 South Utica Avenue, Box 153
Tulsa, Oklahoma 74104
(918) 284-2017

EXHIBIT 11

74

```
 1        A    Yes.

 2        Q    Okay.  Was he a supervisor?

 3        A    No.

 4        Q    Okay.  Just a jailer?

 5        A    Just a jailer.

 6        Q    A subordinate to you, correct?

 7        A    Yes.

 8        Q    And also subordinate to shift supervisor

 9   position?

10        A    Yes.

11        Q    Okay.  So this is the 22nd at 8:18 in

12   the morning.

13                 (Video playing)

14        Q    When you went back and watched the video

15   on the 22nd, do you think you just started it at

16   the time you were there or do you think you went

17   back further and watched these portions?

18        A    When -- Wiford done a pass down with me

19   and said -- stated he got up to use the bathroom

20   and get a drink of water a couple of times.

21   Yes, he was a sergeant.  But, likewise, while

22   reviewing video, I don't really go -- you fast

23   forward it; do you see what I'm saying?  So that

24   you verbally get to see something happening.

25        That's -- I wasn't looking for words.  I was
```

75

1    looking for, okay, well, Wiford said that right

2    here, he got up at this time.   Our cameras are

3    maybe ten minutes off maybe.   Oh, yep, there he

4    goes.

5         Q    Okay.

6         A    Then he said it around here.   Okay, so

7    he did.

8         Q    Okay.

9         A    I confirmed it on camera.

10        Q    Okay.   But were you just spot checking

11   it?   I mean, did you go --

12        A    Yeah, just spot checking --

13        Q    Okay.

14        A    -- just to make sure he did get up, make

15   sure he did go use the bathroom or whatever --

16   utilize in that room.   Whether if it was

17   drinking or utilizing the bathroom, I don't

18   know.

19        Q    Okay.   So let's watch this and see if it

20   was something.

21             (Video playing)

22        Q    Did you see you Mr. Ellis start

23   screaming help?

24        A    Yes.

25        Q    Okay.   I want to go back up and see if

1    we can hear what you say there.  What I'm

2    hearing you say:  Is we did this yesterday,

3    you're not selling me?

4         A    No.

5         Q    Okay.  Let's see if we can hear it.

6              (Video playing)

7         Q    Were you able to hear?

8         A    I heard the word yesterday.

9         Q    Okay.  You didn't hear the part that

10   says you're not selling me?

11        A    No, that's not my language.

12        Q    What did you say?

13        A    That I remember and recall, at this

14   point, I remember getting communication from him

15   for what it is.  I said:  What -- what is it?

16   And he says that he needs help.  I said:  Okay.

17   And then I told him that I will contact the

18   nurse right now.

19        Q    Okay.  I didn't hear that part.  Let me

20   see about that part.

21              MR. SMOLEN:  Can you play this part

22   where it says we're not calling the ER?  It's

23   like right after that.

24              (Video playing)

25        Q    (By Mr. Smolen)  Were you able to hear

77

1    you state we're not calling the ER?

2        A    I heard ER, yes.

3        Q    And that we're not calling the ER?

4        A    Play it one more time.

5                (Video playing)

6        A    Okay.

7        Q    You told Mr. Ellis that we're not

8    calling the ER, correct?

9        A    Correct.

10       Q    Okay.  He was begging for help, correct?

11       A    He -- he was asking for help.

12       Q    Okay.  You didn't think he was begging

13   for it?

14       A    No, he was asking for help.

15       Q    Okay.  What could he have done more to

16   let you know that he needed help?  Tell the jury

17   what Mr. Ellis needed to do to let you send him

18   to the hospital.

19       A    I didn't see anything wrong with him.

20       Q    Are you a doctor?

21       A    Did not think that he was faking it, but

22   I needed to consult with medical.

23       Q    Okay.  But you told him you're not

24   sending him to the ER.  You didn't say I need to

25   consult with medical, did you?

88

1  talking about, if you're having a seizure right

2  now, you could not be speaking to me.

3      Q    Okay.   Was there discussion that Mr.

4  Ellis was faking seizures?

5      A    There wasn't a discussion of it.

6      Q    What would you call it?

7      A    Well, when EMS tells you that you cannot

8  speak to me while you are having a seizure right

9  now, then it's just -- it's not happening.

10     Q    And so was it based on that conversation

11 that the decision was made not to send Mr. Ellis

12 to the hospital?

13             MS. BENNETT:   Object to the form.

14             THE WITNESS.   That was not my

15 choice.

16     Q    (By Mr. Smolen)   I'm asking you, after

17 the conversation that you participated in about

18 the about the seizure activity with EMS, is it

19 after that conversation that a decision was made

20 not to send him to the hospital?

