IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1)  ROBBIE EMERY BURKE, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.  CIV-17-325-JED-FHM |
| | ) | |
| (1)  JEREMY FLOYD, SHERIFF OF | ) | |
| OTTAWA COUNTY, in his | ) | |
| official capacity, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

## DEFENDANT DURBOROW'S MOTION AND BRIEF FOR SUMMARY JUDGMENT

---

Ambre C. Gooch, OBA No. 16586
COLLINS, ZORN, & WAGNER, P.C.
429 N.E. 50th Street, Second Floor
Oklahoma City, OK  73105-1815
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
E-mail: acg@czwlaw.com

ATTORNEY FOR DEFENDANT
TERRY DURBOROW

December 13, 2019

## **TABLE OF CONTENTS**

**PAGE**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii - iv

LIST OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v - vi

LCvR 56.1(b) STATEMENT   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STANDARD OF REVIEW FOR SUMMARY JUDGMENT   . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.     PLAINTIFF CANNOT ESTABLISH SUPERVISORY
       LIABILITY WHERE DURBOROW WAS NOT DELIBERATELY
       INDIFFERENT TO DECEDENT'S SERIOUS MEDICAL NEEDS   . . . . . . . . . . . . . 12

II.    DURBOROW IS ENTITLED TO QUALIFIED IMMUNITY   . . . . . . . . . . . . . . . . . . . 17

CONCLUSION   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITY

**PAGE**

**CASES**

*Adkins v. Rodriguez*, 59 F.3d 1034 (10th Cir. 1995)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998)  . . . . . . . . . . . . . . . . . . . . . . . 11

*Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)  . . . . . . . . . . . 18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Berry v. City of Muskogee, Oklahoma*, 900 F.2d 1489 (10th Cir. 1990)  . . . . . . . . . . . . . . . . . 14

*Board of County Commissioners of Bryan County, Oklahoma v. Brown*,
520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Brousseau v. Haugen*, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)  . . . . . . . . . . . . . . . . . . . . . . . . 18

*Celotext Corp. v. Catrett*, 477 U.S. 317 (1986)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)  . . . . . . . . . 14

*Conaway v. Smith*, 853 F.2d 789 (10th Cir. 1988)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 (10th Cir. 1994)  . . . . . . . . . . . . . . . . . . 11

*Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Estate of Booker v. Gomez*, 745 F.3d 405 (10th Cir. 2014)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Estelle v. Gamble*, 429 U.S. 97 (1976)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Farmer v. Brennan*, 511 U.S. 825 (1994)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Gomes v. Wood*, 451 F.3d 1122 (10th Cir. 2006)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Hall v. Bellmon*, 935 F.2d 1106 (10th Circ. 1991)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Hinton v. City of Elwood, Kan.*, 997 F.2d 774 (10th Cir. 1993)  . . . . . . . . . . . . . . . . . . . . . . . . 18

*Hunt v. Uphoff*, 199 F.3d 1220 (10th Cir. 1999)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hunter v. Bryant*, 502 U.S. 224, 112 S.Ct 532, 537, 116 L.Ed.2d 589 (1991)  . . . . . . . . . . . . 17

*Jenkins v. Wood*, 81 F.3d 988 (10th Cir. 1996)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Martinez v. Beggs*, 563 F.3d 1082 (10th Cir. 2009)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*McClelland v. Facteau*, 610 F.2d 693 (10th Cir. 1979)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Mick v. Brewer*, 76 F.3d 1127 (10th Cir. 1996)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Mitchell v. Maynard*, 80 F.3d 1433 (10th Cir. 1996)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Murrell v. School Dist. No. 1, Denver, Colo.,* 186 F. 3d 1238 (10th Cir. 1999)  . . . . . . . . 12, 17

*Novitsky v. City of Aurora*, 491 F.3d 1244 (10th Cir. 2007)  . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Oxendine v. R.G. Kaplan, M.D.*, 241 F.3d 1272 (10th Cir. 2001)  . . . . . . . . . . . . . . . . . . . 14, 15

*Pahls v. Thomas*, 718 F.3d 1210 (10th Cir. 2013)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Perry v. Durborow*, 892 F.3d 1116, 1123 (10th Cir. 2018)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Rizzo v. Goode*, 423 U.S. 362, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976)  . . . . . . . . . . . . . . . . . . 12

*Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464 (D. Colo. 1996)  . . . . . . . . . . . . . . . . . . 11

*Sample v. Diecks*, 885 F.2d 1099 (3rd Cir. 1989)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)  . . . . . . . . . . . . . 17, 18

*Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760 (10th Cir. 2013)  . . . . . . . . . 13

*Siegert v. Gilley*, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)  . . . . . . . . . . . . . . . 18

*Whitley v. Albers*, 475 U.S. 312 (1986)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Wilson v. Layne*, 526 U.S. 603 (1999)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Woodward v. City of Worland*, 977 F. 2d 1392 (10th Cir. 1992)  . . . . . . . . . . . . . . . . . . . . . . . . 12

*Ying Jing Gan v. City of New York*, 996 F.2d 522 (2d Cir. 1993)  . . . . . . . . . . . . . . . . . . . . . . . 17

- iii -

**STATUTES**

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14, 16, 17, 18

**RULES**

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

LCvR 56.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

<u>**EXHIBITS TO DEFENDANT DURBOROW'S MOTION FOR SUMMARY JUDGMENT**</u>

Ex. 1          Booking sheet, medical intake, and property intake pages for T. Ellis

