**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) ROBBIE EMERY BURKE, *Special Adm'x of the Estate of Terrall Brooks Ellis, II, Deceased, et al.* | ) ) ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| *vs*. | ) | Case No.: 17-cv-00325-JED-FHM |
| | ) | |
| (1) JEREMY FLOYD, Sheriff of Ottawa Cty., in his official capacity, *et al*., | ) ) | |
| | ) | |
| *Defendants*. | ) | |

---

**DEFENDANT THERESA HORN'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

---

GOOLSBY, PROCTOR, HEEFNER & GIBBS, P.C.

James L. Gibbs, II (OBA #15689)
Seth D. Coldiron (OBA #20041)
701 N. Broadway Ave., Suite 400
Oklahoma City, Oklahoma 73102
Telephone: (405) 524-2400
Facsimile: (405) 525-6004

jgibbs@gphglaw.com
scoldiron@gphglaw.com

*Attorneys for Defendant,
Theresa Horn*

December 18, 2019

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. STATEMENT OF UNDISPUTED MATERIAL FACTS ................................ 1

III. STANDARD OF REVIEW ........................................................................... 8

IV. ARGUMENTS AND AUTHORITIES ......................................................... 9

    **A.** PLAINTIFFS CANNOT SHOW THAT NURSE HORN KNEW ABOUT AND FAILED TO REASONABLY RESPOND TO DECEDENT'S SERIOUS MEDICAL NEEDS BY INTENTIONALLY DELAYING HIS ACCESS TO MEDICAL CARE. ............................. 10

    **B.** NURSE HORN ACTED BY REQUESTING AMBULANCES, WHICH DID NOT VIOLATE DECEDENT'S CONSTITUTIONAL RIGHTS, AND, THEREFORE, SHE IS ENTITLED TO QUALIFIED IMMUNITY. ..................................................................... 14

    **C.** SINCE THEY ARE NOT ENTITLED TO COMPENSATORY DAMAGES, PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES. ................................... 18

# TABLE OF AUTHORITIES

## *Cases*

*Abila v. Funk*,
220 F. Supp. 3d 1121 (D.N.M. 2016) ............................................................. 9

*Anderson v. Creighton*,
483 U.S. 635, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987) .............................. 15

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ................................ 8

*Ashcroft v. al-Kidd*,
563 U.S. 731, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) .................... 15, 16

*Bame v. Iron Cty.*,
566 Fed. Appx. 731 (10th Cir. 2014) ............................................................ 16

*Bennett v. Carter Cty. Bd. of Cty. Comm'rs*,
Case No. CIV-17-289-SPS, 2019 WL 1671979 (E.D. Okla. Apr. 17, 2019) ............ 14, 15, 16, 17

*Blackmon v. Sutton*,
734 F.3d 1237 (10th Cir. 2013) ..................................................................... 10

*BMW of N. Am., Inc. v. Gore*,
517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996) ............................ 18

*Bruner-McMahon v. Hinshaw*,
846 F. Supp. 2d 1177 (D. Kan. 2012) ........................................................... 12

*Callahan v. Poppell*,
471 F.3d 1155 (10th Cir. 2006) ..................................................................... 12

*Cardoso v. Calbone*,
490 F.3d 1194, 1997 (10th Cir. 2007) ............................................................. 8

*Celotex Corp. v. Catrett*,
477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ................................ 8

*Clark v. Wilson*,
625 F.3d 686 (10th Cir. 2010) ....................................................................... 14

*Estelle v. Gamble*,
429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) ............................... 10, 12

*Farmer v. Brennan*,
511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) ................. 11, 12, 17

*Harlow v. Fitzgerald*,
457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) .............................. 15

*Hill v. Corr. Corp. of Am.*,
685 Fed. Appx. 665 (10th Cir. 2017) .......................................................................... 11

*Hovater v. Robinson*,
1 F.3d 1063 (10th Cir. 1993) .................................................................................. 16

*Kendall v. Watkins*,
998 F.2d 848 (10th Cir. 1993) .................................................................................. 8

*Lewis v. Tripp*,
604 F.3d 1221 (10th Cir. 2010) ............................................................................... 15

*Lopez v. LeMaster*,
172 F.3d 756 (10th Cir. 1999) ................................................................................. 10

*Martinez v. Beggs*,
563 F.3d 1082 (10th Cir. 2009) ............................................................................... 11

*Martinez v. Carson*,
697 F.3d 1252 (10th Cir. 2012) ................................................................................ 9

*Mata v. Saiz*,
427 F.3d 745 (10th Cir. 2005) ............................................................................ 11, 12

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) .............................................. 8

*Miller v. City of Mission, Kan.*,
705 F.2d 368 (10th Cir. 1983) ................................................................................. 18

*Pearson v. Callahan*,
555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) ....................................... 14, 15

*Perkins v. Kan. Dep't of Corr.*,
165 F.3d 803 (10th Cir. 1999) ................................................................................. 14

*Ramos v. Lamm*,
639 F.2d 559 (10th Cir. 1980) ................................................................................. 16

*Rector v. City and Cty. of Denver*,
348 F.3d 935 (10th Cir. 2003) ................................................................................. 16

*Saucier v. Katz*,
533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) ........................................... 15

*Sealock v. Colorado*,
218 F.3d 1205 (10th Cir. 2000) ........................................................................... 11, 14

*Self v. Crum*,
439 F.3d 1227, 1230 (10th Cir. 2006) .................................................................. 11, 12

