## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ROBBIE EMERY BURKE, | ) | |
| Special Administratrix of the | ) | |
| Estate of Terral Brooks Ellis, II, | ) | |
| Deceased, | ) | |
| TERRAL B. ELLIS, SR., and | ) | |
| SHELLY BLISS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. CIV-17-325-JED-FHM |
| | ) | |
| JEREMY FLOYD, SHERIFF OF | ) | |
| OTTAWA COUNTY, in his | ) | |
| official capacity, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION FOR SUMMARY JUDGMENT OF
## DEFENDANT JOHNNY BRAY AND SUPPORTING BRIEF

Robert S. Lafferrandre, OBA #11897
Randall J. Wood, OBA #10531
Carson C. Smith, OBA #22303
PIERCE COUCH HENDRICKSON
   BAYSINGER & GREEN, L.L.P.
1109 N. Francis Ave.
Oklahoma City, OK 73106
Telephone: (405)235-1611
Facsimile: (405)235-2904
rlafferrandre@piercecouch.com
rwood@piercecouch.com
csmith@piercecouch.com
***Attorney for Defendants, Johnny Bray
and Charles Shoemaker***

- December 20, 2019 -

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………………..ii

EXHIBIT LIST….. …………………………………………………………………………v

INTRODUCTION………….. …………………………………………………………………1

I.    STATEMENT OF UNDISPUTED FACTS..…………………………………………..2

II.   THE DEFENDANT JOHNNY BRAY WAS NOT DELIBERATELY
      INDIFFERENT TO A SUBSTANTIAL RISK OF SERIOUS
      HARM TO ELLIS…………………………………………………………………… ……11

      A.    Bray was not Subjectively Aware of a Developing Serious
            Medical Condition and was not Deliberately Indifferent ……………… ……14

      B.    Officer Bray Relied on Nurse Horn and the Medical First
            Responders Who Examined Ellis…………………………………………… .17

      C.    Lack of Causation…………………………………………………………..20

III.  THE DEFENDANT IS ENTITLED TO QUALIFIED IMMUNITY …………….......21

IV.   PLAINTIFF MAY NOT RECOVER PUNITIVE DAMAGES
      FROM BRAY …………………………………………………………………………...24

Other Authorities

*A.M. v. Holmes*,
   830 F.3d 1123 (10th Cir. 2016) ............................................................................... 22
*Anglin v. City of Aspen, Colo*.,
   552 F.Supp.2d 1205 (D. Colo. 2008) ....................................................................... 19
*Arocho v. Nafziger*,
   367 F. App'x 942 (10th Cir. 2010) ........................................................................... 18
*Ashcroft v. al–Kidd*,
   563 U.S. 731, 131 S.Ct. 2074 (2011) ....................................................................... 22
*Barron v. Macy*,
   268 F. App'x 800 (10th Cir. 2008) ........................................................................... 17
*Bennett v. Carter Cty. Bd. of Cty. Commissioners*,
   No. CIV-17-289-SPS, 2019 WL 1671979 (E.D. Okla., Apr. 17, 2019) ................... 13
*Boyett v. Cty. of Wash*.,
   282 F. App'x 667 (10th Cir. 2008) ........................................................................... 16
*Brower v. Cnty. of Inyo,*
   489 U.S. 593 (1989) .................................................................................................. 20
*Bruner-McMahon v. Jameson*,
   566 Fed. Appx. 628 (10th Cir. 2014) ................................................................. 13, 16
*Callahan v. Poppell*,
   471 F.3d 1155 ........................................................................................................... 12
*Carabajal v. City of Cheyenne*,
   847 F.3d 1203 (10th Cir. 2017) ............................................................................... 11
*Clark v. Colbert*,
   895 F.3d 1258 (10th Cir. 2018) ............................................................................... 12
*Clark v. Edmunds*,
   513 F.3d 1219 (10th Cir. 2008) ............................................................................... 12
*Coudriet v. Vardaro*,
   Civ. No. 11-185, 2013 WL 1673137 (W.D. Pa. Mar. 19, 2013) ............................. 18
*District of Columbia v. Wesby*,
   138 S. Ct. 577 (2018) ............................................................................................... 22
*Durmer v. O'Carroll*,
   991 F.2d 64 (3d Cir.1993) ........................................................................................ 18
*Estate of Booker v. Gomez*,
   745 F.3d 405 (10th Cir.2014) .................................................................................. 12
*Estate of Moffitt by and through Kramer v. Minor*,
   2017 WL 6349706 (D. Colo. Sept. 28, 2017) .......................................................... 13
*Estate of Reat v. Rodriguez*,
   824 F.3d 960 (10th Cir. 2016) ................................................................................. 22

*Estate of Vallina v. Petrescu*,
  757 F. App'x 648 (10th Cir. 2018) ........................................................................................ 17

*Farmer v. Brennan*,
  511 U.S. 825 (1994) ............................................................................................... 13, 20, 23

*Fletcher, v. Unified Government of Wyandotte County, Kansas*,
  No. 19-3128-SAC, 2019 WL 6492633 (D. Kan. Dec. 3, 2019) ............................................. 17

*Fuerschbach v. Southwest Airlines Co.*,
  439 F.3d 1197, fn. 7 (10th Cir. 2006) .................................................................................. 24

*Gallegos v. City & Cty. of Denver*,
  984 F.2d 358 (10th Cir. 1993) ............................................................................................. 12

*Gross v. Pirtle*,
  245 F.3d 1151 (10th Cir. 2001) ........................................................................................... 21

*Hayes v. Snyder*,
  546 F.3d 516 (7th Cir. 2008) .............................................................................................. 18

*Holland v. Harrington*,
  268 F.3d 1179 (10th Cir. 2001) ........................................................................................... 11

*Hollis v. Davis*,
  2014 WL 7184406 (N.D. Okla. Dec. 16, 2014) ..................................................................... 19

*Howard v. Waide*,
  534 F.3d 1227 (10th Cir. 2008) ........................................................................................... 20

*Hunt v. Uphoff*,
  199 F.3d 1220 (10th Cir. 1999) ........................................................................................... 12

*Johnson v. Doughty*,
  433 F.3d 1001 (7th Cir.2006) .............................................................................................. 19

*Kisela v. Hughes*,
  138 S. Ct. 1148 .................................................................................................................. 22

*Lewis v. Tripp*,
  604 F.3d 1221 (10th Cir. 2010) ........................................................................................... 21

*Lopez v. LeMaster*,
  172 F.3d 756, fn. 2 (10th Cir. 1999) .................................................................................... 12

*Malley v. Briggs*,
  475 U.S. 335 (1986) ........................................................................................................... 21

*Marquez v. Martinez,*
  No. CIV 11-838 JAP/KBM, 2015 WL 5090467 (D.N.M. May 1, 2015) ................................... 20

*Martinez v. Beggs*,
  563 F.3d ........................................................................................................................... 13

*Mata v. Saiz*,
  427 F.3d 745 ................................................................................................... 12, 17, 20, 23

*McGaw v. Sevier County*,
  715 F. App'x 495 (6th Cir. 2017) ..................................................................................... 19, 20

