# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

ROBBIE EMERY BURKE,⠀⠀⠀⠀⠀⠀⠀)
Special Administratrix of the⠀⠀⠀⠀⠀)
Estate of Terral Brooks Ellis, II,⠀⠀⠀)
Deceased,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
TERRAL B. ELLIS, SR., and⠀⠀⠀⠀⠀)
SHELLY BLISS,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Plaintiffs,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀Case No. CIV-17-325-JED-FHM
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
JEREMY FLOYD, SHERIFF OF⠀⠀⠀⠀)
OTTAWA COUNTY, in his⠀⠀⠀⠀⠀⠀)
official capacity, et al.,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Defendants.⠀⠀⠀⠀⠀⠀⠀)

---

## MOTION FOR SUMMARY JUDGMENT OF DEFENDANT CHARLES SHOEMAKER AND SUPPORTING BRIEF.

---

Robert S. Lafferrandre, OBA #11897
Randall J. Wood, OBA #10531
Carson C. Smith, OBA #22303
PIERCE COUCH HENDRICKSON
⠀BAYSINGER & GREEN, L.L.P.
1109 N. Francis Ave.
Oklahoma City, OK 73106
Telephone: (405)235-1611
Facsimile: (405)235-2904
rlafferrandre@piercecouch.com
rwood@piercecouch.com
csmith@piercecouch.com
*Attorney for Defendants*
*Charles Shoemaker and Johnny Bray*

- December 20, 2019 -

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………………………………...ii

EXHIBIT LIST….. …………………………………………………………………………….v

INTRODUCTION…………….. ……………………………………………………………………1

I.       STATEMENT OF UNDISPUTED FACTS..…………………………………………..2

II.      THE DEFENDANT CHARLES SHOEMAKER WAS NOT DELIBERATELY
         INDIFFERENT TO A SUBSTANTIAL RISK OF SERIOUS
         HARM TO ELLIS…………………………………………………………………..…...12

         A.      Shoemaker was not Subjectively Aware of a Developing Serious
                 Medical Condition and was not Deliberately Indifferent …………………………15

         B.      Officer Shoemaker Relied on Nurse Horn and the Medical First
                 Responders Who Examined Ellis………………………………………………..18

         C.      Lack of Causation………………………………………………………………… 21

III.     THE DEFENDANT IS ENTITLED TO QUALIFIED IMMUNITY …………………..22

IV.      PLAINTIFF MAY NOT RECOVER PUNITIVE DAMAGES
         FROM SHOEMAKER…………………………………………………………………..25

Page(s)

Other Authorities

*A.M. v. Holmes*,
   830 F.3d 1123 (10th Cir. 2016) ............................................................................................. 23
*Anglin v. City of Aspen, Colo*.,
   552 F.Supp.2d 1205 (D. Colo. 2008)...................................................................................... 20
*Arocho v. Nafziger*,
   367 F. App'x 942 (10th Cir. 2010)......................................................................................... 19
*Ashcroft v. al–Kidd*,
   563 U.S. 731, 131 S.Ct. 2074 (2011)...................................................................................... 23
*Barron v. Macy*,
   268 F. App'x 800 (10th Cir. 2008) ......................................................................................... 18
*Bennett v. Carter Cty. Bd. of Cty. Commissioners*,
   No. CIV-17-289-SPS, 2019 WL 1671979 (E.D. Okla., Apr. 17, 2019) ................................... 15
*Brower v. Cnty. of Inyo,*
   489 U.S. 593 (1989)................................................................................................................ 21
*Bruner-McMahon v. Jameson*,
   566 Fed. Appx. 628 (10th Cir. 2014)...................................................................................... 14
*Callahan v. Poppell*,
   471 F.3d .................................................................................................................................. 14
*Carabajal v. City of Cheyenne*,
   847 F.3d 1203 (10th Cir. 2017) .............................................................................................. 13
*Clark v. Colbert*,
   895 F.3d 1258 (10th Cir. 2018) .............................................................................................. 13
*Clark v. Edmunds*,
   513 F.3d 1219 (10th Cir. 2008) .............................................................................................. 13
*Coudriet v. Vardaro*,
   Civ. No. 11-185, 2013 WL 1673137 (W.D. Pa. Mar. 19, 2013) ............................................ 18
*District of Columbia v. Wesby*,
   138 S. Ct. 577 (2018).............................................................................................................. 23
*Durmer v. O'Carroll*,
   991 F.2d 64 (3d Cir.1993)....................................................................................................... 19
*Estate of Booker v. Gomez*,
   745 F.3d 405 (10th Cir.2014) ................................................................................................. 13
*Estate of Moffitt by and through Kramer v. Minor*,
   2017 WL 6349706 (D. Colo. Sept. 28, 2017)................................................................... 15, 17
*Estate of Reat v. Rodriguez*,
   824 F.3d 960 (10th Cir. 2016) ................................................................................................ 23
*Estate of Vallina v. Petrescu*,
   757 F. App'x 648 (10th Cir. 2018)........................................................................................... 18

*Farmer v. Brennan*,
 511 U.S. 825 (1994) .................................................................................................. 14, 21, 25
*Fletcher, v. Unified Government of Wyandotte County, Kansas*,
 No. 19-3128-SAC, 2019 WL 6492633 (D. Kan. Dec. 3, 2019) ............................................. 18
*Fuerschbach v. Southwest Airlines Co.*,
 439 F.3d 1197, fn. 7 (10th Cir. 2006) .................................................................................... 25
*Gallegos v. City & Cty. of Denver*,
 984 F.2d 358 (10th Cir. 1993) ............................................................................................... 13
*Gross v. Pirtle*,
 245 F.3d 1151 (10th Cir. 2001) ............................................................................................. 22
*Hayes v. Snyder*,
 546 F.3d 516 (7th Cir. 2008) ................................................................................................. 19
*Holland v. Harrington*,
 268 F.3d 1179 (10th Cir. 2001) ............................................................................................. 12
*Hollis v. Davis*,
 2014 WL 7184406 (N.D. Okla. Dec. 16, 2014) ...................................................................... 20
*Howard v. Waide*,
 534 F.3d 1227 (10th Cir. 2008) ............................................................................................. 21
*Hunt v. Uphoff*,
 199 F.3d 1220 (10th Cir. 1999) ............................................................................................. 13
*Johnson v. Doughty*,
 433 F.3d 1001 (7th Cir.2006) ................................................................................................ 20
*Kisela v. Hughes*,
 138 S. Ct. 1148 .................................................................................................................... 23
*Lewis v. Tripp*,
 604 F.3d 1221 (10th Cir. 2010) ............................................................................................. 22
*Lopez v. LeMaster*,
 172 F.3d 756, fn. 2 (10th Cir. 1999) ...................................................................................... 13
*Malley v. Briggs*,
 475 U.S. 335 (1986) .............................................................................................................. 22
*Marquez v. Martinez,*
 No. CIV 11-838 JAP/KBM, 2015 WL 5090467 (D.N.M. May 1, 2015) ................................. 21
*Martinez v. Beggs*,
 563 F.3d .......................................................................................................................... 14, 15
Mata v. Saiz,
 427 F.3d ............................................................................................................. 14, 18, 21, 24
*McGaw v. Sevier County*,
 715 F. App'x 495 (6th Cir. 2017) ...................................................................................... 20, 21
*McRaven v. Sanders*,
 577 F.3d 974 (8th Cir.2009) .................................................................................................. 19
*Medina v. Cram*,
 252 F.3d 1124 (10th Cir. 2001) ............................................................................................. 22
*Meloy v. Bachmeier*,
 302 F.3d 845 (8th Cir. 2002) ................................................................................................. 20
*Mick v. Brewer*,
 76 F.3d 1127 (10th Cir. 1996) ............................................................................................... 13