21             MS. BENNETT:   Object to the form.

22             THE WITNESS:   I don't know about the

23 decision.   I wasn't present for the decision.

24     Q    (By Mr. Smolen)   Okay.   You know at some

25 point after the conversation that you had with

106

1   And her answer was:  Yes, I did but it was -- I

2   guess according to the jail administrator, it

3   was necessary at times.

4        And then I asked her:  When did the jail

5   administrator teach you that it would be

6   necessary to use the D ring?  She says:  He

7   didn't.  And then I asked her:  But you

8   understood it to be used for some form of

9   discipline?  And her answer was yes, okay?

10       A    Okay, yes.

11       Q    So she and I -- and then you could hear

12  her in the video threaten the D ring to Mr.

13  Ellis, and you were present when she did that,

14  correct?

15       A    Yes.

16       Q    Okay.  How long had Mr. Ellis been on

17  the D ring?

18       A    He never was.

19            MS. GOOCH:  Object to the form.

20       Q    (By Mr. Smolen)  Why does she state to

21  him you're going back on the D ring if he hadn't

22  been on it?

23            MR. WOOD:  Object --

24            THE WITNESS:  I don't know why she

25  did.

```
1              MR. WOOD:   Object to form.
2         Q    (By Mr. Smolen)   Do you know whether he
3    was on the D ring prior to your shift?
4         A    He never was.
5         Q    How do you know that?
6         A    Because I would have saw a report of
7    stating inmate so and so was placed on the D
8    ring at this time and removed at this time.
9         Q    Okay.  But we don't even have your
10   disciplinary report in your file, agreed?
11        A    No, no, reports from jailers --
12        Q    Well --
13        A    -- would have sent it to the office and
14   I would have received it.
15        Q    Unless you were present when he was
16   placed on it?
17        A    And he was never placed on it, to my
18   knowledge.
19        Q    To your knowledge?
20        A    Yes, sir.
21        Q    You'd understand that someone could
22   listen to that video and hear her say:  You're
23   going back on the fucking D ring and come to the
24   conclusion -- conclusion that he had been on the
25   D ring prior to her making that statement?
```

126

```
 1  here in a minute.
 2      A   Okay, that's fine.
 3      Q   So I want you to be crystal clear about
 4  why you put in your report what you put in your
 5  report.
 6      A   I put in my report because I have people
 7  to proofread it.
 8      Q   Okay.  Sir, we're going to watch the
 9  video here in a minute.  Isn't it true that you
10  sat at a desk while Nurse Horn told you what to
11  put in that report?
12          MR. GIBBS:  Object to the form.
13          THE WITNESS:  Let's watch it --
14      Q   (By Mr. Smolen)  Okay.
15      A   -- before I answer.
16      Q   Let's -- let's -- we're going to get to
17  it, but I got -- I have another tee -- a clip
18  teed up because I do want to see what you were
19  doing at 9:00, okay --
20      A   Okay.
21      Q   -- based on your entry.  But we -- I'm
22  going to give you an opportunity to explain the
23  report.
24          (Video playing)
25      Q   (By Mr. Smolen).  It's a nine-minute
```

127

```
1   clip so let's break it down.  Okay, start at the
2   beginning.  That's you sitting at the desk,
3   right?
4        A    Yes.
5        Q    Okay.  And who is the other worker?
6        A    Travis Eads.
7        Q    Okay.  This is what I hear in the video,
8   okay, just so you can tell me if you hear the
9   same thing.  I hear Ellis say:  Can I get some
10  water, sir?  I hear Eads say:  What?  Water?  I
11  hears Ellis say:  Yeah.
12       I hear Eads say:  Yeah, I'll get you some
13  water.  I hear you say, no, he can -- he can get
14  up and he can go get it.  He did it last night.
15  Don't let him try to fool you.  I hear Eads say:
16  All right, I guess you've got to get up and go
17  get it if you want it.
18       I hear Eads ask Mr. Ellis:  You want to get
19  up and get it?  I hear Eads say:  Well, I'll
20  leave the door open for a couple of minutes
21  until we've got to start pulling people, but
22  I'll give you a little time.  We see Eads open
23  the door.  So we'll watch that first part of the
24  clip, okay?
25                 MR. GIBBS:  Object to the question
```

128

1  being asked.

2          (Video playing)

3      Q   (By Mr. Smolen)  Were you able to hear

4  that?

5      A   Yes.

6      Q   Okay.  Do you dispute saying to

7  Mr. Eads:  No, he can.  He can get up and he can

8  go get it.  He did it last night.  Don't let him

9  try to fool you?

10     A   Yes.

11     Q   But you've sat here and told me under

12 oath that not a single time did you think Mr.

13 Ellis was faking, correct?  Oh, you dispute

14 that?  You dispute making the statement?