Ex. 2          Progress Notes for T. Ellis     (SEALED)

Ex. 3          Excerpts of the Deposition of Jeff Harding taken on November 15, 2019

Ex. 4          Excerpts of the Deposition of Theresa Horn taken on October 8, 2019

Ex. 5          Lawson's incident report re T. Ellis

Ex. 6          Bray's incident report re T. Ellis

Ex. 7          Excerpts of the Deposition of Johnny Bray taken on November 20, 2019

Ex. 8          EMS Records re T. Ellis     (SEALED)

Ex. 9          First Responders Report dated October 21, 2015   (SEALED)

Ex. 10         Excerpts of the Deposition of Jennifer Grimes taken on April 13, 2018

Ex. 11         Excerpts of the Deposition of Charles Shoemaker taken on November 21, 2019

Ex. 12         Inmate Welfare Check Sheet re T. Ellis

Ex. 13         OCJ Policy re Surveillance of Holding Cells     (SEALED)

Ex. 14         Derwin's supplemental report re T. Ellis

Ex. 15         Excerpts of the Deposition of Derek Derwin taken on September 25, 2019

Ex. 16         Bray's incident report #2 re T. Ellis

Ex. 17         Shoemaker's incident report re T. Ellis

Ex. 18         INTEGRIS Records re T. Ellis   (SEALED)

Ex. 19         ME Report re T. Ellis     (SEALED)

Ex. 20         OCJ Policy re Health Appraisal     (SEALED)

Ex. 21         OCJ Policy re Medical Services     (SEALED)

Ex. 22          OCJ Policy re  Non-Emergency Care & Medical Complaints   (SEALED)

Ex. 23          OCJ contract with A. Fox for July 2015 to July 2016

Ex. 24          OCJ Policy re Emergency Medical Care   (SEALED)

Ex. 25          Excerpts of the Deposition of Terry Durborow taken on November 18, 2019

Ex. 26          OCJ Policy re Staff Training   (SEALED)

Ex. 27          OCJ Jailer Training Records for 2015    (SEALED)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1)  ROBBIE EMERY BURKE, et al.          )
                                         )
                Plaintiffs,              )
                                         )
v.                                       )          Case No.  CIV-17-325-JED-FHM
                                         )
(1)  JEREMY FLOYD, SHERIFF OF            )
     OTTAWA COUNTY, in his               )
     official capacity, et al.,          )
                                         )
                Defendants.              )

## DEFENDANT DURBOROW'S MOTION AND BRIEF FOR SUMMARY JUDGMENT

Decedent Terrall Ellis was incarcerated in the Ottawa County Jail from October 10-22, 2015.  He died at Integris Baptist Regional Hospital in Miami, Oklahoma, following his transport there from the Ottawa County Jail.  Plaintiff Estate has sued multiple Defendants, some are current or former employees or elected officials of Ottawa County, others are medical providers associated with Integris Baptist Regional Hospital.  Defendant Durborow was the Sheriff when Decedent was incarcerated in the Ottawa County Jail.  Plaintiff Estate[1] alleges that Durborow was deliberately indifferent to Decedent's serious medical needs.  Defendant Durborow requests that the Court enter summary judgment in his favor pursuant to Fed. R. Civ. P. 56, for the reasons stated in the following Brief:

## LCvR 56.1(b) STATEMENT

Pursuant to LCvR 56.1(b), Defendant Durborow asserts that there is no genuine dispute as to the following material facts:

1.      On October 10, 2015, Decedent Terral Ellis was booked into the Ottawa County Jail ("OCJ"). At time of his booking, a medical history was taken for Ellis in which he disclosed

---

[1] Plaintiffs Terral Ellis, Sr. and Shelly Bliss have asserted no causes of action against Harding.

that he had asthma for which he took albuterol, but no other current medical conditions, medical treatments, or injuries. He did not have asthma medication in his possession (Ex 1, Booking sheet, medical intake, and property intake pages for T. Ellis).

2.      On Saturday, October 17, 2015, OCJ Nurse Theresa Horn received a call from the jail advising that Ellis was complaining that he thought he had broken his back. The jailer asked Ellis what had happened and Ellis stated he thought it was from sleeping on a hard bunk.  Ellis was mobile and denied having fallen or receiving any other injuries. Horn advised the jailer to give Ellis ibuprofen and that she would check on him the following Monday. (Ex. 2, Progress Notes for T. Ellis).

3.      On Monday, October 19, 2015, Elis was brought to the Nurse's office. Ellis advised Horn that he had pain in the middle of his back and he thought it might be kidney stones. Horn examined him and noted tenderness on the left side of his spine at T-3/T-4 with a slight protrusion at T-4. Horn advised Ellis that it appeared to be a dislocated rib. Horn allowed Ellis to call his grandfather to see if he would pay for a chiropractor appointment. Horn advised Jail Administrator Jeffrey Harding that she was allowing Ellis to make this call. There was no response from Ellis's grandfather so Ellis left a message. Horn gave Ellis two tablets of Ibuprofen and advised him that she would make an appointment for him to see the physician assistant. (Ex. 2, Progress Notes for T. Ellis; Ex. 3, Harding Depo., p. 45:1-7; Ex. 4, Horn Depo., p. 105:1-21; p. 108:1-11).