*Smith v. Wade*,
461 U.S. 30, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983) ................................................................. 18

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003) ........................................................ 18

*West v. Atkins*,
487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) .................................................................. 9

### *Statutes*

Civil Rights Act of 1871, 42 U.S.C. § 1983 ......................................................................... passim

### *Other Authorities*

Exhibit 01 Ottawa Cty. Jail, Book-In Sheet (Oct. 10, 2015) ....................................................... 2

Exhibit 02 Okla. State Dep't of Health, Investigative Report D-2015-015 (Dec. 3, 2015)... passim

Exhibit 03 Deposition of Theresa Horn (Oct. 8, 2019) ......................................................... passim

Exhibit 04 Progress Notes (Oct. 17-22, 2015) ..................................................................... passim

Exhibit 05 Deposition of Megan Jacomine Capel (Jun. 13, 2019) ................................................. 3

Exhibit 06 Ottawa Cty. Incident Report by Curtis Lawson (Oct. 21, 2015)............................. 3, 5

Exhibit 07 Deposition of Kent Williams (Apr. 13, 2018)...................................................... 3, 4, 5

Exhibit 08 Deposition of Jennifer Dillinger (Apr. 13, 2018).................................................. 3, 4, 5

Exhibit 09 Prehospital Care Report (Oct. 21, 2015) ............................................................. 3, 4, 5

Exhibit 10 Ottawa Cty. Incident Report by Officer Bray (Oct. 22, 2015)..................................... 5

Exhibit 11 Ottawa Cty. Incident Report by Officer Shoemaker (Oct. 22, 2015) .......................... 6

Exhibit 12 Quapaw Tribe of Okla. Ambulance Record (Oct. 22, 2015) ....................................... 7

Exhibit 13 Ottawa Cty. Sheriff's Off. Rep. of Deputy Ron Journagan (Oct. 23, 2015)................. 7

Exhibit 14 Emergency Room Report (Oct. 22, 2015) .................................................................... 7

Exhibit 15 Report of Autopsy (Oct. 23, 2015)................................................................................ 7

Exhibit 16 Deposition of Todd Randall Wilcox, M.D. (Oct. 21, 2019) ........................................ 8

Pls.' Compl. (Doc. 002) (Jun. 9, 2017)......................................................................... 1, 9, 10, 18

### *Rules*

10TH CIR. R. 32.1(A)............................................................................................................... 11

FED. R. APP. P. 32.1(a) ........................................................................................................... 11

FED. R. CIV. P. 56................................................................................................................. 1, 8

LCvR 56.1.................................................................................................................................. 1

## DEFENDANT THERESA HORN'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Defendant Theresa Horn, L.P.N. ("Nurse Horn"), pursuant to FED. R. CIV. P. 56 and LCvR 56.1 , moves this Court for summary judgment against Plaintiffs Robbie Emery Burke's ("Burke's"), Special Administratrix of the Estate of Terral Brooks Ellis, II, deceased ("Decedent"), Terral Ellis, Sr.'s ("Ellis's"), and Shelly Bliss's ("Bliss's") (collectively, "Plaintiffs'") claims.[1]  In support, Nurse Horn would show the Court as follows:

## I.
## INTRODUCTION

On June 9, 2017, Plaintiffs brought this action against Nurse Horn and others, alleging, *inter alia*, that Decedent died as a result of being denied medical care.  (*See*, Pls.' Compl. (Doc. 002) at 10, 12 ¶¶36, 48.) They aver that Nurse Horn violated Decedent's civil and constitutional rights guaranteed by the U.S. CONST. amend. VIII and amend. XIV, § 2, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.  (*See id*. at 12-15, ¶¶49-64.)  Nurse Horn requests this Court enter summary judgment in her favor against Plaintiffs as the undisputed material facts show she was ***not*** deliberately indifferent to Decedent's medical needs or, alternatively, that she is entitled to qualified immunity.

## II.
## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      On Saturday, October 10, 2015, Decedent was arrested and detained at the Ottawa County Jail on an outstanding warrant, and he disclosed having Asthma for which he took

---

[1] (*See*, Pls.' Compl. (Doc. 002) (Jun. 9, 2017) at 2-4, ¶¶6-8, 12.)  Burke was recently substituted for Megan Caple as representative for Decedent's estate.  (*See*, Order on Mot. to Substitute Party (Doc. 116) (Nov. 7, 2019) at 1.) **Note**: All page citations to previously filed pleadings and materials are to the ECF/CM pagination.

Albuterol on his intake questionnaire at the time of booking.  (*See*, Ottawa Cty. Jail, Book-In Sheet ("Book-in Sheet") (Oct. 10, 2015) at 000017-18 filed under seal as "**Exhibit 1**;" Okla. State Dep't of Health, Investigation Report D-2015-015 ("Investigation Report") (Dec. 3, 2015) at 000061 filed under seal as "**Exhibit 2**.")

2.      A week later, on Saturday, October 17, 2015, Decedent complained of back pain from sleeping on a hard bunk reporting that he believed his back was broken.  (*See*, Ex. 2, Investigation Report at 000061; *and see*, Deposition of Theresa Horn (Oct. 8, 2019) at 105:1-22, 106:21-25, 107:1-10 attached as "**Exhibit 3**;" Progress Notes (Oct. 17-22, 2015) at 000027 filed under seal as "**Exhibit 4**.")