*McRaven v. Sanders*,
  577 F.3d 974 (8th Cir.2009) ............................................................................................... 18

*Medina v. Cram*,
  252 F.3d 1124 (10th Cir. 2001) ........................................................................................... 21

*Meloy v. Bachmeier,*
  302 F.3d 845 (8th Cir. 2002) .............................................................................................. 19

iii

*Mick v. Brewer*,
　76 F.3d 1127 (10th Cir. 1996) .............................................................................. 11
*Mitchell v. Forsyth*,
　472 U.S. 511 (1985) ............................................................................................. 21
*Nelson v. McMullen,*
　207 F.3d 1202 (10th Cir. 2000) ............................................................................ 12
*Phillips v. Tiona*,
　508 F. App'x 737 (10th Cir. 2013) ........................................................................ 18
*Plumhoff v. Rickard*,
　134 S. Ct. 2012 (2014) .................................................................................... 21, 22
*Puller v. Baca,*
　781 F.3d 1190 (10th Cir. 2015) ............................................................................ 21
*Reynolds v. Powell*,
　370 F.3d 1028 (10th Cir. 2004) ............................................................................ 11
*Rice ex rel. Rice v. Corr. Med. Servs.*,
　675 F.3d 650 (7th Cir. 2012) ................................................................................ 19
*Rojas v. Anderson*,
　727 F.3d 1000 (10th Cir. 2013) ............................................................................ 12
*Saucier v. Katz*,
　533 U.S. 194 (2001) ............................................................................................. 21
*Schwartz v. Booker*,
　702 F.3d 573 (10th Cir. 2012) ............................................................................. 21
*Sealock v. Colorado*,
　218 F.3d 1205 (10th Cir. 2000) ................................................................ 12, 15, 20
*Smith v. Wade*,
　461 U.S. 30 (1983) ............................................................................................... 24
*Spears v. Ruth*,
　589 F.3d 249 (6th Cir. 2009) ................................................................................ 20
*Spruill v. Gillis*,
　372 F.3d 218 (3d Cir. 2004) ................................................................................. 19
*Stella v. Davis Cty.*,
　No. 1:18-CV-002, 2019 WL 4601611 (D. Utah Sept. 23, 2019) ............................. 17
*Thomson v. Salt Lake County*,
　584 F.3d 1304 (10th Cir. 2009) ............................................................................ 11
*White v. Pauly*,
　—– U.S. —––, 137 S. Ct. 548 (2017) ..................................................................... 22
*Wulf v. City of Wichita*,
　883 F.2d 842 (10th Cir. 1989) ............................................................................. 24

Regulations

42 U.S.C. § 1983 ......................................................................... 1, 20, 21, 24

9

Fed.R.Civ.P. 56 ........................................................................................................... 1

## INDEX TO EXHIBITS

Exh. 1       Booking Records for Terral Ellis

Exh. 2       Deposition of Theresa Horn

Exh. 3       Theresa Horn Progress Notes [Filed Under Seal]

Exh. 4       Declaration of Johnny Bray

Exh. 5 `     Deposition of Johnny Bray

Exh. 6       Deposition of Jennifer Grimes

Exh. 7       Integris EMS Run Report  [Filed Under Seal]

Exh. 8       Johnny Bray Incident Report

Exh. 9       Deposition of Charles Shoemaker

Exh. 10      Declaration of Charles Shoemaker

Exh. 11      Video Clip: Ellis Walks from D-Pod to Cell H-1 [Filed Conventionally]

Exh. 12      Video Clip: Ellis Walks to Bathroom at app. 08:18 pm [Filed Conventionally]

Exh. 13      Video Clip:  Ellis Walks to Bathroom at app. 01:37 am [Filed Conventionally]

Exh. 14      Video Clip: Ellis Walks to Bathroom at app. 03:23 am [Filed Conventionally]

Exh. 15      Incident Report of Johnny Bray

Exh. 16      Incident Report of Charles Shoemaker

Exh. 17      Quapaw Tribe Ambulance Service Report [Filed Under Seal]

Exh. 18      Integris Hospital Records [Filed Under Seal]

Exh. 19      Medical Examiner's Report  [Filed Under Seal]

Exh. 20      Report of Dr. Wilson

Exh. 21      Depo of Dr. Wilcox

Exh. 22      Depo of Michael Harrington

## MOTION FOR SUMMARY JUDGMENT OF DEFENDANT JOHNNY BRAY AND SUPPORTING BRIEF

Under the adjusted burden applicable given Bray's qualified immunity defense, Defendant Bray hereby requests the Court grant summary judgment in his favor under Fed.R.Civ.P. 56 for Plaintiff's lone claim against him: "Cruel and Unusual Punishment in Violation of the Eighth and Fourteenth Amendments to the Constitution of the United States (42 U.S.C. § 1983)." [Complaint, Doc. 2, pg. 12]. Defendant also requests he be granted qualified immunity and judgment on Plaintiff's punitive damage claim against him.

Bray, a jailer at the County Jail in October 2015, responded to Ellis on the afternoon of October 21, 2015, when Ellis was reportedly having a seizure, and Emergency Medical Technicians, both paramedics and Fire Department First Responders, promptly arrived and proceeded to medically assess Ellis in the jail, with Bray present for some of this assessment. Later on that evening, when Ellis was in a holding cell, in response to a verbal complaint from Ellis, Bray again promptly conveyed called the jail Nurse, and obtained instructions from her and learned that the Nuse would see Ellis that next morning. Bray also passed on the Nurse's instructions to other jailers on his shift. Video confirms all of this.

Bray fulfilled his duty as a jailer to convey information on Ellis to the jail's medical personnel, and acted promptly at each turn in doing so. As expected and instructed, he relied on medical to medically asses and treat Ellis. As the undisputed facts show that Bray neither had a subjective awareness of a serious medical condition of Ellis nor did he simply disregard any such condition, Bray is entitled to judgment as a matter of law. He is also entitled to qualified immunity, under the established two pronged test, given the facts showing no constitutional

1

violation, and the lack of clearly established law to the contrary, established case law clearly supports the actions of Officer Bray.

## I.   STATEMENT OF UNDISPUTED FACTS

1.   On October 10, 2015, Terral Ellis, the deceased, was booked into the Ottawa County Jail pursuant to an outstanding bench warrant issued in a felony charge against Ellis for DUI, second and subsequent.  [See Exh. 1 – Booking records for Ellis]  At the time of booking, Jail staff took a medical history from Ellis.  Ellis reported that he had a history of asthma, for which he took albuterol, but disclosed no other medical conditions, medications, or injuries. [Exh. 1 – Booking records, Bates 18]

2.   Nurse Theresa Horn, an LPN, was employed at the Ottawa County Jail. [Exh. 2 – Deposition of Theresa Horn, pp. 21-23] On Saturday, October 17, 2015, Nurse Horn was notified that Ellis was complaining of pain, stating "I think I broke my back."  Ellis reported that he thought the pain was from sleeping on a hard bunk.  Jail staff reported that Ellis was up moving around, and reported no other falls or injuries.  Nurse Horn advised jail staff to give Ellis Ibuprofen and that Nurse Horn would check on Ellis on Monday if the pain continued.  Nurse Horn received no reports from the Jail staff regarding Ellis over the weekend.  [Exh. 3 – Nurse Horn's Progress Notes; Exh. 2 – Theresa Horn deposition, pp. 105-107]