*Mitchell v. Forsyth*,
   472 U.S. 511 (1985).............................................................................................................. 22
*Nelson v. McMullen,*
   207 F.3d 1202 (10th Cir. 2000) ........................................................................................... 13
*Phillips v. Tiona*,
   508 F. App'x 737 (10th Cir. 2013).......................................................................................... 19
*Plumhoff v. Rickard*,
   134 S. Ct. 2012 (2014).................................................................................................. 22, 23
*Puller v. Baca,*
   781 F.3d 1190 (10th Cir. 2015) ........................................................................................... 22
*Reynolds v. Powell*,
   370 F.3d 1028 (10th Cir. 2004) ..................................................................................... 12, 13
*Rice ex rel. Rice v. Corr. Med. Servs.*,
   675 F.3d 650 (7th Cir. 2012) ............................................................................................... 20
*Rojas v. Anderson*,
   727 F.3d 1000 (10th Cir. 2013) ........................................................................................... 13
*Saucier v. Katz*,
   533 U.S. 194 (2001)............................................................................................................. 22
*Schwartz v. Booker*,
   702 F.3d 573 (10th Cir. 2012) ............................................................................................. 22
*Sealock v. Colorado*,
   218 F.3d 1205 (10th Cir. 2000) ..................................................................................... 13, 21
*Smith v. Wade*,
   461 U.S. 30 (1983)............................................................................................................... 25
*Spears v. Ruth*,
   589 F.3d 249 (6th Cir. 2009) ............................................................................................... 21
*Spruill v. Gillis*,
   372 F.3d 218 (3d Cir. 2004)................................................................................................. 20
*Stella v. Davis Cty.*,
   No. 1:18-CV-002, 2019 WL 4601611 (D. Utah Sept. 23, 2019)............................................. 18
*Thomson v. Salt Lake County*,
   584 F.3d 1304 (10th Cir. 2009) ........................................................................................... 12
*White v. Pauly*,
   —— U.S. ——, 137 S. Ct. 548 (2017)..................................................................................... 23
*Wulf v. City of Wichita*,
   883 F.2d 842 (10th Cir. 1989) ............................................................................................. 25

Regulations

42 U.S.C. § 1983........................................................................................... 1, 21, 22, 25

9

Fed.R.Civ.P. 56...................................................................................................................... 1

## INDEX TO EXHIBITS

Exh. 1          Booking Records for Terral Ellis

Exh. 2          Deposition of Theresa Horn

Exh. 3          Theresa Horn Progress Notes [Filed Under Seal]

Exh. 4          Declaration of Johnny Bray

Exh. 5 `        Deposition of Johnny Bray

Exh. 6          Deposition of Jennifer Grimes

Exh. 7          Integris EMS Run Report  [Filed Under Seal]

Exh. 8          Johnny Bray Incident Report

Exh. 9          Deposition of Charles Shoemaker

Exh. 10         Declaration of Charles Shoemaker

Exh. 11         Video Clip: Ellis Walks from D-Pod to Cell H-1 [Filed Conventionally]

Exh. 12         Video Clip: Ellis Walks to Bathroom at app. 08:18 pm [Filed Conventionally]

Exh. 13         Video Clip:  Ellis Walks to Bathroom at app. 01:37 am [Filed Conventionally]

Exh. 14         Video Clip: Ellis Walks to Bathroom at app. 03:23 am [Filed Conventionally]

Exh. 15         Incident Report of Johnny Bray

Exh. 16         Incident Report of Charles Shoemaker

Exh. 17         Quapaw Tribe Ambulance Service Report [Filed Under Seal]

Exh. 18         Integris Hospital Records [Filed Under Seal]

Exh. 19         Medical Examiner's Report  [Filed Under Seal]

Exh. 20         Report of Dr. Wilson

Exh. 21         Depo of Dr. Wilcox

Exh. 22         Depo of Michael Harrington

**MOTION FOR SUMMARY JUDGMENT OF DEFENDANT CHARLES SHOEMAKER AND SUPPORTING BRIEF.**

Under the adjusted burden applicable given his qualified immunity defense, Defendant Shoemaker hereby requests the Court grant summary judgment in his favor under Fed.R.Civ.P. 56 for Plaintiff's lone claim against him: "Cruel and Unusual Punishment in Violation of the Eighth and Fourteenth Amendments to the Constitution of the United States (42 U.S.C. § 1983)." [Complaint, Doc. 2, pg. 12]. Defendant also requests he be granted qualified immunity and judgment on Plaintiff's punitive damage claim against him.

Shoemaker, the assistant jail administrator in October 2015, had no real interaction Ellis until the afternoon of October 21, 2015, when he came into D pod after a team of paramedics and first responders had been summoned by other jailers to attend to Inmate Terral Ellis. After this medical assessment, Ellis was moved to a holding cell for observation, and Shoemaker went off shift that day. The next day, Shoemaker called the jail nurse early in the morning, reporting on Ellis and twice thereafter communicated with her, asking her to see him, which she did in his presence.

Shoemaker fulfilled his duty to convey information on Ellis to the jail's medical personnel, and acted promptly at each turn in doing so. As expected and instructed, he relied on medical to medically asses and treat Ellis. As the undisputed facts show that Shoemaker neither had a subjective awareness of a serious medical condition of Ellis nor did he simply disregard any such condition, Shoemaker is entitled to judgment as a matter of law. He is also entitled to qualified immunity, under the established two pronged test, given the facts and the lack of clearly established law which would have clearly shown Shoemaker's actions were unlawful. To the contrary, the established law clearly supports the conclusion that Shoemaker acted lawfully.

1

<u>**STATEMENT OF UNDISPUTED FACTS**</u>

1.     On October 10, 2015, Terral Ellis, the deceased, was booked into the Ottawa County Jail pursuant to an outstanding bench warrant issued in a felony charge against Ellis for DUI, second and subsequent. [See Exh. 1 – Booking records for Ellis]   At the time of booking, Jail staff took a medical history from Ellis. Ellis reported that he had a history of asthma, for which he took albuterol, but disclosed no other medical conditions, medications, or injuries. [Exh. 1 – Booking records, Bates 18]

2.     Nurse Theresa Horn, an LPN, was employed at the Ottawa County Jail. [Exh. 2 – Deposition of Theresa Horn, p. 21-23] On Saturday, October 17, 2015, Nurse Horn was notified that Ellis was complaining of pain, stating "I think I broke my back." Ellis reported that he thought the pain was from sleeping on a hard bunk. Jail staff reported that Ellis was up moving around, and reported no other falls or injuries. Nurse Horn advised jail staff to give Ellis Ibuprofen and that Nurse Horn would check on Ellis on Monday if the pain continued. Nurse Horn received no reports from the Jail staff regarding Ellis over the weekend. [Exh. 3 – Nurse Horn's Progress Notes; Exh. 2 – Theresa Horn deposition, pp. 105-107]

3.     On Monday, October 19, 2015, Ellis was brought to Nurse Horn's office for examination. Ellis reported pain in the middle of his back that he thought was kidney stones. After examination, Nurse Horn informed Ellis that he had what appeared to be a dislocated rib. [Exh. 3 – Progress Notes for October 19th.] Nurse Horn allowed Ellis to call his grandfather to see if he would pay for a chiropractor appointment. There was no response from the grandfather, so Ellis left a message. Nurse Horn gave Ellis Ibuprofen and advised Ellis that she would schedule Ellis to see the Physician's Assistant at her next round. [*Id.*]