15     A   No, I do not dispute it.

16     Q   Okay.  You said -- and we can hear.

17 This one is pretty clear.  No, he can.  He can

18 get up.  He can go get it.  He did it last

19 night.  Don't let him try to fool you.  You

20 heard that, correct?

21     A   Yes.

22     Q   You recall making the statement now?

23     A   Yes.

24     Q   Okay.  You've testified here under oath

25 that at no point in time during Mr. Ellis'

167

1    A    Let me go get him and I'll bring him to

2  your office.

3    Q    Okay.  So you said:  You don't even have

4  to get up?  I'll go --

5    A    I'll go get him, bring him down here.

6    Q    Okay.  And so you go down there and you

7  open the cell door again and what do you see?

8    A    I see him laying down.

9    Q    Okay.

10    A    And I tried talking to him and no

11  response.  I could hear him but he wouldn't give

12  me a verbal command.

13    Q    Okay.

14    A    I went and got the jail nurse.

15    Q    Okay.  She says:  When entering H1,

16  inmate appeared to be in respiratory distress

17  but still responsive and answered when asked

18  what his name was.  Did that happen?

19    A    I was utilizing the phone.  I don't know

20  what happened when she had walked in.

21    Q    Okay.  She says speech slightly garbled,

22  eyes were petechiae, pupils were pinpoint at

23  fixed, head and neck hyperextended, neck area

24  red with what looked like may have been ligature

25  marks, skin cool to the touch, responded in pain

207

1   wasn't going to do anything at the time and

2   there wasn't any reason for him to go, and he

3   rips his cuff off very agitated and says:  Take

4   me to my holding cell.

5        And at that time, I walk off and walk behind

6   Jeff Harding and -- I let medical do their job.

7   I don't -- I don't get in the way with them.  I

8   don't say anything.  If they ask me a question

9   direct, I'll answer it, but I just let them do

10  their job.

11       Q    So is that all you recall then hearing

12  and/or observing while you were in that pod with

13  Inmate Ellis and the EMT's?

14       A    At the end of it, yes.  I wasn't there

15  for the beginning.

16       Q    And have you seen Exhibit 6, I believe

17  it is?  It's the first responder report.  It's

18  Plaintiff's Exhibit 6.  If you have it down

19  there, if you'll look at it.  If not, I can

20  throw you this copy.

21            MR. WOOD:  Is that in this pile?

22       Q    (By Ms. Bennett)  While you're looking

23  for that, did you hear any explanation from the

24  EMT's why they weren't -- you said they were

25  telling him they weren't going do take him; is

208

 1   that what you said?

 2        A    Yes.

 3        Q    Did you hear an explanation?

 4        A    They just said that they didn't see any

 5   reason.  Vitals was fine.  He was coherent.  He

 6   was talking with them.  And after the EMT's

 7   left, he -- he had just walked down to book-in.

 8   If -- if -- I'm sorry, I can't remember if he

 9   walked, but I know he did walk to H1.

10        Q    Sure.  And prior to him walking to H1,

11   you saw him rip off blood pressure cuff and say:

12   Take me to the holding cell; is that correct?

13        A    It was in a pod when he did that.

14        Q    While the EMT's were there?

15        A    Yes.

16        Q    Yes, okay.  Now you have Exhibit 6 in

17   front of you?

18        A    Yes.

19        Q    Okay.  If you'll just look at Page 2.

20        A    Are we looking under remarks?

21        Q    Sure.  And I'll -- I'll start.  It says

22   patient -- it's more than halfway down on that

23   -- your remarks page.  Patient said that he had

24   seen the jail nurse due to pain -- due to the

25   pain in his back.  Patient was not sure if he

210

```
 1              MS. GOOCH:  I just have a few
 2   questions.
 3                    CROSS-EXAMINATION
 4   BY MS. GOOCH:
 5      Q   Did you ever have any conversations with
 6   Sheriff Terry Durborow while you were the
 7   assistant jail administrator regarding any
 8   concerns you had with -- about Theresa Horn?
 9      A   No.
10      Q   You weren't trained to falsify logs,
11   right?
12              MR. SMOLEN:  Objection to the form.
13              THE WITNESS:  No.
14      Q   (By Ms. Gooch)  You weren't trained to
15   refuse an inmate's medical -- an inmate's
16   request for medical attention, right?
17              MR. SMOLEN:  Objection to the form.
18   If we're going to get into this, I'm going to
19   get into the insurance policy because you guys
20   opened the door for it right now with what
21   you're doing to him.
22              MS. GOOCH:  I'm disregarding
23   anything you said at the moment.  I'm asking the
24   questions I want to ask.
25      Q   (By Ms. Gooch)  I think the question I
```