4.      On October 21, 2015, at approximately 4:30 p.m., Jailers Johnny Bray and Curtis Lawson responded to a call from housing unit D of inmate experiencing a medical condition. When they arrived, they found Ellis, who appeared to be having a seizure. Lawson attempted to speak to Ellis to get him to respond and supported his head so he would not bang it on the

2

ground. Bray notified the dispatcher to contact Horn and advise her of the situation. Horn instructed the jailers to call EMS. Bray then ordered the other inmates in the pod to relocate to the recreation yard to provide space and safety for the EMS crew to work. (Ex. 2, Progress Notes for T. Ellis; Ex. 5, Lawson's incident report re T. Ellis; Ex. 6, Bray's incident report re T. Ellis; Ex. 7, Bray Depo., p. 66:22 – p. 68:14; p. 69:10-12).

5.      EMS was called to the jail at approximately 4:37 p.m. to respond to a possible seizure. When EMS arrived, Ellis was alert and advised the EMS techs that he had had two seizures. Ellis further advised them that he was having some pain in his ribs on his right side. When Ellis voiced his concern that his ribs might be broken, the EMS techs advised him that there was really nothing which could be done for broken ribs besides wrapping them. The EMS techs took Ellis's vital signs twice, noted no apparent acute medical concerns, and advised the jailers that Ellis was in stable condition, that no treatment was required, and that they were not going to transport him. At that time, Jail Administrator Jeffrey Harding, acting on the advice of Horn via telephone, instructed Bray and Lawson to place Ellis in holding cell H-1 and to monitor him for any further symptoms. (Ex. 8, EMS Records re T. Ellis; Ex. 9, First Responders Report dated October 21, 2015; Ex. 6, Bray's incident report re T. Ellis; Ex. 3, Harding Depo., 102:6-13; p. 103:4-10, p. 104:4 – p. 105:13; p. 108:12-16; p. 135:23 – p. 136:12; Ex. 10, Grimes's Depo., p. 17:9 – p. 18:25; p. 37:3 – p. 39:23; p. 42:8-11; p. 108:19 – p. 109:13; p. 110:1-5; Ex. 11, Shoemaker Depo., p. 207:1-4; p. 207:24 – p. 208:6).

6.      Ellis advised that the nurse had given him Ibuprofen for his pain and had let him call his grandpa. Ellis stated that he wanted to call his grandpa and, if he could call his grandpa, he wanted to be left alone. The jailer advised the EMS techs that Ellis would be placed in a holding cell in view of the booking desk and checked on every 15 minutes and that, if his

condition changed, EMS would be called back immediately. (Ex. 8, EMS Records re T. Ellis; Ex. 10, Grimes's Depo., p. 27:18 – 28:3).

7.      The jailer told Ellis that he could not call his grandpa. Ellis then became visibly agitated, throwing down the blood-pressure cuff, getting up off the stretcher, and demanding the jailer to take him to the holding cell now. Ellis did not sign the EMS refusal paperwork. (Ex. 8, EMS Records re T. Ellis; Ex. 10, Grimes's Depo., p. 19:1-6; p. 32:17 – p. 33:12; p. 49:15 – p. 50:13; p. 58:13-21; p. 64:5-18; Ex. 11, Shoemaker Depo., p. 88:3-5; p. 207:1-4; Ex. 7, Bray Depo., p. 88:4-5; p. 91:9-10).

8.      No one at the jail told the EMTs that Ellis was faking and no one told the EMTs not to take him to the hospital. (Ex. 8, EMS Records re T. Ellis; Ex. 10, Grimes's Depo., p. 19:1-6; p. 32:17 – p. 33:12; p. 49:15 – p. 50:13; p. 58:13-21; p. 64:5-18; Ex. 11, Shoemaker Depo., p. 88:3-5; p. 207:1-4; Ex. 7, Bray Depo., p. 88:4-5; p. 91:9-10).

9.      Ellis was placed in holding cell H-1 for medical observation on October 21, 2015 at approximately 4:45 p.m. where he was supposed to be visually observed every 15 minutes. However, subsequent investigation determined that various jailers did not check on Ellis from 9:00 p.m. to 10:00 p.m. on October 21, 2015 and from 1:15 p.m. to approximately 1:45 p.m. on October 22, 2015, all in contradiction to what they noted on the observation log. (Ex. 12, Inmate Welfare Check Sheet re T. Ellis; Ex. 13, OCJ Policy re Surveillance of Holding Cells; Ex. 14, Derwin's supplemental report re T. Ellis).

10.     According to Jail video, on October 21, 2015, at approximately 8:18 p.m., Ellis was let out of his cell to use the bathroom. Under his own power, Ellis walks to the bathroom and then back to the cell with a cup in his hand. Ellis does not appear to have any difficulty walking and does not appear to be in any distress. (Ex. 15, Derwin Depo., p. 185:6 – p. 186:9).

11.     On October 21, 2015, at approximately 10:00 p.m., jailers Bray and Lawson responded to a call for assistance from Ellis. Ellis told them that he was having a hard time moving, that he was still in pain, and that he felt he was going numb form the waist down. Bray called Horn and told her about Ellis's complaints. Horn advised him that EMS had already been in to see him and that he needed to get up and move around and to utilize the bathroom himself. She further advised him that, if he needed anything for pain, to give him some over-the-counter pain relief and that she would be in to see him the following morning. (Ex. 16, Bray's incident report #2 re T. Ellis; Ex. 7, Bray Depo., p. 153:5 – p. 155:6).