3.      Thereafter, jail staff contacted Nurse Horn relaying Decedent's complaints of back pain but, also, describing Decedent as up and moving around while denying that he had fallen or received any sort of injury, and Nurse Horn directed jail staff to issue Decedent over-the-counter ibuprofen explaining that she would follow-up with him on Monday.  (*See*, Ex. 2, Investigation Report at 000061; Ex. 4, Progress Notes (Oct. 17, 2015 Entry) at 000027.)

4.      On Monday, October 19, 2015, Decedent presented at Nurse Horn's office, again, complaining of back pain, which he believed may have been kidney stones.  (*See*, Ex. 2, Investigation Report at 000061; Ex. 3, Horn Dep. at 107:17-20; Ex. 4, Progress Notes (Oct. 19, 2015 Entry) at 000027-28.)

5.      Nurse Horn consulted Decedent regarding his complaint, examined his back, identified a protrusion, which she attributed to possibly being a dislocated rib, and administered ibuprofen to Decedent while informing him that she would arrange to have the jail's physician assistant, Aleta Fox, examine him if he continued to have back pain.  (*See*, Ex. 2, Investigation Report at 000061; Ex. 3, Horn Dep. at 105:1-14, 107:24-25, 108:1-11, 111:14-25, 112:1-11,

116:16-19, 117:23-25, 118, 119:1-6, 120:24-25, 121:1-6; Ex. 4, Progress Notes (Oct. 19, 2015 Entry) at 000027-28.)

6.      Nurse Horn also allowed Decedent to call his grandfather to schedule an appointment with a chiropractor, but Decedent was unable to reach his grandfather, so he left him a message.  (*See*, Ex. 2, Investigation Report at 000061; Ex. 3, Horn Dep. at 105:1-14, 107:24-25, 108:1-11, 111:14-25, 112:1-11, 116:16-19, 117:23-25, 118, 119:1-6; Ex. 4, Progress Notes (Oct. 19, 2015 Entry) at 000027-28; *and see*, Deposition of Megan Jacomine Capel (Jun. 13, 2019) at 144:10-18 attached as "**Exhibit 5**.")

7.      On Wednesday, October 21, 2015, jail staff contacted Nurse Horn at approximately 1630 (4:30 pm) informing her that Decedent had a seizure, and Nurse Horn instructed jail staff to call for an ambulance. (*See*, Ex. 2, Investigation Report at 000061-62; Ex. 3, Horn Dep. at 143:25, 144, 145:1-8; Ex. 4, Progress Notes at 000028 (Oct. 21, 2015 Entry); *and see*, Ottawa Cty. Incident Report by Curtis Lawson ("Lawson Incident Report") (Oct. 21, 2015) at 000002 filed under seal as "**Exhibit 6**.")

8.      Thereafter, jail staff contacted the Emergency Medical Services Authority ("EMSA"), and paramedics, Kent Williams ("Williams") and Jennifer Dillinger, *f.k.a.* Jennifer Grimes (hereinafter "Dillinger"), arrived at the jail around 1639 (4:39 pm).  (*See*, Deposition of Kent Williams (Apr. 13, 2018) at 71:22-25, 72:1 attached as "**Exhibit 7**;" Deposition of Jennifer Dillinger (Apr. 13, 2018) at 19:13-25 attached as "**Exhibit 8**;" Prehospital Care Report (Oct. 21, 2015) at 000041-43 filed under seal as "**Exhibit 9**.")

9.      Williams and Dillinger found Decedent laying on the floor on his right side in a cell near the entrance among jail staff and first responders from a local fire department, and Dillinger

proceeded to take Decedent's vitals while speaking with him.  (*See*, Ex. 7, Williams Dep. at 44:2-25, 45:1; Ex. 8, Dillinger Dep. at 17:5-18; Ex. 9, Prehospital Care Report at 000043.)

10.     Decedent appeared alert and oriented, described experiencing a seizure, and complained of back pain and difficulty walking.  (*See*, Ex. 7, Williams Dep. at 25:24-25, 26, 27:1-21; Ex. 8, Dillinger Dep. at 17:19-25, 18:1-25; Ex. 9, Prehospital Care Report at 000043.)

11.     As Dillinger used her stethoscope to listen to his lungs, she explained to Decedent that they could transport him to the emergency room, take x-rays of his back, and, if he had a broken rib, possibly, wrap it, when Decedent complained about being unable to walk and urinating into a cup whereupon a detention officer told Dillinger that Decedent had been up walking before the seizure episode.  (*See*, Ex. 7, Williams Dep. at 27:9-21, 39:19-25, 40:1-5; Ex. 8, Dillinger Dep. at 30:23-25, 31:1-18, 39:3-10; Ex. 9, Prehospital Care Report at 000043.)

12.     Williams and Dillinger continued to try assessing Decedent's condition, but he kept switching topics, for example, when Dillinger took his blood pressure while he was sitting, he began complaining about being dehydrated but admitted to eating and drinking normally.  (*See*, Ex. 8, Dillinger Dep. at 19:18-25, 62:8-16; Ex. 9, Prehospital Care Report at 000043.)

13.     While Williams and Dillinger reassessed Decedent's blood pressure as he was standing, Decedent recounted how he had seen Nurse Horn and called his grandfather and asked permission to try reaching his grandfather again, but when a detention officer refused Decedent became agitated taking off the blood pressure cuff saying, "Take me to my [expletive] cell," which Williams and Dillinger interpreted as Decedent refusing transport to the hospital..  (*See*, Ex. 7 Williams Dep. at 31:17-25, 32, 33:1-21, 93:19-25, 94, 95:1-9; Ex. 8, Dillinger Dep. at 34:6-25, 35:1-25, 63:19-25, 64, 65:1-20, 97:23-25, 98, 99:1-16; Ex. 9, Prehospital Care Report at 000043.)