3.   On Monday, October 19, 2015, Ellis was brought to Nurse Horn's office for examination.  Ellis reported pain in the middle of his back that he thought was kidney stones. After examination, Nurse Horn informed Ellis that he had what appeared to be a dislocated rib. [Exh. 3 – Progress Notes for October 19th.]  Nurse Horn allowed Ellis to call his grandfather to see if he would pay for a chiropractor appointment.  There was no response from the grandfather,

2

so Ellis left a message. Nurse Horn gave Ellis Ibuprofen and advised Ellis that she would schedule Ellis to see the Physician's Assistant at her next round. [*Id.*]

4. In October of 2015, Defendant Johnny Bray worked as a Detention Officer at the Jail. He worked the 3:00 p.m., to 11:00 p.m. shift. He had no prior awareness of Ellis complaining of pain. [Exh. 4 – Declaration of Johnny Bray, ¶¶ 2, 4-6]   On October 21st, 2015, Bray arrived at work at around 3:00 p.m., and was at the booking desk. At approximately 4:30 p.m., Bray heard inmates in the D-Pod calling out for Detention Officers to come to the pod. Officer Bray and his co-worker, Detention Officer Cartis Lawson, immediately went to the D-Pod and learned that an inmate was having a medical problem. For security purposes, Officer Bray stayed at the door to the D-Pod, while Officer Lawson entered the pod and went back to the bunk where Ellis was located. [Exh. 4, ¶¶ 10-11] After several minutes, Officer Lawson returned and advised Officer Bray that inmate Ellis appeared to be having a seizure. Officer Bray immediately radioed the control tower to contact Nurse Horn. The control tower dispatcher advised Officer Bray that Nurse Horn had directed that the ambulance service be contacted, and that the ambulance service was on their way. [*Id.*, at 11; Exh. 3 – Nurse Horn's progress note for October 21st; Exh. 8 – Bray Incident Report]

5. Officer Bray directed the inmates in the pod to go outside to the recreation yard. Officer Bray then cleared a path for the paramedics to reach Ellis. [Exh. 4, at ¶ 11]. First Responders from the Miami Fire Department arrived at approximately 4:39 p.m., and were led by Officer Bray back to Ellis' location. Paramedics Kent Williams and Jennifer Grimes. with Integris Baptist Regional EMS ambulance service arrived a few minutes later. [Exh. 4, at ¶¶ 12-13; Exh. 7 – Integris EMS Run Report; see also Exh. 6 – Deposition of Jennifer Grimes, pp. 16-17]. The Paramedics found inmate Ellis laying on a mattress on the floor of the pod. Ellis was

3

awake and talking. Paramedic Grimes checked his pulse and evaluated his airway, breathing and circulation. Ellis' skin was described as "warm, pink, moist." [Exh. 7, p. 6]. The paramedics found Ellis to be alert and oriented. [Exh. 5, p. 18]. Ellis stated that he had a seizure but did not appear to the Paramedics to be "postictal"[1] at that time. [*Id.*].

6.  The paramedics took Ellis's blood pressure twice and recorded it to be within normal limits. 100/57 and 116/76. [Exh. 7, p. 6 100/57 and 116/76]. Ellis' pulse was also within normal limits. [*Id.*, - pulse rates of 82 and 84] Ellis appeared to be able to stand without difficulty. [Exh. 6, p. 62]. At the time that the paramedics were examining Ellis, he complained of a prior seizure, rib pain, back pain, an inability to walk, and dehydration. [Exh. 6, p. 94; Exh. 7 – Integris EMS Run Report, p. 2:  Ellis reported that he "had been urinating in a cup because he could not walk to the toilet."] But Paramedic Jennifer Grimes has testified that she cannot say yes or no that these are possible signs of a person who is suffering from some type of internal infection. [Exh. 6, p. 97]. The paramedics told a jailer that Ellis was "stable and nothing acute appeared to be happening." [Exh. 7, p. 6: Exh. 6, pp. 108-109]. According to the assessment of the paramedics, Ellis was stable and did not show any signs of an acute illness. [Exh. 6, p. 109]. There was nothing about Ellis that signaled to the paramedics that Ellis was in a dire medical condition at that point in time. [Exh. 6, p. 110].

7.  While the Paramedics and Miami Fire Department first responders were talking with Ellis, Officer Bray was called away to another pod.  [Exh. 4, ¶ 14]   When Officer Bray returned to the D-Pod, the Paramedics stated that they found no medical emergencies and that Inmate Ellis may have minor bruising to his ribs but that there was nothing they could do that was not already being done by the Ottawa County Jail. At this point Jail Administrator Jeff

---

[1] "Postictal" is defined as an altered mental state that is common after a whole-body seizure.  See Exh. 20, Report of Dr. Wilson, at p. 9]

Harding, who was also present, instructed Bray and Lawson to move Inmate Ellis to holding cell 1 and monitor Ellis. [*Id.*, at ¶ 15]

8.      In the presence of the paramedics, Ellis stated that he wanted to call his grandfather. When Ellis was told that he could not call his grandfather, Ellis became agitated, tore off the blood pressure cuff and threw it on the ground. Ellis stated to "take him to the holding cell now." [Exh. 6 – Deposition of Jennifer Grimes, pp. 31-33; see also pp. 34-36; Exh. 9 – Depo., of Charles Shoemaker, pp. 88, 207; Exh. 5 – Bray Depo., pp. 88 – 91]

9.      In the presence of the paramedics, Ellis stated that he wanted to go to the hospital so that he could call his grandfather. But when Ellis was told he couldn't call his grandfather at the hospital, Ellis got visibly angry and said "take me to my f--ing holding cell." Ellis then took off the blood pressure cuff and threw it on the floor. [Exh. 6, pp. 64-65].

10.     Although minutes earlier Ellis had claimed to the paramedics that he could "not walk to the toilet," Ellis was talking, **and had no apparent difficulty in walking from the D Pod to Cell H-1.** [See Exh. 11 – Video Clip 1 showing Ellis walking from D-Pod to Cell H-1.] The Paramedics and first responders left the jail at approximately 5:00 pm. [Exh. 4, at 16]

11.     Officer Bray has no recollection of ever being told by the Paramedics that if Ellis displayed any change in symptoms, to call them back. [Exh. 4, ¶ 16]

12.     Although Ellis had complained to the Paramedics that he could not walk to the bathroom, Officer Bray learned and observed that Ellis left Cell H-1 repeatedly to go to the bathroom. At approximately 8:15 pm, October 21st, Detention Officer Lawson opened the door to Cell H-1 to allow Ellis to use the restroom. The video shows Ellis walking from Cell H-1 to the bathroom with a cup of water in his hand. Ellis returned to his cell several minutes later. Bray

was not present for this, but was later informed that Ellis had been up walking. [See Exh. 4, at ¶ 19; see Exh. 12 – Video Clip No. 2 – Ellis walking at 8:19 to the bathroom.]