4. In October of 2015, Defendant Charles Shoemaker worked as the Assistant Jail Administrator at the Jail. Mr. Shoemaker typically worked from 9:00 a.m. to 5:00 p.m. [Exh. 10 - Declaration of Shoemaker, ¶ 3; Exh. 9 - Deposition of Shoemaker, p. 55] Prior to October 21, 2015, Mr. Shoemaker cannot recall interacting with Inmate Terral Ellis, and does not recall observing Ellis prior to October 21st. Mr. Shoemaker cannot recall having any involvement with any medical complaints that Ellis may have made prior to October 21, 2015. [Exh. 10, ¶ 4]

5. On October 21st, 2015, Detention Officer Johnny Bray arrived at work at around 3:00 p.m, and was at the booking desk. At approximately 4:30 p.m., Bray heard inmates in the D-Pod calling out for Detention Officers to come to the pod. Officer Bray and his co-worker, Detention Officer Cartis Lawson, immediately went to the D-Pod and learned that an inmate was having a medical problem. For security purposes, Officer Bray stayed at the door to the D-Pod, while Officer Lawson entered the pod and went back to the bunk where Ellis was located. [Exh. 4, ¶¶ 10, 11] After several minutes, Officer Lawson returned and advised Officer Bray that inmate Ellis appeared to be having a seizure. Officer Bray immediately radioed the control tower to contact Nurse Horn. The control tower dispatcher advised Officer Bray that Nurse Horn had directed that the ambulance service be contacted, and that the ambulance service was on their way. [*Id.*, at 11; Exh. 3 – Nurse Horn's progress note for October 21st; Exh. 8 – Bray Incident Report.]

6. Officer Bray directed the inmates in the pod to go outside to the recreation yard. Officer Bray then cleared a path for the paramedics to reach Ellis. [Exh. 4, at ¶ 11]. First Responders from the Miami Fire Department arrived at approximately 4:39 p.m., and were led by Officer Bray back to Ellis' location. Paramedics Kent Williams and Jennifer Dillinger (then known as Jennifer Grimes) with Integris Baptist Regional EMS ambulance service arrived a few

minutes later. [Exh. 4, at ¶ 13; Exh. 7 – Integris EMS Run Report; see also Exh. 6 – Deposition of Jennifer Dillinger, pp. 16-17]. The Paramedics found inmate Ellis laying on a mattress on the floor of the pod. Ellis was awake and talking. Paramedic Dillinger checked his pulse and evaluated his airway, breathing and circulation. Ellis' skin was described as "warm, pink, moist." [Exh. 7, p. 6]. The paramedics found Ellis to be alert and oriented. [Exh. 5, p. 18; Exh. 6, pp. 18, 80; Exh. 7, p. 6]. Ellis stated that he had had a seizure "in which he stated that he was awake during." [Exh. 7 - Integris EMS Run report at p. 6] Ellis did not appear to the Paramedics to be "postictal" at that time. [*Id.*].[1]

7.      The paramedics took Ellis's blood pressure twice and recorded it to be within normal limits. 100/57 and 116/76. [Exh. 7, p. 6 100/57 and 116/76]. Ellis' pulse was also within normal limits. [*Id.*, - pulse rates of 82 and 84; Exh 20, p. 8 - Report of Dr. Wilson confirming that these are "low normal values."]   Ellis appeared to be able to stand without difficulty. [Exh. 6, p. 62]. Ellis reported that he "**was not having any trouble breathing."** [Exh. 7, p. 6] Lung sounds were checked by Paramedic Jennifer Dillinger and found to be "clear and equal bilaterally." [*Id.*, at 6] At the time that the paramedics were examining Ellis, he complained of a prior seizure, rib pain, back pain, an inability to walk, and dehydration. [Exh. 6, p. 97; Exh. 7 – Integris EMS Run Report, p. 2:  Ellis reported that he "had been urinating in a cup because he could not walk to the toilet."] But Paramedic Jennifer Dillinger has testified that she cannot say yes or no that these are possible signs of a person who is suffering from some type of internal infection. [Exh. 6, p. 97]. The paramedics told a jailer that Ellis was "stable and nothing acute appeared to be happening." [Exh. 7, p. 6: Exh. 6, pp. 108-109]. According to the assessment of the paramedics, Ellis was stable and did not show any signs of an acute illness. [Exh. 6, p. 109].

---

[1] "Postictal" is defined as an altered mental state that is common after a whole-body seizure.  See Exh. 20, Report of Dr. Wilson, at p. 9]

There was nothing about Ellis that signaled to the paramedics that Ellis was in a dire medical condition at that point in time. [Exh. 6, p. 110].

8.      In the late afternoon of October 21, 2015, Mr. Shoemaker was told that there was an inmate complaining of having a seizure. At approximately 4:53 p.m., Mr. Shoemaker walked into the D Pod (a large dormitory pod) and observed that Inmate Terral Ellis was being examined by two Paramedics from the Integris Baptist Regional EMS and two first responders from the Miami Fire Department. Mr. Shoemaker observed Ellis stating that he was having a seizure. The Paramedics told Ellis that if he was having a seizure right then, he would not be able to speak to the Paramedics. [Exh. 10, ¶ 5.; Exh. 9 - Shoemaker Deposition, p. 88.] Shoemaker understood that Paramedics were not going to transport because Ellis' vital signs were fine, he was coherent and was talking with them. [Exh. 10, ¶ 5] Mr. Shoemaker witnessed Ellis then rip off the blood pressure cuff and become agitated and state "take me to my holding cell." [Exh. 5, ¶ 6]

9.      Mr. Shoemaker did not participate in the decision of whether or not Ellis would be transported to the Hospital. The outcome of the Paramedics coming to the Jail and then departing the facility was that Ellis was not transported. [Exh. 10, ¶ 7] Mr. Shoemaker did not have any other interactions with Ellis on October 21st. Mr. Shoemaker was in the D Pod with Ellis **only for approximately seven minutes on October 21st.** [Exh. 10, ¶¶ 5 - 9] At this point Mr. Shoemaker left the scene and shortly thereafter left the jail to go home. [*Id.*, at ¶ 9.]

10.     Although minutes earlier Ellis had claimed to the paramedics that he could "not walk to the toilet," Ellis was talking, **and had no apparent difficulty in walking from the D Pod to Cell H1.** [See Exh. 11 – Video Clip 1 showing Ellis walking from D-Pod to Cell H-1.] The Paramedics and first responders left the jail at approximately 5:00 pm. [Exh. 4, ¶ 16.]

11. At approximately 8:00 am on October 22, 2015, Mr. Shoemaker returned to the jail. Mr. Shoemaker received a report from Mike Wiford, supervisor on the overnight shift. Mr. Wiford stated that Ellis had used the bathroom a couple of times during the overnight shift. This caused Mr. Shoemaker to review the jail video to confirm whether or not Ellis had been up going to the bathroom, as reported by Mr. Wiford. On that video, Mr. Shoemaker saw that Ellis left cell H-1 on the evening of October 21st at approximately 8:18 pm. [Exh. 10, ¶ 12; see Exh. 12 – Video Clip 2 showing Ellis up and walking at 8:18 p.m.]

12. The video of the overnight shift also showed that at 1:37 a.m., on October 22, 2015, Ellis walked out of cell H-1, went to the bathroom and returned to cell H-1. [Exh. 10, ¶ 13; see Exh. 13 – Video Clip 3 showing Ellis up walking at 1:37 a.m. on October 22nd.]