12.     According to Jail video, on October 22, 2019, at approximately 1:37 a.m., Ellis was let out of his cell to use the bathroom. Under his own power, Ellis walks to the bathroom and then back to the cell with a cup in his hand. Ellis does not appear to have any difficulty walking and does not appear to be in any distress. (Ex. 15, Derwin Depo., p. 188:2 – p. 191:10).

13.     According to Jail video, on October 22, 2019, at approximately 3:23 a.m., Ellis was let out of his cell to use the bathroom. Under his own power, Ellis walks to the bathroom and then back to the cell with a cup in his hand. Ellis does not appear to have any difficulty walking and does not appear to be in any distress. (Ex. 15, Derwin Depo., p. 193:2 – p. 194:9).

14.     On October 22, 2019, between approximately 8:30 a.m. and 8:43 a.m., Ellis repeatedly called out for help and requested jailers to call the E.R. Shoemaker told him that they were not calling the E.R. (Ex. 11, Shoemaker Depo., p. 74:11 – p. 77;14).

15.     On October 22, 2019, at approximately 9:00 a.m., Ellis asked jailer Eads for a drink of water, and Eads said he would get him some water. However, Shoemaker told Eads that Ellis could get up and get it himself. Eads left the cell door open for Ellis to go get water if he wanted. (Ex. 11, Shoemaker Depo., p. 126:16 – p. 128:10).

16. On October 22, 2015, at approximately 10:45 a.m., Horn got into a heated exchange with Ellis. Ellis claimed that he could he not move his legs and asked Horn to look at his legs, claiming that they were turning black. Horn refused to look at his legs, yelled that they were not black, that there was nothing wrong with him, and that she was sick and tired of dealing with him. Horn also threatened to punish Ellis by chaining him to the D-ring in the floor of the cell if he kept complaining about his medical condition. (Ex. 4, Horn Depo., p. 124:5 – p. 127;17; p. 131:13 – p. 136:23; p. 137:1 – p. 138:25).

17. Defendant Harding was not present at the time of the interactions in ¶¶ 9-16 between the jailers, Horn, and Ellis. (Ex. 3, Harding Depo., p. 192:3-15).

18. Ellis was not deprived of the access to the restroom or deprived of water. (Ex. 15, Derwin Depo., p. 194:2-15).

19. October 22, 2015, at approximately 1:45 p.m., jailer Shoemaker was conducting a check on Ellis and observed that his feet and hands were slightly discolored. Shoemaker opened the cell door to further check on him on noticed his arm was cold to the touch. Shoemaker immediately requested Horn to come to the cell to look at Ellis. She directed Shoemaker to call EMS. Horn found Ellis to be respiratory distress, but responsive. She was unable to obtain a blood pressure reading from either arm. (Ex. 17, Shoemaker's incident report re T. Ellis; Ex. 2, Progress Notes for T. Ellis; Ex. 11, Shoemaker Depo., p. 167:6-20).

20. When EMS arrived, Ellis was awake and talking. At approximately 2:14 p.m., Ellis suddenly became unresponsive and went into asystole. The EMS techs gave him epinephrine, intubated him, and started chest compressions. EMS then transported Ellis to INTEGRIS Baptist Regional Health Center where he was pronounced dead. The manner of

Ellis's death was determined to be natural and caused by sepsis/septic shock due to acute bronchopneumonia. (Ex. 18, INTEGRIS Records re T. Ellis; Ex. 19, ME Report re T. Ellis).

21.     The OCJ has a policy requiring a preliminary health screening to be completed for each incoming inmate at the time of booking. The booking officer would go through some medical questions with the incoming inmate and take a medical history. The policy requires the inmate's health history to be filed in the inmate's medical file in the jail's medical office. (Ex. 20, OCJ Policy re Health Appraisal;  Ex. 3, Harding Depo., p. 64:23 – p. 66:25; p. 201:16 – p. 203:25).

22.     The OCJ has a policy which provides that inmates are entitled to health care comparable to that available to citizens in the surrounding community, and which prohibits jailers and other employees from ever arbitrarily or summarily denying an inmate's request for medical services. The policy further provides that a schedule for sick call will be established and published to the inmates, and that emergency medical care is available through the emergency room. (Ex. 21, OCJ Policy re Medical Services).

23.     The OCJ has a policy which provides that inmates are entitled to make medical complaints for review by qualified medical personnel to insure appropriate medical attention. The policy provides for the daily collection of inmate medical requests for referral to either the hospital emergency room as the jail nurse may deem appropriate or to the regularly scheduled sick call visit by the facility physician. (Ex. 22, OCJ Policy re Non-Emergency Care & Medical Complaints).

24.     At the time of Ellis's incarceration, the Ottawa County Sheriff's Office contracted with Certified Physician Assistant (PA-C), Aleta Fox to come to the jail once a week to conduct inmate medical exams and to remain on-call at all times for consultation for any inmate medical

emergencies. (Ex. 23, OCJ contract with A. Fox for July 2015 to July 2016; Ex. 3, Harding Depo., p. 38:23 – p. 39:3; p. 77:2 – p. 78:13).

25.     Horn was responsible for the day-to-day medical care of the inmates. She would see inmates with medical complaints first and, if she was unable to provide treatment, she would call PA-C Fox to come to the jail to see the inmate. (Ex. 3, Harding Depo., p. 38:23 – p. 39:20; Ex. 4, Horn Depo., p. 40:14 – p. 44:2).