14.     At the time of their assessment, neither Williams nor Dillinger considered Decedent to be experiencing any acute, serious, medical condition that would have required immediate hospitalization.  (*See*, Ex. 6, Lawson Incident Report at 000002; Ex. 7: Williams Dep. at 25:24-25, 26:1-18; 101:7-25, 102:1-6; Ex. 8, Dillinger Dep. at 108:17-25, 109-112, 113:1-12; Ex. 9, Prehospital Care Report at 000043.)

15.     Williams did not obtain Decedent's signature on a form declining transport because a detention officer moved Decedent to a holding cell for more frequent observation, and Williams asked jail staff to contact them if Decedent's condition changed.  (*See*, Ex. 7, Williams Dep. at 21:22-25, 22, 23:1-23; Ex. 9, Prehospital Care Report at 000043.)

16.     Around 2200 (10:00 pm) on the night of Wednesday, October 21, 2015, Defendant Officer Johnny Bray ("Officer Bray") contacted Nurse Horn regarding Decedent's continued complaints about difficulty moving and incessant pain, and Nurse Horn explained that paramedics had already seen him and recommended that Decedent get up to move around and take an over-the-counter pain medication. (*See*, Ottawa Cty. Incident Report by Officer Bray (Oct. 22, 2015) at 001025 filed under seal as "**Exhibit 10**.")

17.     On the morning of Thursday, October 22, 2015 about 0945 (9:45 am), jail staff contacted Nurse Horn and informed her that Decedent had eaten breakfast and had not been complaining. (*See*, Ex. 2, Investigation Report at 000062; Ex. 3, Horn Dep. at 165:13-25, 166:1-9; Ex. 4, Progress Notes (Oct. 22, 2015 0945 Entry) at 000028.)

18.     Around 1045 (10:45 am), Nurse Horn arrived and checked on Decedent, who was alert, speaking clearly, and complaining about his inability to walk claiming his legs were black, but when she saw him move his legs and noticed that his skin was pink in color, she mocked him about having a seizure telling him that she was "tired of his dumb [explicative]," and threatened

5

to punish Decedent by placing him on a D ring (*i.e.*, handcuff and shackle him to a metal ring attached to the floor) stating, "Ain't a damn thing wrong with you … You're going on that D ring and that's where you're going to stay the whole [explicative] time because I'm sick and [explicative] tired of dealing with you," when Decedent, again, complained about the pain, Nurse Horn told him to "shut the [explicative] up" because they had already called the ambulance, "They've already come, and they said there's nothing wrong with you." (*See*, Ex. 2, Investigative Report at 000062; Ex. 3, Horn Dep. at 127:3-25, 128, 129:1-13, 131:25, 132-133, 134:1-14, 136:24-25, 137, 138:1-25, 147:1-25, 148, 149:1-4, 162:1-14, 167:19-25; Ex. 4, Progress Notes (Oct. 22, 2015 1015 Entry) at 000029.)

19.     About 1345 (1:45 pm), Defendant Officer Charles Shoemaker ("Officer Shoemaker") asked Nurse Horn about returning Decedent to the general population pod, and she instructed Officer Shoemaker to bring Decedent to her office before returning him to the general population. (*See*, Ex. 2, Investigative Report at 000062; Ex. 3, Horn Dep. at 176:23-25, 177:1-4; Ex. 4, Progress Notes (Oct. 22, 2015 1345 Entry) at 000029; *and see*, Ottawa Cty. Incident Report by Officer Shoemaker (Oct. 22, 2015) at 000001 filed under seal as "**Exhibit 11**.")

20.     Shortly thereafter, Officer Shoemaker returned to her office and requested that Nurse Horn come evaluate Decedent and, when she examined him, she discovered a change in his condition because, even though he was still responsive, he had difficulty speaking and displayed symptoms of respiratory distress including discolored skin and eyes, a cooling body temperature (cold to touch), and an undetectable blood pressure, and Nurse Horn, immediately, instructed Officer Shoemaker to summon an ambulance. (*See*, Ex. 2, Investigative Report at 000062-63; Ex. 3, Horn Dep. at 177:5-25, 178:1-7, 180:2-16, 203:16-19; Ex. 4, Progress Notes (Oct. 22, 2015 1345 Entry) at 000029.)

21.     When the ambulance arrived at about 1400 (2:00 pm), Decedent remained responsive although his speech was garbled, his breathing was shallow and weak, and his circulation had declined, and around 1411 (2:11 pm) he became suddenly unresponsive, which led emergency responders to initial life saving measures before leaving the jail to go to the hospital around 1415 (2:15 pm).  (*See*, Ex. 2, Investigative Report at 000062-063; Ex. 4, Progress Notes (Oct. 22, 2015 1345 Entry) at 000029-030; *and see*, Quapaw Tribe of Okla. Ambulance Record (Oct. 22, 2015) at 000056-060 filed under seal as "**Exhibit 12**;" Ottawa Cty. Sheriff's Off. Narrative Rep. of Deputy Ron Journagan (Oct. 23, 2015) at 000004-05 filed under seal as "**Exhibit 13**;" Emergency Room Report (Oct. 22, 2015) at 000044-048 filed under seal as "**Exhibit 14**.")