13. At approximately 9:30 pm, Officer Lawson checked on Ellis and returned to the booking desk stating that Ellis stated that he "can't feel his legs now." **Bray immediately picked up the phone and called Nurse Horn** to report this information. Nurse Horn informed Bray that EMT's had already been to the jail earlier in the day to check on Ellis. Nurse Horn also advised Bray to insist with Ellis that he needed to get up and move around, and that he needed to get up and use the bathroom himself. [Exh. 4, at ¶¶ 20-22; Exh. 15 – Bray Incident Report # 2; Exh. 5, pp. 153 – 155] Nurse Horn advised Officer Bray to give Ellis over-the-counter pain relief and she would be in to see Ellis the following morning. Bray was uncertain as to Ellis' physical condition. This is why he called Nurse Horn. [Exh. 5, p. 157; Exh. 4, ¶¶ 20-22]

14. Based upon this conversation, it appeared to Officer Bray that Nurse Horn did not believe that Inmate Ellis had an existing serious health condition and that this was a situation that could wait until the morning. Officer Bray relied upon the information that he received from Nurse Horn and he followed her instructions. [Exh. 4, ¶ 22]

15. At approximately 9:55 pm, Officer Lawson reported to Bray that Ellis had stated that he "can't get up to piss. He can't get up for nothing." At this point Bray understood that Ellis had previously been up and walking earlier this same evening. Bray had already been advised by Nurse Horn to just monitor Ellis and she would see him in the morning. Bray had already talked to the nurse less than 30 minutes before this event. [Exh. 4, ¶ 25]

16. At approximately 10:12 pm, Bray went to the door of Cell H1. Bray asked Ellis: "You've got to piss?". Ellis responded that he did not know. In response to a statement by Ellis, Bray stated "You're paralyzed now?" Officer Bray had already reported Ellis' complaints that his

legs were numb to Nurse Horn who had advised to simply continue to monitor Ellis. Bray was also aware that the Paramedics and first responders had already been out to see Ellis between 4:30 and 5:00 pm. When Bray was talking to Ellis at this time, he observed that there was nothing alarming about how Ellis looked or sounded. [Exh. 4, ¶ 26]

17.     At approximately 10:23 pm, Bray spoke with Inmate Ellis again. When Officer Bray saw Ellis, he was able to move his legs. At this point because of his prior conversations with Nurse Horn and because of his observations of the Paramedics and first responders examining Ellis earlier in the evening, Bray told Ellis that he did not have injuries that were going to cause his legs to go numb and not be able to move. This is what Bray understood from his previous conversation with Nurse Horn where Nurse Horn told Bray that Ellis needed to get up and move around.  [Exh. 4, at ¶ 27]

18.     At approximately 11:00 pm, other officers were coming on shift. This included Detention Officer Mike Wiford. At approximately 11:00 pm, Officer Wiford went to the door of Cell H-1 and opened the door and talked with Inmate Ellis.  Officer Bray also went over to the doorway and stood with Officer Wiford and observed the conversation. Ellis said that his legs were "numb." Officer Wiford responded that the "paramedics said that there wasn't anything wrong with you."  [Exh. 4, at ¶ 28]

19.     Officer Bray left the Jail at approximately 11:00 p.m., and had no further contact with Ellis. [Exh. 4, ¶ 29]

20.     Despite Ellis' claims that he could not walk and his legs were "numb," Ellis got up repeatedly to use the bathroom and get drinks of water.  See event at 8:19, p.m., previously discussed at Fact 12.  The video shows Ellis leaving Cell H-1 and walking to the bathroom and

7

returning to his cell at approximately at 1:37 am. [See Exh. 13 – Video Clip No. 3 – showing Ellis walking to the bathroom at 1:37 a.m.]

21. The video shows Ellis leaving Cell H-1 and walking to the bathroom and returning to his cell at approximately 3:23 a.m. [See Exh. 14 – Video Clip No. 4 – showing Ellis walking to the bathroom at 3:23 a.m.]

22. At no time did Bray ever see Ellis chained to a D – ring in Cell H – 1. No one ever told Bray that Ellis had ever been chained to a D – ring in any cell. [Exh. 4, ¶ 31].

23. Ellis' presentation on October 21, 2015, was unusual for a person suffering from developing septic shock secondary to pneumonia. [Report of Dr. Wilson, Exh. 20 at p. 7-8] Septic shock secondary to bronchopneumonia would usually cause low blood pressure, high heart rate, abnormal lung sounds, and cough, **none of which was observed in Ellis by the paramedics on October 21ˢᵗ.** [Exh. 20, p. 8].

24. Both the medical expert for Plaintiff (Dr. Wilcox) and the medical expert for Defendants Bray and Shoemaker (Dr. Wilson) agree on many relevant points with respect to sepsis, a jailer's place in the medical delivery system, and Ellis' presentation over time at the jail. Both expert physicians agree that sepsis is a difficult condition to diagnose, in part, due to the lack of diagnostic indicators that are accurate in all cases and the absence of a single marker for this multifaceted disease process. [Dr. Wilcox Depo, pg. 41:20- 42:19, Ex. 21]; [Dr. Wilson Report, pg. 7, Expert Opinion ¶ 2, Ex. 20]. Hence, sepsis is often difficult to diagnose and missed even in hospital settings, by physicians and other trained healthcare providers. [Dr. Wilcox Depo, pg. 41:20- 42:19; pg. 101:3-10]; [Dr. Wilson Report, *Id.*]. **Neither physician would expect a nurse or certainly a layperson, such as a jailer, to be able to diagnose sepsis or the development of sepsis**. [Dr. Wilcox Depo, pg. 102:10- pg. 103:13, Ex. 21]; [Dr. Wilson

Report, *Id.*, Ex. 20]. The same goes for a layperson's ability to recognize pneumonia or a seizure. [Dr. Wilcox Depo, pg. 104:4-21].

25. Both experts, Dr. Wilcox and Dr. Wilson, agree that, in a jail setting, it is reasonable and expected that jailers would rely on medical personnel or those with medical training, such as jail nurse or Emergency Medical Technicians. [Dr. Wilcox Depo, pg. 117:7- pg. 118:4, Ex. 21];[Dr. Wilson Report, pg. 8, Expert Opinion ¶ 4, Ex. 20]. It is a typical and good way to structure a facility's medical system. *Id.* Thus, a jailer's mental impressions of a detainee and his or her condition can be shaped by what the medical professional says about the patient that professional is seeing or treating. [Dr. Wilcox Depo, pg. 134:8-22, Ex. 21]; [Dr. Wilson Report, *Id.*, Ex. 20]. A layperson, such as a jailer, is not necessarily expected to know the difference medically between an assessment and a diagnosis. [Dr. Wilcox Depo, pg. 138:12-18].