13. The video of the overnight shift also shows that at approximately 3:23 a.m., Ellis got up again and walked out of cell H-1, went to the bathroom, and returned to cell H-1. [Exh. 10, ¶ 14; see Exh. 14 – Video Clip 4 showing Ellis up walking at 3:23 a.m.]

14. On the morning of October 22, 2015, after Shoemaker had reviewed the video, Shoemaker was aware that Ellis had been up several times walking back and forth from cell H-1 to the bathroom. [Exh. 10, ¶ 15]

15. At approximately 8:15 a.m. on the morning of October 22nd, Ellis was in cell H-1 and called out for help. Ellis was asking jail staff to call the ER (emergency room). Mr. Shoemaker told Ellis that Shoemaker was not going to call the ER, **but would call the Jail Nurse.** [Exh. 10, ¶ 16] Mr. Shoemaker said this because he could not see anything wrong with Ellis in the cell, and also because Mr. Shoemaker knew that Ellis had been seen by the Paramedics and Miami Fire Department first responders the night before. But Ellis had been up several times during the night going to the bathroom and/or getting drinks of water. Mr. Wiford,

the shift supervisor of the previous shift, had also told Shoemaker that there were times that Ellis said that he did not really want to get up, but then Ellis got up several times during the overnight shift. [*Id.*, at ¶ 17]

16. Mr. Shoemaker did not think that Ellis was faking an illness, but needed to consult with the Jail Nurse. [Exh. 10, ¶ 17]

17. Several minutes after talking with Ellis, Shoemaker called the jail nurse, Nurse Theresa Horn. Shoemaker has reviewed the shift logs maintained by the jail and these shift logs reflect that this call was made to Nurse Horn at 8:33 am. Shoemaker informed Nurse Horn of Ellis' complaints. Shoemaker told Nurse Horn that Ellis was calling out for help and asked her what she wanted Shoemaker to do. Nurse Horn informed Shoemaker that she would see Ellis when she got into the jail that morning. [Exh. 10, ¶ 18]

18. At approximately 9:00 a.m., Shoemaker was sitting at the booking desk and another detention officer, Travis Eads, was with Shoemaker in the booking area. Ellis called out for a drink of water. When Officer Eads started to retrieve a cup of water for Ellis, Shoemaker stated "No, he can get up and he can go get it. He did it last night. Don't let him try to fool you." Mr. Eads then informed Ellis that he would leave the door open to cell H1 for a couple of minutes so that Ellis could get a drink of water. Shoemaker made these statements because he had already watched the video of Ellis walking to the bathroom to get water and Shoemaker had been advised by Mr. Wiford that Ellis had gone to the bathroom several times. [Exh. 10, ¶ 19]

19. The video shows Shoemaker opening the cell door to H-1 and talking with Ellis at approximately 9:40 am. Shoemaker does not have any recollection of Ellis appearing to have a medical emergency or serious medical condition at this time. [Exh. 10, ¶ 20.]

7

20. At approximately 10:00 am, Ellis reported that he was having difficulty breathing. Officer Eads went over to the cell and checked on Ellis. [Exh. 10, ¶ 21]

21. At approximately 10:20 am on the morning of October 22nd, Nurse Theresa Horn arrived at the jail. Shoemaker was waiting for Nurse Horn and immediately went to her and told her that she needed to see Ellis now. Her response was "yeah, give me a minute." [Exh. 10, ¶ 22]

22. At approximately 10:45 Nurse Horn came to cell H-1 to see Ellis. Shoemaker was also present near the door to cell H-1 when Nurse Horn talked to Ellis. Shoemaker did not go into the cell. Ellis told Nurse Horn that his legs were black and blue. Nurse Horn told Ellis that his legs were fine, that they were not black, that they were pink and they were red. Nurse Horn stated to Ellis that EMS had checked him out and that they thought that "there is nothing wrong with you." At this point Shoemaker understood that Nurse Horn had formed the opinion that there was nothing wrong with Ellis and that he was cleared to come off of medical watch. [Exh. 10, ¶¶ 23 - 24]

23. After this Shoemaker decided to let Ellis stay in cell H-1 for the rest of the day so that things could calm down. Shoemaker did not want to put an angry, upset inmate into a pod with 40 other people. Shoemaker wanted to allow things to calm down and de-escalate. Shoemaker planned to move Ellis out of cell H-1 and back to the general pod at the end of my shift, which would have been at approximately 5:00 pm. [Exh. 10, ¶ 25]

24. At approximately 1:40 pm on October 22nd, Shoemaker had been dealing with Nurse Horn regarding another inmate. While Shoemaker was talking to Nurse Horn, Shoemaker asked her to go see Inmate Ellis. Shoemaker stated to Nurse Horn that Shoemaker would go get Ellis and bring Ellis to her office. She agreed to see him. Shoemaker then went to cell H-1 and opened the door and Shoemaker saw Ellis laying down. Shoemaker tried talking to him but

Shoemaker could not get any verbal response. **Ellis looked very different from when Shoemaker had seen him earlier in the day.** Shoemaker noticed that his feet and hands were discolored to a blue with red spots. Ellis' arm was cold to the touch. Ellis looked like he needed immediate medical attention. Shoemaker immediately went to Nurse Horn and told her that she needed to go look at Ellis right then. [Exh. 10, ¶¶ 26 - 27; Exh. 16 - Shoemaker Incident Report.]

25.     Shoemaker followed Nurse Horn back to cell H-1. Nurse Horn and Shoemaker entered cell H-1. Nurse Horn then informed Shoemaker to contact emergency medical services. Shoemaker immediately left cell H-1 and contacted dispatch to contact the ambulance service. Shoemaker stayed at the booking desk and did not re-enter the cell. Nurse Horn remained in the cell, and then came out of the cell while Shoemaker was waiting for the ambulance personnel to arrive. [Exh. 10, ¶ 28; Exh. 16 - Shoemaker Incident Report.]

26.     The Quapaw Tribe Ambulance Service arrived at the jail at approximately 2:00 p.m. [Exh. 10, ¶ 29] When the paramedics entered the cell, they recorded they described Ellis condition: "Patient alert, will respond to some questions and will follow with eyes." [Exh. 17 - Quapaw Tribe Ambulance Service Report, at Bates 59] Ellis had a normal sinus rhythm, blood pressure of 121/61, pulse rate "regular 84," and skin described as mottled, dry and cool. [*Id.*, at Bates 57] At approximately 2:07 p.m the paramedics and first responders took Ellis out of cell H-1 and placed him on the gurney. [[Exh. 10, ¶ 29; Exh. 17, at Bates 59]. Once Ellis was loaded into the ambulance, he had an "abrupt change in level of responsiveness." [Exh. 17, at Bates 59] The paramedics began resuscitation efforts in the ambulance and transported Ellis to the hospital, where he was pronounced dead. [Exh. 17, at Bates 59; Exh. 18 - Integris Hospital Records.]

27.     The Medical Examiner determined the cause of death to be "sepsis/septic shock due to acute bronchopneumonia." [Exh. 19 - Medical Examiner's Report.]

28.     At no time did Shoemaker ever see Inmate Ellis chained to a D – ring in Cell H –
1. No one ever told Shoemaker that Ellis had ever been chained to a D – ring in any cell. [Exh.
9, pp. 106 - 107].