26.     The OCJ has a policy providing that inmate emergency medical care is available 24 hours a day. The policy requires jailers to remain alert for emergency medical situations and to be trained to respond thereto, and defines medical emergency situations including unconsciousness, serious breathing difficulties, and health or life threatening situations. The policy requires jailers encountering inmate medical emergencies to immediately notify the supervisor on duty and request assistance in rendering first aid. The policy also requires the jailer to notify the nurse or to contact an ambulance if no nurse is on duty. Jailers were not required to contact a nurse before calling for an ambulance. OCJ policy further requires all jailers to be trained in first aid and CPR with update training annually. (Ex. 24, OCJ Policy re Emergency Medical Care; Ex. 21, OCJ Policy re Medical Services; Ex. 3, Harding Depo., p. 67:4-14; p. 68:1 – p. 69:6; p. 85:23 – p. 86:9; Ex. 25, Durborow Depo., p. 174:2-10).

27.     The OCCJ has a policy providing that the jail administrator may place an inmate in a holding cell if they suspect the inmate is in need of medical observation. The policy requires inmates placed in a holding cell for medical observation to be monitored more frequently, requiring visual observation of the inmate at least once every 15 minutes. (Ex. 13, OCJ Policy re Surveillance of Holding Cells).

28.     If jail staff believed that an inmate had become paralyzed, OCJ policy would require them to contact an ambulance for immediate emergency medical assistance. (Ex. 3, Harding Depo., p. 152:1-16).

29.     Upon hiring, new OCJ staff were given at least two days training on the OCJ's policies and procedures, including training on the OCJ's medical policies, and on the Oklahoma Jail Standards. Then they would be required to shadow a supervisor in performing jail duties for a period of time until they were adequately familiar with jail functions. Jail staff were also required to complete 20 hours of annual jail training on the Oklahoma jail standards, including training on supervision of prisoners, rights and responsibilities of inmates, emergency procedures, and First Aid & CPR. Jail Administrator Harding provided the jail staff training. (Ex. 26, OCJ Policy re Staff Training; Ex. 3, Harding Depo., p. 71:4-13; p. 86:9-15; p. 209:10 – p. 210:11; Ex. 25, Durborow Depo., p. 175:12 – 177:15; Ex. 4, Horn Depo., p. 14:24 – p. 15:22; Ex. 7, Bray Depo., p. 267:10 – p. 268:11).

30.     On June 17, 2015, Horn, Harding, Shoemaker, and Bray each completed their annual State Jail training for the year 2015. This included, among other things, training on supervision of prisoners, rights and responsibilities of inmates, emergency procedures, and First Aid & CPR. (Ex. 27, OCJ Jailer Training Records for 2015).

31.     Sheriff Durborow had no interactions with Ellis. (Ex. 25, Durborow Depo., p. 171:18-23; p. 174:11-13).

32.     At the time relevant to this case, Sheriff Durborow conducted weekly tours of the Jail to verify that it was being operated properly. (Ex. 25, Durborow Depo., p. 64:11-24).

33.     Prior to this incident, neither Sheriff Durborow nor Jail Administrator Harding had received notice of any substantial complaints about Horn's performance nor any reasons to

9

doubt that she was providing adequate medical care to inmates. Sheriff Durborow never had any cause to discipline Horn. (Ex. 3, Harding Depo., p. 204:22 – p. 206:23; p. 208:13-21; p. 211:10-15; Ex. 25, Durborow Depo., p. 171:11 – p. 172:24; Ex. 11, Shoemaker Depo., p. 210:5-9; Ex. 4, Horn Depo., p. 12:18-25; Ex. 7, Bray Depo., p. 274:15-18; p. 275:3 – p. 276:8).

34.    Prior to this incident, there had never been any complaints about Shoemaker's treatment of inmates or any reason to suggest that he may have been mistreating inmates. (Ex. 3, Harding Depo., p. 210:21 – p. 211:16; Ex.7, Bray Depo., p. 274:19-22; p. 275:3 – p. 276:8).

35.    Prior to this incident, Sheriff Durborow had never heard of any jail staff interacting with any OCJ inmates in a manner similar to which staff members interacted with Ellis. (Ex. 25, Durborow Depo., p. 174:14 – p. 175:11).

36.    Ellis was never chained to the D-ring. Prior to this incident, there is no evidence that D-ring had ever been used for the punishment of inmates. Sheriff Durborow had never approved use of the D-ring. (Ex. 3, Harding Depo., p. 213:13 – p. 215:1; Ex. 25, Durborow Depo., p. 109:5-20; p. 113:7 – p. 114:16; p. 147:6 – p. 148:5; Ex. 11, Shoemaker Depo., p. 106:16-18; p. 107:2-20; Ex. 7, Bray Depo., p. 77:2-25; p. 82:6-17).

37.    Prior to this incident, there were no indications that the procedures and practices in place for delivering medical care to OCJ inmates was inadequate or that OCJ inmates were not receiving adequate medical attention. (Ex. 25, Durborow Depo., p. 59:12-25; p. 61:15-21).

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Summary judgment is not a

disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court held that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."  The Court further held that "if the evidence is merely colorable, or not significantly probative, summary judgment may be granted." *Id.*  In addition, the *Anderson* Court stated that "the mere existence of a scintilla of evidence in support of a plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Id.* A movant's summary judgment burden may properly be met by reference to the lack of evidence in support of plaintiff's position. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 325).