22.     Decedent arrived at the hospital around 1425 (2:25 pm) in an unconscious state without any discernable pulse, but he apparently responded to some treatment rebounding with a weak pulse, which encouraged emergency room physicians to make repeated attempts to revive him before pronouncing him dead at 1451 (2:51 pm), and an autopsy later revealed that Decedent died from sepsis/septic shock resulting from acute bronchopneumonia.  (*See*, Ex. 14, Emergency Room Report at 00044-047; *and see*, Report of Autopsy (Oct. 23, 2015) at 1 filed under seal as "**Exhibit 15**.")

23.     Later that day, Nurse Horn was informed that Decedent had died at the hospital. (*See*, Ex. 3, Horn Dep. at 188:23-25, 189:1-3.)

24.     According to Plaintiffs' purported expert, Todd Randall Wilcox, M.D., sepsis, in some cases, can be difficult to diagnose, and the medical field has struggled to find reliable laboratory or diagnostic indicators that are accurate in all cases since sepsis is a multifaceted disease process that does not lend itself to a single marker that can be identified through a single

7

laboratory test, which sometimes leads to misdiagnosis even in hospitals. (*See*, Deposition of Todd Randall Wilcox, M.D. (Oct. 21, 2019) at 41:2-25, 42-43, 44:1-22 attached as "**Exhibit 16**.")

**III.**
**STANDARD OF REVIEW**

Summary judgment pursuant to FED. R. CIV. P. 56 is appropriate where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Kendall v. Watkins*, 998 F.2d 848, 850 (10th Cir. 1993). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 317.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts … where the records taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1355–56, 89 L. Ed. 2d 538 (1986) (citations omitted). On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." *Cardoso v. Calbone*, 490 F.3d 1194, 1997 (10th Cir. 2007); *see also*, *Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff").

# IV.
# ARGUMENTS AND AUTHORITIES

Plaintiffs assert a single cause of action against Nurse Horn for allegedly violating Decedent's Eighth Amendment right to adequate medical care. (*See*, Pls.' Compl. (Doc. 002) at 12-13, ¶¶49-54.) They contend that Decedent had obvious, severe, and emergent medical needs that Nurse Horn knew about but, nevertheless, deliberately disregarded. (*See id*. at 13, ¶¶50-51.) They alleged that Nurse Horn was deliberately indifferent to Decedent's medical needs by failing to timely or adequately provide medical treatment or by failing to supervise his condition, which they claim was the proximate cause of his death. (*See id*. at 13, ¶¶52-53.)  Plaintiffs also seek punitive damages against Nurse Horn. (*See id*. at 18, ¶80.)

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *Abila v. Funk*, 220 F. Supp. 3d 1121, 1161 (D.N.M. 2016) (quoting *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)). Individual, non-supervisory defendants *may* be liable *only if* the plaintiff can establish the requisite level of knowledge of the deprivation, and an unforeseeable intervening act has not terminated liability. *Id.* (citing *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012)).  A prison official's deliberate indifference to a prisoner's "serious medical needs" constitutes cruel and unusual punishment in violation of the Eighth Amendment.[2]

---

[2] *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976). Decedent was a pre-trial detainee, which invokes the Fourteenth Amendment's Due Process Clause. *Lopez v. LeMaster*, 172 F.3d 756, 759 n. 2 (10th Cir. 1999) ("Pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment") (citation omitted). "A pretrial detainee enjoys *at least* the same constitutional protections as convicted criminal.  Conduct that violates the clearly established rights of convicts necessarily violates the clearly established rights of pretrial detainees." *Blackmon v. Sutton*, 734 F.3d 1237, 1240–41 (10th Cir. 2013)  (citation omitted, emphasis in *Blackmon*); *and see*, *Lopez*, 172 F.3d at 759 n. 2 . ("In determining whether appellant's rights were violated, however, we apply an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983") (citation omitted).

Contrary to Petitioners' assertions, Nurse Horn was never deliberately indifferent to Decedent's serious medical needs.  Although Decedent died, a potential medical malpractice claim fails to establish a constitutional violation.  Regardless, even if Plaintiffs could establish Nurse Horn's liability (which they cannot), she is still entitled to qualified immunity.  Finally, Plaintiffs' demand for punitive damages is misplaced.  Thus, Nurse Horn is entitled to summary judgment in her favor against Plaintiffs' claim.

### A. PLAINTIFFS CANNOT SHOW THAT NURSE HORN KNEW ABOUT AND FAILED TO REASONABLY RESPOND TO DECEDENT'S SERIOUS MEDICAL NEEDS BY INTENTIONALLY DELAYING HIS ACCESS TO MEDICAL CARE.

Plaintiffs contend that Decedent had obvious, severe, and emergent medical needs that Nurse Horn knew about but, nevertheless, deliberately disregarded. (*See*, Pls.' Compl. (Doc. 002) at 13, ¶¶50-51.)  Plaintiffs alleged that Nurse Horn was deliberately indifferent to Decedent's medical needs by failing to timely or adequately provide medical treatment or by failing to supervise his condition.  (*See* Pls.' Compl. (Doc. 002) at 13, ¶¶52-53.)  To prevail on an Eighth Amendment deliberate-indifference claim, an inmate must satisfy "a two-pronged inquiry, comprised of an objective and subjective component." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) ; *and see*, *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) ("The test for deliberate indifference is both objective and subjective").