26. Some of the conditions reported by Ellis turned out to be incorrect, as part of what was likely a confusing picture presented to jail and medical staff, during his stay at the Ottawa County jail. [Dr. Wilcox Depo, pg. 128:16-20, Ex. 21]; [Dr. Wilson Report, pg. 9, Expert Opinion ¶ 7, Ex. 20]. Both expert physicians agree that although Ellis reported that he was having a seizure on October 21, 2015, it is likely he was not having one. [Dr. Wilcox Depo, pg. 125:19-24; pg. 65:21- pg. 66-8]; [Dr. Wilson Report, pg. 9, Expert Opinion ¶ 6, 7]. Although Ellis reported that he was paralyzed, that was not accurate either, even to a layperson. [Dr. Wilcox Depo, pg. 136:2-12]; [Dr. Wilson Report, *Id.*]. Neither did he have a broken back, as many would understand the term relating to a structural fracture. [Dr. Wilcox Depo, pg. 111:22-112:9, Ex. 21]; [Dr. Wilson Report, pg. 9, Expert Opinion ¶ 7, Ex. 20].

27. Regardless of any verbal comments by jail staff, which did not affect Ellis's condition for the worse, the expert physicians both agree that Bray, after a comment doubting the

seizure report on the afternoon of October 21, called the jail nurse, who then called EMTs to come to the jail to see Ellis.  [Dr. Wilcox Depo, pg. pg. 131:6-9; 126:25- pg. 127:15, Ex. 21]; [Dr. Wilson Report, pg. 8, Expert Opinion ¶ 5, Ex. 20].  **The response time of Bray's actions, in calling the nurse, and the EMTs in arriving, was excellent**.  [Dr. Wilcox Depo, pg. 127:13- pg. 128:1] [Dr. Wilson Report, Exh. 20].  Dr. Wilcox admits that in his practice and experience, a caregiver may make an insensitive comment but then thereafter deliver good or excellent care. [Dr. Wilcox Depo, pg. 121:18-24; pg. pg. 124:11-21; pg. 128:2-9]; Dr. Wilson Report, Exh. 20]. People are capable of this; good care and negative comments are not mutually exclusive.  [Dr. Wilcox Depo, pg. 132:5-8;]; [Dr. Wilson Report, *Id.*]  The same scenario and opinion of Dr. Wilcox applies to Bray's quickly calling Nurse Horn later that evening, around 9:34 p.m., despite another jailer making an insensitive comment in his presence about Ellis at that time.  [Dr. Wilcox Depo, pg. 131:3- pg. 132:8];[Dr. Wilson Report, *Id.*].

28.     **Dr. Wilcox agrees jailers were doing their jobs by promptly reporting these situations to medical personnel**, in this case the jail nurse, Nurse Horn, especially if they were expecting and seeing Nurse Horn follow up, as they were, which Dr. Wilcox cannot dispute. [Dr. Wilcox Depo, pg. 131:3- pg. 133:22, Ex. 21]. Dr. Wilson agrees that jailers Bray and Shoemaker provided Ellis appropriate attention and that it would be unreasonable to expect something more or different from non-medical security staff. [Dr. Wilson Report, pg. 9, Expert Opinion ¶ 5, Ex. 20].

29.     Michael Harrington was detained in the Ottawa County jail in D pod during some of the time that Ellis was housed in D pod; Harrington was taken to another pod, F pod, for a four to five day period when Ellis was still in D pod. [M. Harrington Depo, pg. 102:7-21, Ex. 22].  Although Harrington alleges he and Ellis talked to Bray in the Rec yard at some point prior

to when Ellis was reported to be having a seizure on October 21, 2015, Harrington does not know what Bray did with the information from Harrington and Ellis, whether he reported to the nurse or not. [M. Harrington Depo, pg. 159: 7-16, Ex. 22].

30. Harrington does know, and testified that, during this exchange in the Rec yard, Bray asked Ellis and Harrington if Ellis had seen the nurse. Informed he had, and with Bray understanding Ellis had been seen, Bray instructed Ellis to follow the Nurse's directions and take the medicine she prescribed. [M. Harrington Depo, pg. 158:11-14; pg. 160:22-pg. 161:3, Ex. 22].

## II. The Defendant Johnny Bray was not Deliberately Indifferent to a Substantial Risk of Serious Harm to Ellis.

The Plaintiff asserts a single claim against Defendant Bray. Plaintiff claims Bray was deliberately indifferent to Ellis' medical needs, health and safety, and therefore violated Ellis' rights under the 8th and 14th Amendments. [See Complaint, Doc. 2, ¶¶ 50 - 54.] The Court is well familiar with the standard of deliberate indifference, but Bray emphasizes the following points:

**Where the Defendant has asserted qualified immunity, the Plaintiff must carry a heavy burden.** This Motion for Summary Judgment asserting qualified immunity must be reviewed differently from other summary judgment motions. *Holland v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001) *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004); *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009) Specifically, it is now the Plaintiff's burden to show (1) that Bray's actions violated a constitutional right, and (2) that the right allegedly violated was clearly established at the time of Ellis' death. Unless the Plaintiff carries this twofold burden, the Defendant prevails. *Reynolds*, 370 F.3d at 1030; *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996). **"This is a heavy burden.** If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Carabajal v. City of Cheyenne*, 847

F.3d 1203, 1208 (10th Cir. 2017)(emphasis added)**.** If the Plaintiff meets this two-part burden, **only then** does the Defendant then bear the traditional burden of the movant for summary judgment–showing that there are no genuine issues of material fact and that the Defendant is entitled to judgment as a matter of law. *Rojas v. Anderson*, 727 F.3d 1000, 1003 (10th Cir. 2013); *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008); *Nelson v. McMullen,* 207 F.3d 1202, 1205 (10th Cir. 2000); *Gallegos v. City & Cty. of Denver*, 984 F.2d 358, 361 (10th Cir. 1993) ("Only after plaintiff has met this initial [two-part qualified immunity] burden does the burden shift to defendants to prove that no genuine issue of material fact exists.").

As Ellis was a pretrial detainee, Plaintiff's denial of medical care claim is analyzed under the Due Process Clause of the 14th Amendment. However, the standard of review is the same under either the 14th Amendment or the 8th Amendment. *Estate of Booker v. Gomez*, 745 F.3d 405, 430 n. 30 (10th Cir.2014); *Lopez v. LeMaster*, 172 F.3d 756, fn. 2 (10th Cir. 1999).

**Objective componen**t.  "A medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)(quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)); *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018).

**Subjective Component - Deliberate Indifference.** "To prevail on the subjective component, the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Callahan v. Poppell*, 471 F.3d 1155, 1159 (internal quotation marks omitted)(quoting *Mata v. Saiz*, 427 F.3d 745, 753). Specifically, the subjective component is met if the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts

from which the inference could be drawn that a substantial risk of serious harm exists, **and he must also draw the inference**." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)(emphasis added).

The Supreme Court has emphasized that negligence, or even gross negligence, is not enough to show deliberate indifference. See *Farmer v. Brennan*, 511 U.S. 825, 836 - 38 (1994), wherein the Supreme Court compared deliberate indifference to criminal recklessness, which makes a person liable when the defendant consciously disregards a substantial risk of serious harm. *Id.*

The Supreme Court has cautioned that "an obvious risk cannot conclusively establish an inference that the official subjectively knew of the substantial risk of harm, because 'a prison official may show that the obvious escaped him.' "*Martinez v. Beggs*, 563 F.3d at 1089 (quoting *Farmer v. Brennan*, 511 U.S. at 843 n.8, 114 S.Ct. 1970).