29.     Ellis' presentation on October 21, 2015, was unusual for a person perhaps
suffering from developing septic shock secondary to pneumonia.  [Report of Dr. Wilson, Exh. 20
at p. 7] Septic shock secondary to bronchopneumonia would usually cause low blood pressure,
high heart rate, abnormal lung sounds, and cough, **none of which was observed in Ellis by the
paramedics on October 21st.**  [Exh. 20, pp. 7 - 8]

30.     Both the medical expert for Plaintiff (Dr. Wilcox) and for Defendants Bray and
Shoemaker (Dr. Wilson) agree on many relevant points with respect to sepsis, a jailer's place in
the medical delivery system, and Ellis' presentation over time at the jail. Both expert physicians
agree that sepsis is a difficult condition to diagnose, in part, due to the lack of diagnostic
indicators that are accurate in all cases and the absence of a single marker for this multifaceted
disease process. [Dr. Wilcox Depo, pg. 41:20- 42:19, Ex. 21; Dr. Wilson Report, pg. 7, Expert
Opinion ¶ 2, Ex. 20].  Hence, sepsis is often difficult to diagnose and missed even in hospital
settings, by physicians and other trained healthcare providers. [Dr. Wilcox Depo, pg. 41:20-
42:19; pg. 101:3-10; Dr. Wilson Report, *Id.*]. Neither physician would expect a nurse or certainly
a layperson, such as a jailer, to be able to diagnose sepsis or the development of sepsis.  [Dr.
Wilcox Depo, pg. 102:10- pg. 103:13, Ex. 21]; [Dr. Wilson Report, *Id.*, Ex. 20]. The same goes
for a layperson's ability to recognize pneumonia or a seizure.  [Dr. Wilcox Depo, pg. 104:4-21].

31.     Both experts, Dr. Wilcox and Dr. Wilson, agree that, in a jail setting, it is
reasonable and expected that jailers would rely on medical personnel or those with medical
training, such as jail nurse or Emergency Medical Technicians.  [Dr. Wilcox Depo, pg. 117:7-

pg. 118:4, Ex. 21; Dr. Wilson Report, pg. 8, Expert Opinion ¶ 4, Ex. 20]. It is a typical and good way to structure a facility's medical system. *Id.* Thus, a jailer's mental impressions of a detainee and his or her condition can be shaped by what the medical professional says about the patient that professional is seeing or treating. [Dr. Wilcox Depo, pg. 134:8-22, Ex. 21]; Dr. Wilson Report, *Id.*, Ex. 20]. A layperson, such as a jailer, is not necessarily expected to know the difference medically between an assessment and a diagnosis. [Dr. Wilcox Depo, pg. 138:12-18].

33. Some of the conditions reported by Ellis turned out to be incorrect, as part of what was likely a confusing picture presented to jail and medical staff, during his stay at the Ottawa County jail. [Dr. Wilcox Depo, pg. 128:16-20, Ex. 21; Dr. Wilson Report, pg. 9, Expert Opinion ¶ 7, Ex. 20]. Both expert physicians agree that although Ellis reported that he was having a seizure on October 21, 2015, it is likely he was not having one. [Dr. Wilcox Depo, pg. 125:19-24; pg. 65:21- pg. 66-8; Dr. Wilson Report, pg. 9, Expert Opinion ¶ 6, 7]. Although Ellis reported that he was paralyzed, that was not accurate either, even to a layperson. [Dr. Wilcox Depo, pg. 136:2-12; Dr. Wilson Report, *Id.*]. Neither did he have a broken back, as many would understand the term relating to a structural fracture. [Dr. Wilcox Depo, pg. 111:22- 112:9, Ex. 21; Dr. Wilson Report, pg. 9, Expert Opinion ¶ 7, Ex. 20].

33. Regardless of any verbal comments by jail staff, which did not affect Ellis's condition for the worse, the expert physicians both agree that Bray, after a comment doubting the seizure report on the afternoon of October 21, called the jail nurse, who then called EMTs to come to the jail to see Ellis. [Dr. Wilcox Depo, pg. pg. 131:6-9; 126:25- pg. 127:15, Ex. 21; Dr. Wilson Report, pg. 8, Expert Opinion ¶ 5, Ex. 20]. The response time of Bray's actions, in calling the nurse, and the EMTs in arriving, was excellent. [Dr. Wilcox Depo, pg. 127:13- pg. 128:1; Dr. Wilson Report, *Id.*]. Dr. Wilcox admits that in his practice and experience, a

11

caregiver may make an insensitive comment but then thereafter deliver good or excellent care. [Dr. Wilcox Depo, pg. 121:18-24; pg. pg. 124:11-21; pg. 128:2-9; Dr. Wilson Report, *Id.*]. People are capable of this; good care and negative comments are not mutually exclusive. [Dr. Wilcox Depo, pg. 132:5-8; Dr. Wilson Report, *Id.*] The same scenario and opinion of Dr. Wilcox applies to Bray's quickly calling Nurse Horn later that evening, around 9:34pm, despite another jailer making an insensitive comment in his presence about Ellis at that time. [Dr. Wilcox Depo, pg. 131:3- pg. 132:8; Dr. Wilson Report, *Id.*].

34. Dr. Wilcox agrees jailers were doing their jobs by promptly reporting these situations to medical personnel, here, Nurse Horn, especially if they were expecting and seeing Nurse Horn follow up, as they were, which Dr. Wilcox cannot dispute. [Dr. Wilcox Depo, pg. 131:3- pg. 133:22, Ex. 21]. Dr. Wilson opines that jailers Bray and Shoemaker provided Ellis appropriate attention and that it would be unreasonable to expect something more or different from non-medical security staff. [Dr. Wilson Report, pg. 9, Expert Opinion ¶ 5, Ex. 20].

## II. Defendant Charles Shoemaker was not Deliberately Indifferent to a Substantial Risk of Serious Harm to Ellis.

The Plaintiff asserts a single claim against Defendant Shoemaker. Plaintiff claims Shoemaker was deliberately indifferent to Ellis' medical needs, health and safety, and therefore violated Ellis' rights under the 8th and 14th Amendments. [See Complaint, Doc. 2, ¶¶ 50 - 54.] The Court is well familiar with the standard of deliberate indifference, but Shoemaker emphasizes the following points:

**Where the Defendant has asserted qualified immunity, the Plaintiff must carry a heavy burden.** This Motion for Summary Judgment asserting qualified immunity must be reviewed differently from other summary judgment motions. *Holland v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001) *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004); *Thomson*

*v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009) Specifically, it is now the Plaintiff's burden to show (1) that Shoemaker's actions violated a constitutional right, and (2) that the right allegedly violated was clearly established at the time of Ellis' death. Unless the Plaintiff carries this twofold burden, the Defendant prevails. *Reynolds*, 370 F.3d at 1030; *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996). **"This is a heavy burden.** If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017)(emphasis added)**.** If the Plaintiff meets this two-part burden, **only then** does the Defendant then bear the traditional burden of the movant for summary judgment–showing that there are no genuine issues of material fact and that the Defendant is entitled to judgment as a matter of law. *Rojas v. Anderson*, 727 F.3d 1000, 1003 (10th Cir. 2013); *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008); *Nelson v. McMullen,* 207 F.3d 1202, 1205 (10th Cir. 2000); *Gallegos v. City & Cty. of Denver*, 984 F.2d 358, 361 (10th Cir. 1993) ("Only after plaintiff has met this initial [two-part qualified immunity] burden does the burden shift to defendants to prove that no genuine issue of material fact exists.").

As Ellis was a pretrial detainee, Plaintiff's denial of medical care claim is analyzed under the Due Process Clause of the 14th Amendment. However, the standard of review is the same under either the 14th Amendment or the 8th Amendment. *Estate of Booker v. Gomez*, 745 F.3d 405, 430 n. 30 (10th Cir.2014); *Lopez v. LeMaster*, 172 F.3d 756, fn. 2 (10th Cir. 1999).

**Objective componen**t. "A medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)(quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)); *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018).