Furthermore, as described by the court in *Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 (10th Cir. 1994), "Even though all doubts must be resolved in (the nonmovant's) favor, allegations alone will not defeat summary judgment." *Cone* at 530 (citing *Celotex*, 477 U.S. at 324). *See also Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991); *Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464, 469 (D. Colo. 1996).  Moreover, "(i)n response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

I.   **PLAINTIFF CANNOT ESTABLISH SUPERVISORY LIABILITY WHERE DURBOROW WAS NOT DELIBERATELY INDIFFERENT TO DECEDENT'S SERIOUS MEDICAL NEEDS.**

Plaintiff asserts a claim against Defendant Durborow in his individual capacity under 42 U.S.C. § 1983 premised on a theory of supervisory liability. (Dkt. 2, pp. 13-14). However, supervisory "status by itself is insufficient to support liability." *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996) (citing *Rizzo v. Goode*, 423 U.S. 362, 376, 96 S. Ct. 598, 606-07, 46 L. Ed. 2d 561 (1976)).  It is insufficient for Plaintiff to merely show that the Defendant Durborow had authority over the individual Defendants who are alleged to have directly violated the Decedent's constitutional rights. *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996). Additionally, "it is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the supervisor had done more than he or she did." *Sample v. Diecks*, 885 F.2d 1099, 1118 (3rd Cir. 1989). Rather, in order for liability to arise under § 1983, a defendant's direct personal responsibility for the claimed deprivation of constitutional rights must be established. *Novitsky v. City of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007) (police officer who was present at scene but who did not assist or direct other officer in removing arrestee from vehicle did not violate Fourth Amendment; he did not "personally participate" in the use of the twist-lock restraint). Accordingly, Plaintiff must demonstrate "a deliberate, intentional act" by [Defendant Durborow] to violate constitutional rights." *Id.* at 994-95. Furthermore, "'[L]iability under §1983 must be predicated upon a 'deliberate' deprivation of constitutional rights by the defendant and not upon mere negligence.'" *Murrell v. School Dist. No. 1, Denver, Colo.,* 186 F. 3d 1238, 1250 (10th Cir. 1999) (citing *Woodward v. City of Worland,* 977 F. 2d 1392, 1399 (10th Cir. 1992)).

In order to prevail on such a claim, Plaintiff must present evidence of an affirmative link between the alleged constitutional violation and Defendant Durborow's actions. *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014).

> This requires "more than a supervisor's mere knowledge of his [or her] subordinate's conduct"…Rather a plaintiff must satisfy "three elements…to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities: (1) personal involvement; (2) causation; and (3) state of mind."

*Id*. (quoting *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, (10th Cir. 2013)). Furthermore, in order to establish a failure to supervise claim, Plaintiff "must show that the defendant was adequately put on notice of prior misbehavior." *McClelland v. Facteau*, 610 F.2d 693, 697 (10th Cir. 1979).

In the wake of *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009), which "articulated a stricter liability standard for…personal involvement," *Schneider*, 717 F.3d at 768, the exact contours of the first element of supervisory liability remain somewhat unclear. *Estate of Booker*, *supra*. However, "direct participation" is not necessary to satisfy this element. *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013).

"The second elements 'requires the plaintiff to show that the defendant's alleged actions(s) caused the constitutional violation' by setting 'in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff or her constitutional rights.'" *Estate of Booker*, *supra*. (quoting *Schneider*, 717 F.3d at 768). "The third element 'requires the plaintiff to show that the defendant took the alleged actions with the requisite state of mind…" *Id*. (quoting *Schneider*, 717 F.3d at 769). Here, because the alleged underlying violation of the Decedent's constitutional rights is premised upon the alleged denial of adequate medical care, the requisite state of mind to impose liability against Defendant

Durborow in his supervisory capacity is deliberate indifference. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

In that regard, the Eighth Amendment requires prison officials to provide humane conditions of confinement, including access to the basic necessities of health care. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Estelle*, 429 U.S. at 103. The United States Supreme Court has made clear that "deliberate indifference to serious medical needs of prisoners" may amount to a violation of the Eighth Amendment and state a cause of action under 42 U.S.C. § 1983. *See Estelle*, 429 U.S. at 104. However, mere negligence – even gross negligence – is insufficient to support a claim of deliberate indifference under § 1983. *Berry v. City of Muskogee, Oklahoma*, 900 F.2d 1489, 1495 (10th Cir. 1990) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 and n. 7, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)); *see also Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("[D]eliberate indifference is a stringent standard of fault, requiring proof that [an] actor disregarded a known or obvious consequence of his action."). "It is obduracy and wantonness, not inadvertence or error in good faith," that violate the Constitution with regard to the "supplying of medical needs..." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). A § 1983 claim alleging inadequate or delayed medical care involves "both an objective and subjective component, such that [the Court] must determine both whether the deprivation is sufficiently serious and whether the government official acted with a sufficiently culpable state of mind." *Oxendine v. R.G. Kaplan, M.D.*, 241 F.3d 1272, 1276 (10th Cir. 2001).

As to the objective component, a medical need is considered sufficiently serious if a physician has diagnosed the condition and mandated treatment, or the condition is so obvious that even a lay person would easily recognize the medical necessity for a doctor's attention.