The objective component requires the deprivation be "sufficiently serious,"  meaning the deprivation exposed the inmate to a "substantial risk of serious harm." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000); *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977, 128 L. Ed. 2d 811 (1994).  The objective component of deliberate indifference is met if the "harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause." *Mata v. Saiz*, 427 F.3d 745, 752-53 (10th Cir. 2005) (quoting *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970). It is sufficient to provide evidence that a delay or deprivation of

medical care "unnecessarily prolonged appellant's pain and suffering." *Sealock*, 218 F.3d at 1210 n.5. It is conceded, for purposes of this Motion, that Plaintiffs could establish the objective prong.

Thus, the issue is whether Plaintiffs can satisfy the subjective prong on the evidentiary record. They cannot. "The subjective prong of the deliberate indifference test requires the plaintiff to present evidence of the prison official's culpable state of mind."[3] Plaintiffs may prevail on this component by showing that Nurse Horn knew that Decedent "faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Id*. (quoting *Martinez*, 563 F.3d at 1089).

But an inadvertent failure to provide adequate medical care—even if it rises to the level of medical malpractice—does not in itself amount to a constitutional violation. *Id*. (citing *Estelle*, 429 U.S. at 105-06). Nor does mere disagreement with the type of medical care provided establish an Eighth Amendment violation. *Id*. (citing *Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th Cir. 2006)) (prisoners do not have Eighth Amendment right to a particular course of treatment). To survive summary judgment, Plaintiffs must provide evidence supporting an inference that Nurse Horn knew about and disregarded a substantial risk of harm to Decedent's health or safety. *Id*. (citing *Mata*, 427 F.3d at 752).

Furthermore, "the fact that a serious medical need was 'obvious' could be evidence of deliberate indifference, although a 'prison official may show that the obvious escaped him' and avoid liability." *Self,* 439 F.3d at 1231 (citing *Farmer*, 511 U.S. at 843, n. 8). In addition, "'prison officials who actually knew of a substantial risk to inmate health or safety may be found free from

---

[3] *Hill v. Corr. Corp. of Am.*, 685 Fed. Appx. 665, 668 (10th Cir. 2017) (unpublished) (quoting *Mata*, 427 F.3d at 751). **NOTE**: Nurse Horn refers to *Hill*, and other unpublished decisions, not for any precedential value but for their persuasive value based upon their reasoned analysis. *See*, FED. R. APP. P. 32.1(a); 10TH CIR. R. 32.1(A).

liability if they responded reasonably to the risk, even if the harm ultimately was not averted.'" *Bruner-McMahon v. Hinshaw*, 846 F. Supp. 2d 1177, 1200, (D. Kan. 2012), *aff'd sub nom. Bruner-McMahon v. Jameson*, 566 Fed. Appx. 628 (10th Cir. 2014) (citing *Farmer,* 511 U.S. at 844).

Plaintiffs cannot show that Nurse Horn knew about and failed to reasonably respond to a substantial risk posed by Decedent's condition.  Nurse Horn was first informed of Decedent's complaints about back pain on Saturday, October 17th, but Decedent denied having fallen or received any other injuries, so she instructed jail staff to administer ibuprofen.  The following Monday, October 19th, she consulted with Decedent and examined his back, which led her believe that he may, possibly, have had a dislocated rib.  At that time, she permitted Decedent to contact his grandfather to schedule an appointment with a chiropractor.

When jail staff informed Nurse Horn of Decedent having a seizure on Wednesday, October 21st, she instructed them to call for an ambulance.  Paramedics Williams and Dillinger assessed Decedent's medical condition attempting to address his complaints of having a seizure, his inability to walk, and his back pain, among others, but Decedent refused transport to a hospital when he was not permitted to call his grandfather by removing a blood pressure cuff, standing up, and saying, "Take me to my [explicative] cell."  At the time, neither Williams nor Dillinger believed that Decedent was experiencing any acute, emergent, serious medical issue that required immediate hospitalization.

The next morning, on Thursday, October 22nd, Nurse Horn checked on Decedent who continued to complain about the same symptoms. She grew agitated with Decedent's complaints believing that he was not experiencing the symptoms that he complained of based upon her own observations of him moving his legs, statements made by other jail staff members that Decedent had walked to the restroom, and the paramedics not transporting him to a hospital the day before.

12

However, once Nurse Horn recognized that Decedent's condition had worsened a few hours later, she immediately requested another ambulance.  Thereafter, Decedent was transported to a hospital where he expired.  An autopsy revealed that Decedent died from acute pneumonia and sepsis but did not have a dislocated rib.

There is no evidence that suggests Nurse Horn knew the treatment provided or her referrals to paramedics were inadequate to assess and treat Decedent's complaints of back pain and his perceived injury (a dislocated rib). While her behavior on the morning of October 22nd was regrettable, unprofessional, and, certainly, not worthy of any accommodation, it does not support an inference that Nurse Horn knew of and deliberately disregarded a substantial risk of harm to Decedent's health or safety.  To the contrary, it supports an inference that Nurse Horn did not know Decedent had any acute, emergent, serious medical issue.  She stated, for example, that "there was nothing wrong" with Decedent and that she was "sick and tired of his dumb [explicative]."  When he continued to complain, she told him to "shut the [explicative] up."

However, once she realized that Decedent was in respiratory distress and that he may be suffering from something more serious than a dislocated rib, Nurse Horn immediately requested another ambulance. Although Plaintiffs could likely establish that the treatment Nurse Horn provided Decedent was not free of error, this is insufficient for establishing a violation of Decedent's civil rights or a constitutional violation. "A negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation," *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999).  In short, the treatment Decedent received does not amount to an "unnecessary ***and wanton*** infliction of ***pain***" proscribed by the Eighth Amendment. *Sealock*, 218 F.3d at 1210 (internal quotation marks

omitted, emphasis added). Since Plaintiffs cannot show that Nurse Horn acted with the requisite state of mind, she is entitled summary judgment on Plaintiffs' claim.