When evaluating the subjective state of mind of the detention officer, Courts must also consider facts such as the obviousness of the risk, the information available to the officer, the observable symptoms, and the expected level of knowledge of the particular official. *Farmer*, 511 U.S. at 842–43, 114 S.Ct. 1970.

Finally, accusations of failure to recognize a broad range of "risk" are insufficient. The risk claimed by the plaintiff must be the same risk ignored by the Defendants. see *Bruner-McMahon v. Jameson*, 566 Fed. Appx. 628 (10th Cir. 2014) ("The risk prison officials ignored must be the risk appellants claimed."), citing *Martinez*, 563 F.3d at 1089 ("Finally, the subjective component requires the prison official to disregard the risk of harm claimed by the prisoner."). *Bennett v. Carter Cty. Bd. of Cty. Commissioners*, No. CIV-17-289-SPS, 2019 WL 1671979, at *7 (E.D. Okla., Apr. 17, 2019); *Estate of Moffitt by and through Kramer v. Minor*, 2017 WL 6349706, at *14 (D. Colo. Sept. 28, 2017) ("Although Hosier may have ultimately been wrong in

his assessment that Moffitt needed mental health treatment as compared to treatment for his alcohol related symptoms, a mistake or even negligent failure to provide adequate medical care does not rise to the level of a constitutional violation.").

### A. Bray was not Subjectively Aware of a Developing Serious Medical Condition and was not Deliberately Indifferent.

As shown by the Statement of Facts, supra, this is not a case where Bray ignored Ellis. To the contrary, the facts show that Bray and the Jail Staff repeatedly turned to medical staff to evaluate Ellis on October 21st and 22nd. Prior to October 21st, Bray has no recollection of any health complaints from Ellis. On October 21st, when Bray was informed that Ellis appeared to be having a seizure, Bray **immediately called dispatch to contact Nurse Horn.** Nurse Horn directed that an ambulance be called for Ellis. While Bray was present in the D-Pod, two trained First Responders from the Miami Fire Department and two trained paramedics from the Integris Baptist Regional EMS service interviewed and examined Ellis. But the medical staff found that his **vital signs were normal**, he was conscious, oriented, speaking normally, responsive to questions and "moving around without dizziness or any complaints of pain." [See Facts 5-7; see Exh. 7, Run Report p. 6] The Paramedics told jail staff that Ellis "was stable and nothing acute appeared to be happening." [See Fact 6]. **There was nothing that signaled to the paramedics that Ellis was in a serious or dire medical condition.** [Fact 7] Although Ellis was claiming that he could not walk or leave his bed, minutes later he stood up and **walked from the D-Pod to Cell H-1 with no apparent difficulty.** Bray observed a man who was coherent, responsive, and walking, and who was not transported by the team of medical professionals tending to Ellis that day. Nothing about this brief event caused Bray to believe that Ellis was experiencing a serious risk of medical harm.

Thereafter, Bray learned that at around 8:15 p.m., Ellis had been up walking from Cell H – 1 to the bathroom. Approximately one hour later, at 9:30 p.m., Ellis said that his legs were numb. But Bray had already seen Ellis walking earlier in the day, had witnessed the Paramedics evaluate Ellis and state that they found no medical emergencies, and had been told that Ellis had recently been up walking. Because of this series of events, Bray was uncertain as to Ellis' condition, **so he immediately called Nurse Horn**. Bray was told by Nurse Horn to tell Ellis to get up and move around, and she would see Ellis in the morning. Bray relied on Nurse Horn's instructions.

Between 10:00 p.m., and end of shift at 11:00, Ellis made other complaint that his legs were numb and he could not get up. But Bray could see Ellis legs moving, and had already called Nurse Horn to report the situation. [Exh. 4, ¶ 27] Bray left the jail just after 11:00 p.m., and had no other interaction with Ellis. Bray would also emphasize that even after Ellis repeatedly claimed that he "could not get up," Ellis was up walking around without apparent difficulty at 8:19 p.m., 1:37 a.m., and 3:23 a.m.

These facts show that Bray repeatedly referred Ellis to medical attention either through Nurse Horn or the Paramedics. This is not a case where Bray refused to allow access to medical staff or refused to fulfill his role as a gatekeeper. The Tenth Circuit has recognized two types of conduct constituting deliberate indifference: "First, a medical professional may fail to treat a serious medical condition properly.... The second type of deliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). "While access to a medical doctor may be necessary in certain situations, no constitutional violation occurs unless medical care is intentionally or recklessly denied."

*Boyett v. Cty. of Wash.*, 282 F. App'x 667, 673 (10th Cir. 2008)(internal citation omitted). Here, it is clear that Bray did not prevent Ellis from receiving treatment or accessing the Nurse. Bray contacted the Nurse through dispatch or called Nurse Horn directly **twice within the remainder of the shift.**

Although Ellis complained this legs were numb or that he could not get up, Bray was faced with differing information including that Bray *saw Ellis moving his legs.* Nurse Horn had been informed of Ellis' complaints and had stated that she would wait to see Ellis in the morning. There was nothing alarming about Ellis' appearance. [Exh. 4, ¶¶ 26 – 27.] Under these circumstances, there is no evidence that Bray believed that Ellis was dying, or facing any other serious medical condition. Any accusation that Bray should have perceived that Ellis was "ill" or "sick" is insufficient to show deliberate indifference. In *Bruner-McMahon v. Jameson,* 566 F. App'x 628, 634 (10th Cir. 2014), the Tenth Circuit observed that it "it is not sufficient—for a constitutional claim—to show that defendants observed that Mr. Bruner appeared to have the flu or was acting in a strange way that might have been related to a mental health condition. Rather, as the district court properly observed, **appellants were required to produce evidence showing that defendants appreciated that Mr. Bruner 'had a risk of a fatal medical condition and chose to disregard" that risk**.'" (emphasis added).

The facts show that Ellis had a developing internal infection process but presented symptoms that are atypical of developing sepsis or acute bronchopneumonia. As repeatedly admitted by Plaintiff's expert, Dr. Wilcox, sepsis is **a notoriously difficult condition to diagnose**. [Fact 24] Neither Dr. Wilcox or Dr. Wilson (Defendants' expert witness) *would expect a layperson to be able to diagnose sepsis, the development of sepsis, or developing pneumonia.* [Fact 24] Both experts agree that it is reasonable for jail staff to rely on medical

16

staff, such as a jail nurse or EMT's. [Fact 25] Both experts agree that reports by Ellis that he was having a seizure, "paralyzed," or had a "broken back" were not accurate. [Fact 26]. The core fact remains that Bray contacted Nurse Horn repeatedly to respond to Ellis and check him out. Under these facts, it cannot be said that Bray was deliberately indifferent.