**Subjective Component - Deliberate Indifference.** "To prevail on the subjective component, the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Callahan v. Poppell*, 471 F.3d at 1159 (internal quotation marks omitted)(quoting Mata v. Saiz, 427 F.3d at 753). Specifically, the subjective component is met if the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, **and he must also draw the inference**." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)(emphasis added).

The Supreme Court has emphasized the negligence, or even gross negligence, is not enough to show deliberate indifference. See *Farmer v. Brennan*, 511 U.S. 825, 836 - 38 (1994), wherein the Supreme Court compared deliberate indifference to criminal recklessness, which makes a person liable when the defendant consciously disregards a substantial risk of serious harm. *Id.*

The Supreme Court has cautioned that "an obvious risk cannot conclusively establish an inference that the official subjectively knew of the substantial risk of harm, because 'a prison official may show that the obvious escaped him.' "*Martinez v. Beggs*, 563 F.3d at 1089 (quoting *Farmer v. Brennan*, 511 U.S. at 843 n.8, 114 S.Ct. 1970).

When evaluating the subjective state of mind of the detention officer, Courts must also consider facts such as the obviousness of the risk, the information available to the officer, the observable symptoms, and the expected level of knowledge of the particular official. *Farmer*, 511 U.S. at 842–43, 114 S.Ct. 1970.

Finally, accusations of failure to recognize "risk" are insufficient. The risk claimed by the plaintiff must be the same risk ignored by the Defendants. see *Bruner-McMahon v. Jameson*, 566

14

Fed. Appx. 628 (10th Cir. 2014) ("The risk prison officials ignored must be the risk appellants claimed."), citing *Martinez*, 563 F.3d at 1089 ("Finally, the subjective component requires the prison official to disregard the risk of harm claimed by the prisoner."). *Bennett v. Carter Cty. Bd. of Cty. Commissioners*, No. CIV-17-289-SPS, 2019 WL 1671979, at *7 (E.D. Okla., Apr. 17, 2019); *Estate of Moffitt by and through Kramer v. Minor*, 2017 WL 6349706, at *14 (D. Colo. Sept. 28, 2017) ("Although Hosier may have ultimately been wrong in his assessment that Moffitt needed mental health treatment as compared to treatment for his alcohol related symptoms, a mistake or even negligent failure to provide adequate medical care does not rise to the level of a constitutional violation.").

### A. Shoemaker was not Subjectively Aware of a Developing Serious Medical Condition and was not Deliberately Indifferent.

As shown by the Statement of Facts, supra, this is not a case where Shoemaker ignored Ellis. To the contrary, the facts show that Shoemaker and Jail Staff repeatedly turned to medical staff to evaluate Ellis on October 21st and 22nd. Prior to October 21st, Shoemaker has no recollection of any health complaints from Ellis. On October 21st, Shoemaker observed Ellis **for less than 8 minutes.** While Shoemaker was in the D-Pod, two trained First Responders from the Miami Fire Department and two trained paramedics from the Integris Ambulance interviewed and examined Ellis. But the medical staff examined Ellis and found his **vital signs were normal**, he was conscious, oriented, speaking normally, responsive to questions and "moving around without dizziness or any complaints of pain." [See Facts 6 – 7; Exh. 7] The Paramedics told jail staff that Ellis "was stable and nothing acute appeared to be happening." [See Fact 7] **There was nothing that signaled to the paramedics that Ellis was in a serious or dire medical condition.** [*Id.*] Although Ellis was claiming that he could not walk or leave his bed, minutes later he stood up and **walked from the D-Pod to Cell H-1 with no apparent difficulty.**

15

Shoemaker observed a man coherent, responsive, and walking, and who was not transported by the team of medical professionals tending to Ellis that day. Nothing about this brief event caused Shoemaker to believe that Ellis was experiencing a serious risk of medical harm.

On the morning of October 22nd, Shoemaker learned that Ellis had been up walking at various times through the night. Shoemaker even personally reviewed the video and saw for himself Ellis walking back and forth between Cell H-1 and the bathroom, without apparent difficulty. [See Video Clips, Exhibits 11 – 14] However, when Ellis called out for help at approximately 8:15 in the morning, Shoemaker did not ignore Ellis. Shoemaker responded and talked to Ellis. Shoemaker did not see anything about Ellis that made him think that Ellis was experiencing a serious medical problem. Ellis was oriented, responsive, conscious, breathing, and had normal skin color. [Facts 6 - 7] Shoemaker knew that Ellis had been drinking water and had been up repeatedly drinking water. Nonetheless, Shoemaker **immediately called Nurse Horn** at 8:33 a.m., and asked her to see Ellis. [Fact 15] Nurse Horn told Shoemaker that she would see Ellis when she came in *that morning*. When Nurse Horn came in two hours later, Shoemaker immediately asked her to see Ellis. [Fact 21]

At 10:45 a.m., Shoemaker escorted Nurse Horn to Ellis' cell. Although Nurse Horn's language is unfortunate and regrettable, at the time Shoemaker *observed Nurse Horn emphatically tell Ellis that there was nothing wrong with him,* that Ellis' legs were "not black, they are pink and they are red." [Fact 22.] Shoemaker understood that Nurse Horn had cleared Ellis from medical watch. Shoemaker planned to let Ellis calm down and then return him to the D-Pod at the end of the shift at 5:00 p.m.

Shoemaker planned to have Nurse Horn check out Ellis one more time at 1:45 p.m. But when Shoemaker entered Cell H-1, things had changed dramatically. Ellis was not responding

verbally. Ellis' skin color had changed. His feet and hands were discolored, now blue with red spots. Ellis' skin was cold. Shoemaker immediately reported this to Nurse Horn who returned to the cell with Shoemaker. Nurse Horn directed Shoemaker to contact emergency services. Shoemaker directly contacted dispatch, who notified emergency medical services. [Fact 25] Shoemaker did not reenter the cell, but waited on the emergency medical service members to arrive. The first responders and paramedics reported that when they first entered the cell Ellis had a normal sinus rhythm, blood pressure of 121/61, pulse rate "regular 84," and skin described as mottled, dry and cool. [Fact 26] However, after Ellis was removed from the cell, and loaded into the ambulance, Ellis had an "abrupt change in level of responsiveness." The paramedics began resuscitation efforts in the ambulance and transported Ellis to the hospital, where he was pronounced dead. The Medical Examiner determined that Ellis died from "sepsis/septic shock due to acute bronchopneumonia."

These facts show that Ellis had a developing internal infection process but presented symptoms that are atypical of developing sepsis or acute bronchopneumonia. As repeatedly admitted by Plaintiff's expert, Dr. Wilcox, sepsis is **a notoriously difficult condition to diagnose**. [Fact 30] Neither Dr. Wilcox or Dr. Wilson (Defendants' expert witness) *would expect a layperson to be able to diagnose sepsis, the development of sepsis, or developing pneumonia.* [*Id.*] Both experts agree that it is reasonable for jail staff to rely on medical staff, such as a jail nurse or EMT's. [Fact 31] Both experts agree that reports by Ellis that he was having a seizure, "paralyzed," or had a "broken back" were not accurate. [Fact 32] The core fact remains that Shoemaker contacted Nurse Horn repeatedly to respond to Ellis and check him out. Under these facts, it cannot be said that Shoemaker was deliberately indifferent.