*Oxendine,* 241 F.3d at 1276.  A plaintiff must further demonstrate that the defendant's failure to timely meet that objective medical need caused him to suffer substantial harm.  *Id*. at 1276-77. As to the subjective prong of this test, a plaintiff must establish that a defendant knew of a substantial risk of harm and failed to take reasonable measures to abate it.  *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting *Farmer*, 511 U.S. at 847).  In that regard, a plaintiff must show that the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the defendant actually drew that inference. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Farmer*, 511 U.S. at 837).  Deliberate indifference is characterized by "obduracy and wantoness." *Whitley, supra.* "[A]n inadvertent failure to provide medical care does not rise to a constitutional violation." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (internal quotations and citations omitted).

Here, Plaintiff cannot meet the subjective prong of the deliberate indifference test with regard to Defendant Durborow.  There is simply no evidence in this case that Durborow was subjectively aware that the Decedent suffered from an objectively serious medical need and failed in his supervisory capacity to take reasonable measures to abate it. In fact, there is no evidence that Durborow was even aware of Ellis's presence in the OCJ prior to his death, much less that he was subjectively aware of Ellis's medical condition. Sheriff Durborow had no interactions with Ellis. (Fact No. 31).

Moreover, Plaintiff cannot demonstrate that Defendant Durborow was deliberately indifferent to a substantial risk that other OCJ staff members might be likely to violate Ellis's constitutional right to medical care. At the time relevant to this case, Sheriff Durborow conducted weekly tours of the jail to verify that it was being operated properly. (Fact No. 32). However, prior to this incident, Sheriff Durborow had not received notice of any substantial

complaints about Nurse Horn's performance nor any reasons to doubt that she was providing adequate medical care to inmates. Durborow never had any cause to discipline Nurse Horn. (Fact No. 33). Prior to this incident, there had never been any complaints about Shoemaker's treatment of inmates or any reason to suggest that he may have been mistreating inmates. (Fact No. 34). Prior to this incident, there were no indications that the procedures and practices in place for delivering medical care to OCJ inmates was inadequate or that OCJ inmates were not receiving adequate medical attention. (Fact No. 37). As such, Plaintiff cannot show that Durborow was subjectively aware of a substantial risk that any other OCJ staff member might be likely to violate Ellis's constitutional right to medical care and failed to take action to reasonable action to abate it.

Plaintiff may claim that, as former Sheriff of Ottawa County and policy-maker for the jail, Defendant Durborow can be held liable in his individual under § 1983 for the creation, promulgation, implementation, or continued operation of a policy or custom that caused a violation of the Decedent's constitutional rights. *See Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). However, as set forth in Defendant Floyd's summary judgment motion filed contemporaneously with this Motion, and which is adopted herein by reference, the alleged violation of the Decedent's constitutional rights was not caused by any policy, practice, or custom of the Ottawa County Jail. Moreover, Plaintiff cannot demonstrate that Defendant Durborow was deliberately indifferent to a substantial risk that any policy, practice, or custom of the OCJ would be likely to result in the violation of inmates' rights to medical care. There is no evidence of any persistent and widespread pattern of denial of medical care to OCJ inmates prior to the subject incident that would have put Durborow on notice of such a risk. Prior to this incident, there were no indications that the procedures and practices in place for delivering

16

medical care to OCJ inmates was inadequate or that OCJ inmates were not receiving adequate medical attention. (Fact No. 37). Accordingly, Defendant Durborow is entitled to summary judgment with regard to Plaintiff's § 1983 claims.

## II.   DURBOROW IS ENTITLED TO QUALIFIED IMMUNITY.

Defendants sued in their individual capacities in an action under § 1983 "are entitled to qualified immunity unless it is demonstrated that their conduct violated clearly established constitutional rights of which a reasonable person in their positions would have known." *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1251 (10th Cir. 1999).  Qualified immunity is therefore an affirmative defense that provides immunity to suit in a § 1983 action.  *Adkins v. Rodriguez*, 59 F.3d 1034, 1036 (10th Cir. 1995).  When the defense is raised in a motion for summary judgment, the plaintiff bears the burden to show the defendant's actions violated a constitutional right, and that the allegedly violated right was clearly established at the time of the conduct at issue.  *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996).  Qualified immunity gives ample room for mistaken judgment by protecting all but the plainly incompetent or those who knowingly violate the law.  *Hunter v. Bryant*, 502 U.S. 224, 112 S.Ct 532, 537, 116 L.Ed.2d 589 (1991).  The issue of qualified immunity is for the courts and not the trier of fact.  *Id*. Summary judgment based on qualified immunity is available when a defendant's actions are objectively reasonable.  *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993).

As a threshold matter, if no constitutional right on the facts alleged would have been violated, no further inquiry is required, and the defendant is entitled to dismissal.  *Saucier v. Katz*, 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  If a constitutional right could be made out, then "[t]he relative, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official in the defendant's

position] that his conduct was unlawful in the situation he confronted."  *Id.* at 202; *see also Brousseau v. Haugen*, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004) (emphasizing inquiry should be conducted in light of the specific context of the case.)

Here, as discussed above, Plaintiff has failed to show that Defendant Durborow violated the Decedent's constitutional rights. Accordingly, Defendant Durborow is entitled to qualified immunity and Plaintiff's § 1983 claims against him should be dismissed.  *See Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 783 (10th Cir. 1993) (citing *Siegert v. Gilley*, 500 U.S. 226, 231-33, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)) (officer entitled to qualified immunity if their conduct did not violate the law).