### B. NURSE HORN ACTED BY REQUESTING AMBULANCES, WHICH DID NOT VIOLATE DECEDENT'S CONSTITUTIONAL RIGHTS, AND, THEREFORE, SHE IS ENTITLED TO QUALIFIED IMMUNITY.

Plaintiffs assert claims against Nurse Horn in her individual capacity. (*See*, Pl.'s Am. Pet. (Doc. #002-28) at 14-18, ¶¶95-122.) Such claims are subject to the defense of qualified immunity. *Bennett v. Carter Cty. Bd. of Cty. Comm'rs*, Case No. CIV-17-289-SPS, 2019 WL 1671979, at *4 (E.D. Okla. Apr. 17, 2019) (slip op.) (Shreder, J.) (citing *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010) ("The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known") (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) ).

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S. Ct. 2727, 2732, 73 L. Ed. 2d 396 (1982) (citation omitted).  Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." *Pearson*, 555 U.S. at 232, 129 S. Ct. at 815 (citation omitted).  "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." *Lewis v. Tripp,* 604 F.3d 1221, 1230 (10th Cir. 2010).  Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. at 231 (citation omitted)). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy

border[s]" of the law. *Saucier v. Katz*, 533 U.S. 194, 205, 121 S. Ct. 2151, 2158, 150 L. Ed. 2d 272 (2001).

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right ***and*** (2) the constitutional right was clearly established. The court may consider either of these prongs before the other 'in light of the circumstances in the particular case at hand.'" *Bennett*, 2019 WL 1671979, at *4 (citations omitted, emphasis added in *Bennett*).  In defining a constitutional right, the court will consider whether at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would [have understood] that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011) (internal quotations and citation omitted, alteration in *al-Kidd*).

In reaching this determination, it is necessary to consider how specific to define the constitutional right.  *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S. Ct. 3034, 3038–39, 97 L. Ed. 2d 523 (1987). While it is not necessary for the plaintiff to provide a case with identical facts to establish that a right was clearly established, the plaintiff must do more than assert some general legal rule. *al-Kidd*, 563 U.S. at, 742, 131 S. Ct. at 2084 ("The general proposition, for example, that a search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established"). A prison admittedly has a "'[c]onstitutional obligation 'to provide medical care for those whom it is punishing by incarceration." *Ramos v. Lamm*, 639 F.2d 559, 574-75 (10th Cir. 1980) (citations omitted). However, this is a broad, general obligation. In defining whether there was a clearly established constitutional right in this case, the relevant inquiry is whether it was clearly established in 2015

that an inmate displaying some symptoms of back pain would need to receive immediate emergency medical treatment. On this issue, the law was not clearly established.

Decedent was not given medical treatment when paramedics first accessed his medical condition on Wednesday, October 21st.  Further, Nurse Horn may have acted in an uncouth, unprofessional, and regrettable bedside manner toward Decedent on Thursday, October 22nd. Both shortcomings may constitute violations of policy.  However, there is no evidence that Nurse Horn had anything to do with the paramedics' termination of their assessment or that she was involved in Decedent's refusal of medical treatment.  Likewise, there is no evidence that Nurse Horn had any contemporaneous knowledge of Decedent's actual internal illness rather than mistakenly believing that he suffered from a dislocated rib when she spoke harshly to him.  In any event, a violation of policy (even if such policy is required by state law) would not *ipso facto* establish a constitutional violation under § 1983.[4]

Regardless, Plaintiffs aver that Decedents' physical limitations and verbal descriptions of his unqualified persistent pain made it so obvious that he suffered from an acute, emergent, severe medical need that Nurse Horn knew or should have known that he had an untreated internal infection or needed additional examination or testing.[5]  Essentially, Plaintiffs contend that even a lay person, such as another inmate, could recognized that Decedent obviously needed medical

---

[4] *Bennett*, 2019 WL 1671979 , at *6 (citing *Rector v. City and Cty. of Denver*, 348 F.3d 935, 947 (10th Cir. 2003) ("It is well established, however, that a state's violation of its own laws does not create a claim under § 1983"); *and see*, *Bame v. Iron Cty.*, 566 Fed. Appx. 731, 738 (10th Cir. 2014) (unpublished) (citing *Hovater v. Robinson*, 1 F.3d 1063, 1068 n. 4 (10th Cir. 1993)) ("[A] failure to adhere to administrative regulations does not equate to a constitutional violation").

[5] *See*, *Bennett*, 2019 WL 1671979 , at *6 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious … [I]t remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety. That a trier of fact may infer knowledge from the obvious, in other words, does not mean that it must do so") (quoting *Farmer*, 511 U.S. at 842-844).

attention. However, this fails to show that Decedent displayed any symptoms that Nurse Horn interpreted as acute, emergent or severe beyond what he told her and she understood.