Ellis' internally developing sepsis and bronchopneumonia were not the type of malady "'that even a lay person would easily recognize the necessity for medical care.'" *Fletcher, v. Unified Government of Wyandotte County, Kansas*, No. 19-3128-SAC, 2019 WL 6492633, at \*3 (D. Kan. Dec. 3, 2019)(citing *Mata*, 427 F.3d at 751); *Barron v. Macy*, 268 F. App'x 800, 801 (10th Cir. 2008)(Tenth Circuit affirmed dismissal of case where inmate alleged a broken little finger but did not allege "swelling, discoloration, bleeding, or [visible] broken bones that would make his injury as one obviously needing immediate medical care."); *Stella v. Davis Cty.*, No. 1:18-CV-002, 2019 WL 4601611, at \*9 (D. Utah Sept. 23, 2019)("a ruptured spleen and/or internal bleeding would not be obvious to a lay person.").

## B. Officer Bray Relied on Nurse Horn and the Medical First Responders Who Examined Ellis.

The Tenth Circuit has held that although "denial of access to treatment for a serious medical condition" constitutes deliberate indifference, the failure to "treat a serious medical condition properly" does not. *Estate of Vallina v. Petrescu*, 757 F. App'x 648, 651 (10th Cir. 2018)(unpublished). Discussing *Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005), the Tenth Circuit in *Petruscu* stated: "Although *Mata* clearly establishes that denial of access to treatment for a serious medical condition constitutes deliberate indifference, plaintiffs' allegations in this case concern the failure to 'treat a serious medical condition properly,' **which we have long held fails to evince deliberate indifference**." (emphasis added) Thus, the Tenth Circuit has made it clear that it is a complete denial of access to treatment that shows deliberate indifference. Plaintiff's

argument that Ellis should have been given more or better attention or treatment from either Nurse Horn or the paramedics is the same argument that the Tenth Circuit has "long held fails to evince deliberate indifference." As another court has stated, "deliberate indifference is often not found when "some level of medical care has been offered to the inmate." *Coudriet v. Vardaro*, Civ. No. 11-185, 2013 WL 1673137, at *5 (W.D. Pa. Mar. 19, 2013), report and recommendation adopted, Civ. No. 11-185, 2013 WL 1668225 (W.D. Pa. Apr. 17, 2013), aff'd, 545 F. App'x 99 (3d Cir. 2013).

These facts show Bray was acting to get Ellis access to medical staff, and then relying on the judgment of jail medical staff "which negates rather than supports liability." *Arocho v. Nafziger*, 367 F. App'x 942, 956 (10th Cir. 2010)(allegations showing a warden's reasonable reliance on prison medical staff does not support deliberate indifference); *McRaven v. Sanders*, 577 F.3d 974, 981 (8th Cir.2009); *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008); *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir.1993).

In *Phillips v. Tiona*, 508 F. App'x 737, 744 (10th Cir. 2013), the inmate complained for months for the removal of a surgical screw in his ankle. The warden responded that ""[medical staff] is evaluating your case. You will hear soon." *Id.* at 744. In affirming dismissal of the claim against the warden, the Tenth Circuit stated that "[m]erely sending grievances to a warden is not enough to attach liability, and the warden's response signified nothing more than a reasonable reliance on the judgment of prison medical staff." *Id.* Here, Bray was responding in a similar fashion, and certainly quicker, by relaying Ellis' complaints to Nurse Horn and following her instructions to continue to monitor Ellis, to tell Ellis to get up and move around, and that she would see Ellis in the morning.

Many other cases confirm that jail staff's deferral to jail medical staff is not deliberate

indifference. In *Hollis v. Davis*, 2014 WL 7184406, at \*6 (N.D. Okla. Dec. 16, 2014) the Court there stated that "the reasonable reliance of jail officials on the medical advice of their contract partners would not necessarily be deliberate indifference. [citation omitted] Thus, summary judgment on defendant's provision of medical care defense can be granted in plaintiff's favor **only if plaintiff shows that no reasonable juror could find that defendants could reasonably rely on the advice of [the contract medical provider]'s medical staff as to plaintiff's care**." (emphasis added). See also *Anglin v. City of Aspen, Colo*., 552 F.Supp.2d 1205, 1225 n.4 (D. Colo. 2008) ("As a non-medical professional, a reasonable law enforcement officer cannot be expected to question the judgment of qualified medical professional absent some extraordinary circumstances, the nature of which the court cannot even conjecture at this point."). *McGaw v. Sevier County*, 715 F. App'x 495, 498–99 (6th Cir. 2017) ("Where, as here, an officer responds to a substantial risk of serious harm by asking for and following the advice of a professional [that] the officer believes to be capable of assessing and addressing that risk, then the officer commits no act of deliberate indifference in adhering to that advice."); *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)(where "a prisoner is under the care of medical experts ... a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."); *Johnson v. Doughty*, 433 F.3d 1001, 1010–11 (7th Cir. 2006) (prison official may reasonably rely on the judgment of medical professionals); *Meloy v. Bachmeier,* 302 F.3d 845, 849 (8th Cir. 2002) ("The law does not clearly require an administrator with less medical training to second-guess or disregard a treating physician's treatment decision."); *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 676, 678–79 (7th Cir. 2012)("When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention.").

Bray was entitled to rely on the medical training of Nurse Horn, an LPN, and the paramedics from the Integris Baptist Regional EMS service. *McGaw v. Sevier Cty., Tennessee*, 715 F. App'x 495, 498–99 (6th Cir. 2017)("Nor has this court ever recognized the status of an LPN as precluding an officer from relying on that LPN's judgment."); *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009)(officer entitled to rely on the EMTs' and the jail nurse's medical assessments that the inmate did not need to be transported to the hospital.)

The fact that the harm to Ellis was ultimately not averted does not change the fact that Bray was not deliberately indifferent. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. 825, at 844); *Howard v. Waide*, 534 F.3d 1227, 1239 (10th Cir. 2008).

### C. Lack of Causation.

Additionally, Plaintiff has failed to establish that any action or inaction of Bray actually caused his alleged damages. Section 1983 only imposes liability on a defendant who "subjects, or causes to be subjected, any citizen … or other person … to the deprivation of any rights" under federal law. 42 U.S.C. § 1983. "This provision has been read to require a § 1983 plaintiff to prove that the defendant's conduct was the 'proximate result' of Plaintiff's injuries." *Marquez v. Martinez,* No. CIV 11-838 JAP/KBM, 2015 WL 5090467 * 7 (D.N.M. May 1, 2015) (quoting *Brower v. Cnty. of Inyo,* 489 U.S. 593, 599 (1989); When a plaintiff claims a delay in medical care, he must show the delay resulted in substantial harm. See *Mata,* 427 F.3d at 753; *Sealock,* 218 F.3d at 1210. Plaintiff cannot establish any affirmative link between Bray's alleged acts or omission and his alleged damages.

### III. THE DEFENDANT IS ENTITLED TO QUALIFIED IMMUNITY.

Defendant Bray is entitled to qualified immunity. In civil rights actions seeking damages from governmental officials, "courts recognize the affirmative defense of qualified immunity, which protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001) quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity protects public officials from individual liability in Section 1983 claims and is "an entitlement to not stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Qualified immunity is more than a defense to liability: it is immunity from suit that is effectively lost if a case is erroneously permitted to go to trial. *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012). "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." *Lewis v. Tripp*, 604 F.3d 1221, 1230 (10th Cir. 2010).