Ellis' internally developing sepsis and bronchopneumonia "were not of the type that would have been 'so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Fletcher, v. Unified Government of Wyandotte County, Kansas*, No. 19-3128-SAC, 2019 WL 6492633, at \*3 (D. Kan. Dec. 3, 2019)(citing *Mata*, 427 F.3d at 751); *Barron v. Macy*, 268 F. App'x 800, 801 (10th Cir. 2008)(Tenth Circuit affirmed dismissal where inmate alleged a broken little finger but did not allege "swelling, discoloration, bleeding, or [visible] broken bones that would make his injury as one obviously needing immediate medical care."); *Stella v. Davis Cty.*, No. 1:18-CV-002, 2019 WL 4601611, at \*9 (D. Utah Sept. 23, 2019)("a ruptured spleen and/or internal bleeding would not be obvious to a lay person.");

### B. Officer Shoemaker Relied on Nurse Horn and the Medical First Responders Who Examined Ellis.

The Tenth Circuit has held that although "denial of access to treatment for a serious medical condition" constitutes deliberate indifference, the failure to "treat a serious medical condition properly" does not. *Estate of Vallina v. Petrescu*, 757 F. App'x 648, 651 (10th Cir. 2018)(unpublished). Discussing *Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005), the Tenth Circuit in *Petruscu* stated: "Although *Mata* clearly establishes that denial of access to treatment for a serious medical condition constitutes deliberate indifference, plaintiffs' allegations in this case concern the failure to 'treat a serious medical condition properly,' **which we have long held fails to evince deliberate indifference**." (emphasis added) Thus, the Tenth Circuit has clarified that it is a complete denial of access to treatment that is deliberate indifference. Plaintiff's argument that Ellis should have been given more or better attention or treatment from either Nurse Horn or the paramedics is the same argument the Tenth Circuit has "long held fails to evince deliberate indifference." As another court stated, "deliberate indifference is often not found when "some level of medical care has been offered to the inmate." *Coudriet v. Vardaro*, Civ. No. 11-185,

2013 WL 1673137, at *5 (W.D. Pa. Mar. 19, 2013), report and recommendation adopted, Civ. No. 11-185, 2013 WL 1668225 (W.D. Pa. Apr. 17, 2013), aff'd, 545 F. App'x 99 (3d Cir. 2013).

Courts have uniformly held that deliberate indifference is not present when jail staff are fulfilling their gatekeeper role and contacting medical staff in response to inmate complaints. Here, Shoemaker advised Ellis that he would call the nurse, Shoemaker promptly called the nurse, Shoemaker observed the nurse tell Ellis there was nothing wrong, Shoemaker again asked Nurse Shoemaker to see Ellis, Shoemaker went to Cell H-1 and observe a dramatic change in Ellis' condition, retrieved Nurse Horn to see Ellis immediately, and then called for the ambulance, **all in the space of five hours.** (8:30 a.m., to 1:40 p.m.)

These facts show Shoemaker was acting to get Ellis access to medical staff, and then relying on the judgment of jail medical staff "which negates rather than supports liability." *Arocho v. Nafziger*, 367 F. App'x 942, 956 (10th Cir. 2010)(allegations showing a warden's reasonable reliance on prison medical staff does not support deliberate indifference); *McRaven v. Sanders*, 577 F.3d 974, 981 (8th Cir.2009); *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008); *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir.1993).

In *Phillips v. Tiona*, 508 F. App'x 737, 744 (10th Cir. 2013), the inmate complained for months for the removal of a surgical screw in his ankle. The warden responded that ""[medical staff] is evaluating your case. You will hear soon." *Id.* at 744. In affirming dismissal of the claim against the warden, the Tenth Circuit stated that "[m]erely sending grievances to a warden is not enough to attach liability, and the warden's response signified nothing more than a reasonable reliance on the judgment of prison medical staff." *Id.* Here, Shoemaker was responding in a similar fashion, and certainly quicker, by relaying Ellis' complaints to Nurse Horn and waiting for only approximately two hours (8:30 to 10:45 a.m.) for her to address the situation.

Many other cases confirm that jail staff's deferral to jail medical staff is not deliberate indifference. In *Hollis v. Davis*, 2014 WL 7184406, at \*6 (N.D. Okla. Dec. 16, 2014) the Court there stated that "the reasonable reliance of jail officials on the medical advice of their contract partners would not necessarily be deliberate indifference. [citation omitted] Thus, summary judgment on defendant's provision of medical care defense can be granted in plaintiff's favor **only if plaintiff shows that no reasonable juror could find that defendants could reasonably rely on the advice of [the contract medical provider]'s medical staff as to plaintiff's care**." (emphasis added). See also *Anglin v. City of Aspen, Colo.*, 552 F.Supp.2d 1205, 1225 n.4 (D. Colo. 2008) ("As a non-medical professional, a reasonable law enforcement officer cannot be expected to question the judgment of qualified medical professional absent some extraordinary circumstances, the nature of which the court cannot even conjecture at this point."). *McGaw v. Sevier County*, 715 F. App'x 495, 498–99 (6th Cir. 2017) ("Where, as here, an officer responds to a substantial risk of serious harm by asking for and following the advice of a professional [that] the officer believes to be capable of assessing and addressing that risk, then the officer commits no act of deliberate indifference in adhering to that advice."); *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)(where "a prisoner is under the care of medical experts ... a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."); *Johnson v. Doughty*, 433 F.3d 1001, 1010–11 (7th Cir.2006) (prison official may reasonably rely on the judgment of medical professionals); *Meloy v. Bachmeier,* 302 F.3d 845, 849 (8th Cir. 2002) ("The law does not clearly require an administrator with less medical training to second-guess or disregard a treating physician's treatment decision."); *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 676, 678–79 (7th Cir. 2012)("When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate

medical attention.").

Shoemaker was entitled to rely on the medical training of Nurse Horn, an LPN, and the paramedics from the Integris Emergency Medical Service. *McGaw v. Sevier Cty., Tennessee*, 715 F. App'x 495, 498–99 (6th Cir. 2017)("Nor has this court ever recognized the status of an LPN as precluding an officer from relying on that LPN's judgment."); *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009)(officer entitled to rely on the EMTs' and the jail nurse's medical assessments that the inmate did not need to be transported to the hospital.)

The fact that the harm to Ellis was ultimately not averted does not change the fact that Shoemaker was not deliberately indifferent. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. 825, at 844); *Howard v. Waide*, 534 F.3d 1227, 1239 (10th Cir. 2008).

### C.     Lack of Causation.

Additionally, Plaintiff has failed to establish that any action or inaction of Shoemaker actually caused his alleged damages. Section 1983 only imposes liability on a defendant who "subjects, or causes to be subjected, any citizen … or other person … to the deprivation of any rights" under federal law. 42 U.S.C. § 1983. "This provision has been read to require a § 1983 plaintiff to prove that the defendant's conduct was the 'proximate result' of Plaintiff's injuries." *Marquez v. Martinez,* No. CIV 11-838 JAP/KBM, 2015 WL 5090467 * 7 (D.N.M. May 1, 2015) (quoting *Brower v. Cnty. of Inyo,* 489 U.S. 593, 599 (1989); When a plaintiff claims a delay in medical care, he must show the delay resulted in substantial harm. See *Mata,* 427 F.3d at 753; *Sealock,* 218 F.3d at 1210. Plaintiff cannot establish any affirmative link between Shoemaker's alleged acts or omission and his alleged damages.

### III. THE DEFENDANT IS ENTITLED TO QUALIFIED IMMUNITY.

Defendant Shoemaker is entitled to qualified immunity. In civil rights actions seeking damages from governmental officials, "courts recognize the affirmative defense of qualified immunity, which protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001) quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity protects public officials from individual liability in Section 1983 claims and is "an entitlement to not stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Qualified immunity is more than a defense to liability: it is immunity from suit that is effectively lost if a case is erroneously permitted to go to trial. *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012). "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." *Lewis v. Tripp*, 604 F.3d 1221, 1230 (10th Cir. 2010).