In *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the U.S. Supreme Court explained that "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken."  (Internal citations omitted).  *See also Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006) ("The law is clearly established if a reasonable official in the defendant's circumstances would understand that her conduct violated the plaintiff's constitutional right.").

The legal principle that pre-trial detainees are to be provided access to adequate medical is indeed well established; however, the qualified immunity analysis in this regard is analyzed "in a more particularized, and hence more relevant, sense."  *Anderson*, 483 U.S. at 640. Specifically, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id.  See also Saucier*, 533 U.S. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).  The question is not whether the

Decedent had such rights, but whether it was clearly established that Defendant Durborow's alleged actions violated those rights. *Id.*

While an inmate's right to medical care is clearly established in a general sense, the qualified immunity inquiry requires that the Court look to clearly established law which is particularized to the facts of the case. *Perry v. Durborow*, 892 F.3d 1116, 1123 (10th Cir. 2018). Before the Court can determine the law was clearly established, it has to identify a case where an individual acting under similar circumstances as Defendant Durborow was held to have violated the Eighth or Fourteenth Amendments under a theory of individual liability. *Id.*

The undisputed, particularized facts of this case with regard to Defendant Durborow had absolutely no personal participation with regard to the provision of medical care to Ellis in the OCJ. In fact, there is no evidence that Durborow was even aware of Ellis's presence in the OCJ prior to his death, much less that he was subjectively aware of Ellis's medical condition. Sheriff Durborow had no interactions with Ellis. (Fact No. 31).  Moreover, there is no evidence that Defendant Durborow knew that any other OCJ staff members were likely to violate Ellis's constitutional right to medical care. Sheriff Durborow conducted weekly tours of the jail to verify that it was being operated properly. (Fact No. 32). However, prior to this incident, Sheriff Durborow had not received notice of any substantial complaints about Nurse Horn's performance nor any reasons to doubt that she was providing adequate medical care to inmates. Durborow never had any cause to discipline Nurse Horn. (Fact No. 33). Prior to this incident, there had never been any complaints about Shoemaker's treatment of inmates or any reason to suggest that he may have been mistreating inmates. (Fact No. 34). Prior to this incident, there were no indications that the procedures and practices in place for delivering medical care to OCJ inmates was inadequate or that OCJ inmates were not receiving adequate medical attention. (Fact

No. 37). Considering the particularized facts of this case specific to Defendant Durborow and the qualified immunity inquiry as to him, there is no published decision of the United States Supreme Court or the Tenth Circuit Court of Appeals which would have placed Durborow on notice that his acts or omissions in October 2015 with respect to the Decedent, were in violation of the Decedent's clearly established constitutional rights. Defendant Durborow is entitled to qualified immunity.

<b><u>CONCLUSION</u></b>

Defendant Durborow is entitled to summary judgment in this case. Plaintiff cannot show that Durborow was deliberately indifferent to the Decedent's medical needs or that the alleged violation of the Decedent's constitutional rights was caused by any policy, practice, or custom of the Ottawa County Jail. Moreover, Defendant Durborow is entitled to qualified immunity. Considering the particularized facts of this case specific to Durborow, there is no published decision of the United States Supreme Court or the Tenth Circuit Court of Appeals which would have placed him on notice that his acts or omissions in October 2015 with respect to the Decedent, were in violation of the Decedent's clearly established constitutional rights.

Respectfully submitted,

s/ Ambre C. Gooch
Ambre C. Gooch, OBA No. 16586
COLLINS, ZORN, & WAGNER, P.C.
429 N.E. 50th Street, Second Floor
Oklahoma City, OK  73105-1815
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
E-mail: acg@czwlaw.com

ATTORNEY FOR DEFENDANT
TERRY DURBOROW

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 13, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Daniel E. Smolen, via electronic mail at: danielsmolen@ssrok.com
kendrarash@ssrok.com
Robert M. Blakemore, via electronic mail at: bobblakemore@ssrok.com
Bryon D. Helm, via electronic mail at: bryonhelm@ssrok.com
SMOLEN & ROYTMAN, PLLC
701 South Cincinnati Avenue
Tulsa, OK 74119
***Attorneys for Plaintiffs***

John R. Paul, via electronic mail at: john@paulandlackey.com
PAUL & LACKEY, P.C.
9 East Fourth Street, Suite 400
Tulsa, OK 74103

John David Lackey, via electronic mail at: johndavid@paulandlackey.com
Amy N. Bennett, via electronic mail at: amy@paulandlackey.com
PAUL & LACKEY, P.C.
20 East Fifth Street, Suite 1000
T7ulsa, OK 74103
***Attorneys for Defendants Baptist Healthcare of Oklahoma, LLC,***
  ***d/b/a Integris Miami EMS, Jennifer Grimes and Kent Williams***

Randall J. Wood, via electronic mail at: rwood@piercecouch.com
Carson C. Smith, via electronic mail at: csmith@piercecouch.com
Pierce Couch Hendrickson Baysinger & Green, L.L.P.
1109 N. Francis
Oklahoma City, OK 73106
***Attorney for Defendants Johnny Bray***
  ***and Charles Shoemaker***

James L. Gibbs, II, via electronic mail at: jgibbs@gphglaw.com
GOOLSBY, PROCTOR, HEEFNER & GIBBS, P.C.
701 N. Broadway Avenue, Suite 400
Oklahoma City, OK 73102-6006
***Attorney for Defendant Theresa Horn, L.P.***

s/ Ambre C. Gooch
Ambre C. Gooch