Based on her consultations with and assessments of Decedent, Nurse Horn mistakenly believed that he had a dislocated rib.  There is no evidence showing that Nurse Horn, at any time, had a reasonable basis for suspecting or knowing that Decedent had pneumonia or sepsis.  There is no evidence showing that Decedent ever presented with symptoms typically associated with pneumonia (*e.g.*, a cough, mucus streaked with blood, fever, shortness of breath, chest pain, *etc.*). While Decedent displayed symptoms associated with sepsis, these symptoms (*e.g.*, patches of discolored skin, problems breathing, cold to touch (falling body temperature), unconsciousness, *etc.*) did not become apparent until shortly before Nurse Horn summoned an ambulance.

In fact, it was Nurse Horn's recognition of his respiratory distress that alerted her to Decedent's emergent and serious medical condition.  Nurse Horn reasonably responded to Decedent's perceived medical conditions—a seizure on October 21st and respiratory distress on October 22nd—by requesting ambulances. In short, Nurse Horn did her job while exercising her best judgment based on her experience. She consulted with and assessed Decedent's medical condition, albeit, wrongfully assuming he had a dislocated rib. However, she responded quickly upon either becoming informed of or witnessing Decedent displaying a serious medical need. She called paramedics twice on two different occasions within just twenty-four (24) hours of each episode for Decedent's seizure and his septic shock.  Thus, there is no evidence of any extraordinary neglect by Nurse Horn in failing to recognize the seriousness and imminence of Decedent's condition as to constitute deliberate indifference.  Qualified immunity is, therefore, appropriate.

17

### C.     SINCE THEY ARE NOT ENTITLED TO COMPENSATORY DAMAGES, PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES.

Plaintiffs assert a claim for punitive damages against Nurse Horn. (*See*, Pls.' Compl. (Doc. 002) at 18, ¶80.) Punitive damages may be awarded under § 1983 in appropriate circumstances to deter or punish violations of constitutional rights. *Miller v. City of Mission, Kan.,* 705 F.2d 368, 377 (10th Cir. 1983) (internal citations omitted). However, it is elementary that punitive damages are only awardable when compensatory damages have been established, and furthermore, are only appropriate when the defendant's actions amount to a reckless or callous disregard for the plaintiff's rights, or intentional violations of federal law. *Smith v. Wade*, 461 U.S. 30, 51, 103 S. Ct. 1625, 1637, 75 L. Ed. 2d 632 (1983). Further any award of punitive damages against Nurse Horn would be barred to the extent that it such an award would be inconsistent with the standards and limitations set forth in *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996) and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003).

Even assuming for purposes of argument that compensatory damages could be awarded against Nurse Horn (which they cannot), Plaintiffs' evidence against her clearly fails to rise to the level of showing she acted with reckless or callous disregard for Decedent's rights or that she intentionally violated federal law. Rather, the evidence shows, at most, that Nurse Horn mistakenly believed Decedent had a dislocated rib and requested an ambulance on two separate occasions within twenty-four hours of each event to address his medical needs. Thus, there is insufficient evidence to support an action for punitive damages.

**WHEREFORE**, Defendant Theresa Horn, L.P.N., moves this Court to enter an Order granting her summary judgment against Plaintiffs Robbie Emery Burke, Special Administratrix of the Estate of Terrall Brooks Ellis, II, Deceased, Terral B. Ellis, Sr., and Shelly Bliss, and for such other relief as may be proper and just under the circumstances.

GOOLSBY, PROCTOR, HEEFNER & GIBBS, P.C.

*/s/ James L. Gibbs, II*
James L. Gibbs, II (OBA #15689)
Seth D. Coldiron (OBA #20041)
701 N. Broadway Ave., Suite 400
Oklahoma City, Oklahoma 73102
Telephone: (405) 524-2400
Facsimile: (405) 525-6004
Email: jgibbs@gphglaw.com
            scoliron@gphglaw.com

*Attorneys for Defendant,*
*Theresa Horn, L.P.N.*

## <u>CERTIFICATE OF SERVICE</u>

I, hereby, certify that in this 18th day of December 2019, I electronically transmitted the above and forgoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

SMOLEN & ROYTMAN, P.L.L.C.
Daniel E. Smolen, Esq.
Robert M. Blakemore, Esq.
Bryan D. Helm, Esq.
Email: danielsmolen@ssrok.com
         bobblakemore@ssrok.com
         bryonheld@ssrok.com

*Attorneys for Plaintiffs,*
*Robbie Emery Burk, Special Adm'x of the*
*Estate of Terrall Brooks Ellis, II, Deceased,*
*Terral B. Ellis, Sr., and Shelly Bliss*

PIERCE, COUCH, HENDRICKSON,
  BAYSINGER & GREEN, L.L.P.
Randall J. Wood, Esq.
Carson C. Smith, Esq.
Email: rwood@piercecouch.com
         csmith@piercecouch.com

*Attorneys for Defendants,*
*Johnny Bray and Charles Shoemaker*

COLLINS, ZORN & WAGNER, P.C.
Ambre C. Gooch, Esq.
Email: acg@czwlaw.com

*Attorney for Defendants,*
*Jeremy Floyd, Sheriff of Ottawa Cty., Terry*
*Durborow, former Sheriff of Ottawa Cty.,*
*and Jeffrey Harding*

PAUL & LACKEY, P.C.
John R. Paul, Esq.
John David Lackey, Esq.
Amy N. Bennett, Esq.
Email: john@paulandlackey.com
         johndavid@paulandlackey.com
         amy@paulandlackey.com

*Attorneys for Defendants,*
*Baptist Healthcare of Okla., L.L.C., d/b/a*
*Integris Miami EMS, Jennifer Dillinger*
*(Grimes) and Kent Williams*

/s/ James L. Gibbs, II
James L. Gibbs, II

20