An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was "clearly established." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). Thus, the burden is on Plaintiff to prove (a) that Ellis' constitutional rights were violated by Bray, and (b) at the time that the constitutional violation occurred, the law was so clearly established that the Defendant would have clearly understood that his actions violated the Constitution. "When a defendant asserts qualified immunity, ... the burden shifts to the plaintiff to establish (1) a violation of a constitutional right (2) that was clearly established." *Puller v. Baca,* 781 F.3d 1190, 1196 (10th Cir. 2015). This is a " 'heavy, two-part burden' that the plaintiff must meet," and "[f]ailure on either element is fatal to the plaintiff's claims." *Id.* (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)).

21

A defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable officer in the defendant's shoes would have understood that he was violating the constitutional right. *Plumhoff v. Rickard*,572 U.S. 765, 778-779, 134 S.Ct. 2012, 2023, (2014) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 2080 (2011)) The Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018); *Plumhoff* at 778 – 779. Thus, existing precedent must have placed the statutory or constitutional question **beyond debate.**" *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (quoting *White v. Pauly*, ––– U.S. ––––, 137 S. Ct. 548, 551 (2017))(emphasis added). A right is clearly established when a precedent involves " 'materially similar conduct' " or applies " 'with obvious clarity' " to the conduct at issue. *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964–65 (10th Cir. 2016). This is a "quite heavy" burden for the Plaintiff to meet. *A.M. v. Holmes*, 830 F.3d 1123, 1135 (10th Cir. 2016).

As previously discussed, Bray was not deliberately indifferent to a known risk of serious medical harm to Ellis, and thus did not violate the constitutional rights of Ellis.

The Plaintiff cannot identify a body of case law that clearly establishes that Bray violated Ellis' constitutional rights when Bray observed Ellis being evaluated by a team of four first responders and paramedics on October 21st, received reports that Ellis had been up walking, called Nurse Horn again at 9:30 p.m., and repeatedly observed Ellis to be alert, oriented, and verbally responsive.

Here, Defendants Bray and Shoemaker both received reports of pain, possible seizure and leg numbness from Ellis and passed those reports on to Nurse Horn. A review of the established

authority does not show that such actions violate clearly established law. To the contrary, the great weight of authority shows that where jail staff fulfill a role as gatekeepers to other medical staff, they are not deliberately indifferent. In *Mata v. Saiz, supra*, Nurse Amy Hough was aware that the inmate had been complaining for days of severe chest pains and that she "could hardly breath." 427 F.3d at 759. Nurse Hough reported the inmate's complaints to a Nurse Practitioner. Despite Nurse Hough's specific knowledge of the inmate's complaints of severe chest pain, the Tenth Circuit firmly agreed that Nurse Hough was not deliberately indifferent. Because Nurse Hough had "fulfilled her gatekeeper duty" by reporting the inmate's reported chest pain to the Nurse Practitioner, the district court "correctly concluded that Ms. Hough was not deliberately indifferent to Ms. Mata's serious medical needs" and was properly dismissed from the case. *Id.* Additionally, because the Nurse Practitioner in turn relayed the inmate's EKG test results on to a doctor, the Nurse Practitioner also had "fulfilled her gatekeeper duty" and was therefore not deliberately indifferent to the inmate's health even though the Nurse Practitioner was well aware of the inmate's report of severe chest pains. 427 F.3d at 759 – 760.

This rule is supported by the numerous other cases cited in this Brief above, where courts have concluded that jail staff is not deliberately indifferent when they refer the complaints to medical staff and rely on the medical staff's higher knowledge. Further, conceptually, Bray cannot be said to have "consciously disregard[ed]" a substantial risk of serious harm when he took action, and prompt action at that, to report the situation to the medical personnel, as was the policy and practice at the Ottawa County jail. *Farmer v. Brennan*, 511 U.S. 825, 836 - 38 (1994). In these circumstances, there was no clearly established law that would have made Bray's actions unlawful to him in October 2015.

### IV. PLAINTIFF MAY NOT RECOVER PUNITIVE DAMAGES FROM BRAY

As discussed at length previously in this Brief, there is no evidence that Bray deliberately intended to cause Ellis any harm.  "In § 1983 matters, punitive damages will be awarded only when 'the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1214, fn. 7 (10th Cir. 2006), quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983). See also *Wulf v. City of Wichita*, 883 F.2d 842, 867 (10th Cir. 1989) ("an award of punitive damages requires an assessment of [defendant's] subjective state of mind"). The evidence, even viewed in the light most favorable to Plaintiff, does not support a reasonable inference that Bray's conduct rose to that level in this case. See, e.g., *Wulf,* 883 F.2d at 867 ("[N]ot every intentional violation of a plaintiff's constitutional rights subjects a defendant to punitive damages."). Not a single witness has testified that Bray exhibited any malevolence or other sufficiently culpable wrongful intent nor is there any evidence thereof. In fact, Dr. Wilcox testified that the jail staff were doing their jobs by promptly reporting Ellis' complaints to Nurse Horn.  [Fact 34]. The evidence in the record confirms that Bray did not deliberately block Ellis from accessing to health care.

WHEREFORE, foregoing premises considered, Defendant Bray is entitled to qualified immunity and judgment as a matter of law on Plaintiff's Section 1983 claim and his request for punitive damages, together with such further relief this Court deems just and proper.

Respectfully submitted,

s/Randall J. Wood
Robert S. Lafferrandre, OBA #11897
Randall J. Wood, OBA #10531
Carson C. Smith, OBA #11897
PIERCE COUCH HENDRICKSON
  BAYSINGER & GREEN, L.L.P.
1109 N. Francis Ave.
Oklahoma City, OK 73106
Telephone: (405)235-1611
Facsimile: (405)235-2904
rlafferrandre@piercecouch.com
rwood@piercecouch.com
csmith@piercecouch.com
***Attorneys for Defendants Johnny Bray
and Charles Shoemaker***

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of December, 2019, I electronically transmitted the above and foregoing document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Daniel E. Smolen           danielsmolen@ssrok.com
Robert M. Blakemore        bobblakemore@ssrok.com
Bryon D. Helm              bryonheld@ssrok.com
SMOLEN & ROYTMAN, P.L.L.C.
*Attorneys for Plaintiffs*

Ambre C. Gooch        .      acg@czwlaw.com
COLLINS ZORN WAGNER, P.C.
*Attorneys for Defendants,*
*Jeremy Floyd, Sheriff of Ottawa County, Terry*
*Durburow, former Sheriff of Ottawa County,*
*and Jeffrey Harding*

John R. Paul               john@paulandlackey.com
John David Lackey          johndavid@paulandlackey.com
Amy N. Bennett             amy@paulandlackey.com
PAUL & LACKEY, P.C.
*Attorneys for Defendants,*
*Baptist Healthcare of Okla., L.L.C.,*
*d/b/a Integris Miami EMS, Jennifer*
*Dillinger (Grimes) and Kent Williams*

James L. Gibbs, II         jgibbs@gphglaw.com
Seth D. Coldiron           scoldiron@gphglaw.com
GOOLSBY, PROCTOR, HEEFNER
  & GIBBS, P.C.
*Attorneys for Defendant,*
*Theresa Horn, L.P.N.*


                              s/Randall J. Wood
                              Randall J. Wood