An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was "clearly established." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). Thus, the burden is on Plaintiff to prove (a) that Ellis' constitutional rights were violated by Shoemaker, and (b) at the time that the constitutional violation occurred, the law was so clearly established that Shoemaker would have clearly understood that his actions violated the Constitution. "When a defendant asserts qualified immunity, ... the burden shifts to the plaintiff to establish (1) a violation of a constitutional right (2) that was clearly established." *Puller v. Baca,* 781 F.3d 1190, 1196 (10th Cir. 2015). This is a " 'heavy, two-part burden' that the plaintiff must meet," and "[f]ailure on either element is fatal to the plaintiff's claims." *Id.* (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)).

A defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable officer in the defendant's shoes would have understood that he was violating the constitutional right. *Plumhoff v. Rickard*,572 U.S. 765, 778-779, 134 S.Ct. 2012, 2023, (2014) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 2080 (2011)) The Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018); *Plumhoff* at 778 – 779. Thus, existing precedent must have placed the statutory or constitutional question **beyond debate.**" *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (quoting *White v. Pauly*, ––– U.S. ––––, 137 S. Ct. 548, 551 (2017))(emphasis added). This is a "quite heavy" burden for the Plaintiff to meet. *A.M. v. Holmes*, 830 F.3d 1123, 1135 (10th Cir. 2016).

As previously discussed, Shoemaker was not deliberately indifferent to a known risk of serious medical harm to Ellis, and thus did not violate the constitutional rights of Ellis. Plaintiff cannot identify a body of case law that clearly establishes that Shoemaker violated Ellis' constitutional rights when he observed Ellis being evaluated by a team of first responders and paramedics on October 21st, reviewed video and received reports that Ellis had been up walking through the night, called Nurse Horn **within minutes** of talking to Ellis at 8:30 a.m, repeatedly asked Nurse Horn to "come see Ellis," and repeatedly observed Ellis to be alert and verbally responsive. A right is clearly established when a precedent involves "'materially similar conduct'" or applies "'with obvious clarity'" to the conduct at issue. *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964–65 (10th Cir. 2016).

Here, Defendants Bray and Shoemaker both received reports of pain, possible seizure and leg numbness from Ellis and passed those reports on to Nurse Horn. A review of the established authority does not show that such actions violate clearly established law. To the contrary, the great weight of authority shows that where jail staff fulfill a role as gatekeepers to other medical staff, they are not deliberately indifferent. In *Mata v. Saiz, supra*, Nurse Amy Hough was aware that the inmate had been complaining for days of severe chest pains and that she "could hardly breath." 427 F.3d at 759. Nurse Hough reported the inmate's complaints to a Nurse Practitioner. Despite Nurse Hough's specific knowledge of the inmate's complaints of severe chest pain, the Tenth Circuit firmly agreed that Nurse Hough was not deliberately indifferent. Because Nurse Hough had "fulfilled her gatekeeper duty" by reporting the inmate's reported chest pain to the Nurse Practitioner, the district court "correctly concluded that Ms. Hough was not deliberately indifferent to Ms. Mata's serious medical needs" and was properly dismissed from the case. *Id.* Additionally, because the Nurse Practitioner in turn relayed the inmate's EKG test results on to a doctor, the Nurse Practitioner also had "fulfilled her gatekeeper duty" and was therefore not deliberately indifferent to the inmate's health even though the Nurse Practitioner was well aware of the inmate's report of severe chest pains. 427 F.3d at 759 – 760.

This rule is supported by the numerous other cases cited in this Brief above, where courts have concluded that jail staff is not deliberately indifferent when they refer the complaints to medical staff and rely on the medical staff's higher knowledge.

Further, conceptually, Shoemaker cannot be said to have "consciously disregard[ed]" a substantial risk of serious harm when he took action, and prompt action at that, to report the situation to the medical personnel, as was the policy and practice at the Ottawa County jail.

*Farmer v. Brennan*, 511 U.S. 825, 836 - 38 (1994). In these circumstances, there was no clearly established law that would have made Shoemaker's actions unlawful in October 2015.

## IV. PLAINTIFF MAY NOT RECOVER PUNITIVE DAMAGES FROM SHOEMAKER

As discussed at length previously in this Brief, there is no evidence that Shoemaker deliberately intended to cause Ellis any harm. "In § 1983 matters, punitive damages will be awarded only when 'the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1214, fn. 7 (10th Cir. 2006), quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983). See also *Wulf v. City of Wichita*, 883 F.2d 842, 867 (10th Cir. 1989) ("an award of punitive damages requires an assessment of [defendant's] subjective state of mind"). The evidence, even viewed in the light most favorable to Plaintiff, does not support a reasonable inference that Shoemaker's conduct rose to that level in this case. See, e.g., *Wulf,* 883 F.2d at 867 ("[N]ot every intentional violation of a plaintiff's constitutional rights subjects a defendant to punitive damages."). Not a single witness has testified that Shoemaker exhibited any malevolence or other sufficiently culpable wrongful intent nor is there any evidence thereof. In fact, Dr. Wilcox testified that the jail staff were doing their jobs by promptly reporting Ellis' complaints to Nurse Horn. [Fact 34]. The evidence in the record confirms Shoemaker's position that he did not deliberately block Ellis from accessing health care.

WHEREFORE, premises considered, Defendant Shoemaker is entitled to qualified immunity and judgment as a matter of law on Plaintiff's Section 1983 claim and his request for punitive damages, together with such further relief this Court deems just and proper.

Respectfully submitted,

s/Randall J. Wood
Robert S. Lafferrandre, OBA #11897
Randall J. Wood, OBA #10531
Carson C. Smith, OBA #11897
PIERCE COUCH HENDRICKSON
    BAYSINGER & GREEN, L.L.P.
1109 N. Francis Ave.
Oklahoma City, OK 73106
Telephone: (405)235-1611
Facsimile: (405)235-2904
rlafferrandre@piercecouch.com
rwood@piercecouch.com
csmith@piercecouch.com
*Attorneys for Defendants Johnny Bray
and Charles Shoemaker*

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of December, 2019, I electronically transmitted the above and foregoing document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Daniel E. Smolen      danielsmolen@ssrok.com
Robert M. Blakemore      bobblakemore@ssrok.com
Bryon D. Helm      bryonheld@ssrok.com
SMOLEN & ROYTMAN, P.L.L.C.
*Attorneys for Plaintiffs*

Ambre C. Gooch     .     acg@czwlaw.com
COLLINS ZORN WAGNER, P.C.
*Attorneys for Defendants,*
*Jeremy Floyd, Sheriff of Ottawa County, Terry*
*Durburow, former Sheriff of Ottawa County,*
*and Jeffrey Harding*

John R. Paul      john@paulandlackey.com
John David Lackey      johndavid@paulandlackey.com
Amy N. Bennett      amy@paulandlackey.com
PAUL & LACKEY, P.C.
*Attorneys for Defendants,*
*Baptist Healthcare of Okla., L.L.C.,*
*d/b/a Integris Miami EMS, Jennifer*
*Dillinger (Grimes) and Kent Williams*

James L. Gibbs, II      jgibbs@gphglaw.com
Seth D. Coldiron      scoldiron@gphglaw.com
GOOLSBY, PROCTOR, HEEFNER
   & GIBBS, P.C.
*Attorneys for Defendant,*
*Theresa Horn, L.P.N.*

                   s/Randall J. Wood
                   Randall J. Wood