# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

ROBBIE EMERY BURKE,                )
Administratrix of the Estate of           )
Terral Brooks Ellis II, Deceased, et al.  )
                                                        )
    Plaintiffs,                                )
                                                        )
    v.                                           )    Case No.: 17-cv-00325-JED-FHM
                                                        )
OTTAWA COUNTY BOARD OF           )
COUNTY COMMISSIONERS, et al.,   )
                                                        )
    Defendants.                                )

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT JOHNNY BRAY'S  MOTION FOR SUMMARY JUDGMENT (DKT. 134)

Robert M. Blakemore, OBA #18656
bobblakemore@ssrok.com
Daniel E. Smolen, OBA # 19943
danielsmolen@ssrok.com
Bryon D. Helm, OBA #33003
bryonhelm@ssrok.com
SMOLEN & ROYTMAN
701 South Cincinnati Avenue
Tulsa, Oklahoma 74119
Telephone:  (918) 585-2667
Facsimile:  (918) 585-2669
*Attorneys for Plaintiffs*

January 22, 2020

# TABLE OF CONTENTS

Page

Table of Authorities ..... ii

Introductory Statement ..... 1

LCvR 56.1(c) Statement ..... 1

- Booking and the Early Days in D-Pod ..... 1

- October 17 through October 20, 2015 ..... 2

- October 21, 2015 ..... 3

Discussion ..... 9

Proposition:  Bray is *Not* Entitled to Qualified Immunity and is *Not* Entitled to Summary Judgment on Plaintiffs' Fourteenth Amendment Claims ..... 9

   A.  Standard of Review: Qualified Immunity and Summary Judgment ..... 9

   B.  A Reasonable Jury Could Find Facts Supporting Plaintiffs' Claim that Bray Violated Mr. Ellis's Constitutional Rights ..... 10

      1.  The "Deliberate Indifference" Standard Relied Upon by Bray No Longer Applies in Cases Involving the Fourteenth Amendment Rights of Pretrial Detainees; Plaintiffs Have Set Out Sufficient Evidence of Deliberate Indifference Under the Applicable Objective Standard ..... 10

      2.  Even if This Court Should Apply the "Subjective Component" of the Traditional Deliberate Indifference Standard, Plaintiffs Have Still Established that Bray Violated the Constitution ..... 15

   C.  The Right Was Clearly Established at the Time of the Bray's Conduct ..... 17

   D.  Plaintiffs' Claim for Punitive Damages Should Not Be Dismissed ..... 19

## ***TABLE OF AUTHORITIES***

### ***CASES***                                                    ***Page***

*Anderson v. Creighton,* 483 U.S. 635, 640 (1987)……………………………….....……...18

*Ashcroft v. al-Kidd,* 563 U.S. 731, 742 (2011)………………………………………....…….17

*Bell v. Wolfish,* 441 U.S. 520, 545 (1979)……………………………………………….....…10

*Bruno v. City of Schenectady,* 727 Fed.Appx. 717, 720 (2d Cir. 2018)....………….......…11, 13

*Burke v. Regalado,* 935 F.3d 960, 999-1001 (10th Cir. 2019)………………………..….……15

*Caiozzo v. Koreman,* 581 F.3d 63 (2d Cir. 2009)……...………………………...…………13

*Castro v. Cnty. of L.A.,* 833 F.3d 1060, 1070–71 (9th Cir. 2016)……………….......………13

*Colbruno v. Kessler,* 928 F.3d 1155, 1163-65 (10th Cir. 2019)……………………......…...12

*Currie v. Chhabra,* 728 F.3d 626, 630 (7th Cir. 2013)…...…………………….......………13

*Darnell v. Pineiro,* 849 F.3d 17, 34–35 (2nd Cir. 2017)….....….……………………....…11, 13

*DeSpain v. Uphoff,* 264 F.3d 965, 975 (10th Cir. 2001)………...…………………….……15

*Estate of Booker v. Gomez,* 745 F.3d 405, 411 (10th Cir. 2014)...…………………………10, 15

*Estelle v. Gamble,* 429 U.S. 97, 103 (1976)……………………….…………...………...10, 18

*Farmer v. Brennan,* 511 U.S. 825 (1994)......…………………………………………….....15, 16

*Garcia v. Salt Lake Cnty.,* 768 F.2d 303, 307 (10th Cir. 1985)……………….…….………15

*Gordon v. Cnty. of Orange,* 888 F.3d 1118 (9th Cir. 2018)…………...……...……....…11, 13, 14

*Hardeman v. Curran,* 933 F.3d 816, 823 (7th Cir. 2019)……...…………………………12

*Henderson v. Glanz,* 813 F.3d 938, 952 (10th Cir. 2015)….....…………………………10

*Hope v. Pelzer,* 536 U.S. 730, 739–42 (2002)……………………………………………...18

*Kingsley v. Hendrickson,* —— U.S. ——, 135 S.Ct. 2466, 2473 (2015)...…………...………p*assim*

*Kisela v. Hughes,* 138 S. Ct. 1148, 1152, 200 L. Ed. 2d 449 (2018).....................................18

*Manuel v. City of Joliet,* —— U.S. ——, 137 S.Ct. 911, 197 L.Ed.2d 312 (2017)………....13

*Martin v. Bd. of County Com'rs of County of Pueblo,* 909 F.2d 402, 406 (10th Cir. 1990)...…….10

*Mata v. Saiz,* 427 F.3d 745, 758 (10th Cir. 2005)…………………...……...15, 16, 18, 19

*McCowan v. Morales,* 945 F.3d 1276 (10th Cir. 2019)…………...…….…..….…......……16

*Miranda v. Cty. of Lake,* 900 F.3d 335, 352 (7th Cir. 2018)…………....…………...13, 14

*Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1317−18 (10th Cir. 2002)…………...............15

*Perry v. Durborow,* 892 F.3d 1116, 1122, n. 1 (10th Cir. 2018)...........................................12

*Prado v. Lane,* 98 F. App'x 757, 759-60 (10th Cir. 2004)…..........…………….…….........15

*Richmond v. Huq,* 885 F.3d 928, 938 (6th Cir. 2018)....…….......…………………...…11, 13

*Rife v. Oklahoma Dep't of Pub. Safety,* 854 F.3d 637, 647 (10th Cir. 2017)…………..…...…15

*Safford Uni-fied Sch. Dist. #1 v. Redding,* 557 U.S. 364, 377 (2009)...…………………......18

*Sealock v. Colorado,* 218 F.3d 1205, 1209 (10th Cir. 2000)……...…......…………...…....*passim*

*Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994)…………...…………………….……...2

*Smith v. Wade,* 461 U.S. 30, 56 (1983)……………………………....…………….……19

*Tafoya v. Salazar,* 516 F.3d 912, 919 (10th Cir. 2008)……………………...……….....15

*United States v. Lanier,* 520 U.S. 259, 271 (1997)……………………...………....…...18, 19

*White v. Pauly,* 137 S. Ct. 548, 552 (2017)……………….…...…….….......……...18, 19

*Wilson v. Layne,* 526 U.S. 603, 615 (1999)……………………….……...…………....…...18

**COME NOW** the Plaintiffs and respectfully submit their Response in Opposition to Defendant Johnny Bray's ("Officer Bray", "Bray" or "Defendant") Motion for Summary Judgment (Dkt. #134) as follows:

## Introductory Statement[1]

Plaintiffs have brought suit against Bray, pursuant to 42 U.S.C. § 1983, alleging that he violated Mr. Ellis's Fourteenth Amendment right to reasonable medical care. As shown herein, the evidence of Bray's deliberate indifference is overwhelming. Bray's Motion for Summary Judgment (Dkt. #134) should be denied.

## LCvR 56.1(c) Statement

- **Booking and the Early Days in D-Pod**

**1.** On October 10, 2015, Mr. Ellis voluntarily turned himself in to the Ottawa County Jail on a warrant. *See, e.g.,* Dkt. #152-1 ([https://vimeo.com/385605637/7cd4a08a77](https://vimeo.com/385605637/7cd4a08a77)); Bray Depo. (Ex. 1) at 254:17–255:11. As one may observe in the video of this event, Mr. Ellis arrived at the Jail with his grandfather and was cooperative and courteous. *Id.* As part of the booking process, the booking officer filled out a Medical Treatment/Injuries Questionnaire. The Medical Treatment/Injuries Questionnaire indicates that Ellis suffered from asthma, had previously been treated at Saint Francis and was prescribed albuterol. *See* Medical Questionnaire (Ex. 2) at 000018.

After book-in, Ellis was placed in "D-Pod". *See, e.g.,* Dkt. #135-4 at 1-2. D-Pod is a "dormitory style housing unit" at the Jail. *Id.* Ellis was housed in D-Pod with numerous other inmates, including an inmate named Michael Harrington. *See* Harrington Depo. (Ex. 3) at 34:12-15. When Harrington first encountered Mr. Ellis in "early October", Ellis seemed to be in good health and "good spirits". *Id.* at 11:18 – 12:9. After initially meeting Ellis in D-Pod, Harrington

---

[1]    Plaintiffs adopt and incorporate herein the Introductory Statement from their Response in Opposition to Sheriff Floyd's Motion for Summary Judgment. *See* Dkt. #152.

was moved to segregated housing for approximately six (6) days. *Id.* at 33:24 – 34:4, 35:3-6; *See also* Harrington Letter (Ex. 4).  When Harrington was returned to D-Pod, he "found [Ellis] sick in bed" and observed that ***"something was extremely wrong*** with him…." Harrington Depo. (Ex. 3) at 35:20 – 38:17 (emphasis added).

- **October 17 through October 20, 2015**

**2.**     Nurse Horn's "Progress Notes" are not credible and cannot be accepted at face value.  The Assistant Jail Administrator, Charles Shoemaker, testified that Nurse Horn's progress notes contain at least one outright lie (which is discussed in detail, *infra*). *See* Shoemaker Depo. (Ex. 5) at 85:5 – 87:6. More generally, courts are loath to accept self-serving accounts of a defendant as undisputed fact for the purposes of summary judgment, where, as here, the only other witness to the events in question is deceased. *See, e.g., Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.1994). However, even accepting Nurse Horn's progress notes as true, she had no contact with Ellis on October 17, 2015, despite receiving a report (over the phone) that Ellis was complaining of severe back pain. *See* Progress Notes (Ex. 6) at 000027.  In addition to experiencing severe back pain, Mr. Ellis was not eating. *See* Harrington Depo. (Ex. 3) at 39:12 – 40:11; *See also* Harrington Letter (Ex. 4).  According to inmate Harrington, the Jail staff "ignored the fact that [Ellis] wasn't eating." *Id.*

**3.**     Nurse Horn did not take Ellis's vital signs when she saw him on October 19, 2015. *See* Horn Depo. (Ex. 7) at 123:9 – 124:4; Progress Notes (Ex. 6) at 000027-28. Rather, without gathering any objective data, Nurse Horn, who is a Licensed Practical Nurse, diagnosed Ellis with a broken rib. Progress Notes (Ex. 6) at 000027-28.[2]  After Mr. Ellis's visit with Nurse Horn on

---

[2]     Plaintiffs' expert, Todd Wilcox, M.D., opines that Nurse Horn violated the standard of care by, *inter alia*: (A) failing to take Mr. Ellis's vital signs; (B) practicing outside the scope of her qualifications and training as an LPN by making a medical diagnosis; and (C) rendering an "inaccurate diagnosis [based on no objective data, which] led everyone [at the Jail] to label this patient as a malingerer and not take him seriously when he continued to have medical problems…."  Wilcox (Verified) Report (Ex. 8) at 8.

October 19, he "complained to [Inmate Harrington] that it felt like [his condition] was getting worse, at which point [both Ellis and Harrington] continued to request medical attention" for Ellis. Harrington Depo. (Ex. 3) at 40:14 – 43:11.  Nonetheless, the Jail staff provided "[n]o reply" and the requests for medical attention were "ignored." *Id.* Over the next couple of days (approximately October 19-21), Ellis was ***"sweating profusely."*** *Id.* He had stopped eating or drinking on his own. *Id.* Inmate Harrington was ***"worried" about Ellis's "level of dehydration***...." *Id.*  Ellis had become so weak that Inmate Harrington "literally had to hand feed and water him." *Id.* Inmate Harrington gave Ellis ***"cups to urinate in***, and then dump[ed] them out for him." *Id.* While Harrington and other inmates in D-Pod were helping Ellis, the Jail personnel were ***"absolutely not"*** doing anything to assist Mr. Ellis. *See* Harrington Depo. (Ex. 3) at 43:12-21. At one point, as Harrington was physically assisting Ellis to the "rec yard", he saw one of the Jail's detention officers, Johnny Bray. *Id.* at 44:14 – 46:11. Harrington pressed Officer Bray, "aren't you [going to] help him? He needs help. There's something wrong with him." *Id.* In reply, Bray became irritated, indicated that there was nothing he could do and accused Ellis of faking his illness to get released from the Jail. *Id.* Ellis prophetically inquired of Officer Bray: ***"What are you going to tell my 2-year-old son whenever I die?"*** *Id.*  Unmoved, Officer Bray simply told Ellis to lie back down. *Id.*  Hours later, Ellis earnestly stated to Harrington: "They're not going to help me, are they? ***I think I'm going to die."*** Harrington Letter (Ex. 4); *see also* Harrington Depo. (Ex. 3) at 46:12 – 47:16.  Ellis said that he was experiencing the "worst pain of [his] life." Harrington Depo. (Ex. 3) at 46:12 – 47:16.

- **October 21, 2015**

**4.**     Plaintiffs dispute the assertion that Bray was unaware of Ellis complaining of pain prior to October 21. *See, e.g.,* LCvR 56.1(c) Statement(3), *supra*.  Furthermore, Defendant omits pertinent facts.  At around 4:29 PM on October 21, Ellis began having what appeared to be a

seizure. *See, e.g.,* Jail Log (Ex. 9) at 00746; Harrington Letter (Ex. 4). Ellis was "begging for his life" and "begging for help." Harrington Letter (Ex. 4); *see also* Harrington Depo. (Ex. 3) at 48:14 – 49:18. Harrington and other inmates in D-Pod "started raising a hundred kinds of hell and protest as to why [the Jail staff] weren't giving Terral the medical attention that he needed." Harrington Depo. (Ex. 3) at 48:14 – 49:18. Only after the inmates vociferously advocated for Ellis did Officers Bray and Lawson respond. *Id.*; *see also* Lawson Incident Report (Ex. 10); Dkt. #152-13 (https://vimeo.com/385605662/5585059ad0). Upon arrival, Bray and Lawson ordered the D-Pod inmates, including Harrington, to the nearby rec yard. *Id.* As was common, Nurse Horn was offsite, but was contacted by the dispatcher. *See* Bray Depo. (Ex. 1) at 67:3 – 68:6. Nurse Horn advised the officers to call "EMS to come and check on the inmate." *Id.*[3] Officer Bray knew that the ***medical care provided at the Jail was "subpar"*** and that Ellis was complaining of a ***"serious medical condition."*** Bray Depo. (Ex. 1) at 30:20 – 31:11.

**5-7.** Defendant omits pertinent facts. At approximately 4:33 PM, while awaiting the arrival of paramedics, Officers Bray and Lawson are heard sarcastically mocking Ellis and commenting on the poor quality of medical care at the Jail: "[I]t's awesome how a guy with no history of seizures suddenly has seizures" "Yeah, I think I feel one coming on Bray" "I feel one coming on too. I hear the medical around here is excellent… (laughs)" Dkt. #152-13 at 16:33 – 17:02. Only in hindsight does Bray concede that his comments were "regrettable", "inappropriate" and "in bad taste…." Bray Depo. (Ex. 1) at 24:8-19, 88:25 – 89:12.

---

[3]     Dr. Wilcox opines that it was "inappropriate" for Nurse Horn to have EMS "come check out the patient to determine whether [Ellis] needed to go to the hospital" as this constitutes "a reversal in the medical licensure." Wilcox Depo. (Ex. 11) at 66:12 – 67:20. That is, despite the fact that paramedics have less medical training than a nurse, Nurse Horn was "relying upon them to assess the patient and make a determination about whether he needs additional care." *Id.*

Plaintiffs dispute any suggestion that Integris EMS took a full set of vital signs or otherwise provided appropriate treatment. Integris EMS was dispatched to the Jail at 4:36 PM on October 21 – they were apparently notified that an "INMATE HAD SEIZURE AND IS COMPLAINING OF OTHER MEDICAL PROBLEMS." Miami Police Department Complaint Card (Ex. 12) at 000038. At 4:39 PM, Integris EMS arrived at the scene. *See* Integris EMS Records (10/21/15) (Ex. 13) at Plaintiffs_000013. Ellis purportedly informed Integris EMS that he: (A) had flank pain which grew worse upon palpitation; (B) had "two seizures"; (C) was "severely dehydrated"; and (D) had been urinating in a cup because he could not get up to go to the bathroom. *Id.* at Plaintiffs_000014 and 000018.[4]   Harrington overheard one of the detention officers, believed to be **Officer Bray**, tell the Integris paramedics that **Ellis was "faking"** his illness, and that unless his condition was life threatening, **"do not take him"** to the hospital. Harrington Depo. (Ex. 3) at 50:12 – 51:4; *see also* Harrington Letter (Ex. 4).   Harrington further heard the officer, **likely Bray**, state to the Integris paramedics that the Jail would **not "foot[] the bill"** for Ellis's transport to the hospital. *Id.*[5]   Under these circumstances, Integris EMS ultimately decided not to transport Ellis. *See, e.g.,* Integris EMS Records (10/21/15) (Ex. 13) at Plaintiffs_000013-14.   Prior to leaving Ellis at the Jail, Integris took Ellis's blood pressure and determined that he "did not appear to be in" respiratory distress. *Id.* at Plaintiffs_000014.   However, video does not show paramedic Jennifer Grimes using her stethoscope. *See* Dkt. #152-13 at 13:30 – 28:45.[6] Further, Integris EMS did not

---

[4]       There are unexplained discrepancies between the Integris EMS "Comprehensive Report" and Integris EMS paramedic Jennifer Grimes' individual report.  For instance, while the so-called "Comprehensive Report" states that Ellis's pain did not worsen with palpitation, Grimes' individual report states that his ribs were hurting "upon palpitation." *Compare* Integris EMS Records (10/21/15) (Ex. 13) at Plaintiffs_000014 and 18.  The above summary combines facts taken from both reports, which must be read in the light most favorable to Plaintiffs.

[5]       Officer Bray now claims that he did not believe Ellis was faking. Bray Depo. (Ex. 1) at 173:14 – 174:1.

[6]       *See also* Dkt. #152-17 (https://vimeo.com/385605789/20afd4c23d).

take a full set of Ellis's vital signs; most importantly, Integris EMS failed to measure Ellis's pulse oximetry. *See* Integris EMS Records (10/21/15) (Ex. 13); Wilcox Depo. (Ex. 11) at 171:22 − 172:4.

**8-9.** Ellis did ***not*** refuse transport to the emergency room. *See* Dkt. #152-17 (https://vimeo.com/385605789/20afd4c23d); Bray Depo. (Ex. 1) at 97:5-11; Harding Depo. (Ex. 14) at 135:18 − 136:14, 197:19 − 198:14; Williams Depo. (Ex. 15) at 25:6-15; Grimes Depo. (Ex. 16) at 79:18-21; Shoemaker Depo. (Ex. 5) at 221:8 − 222:1-12.

**10, 12.** The fact Ellis was able to walk from cell H-1 to the bathroom is immaterial. As Dr. Wilcox explains, "I would expect that a patient with evolving significant pneumonia would still be ambulatory, so [Ellis's ability to walk] doesn't strike me as abnormal at all." Wilcox Depo. (Ex. 11) at 73:18-24. Further, Ellis's complaint that his legs were "numb" would not "necessarily preclude the ability to walk." *Id.* at 72:2-4. As Dr. Wilcox observed, Ellis was walking "very guardedly." *Id.* at 72:23 − 73:24.

**11.** Denied. Bray ***admits*** to being told by the paramedics to call them if Ellis's condition changed. Bray Depo. (Ex. 1) at 156:10-23; 199:13-23.

**13-17.** Defendant omits material facts. At 9:34 PM, Ellis complained to Officers Lawson and ***Bray***, who were at the booking desk, that his ***legs were numb***. *See* Dkt. #152-23 (https://vimeo.com/385605868/4d749d5260). *See also* Bray Depo. (Ex. 1) at 154:17-22.[7] In reply to Ellis's complaint, Lawson sarcastically commented: "He can't feel his legs now, Bray, he can't feel his legs!" Dkt. #152-23. Despite his lack of any medical training, Officer Bray told Mr. Ellis that he had no injuries to cause him to be unable to move his legs. *See* Bray Depo. (Ex. 1) at 202:12 − 204:9. At 9:56 PM, Officer Bray can be heard mocking Ellis again, referring to him as ***"the***

---

[7]      Tellingly, Bray fails to mention this fact in his Motion.

***zombie…."*** Dkt. #152-24 ([https://vimeo.com/385605893/6bcbf61aa2](https://vimeo.com/385605893/6bcbf61aa2))[8].  Still, ***Bray admits*** that Mr. Ellis's conditions, as reported to him, were ***getting worse.*** *Id.* at 201:25 − 202:8. Similarly, ***Officer Shoemaker admits that Ellis had been begging for help on October 21 and that his condition deteriorated the evening of October 21 into the morning of October 22.*** *See* Shoemaker Depo. (Ex. 5) at 78:15 − 79:17.   Still, Bray did not call EMS as instructed, even after Nurse Horn told him that she would not be in until the following day. Bray Depo. (Ex. 1) at 154:23 − 156:9; 156:10-23; 199:13-23.  Assuming that Bray did not think Ellis was faking, as he has testified,[9] his sudden and extreme change in condition should have triggered OSCO's Emergency Medical Care Policy which defines an emergency situation to include "unconsciousness", "severe breathing difficulties", "sudden onset of bizarre behavior" and "health or life-threatening situation". Dkt. #120-24 (Under Seal) at 000282; Shoemaker Depo. (Ex. 5) at 80:3-14. The written Policy allowed detention officers to directly "contact an ambulance" in an emergency situation if the nurse was not on the premises. *Id.* By his own admission, Bray did not call an ambulance.

At around 10:11 PM, Bray is heard taunting Ellis yet again: "Oh, you're paralyzed now? … Ok … I ain't laughing at you…." Dkt #152-25 ([https://vimeo.com/385605995/115225a279](https://vimeo.com/385605995/115225a279)). Ellis then asks Bray to call an ambulance, to which Bray sarcastically responds, "I'm gonna call her right now." *Id.* The credibility of Bray's self-serving statements, in the sham affidavit, about his state of mind should be decided by a jury.  The circumstantial evidence establishes his deliberate indifference. While Jail staff was to check on Ellis in H-1 every 15 minutes, this did not happen. Indeed, OCSO's own investigator determined, by watching the surveillance video, that officers

---

[8]     While drafting his incident report concerning Ellis's seizure activity, Bray can be heard asking, "What time did we go to D-Pod to check on the zombie?"

[9]     Bray Depo. (Ex. 1) at 173:14 − 174:1.

***falsely reported*** they had checked on Ellis every 15 minutes, when in fact, they had not. *See* Derwin Depo. (Ex. 17) at 35:22 – 40:18, 44:12-16, 46:16 – 48:16; Derwin Supp. Report (Ex. 18).

**18-19.** Admit.

**20-21.** *See, e.g.,* LCvR 56.1(c) Statement(10, 12), *supra.*

**22.**      Irrelevant.

**23-24.** As Dr. Wilcox opines: "On the officer side it is clear that there is an overwhelming lack of empathy demonstrated by the officers in the audio and video clips. There were many opportunities when the officers were informed that Mr. Ellis was doing poorly and needed help and they chose to joke about it and to conclude that he was faking and did not need any assistance. It is tragic on a human level that officers charged with caring for individuals who cannot advocate for themselves have such a deficit of empathy." Wilcox (Verified) Report (Ex. 8) at 9.  Any difficulty in diagnosing sepsis is immaterial in this case. As Dr. Wilcox explains, sepsis is "a final common pathway of many types of infections, and if you … diagnose [***the underlying infection*** ***properly*** and treat the infection adequately early enough, the patients never enter sepsis." Wilcox Depo. (Ex. 11) at 80:17 – 81:15.  Dr. Wilcox opines that Ellis's death was "entirely preventable" as he was "young and otherwise healthy" and his  "acute pneumonia … could easily have been diagnosed and treated." Wilcox (Verified) Report (Ex. 8) at 8.  Dr. Wilcox notes that "it is so basic from a healthcare perspective to take care of an otherwise healthy young male who has a significant change in his health presentation" and that "[t]here were so many opportunities for so many people [at the Jail] to intervene and none of them did." *Id.* at 9.  Ultimately, Dr. Wilcox found that the "evidence of deliberate indifference to Mr. Ellis's serious medical needs is overwhelming and systemwide." *Id.* at 10.

**25.**      Dr. Wilcox testified that it is reasonable for an officer to rely on a nurse with respect to medical issues as long as the nurse is "attending to the patient appropriately." Wilcox Depo. (Ex.

11) at 117:7-14.  Even a layperson would recognize that Nurse Horn was not attending to Ellis appropriately. Durborow Depo. (Ex. 19) at $107:22 - 108:20, 118:5 - 119:3$.  Sheriff Durborow also concedes that his ***jailers failed to follow policy and could have "gotten [Ellis] out" of the Jail if they had appropriately responded to his complaints.*** *Id.* at 119:2-24.  Officer Bray knew that the ***medical care provided at the Jail was "subpar"*** and that Ellis was complaining of a ***"serious medical condition."*** Bray Depo. (Ex. 1) at $30:20 - 31:11$. According to Officer Bray, the medical care at the Jail "[w]ould not be what [he] would expect to find in a civilian world…." *Id.* at $28:20 - 29:19, 33:16-21$. Bray knew that the Jail's medical delivery system was ***"destined to fail."*** *Id.* at 148:18-22.

26.     There was nothing "confusing" about Ellis's serious and emergent condition. It was obvious. *See, generally,* LCvR 56.1(c) Statement(1-25), *supra.*  Also, Plaintiffs dispute that Ellis ever reported that he was "paralyzed"; rather, he reported that he could not feel his legs or that his legs were "numb". *Id.* at (13-17).

27.     Bray's conduct toward Ellis, including telling EMS that he was faking and encouraging them not to take Ellis to the hospital, was inexcusable and constitutes deliberate indifference.  *See, e.g.,* LCvR 56.1(c) Statement(3-7), *supra.*

28.     *See* LCvR 56.1(c) Statement(25), *supra.*

**29-30.** *See* LCvR 56.1(c) Statement(1-7), *supra.*

<u>**Discussion**</u>

**<u>PROPOSITION:</u>    BRAY IS *NOT* ENTITLED TO QUALIFIED IMMUNITY AND IS *NOT* ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FOURTEENTH AMENDMENT CLAIMS**

**A.     Standard of Review: Qualified Immunity and Summary Judgment**

Where, as here, a "defendant has moved for summary judgment based on qualified immunity, [courts] still view the facts in the light most favorable to the non-moving party and

resolve all factual disputes and reasonable inferences in its favor." *Henderson v. Glanz,* 813 F.3d 938, 952 (10th Cir. 2015) (citing *Estate of Booker v. Gomez,* 745 F.3d 405, 411 (10th Cir. 2014)).  "At the summary judgment stage, courts will grant qualified immunity unless "the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Estate of Booker,* 745 F.3d at 411 (citation omitted).

Here, as discussed more fully *infra*, Plaintiffs have shown that a reasonable jury could find facts supporting a violation of a clearly-established constitutional right.  Thus, summary judgment is unwarranted.

**B.     A Reasonable Jury Could Find Facts Supporting Plaintiffs' Claim that Bray Violated Mr. Ellis's Constitutional Rights**

**1.   The "Deliberate Indifference" Standard Relied Upon by Bray No Longer Applies in Cases Involving the Fourteenth Amendment Rights of Pretrial Detainees; Plaintiffs Have Set Out Sufficient Evidence of Deliberate Indifference Under the Applicable Objective Standard**

Under the Eighth Amendment, prisoners possess a constitutional right to medical care, and that right is violated when doctors or officials are deliberately indifferent to a prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). Pretrial detainees, like Mr. Ellis, who have not been convicted of a crime, have a constitutional right to medical care under the Due Process Clause of the Fourteenth Amendment with the standard for deliberate indifference ***at least*** as protective as the standard for convicted prisoners under the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Martin v. Bd. of County Com'rs of County of Pueblo*, 909 F.2d 402, 406 (10th Cir. 1990) (emphasis added). Because Mr. Ellis was a pretrial detainee, Plaintiffs' claims must be assessed under the Fourteenth Amendment.

It is now well-established that the traditional deliberate indifference analysis no longer applies in cases, such as the case-at-bar, involving pretrial detainees. Under the traditional analysis,

deliberate indifference involves both an objective[10] and subjective component. *See, e.g., Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).  However, more recent caselaw indicates that the Fourteenth Amendment rights of pretrial detainees, like Mr. Ellis, should be analyzed under a **_purely_ _objective_** standard.  *See, e.g., Kingsley v. Hendrickson*, ––– U.S. –––, 135 S.Ct. 2466, 2473 (2015) (held that a pretrial detainee's Fourteenth Amendment excessive force claim need only meet the objective component by showing that "the force purposely or knowingly used against him was objectively unreasonable.").  And several federal circuit courts have applied *Kingsley*'s **objective standard in medical-care claims** brought by pretrial detainees under the Fourteenth Amendment.  *See, e.g., Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (extending *Kingsley* to medical care claims brought by pretrial detainees under the Fourteenth Amendment); *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) ("We … conclude, along with the Ninth and Second Circuits, that medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley*."); *Darnell v. Pineiro*, 849 F.3d 17, 34–35 (2nd Cir. 2017) (applying the objective standard to detainees' Fourteenth-Amendment complaints about their conditions of confinement; in the process it overruled a decision applying a subjective test to a medical-care claim); *Bruno v. City of Schenectady*, 727 Fed.Appx. 717, 720 (2d Cir. 2018) (unpublished) (in a medical care case, asking "whether a 'reasonable person' would appreciate the risk to which the detainee was subjected").  *See also Richmond v. Huq*, 885 F.3d 928, 938 (6th Cir. 2018) (relying on *Kingsley* for the observation that "this shift in Fourteenth Amendment deliberate indifference jurisprudence calls into serious doubt

_____

[10]     Bray raises no argument with respect to the objective component, in essence conceding that Ellis's conditions were sufficiently serious for the purposes of a Constitutional analysis.

whether Richmond need even show that the individual defendant-officials were subjectively aware of her serious medical conditions and nonetheless wantonly disregarded them.").

Importantly, the Tenth Circuit has now weighed in on this rapidly evolving area of the law. *See Colbruno v. Kessler,* 928 F.3d 1155, 1163-65 (10th Cir. 2019). Prior to July 2, 2019, the Tenth Circuit has not applied *Kingsley* in contexts outside of an excessive force claim. *But see Perry v. Durborow,* 892 F.3d 1116, 1122, n. 1 (10th Cir. 2018) (strongly suggesting in *dicta,* that *Kingsley* applies in 14th Amendment conditions of confinement cases).  On July 2, however, the Circuit issued its opinion in *Colbruno v. Kessler.* The *Colbruno* case does not involve an excessive force claim, but rather, a claim that sheriff's deputies violated the plaintiff's Fourteenth Amendment rights when they marched him into and through a public hospital while he was completely naked, save a pair of mittens.  Citing *Kingsley,* the *Colbruno* Court reasoned that "a ***pretrial detainee can establish a due-process violation by 'providing only objective evidence*** that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.'" *Colbruno,* 928 F.3d at 1163 (quoting *Kingsley,*135 S.Ct. at 2473-74) (emphasis added).  The Court ultimately held that the deputies' exposure of the plaintiff's body violated the Fourteenth Amendment as such conduct was not "'rationally related to a legitimate governmental objective or [was] excessive in relation to that purpose.'" *Id.* at 1164.

The *Colbruno* decision is a landmark. In light of *Colbruno,* it can no longer be argued that *Kingsley*'s scope is limited to excessive force cases. *See, e.g., Hardeman v. Curran,* 933 F.3d 816, 823 (7th Cir. 2019) (noting that "the Tenth Circuit has joined those [other Circuits] that apply *Kingsley*'s objective inquiry to a claim other than excessive use of force.").  Rather, as recognized by *Colbruno,* *Kingsley's* objective standard of liability applies, generally, to Fourteenth Amendment cases concerning the rights of pretrial detainees. More to the point, under *Colbruno,* the *Kingsley* standard should be applied in ***this*** case involving "medical-need" claims of a pretrial detainee.

As the Seventh Circuit held and persuasively reasoned in *Miranda*:

Though *Kingsley*'s direct holding spoke only of excessive-force claims, two of our sister circuits have held that its logic is not so constrained. The Ninth Circuit first extended *Kingsley*'s objective inquiry to detainees' Fourteenth-Amendment failure-to-protect claims. *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1070–71 (9th Cir. 2016) (en banc), *cert. denied*, —— U.S. ——, 137 S.Ct. 831, 197 L.Ed.2d 69 (2017). Since then, that court has applied the *Kingsley* holding more broadly to a medical-need claim brought by a pretrial detainee. *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1120, 1122–25 (9th Cir. 2018). The Second Circuit followed suit, applying the objective standard to detainees' Fourteenth-Amendment complaints about their conditions of confinement; in the process it overruled a decision applying a subjective test to a medical-care claim. *Darnell v. Pineiro*, 849 F.3d 17, 34–35 (2d Cir. 2017) (overruling *Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009) ).... Later, the Second Circuit expressly applied an objective standard to a claim of deliberate indifference to a serious medical condition. *Bruno v. City of Schenectady*, 727 Fed.Appx. 717, 720 (2d Cir. 2018) (unpublished) (asking "whether a 'reasonable person' would appreciate the risk to which the detainee was subjected"). Other courts of appeals have contemplated the same reading of *Kingsley*. *Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018)....

The Eighth, Eleventh, and Fifth Circuits have chosen to confine *Kingsley* to its facts—that is, to Fourteenth-Amendment claims based on excessive-force allegations in a pretrial setting [citations omitted].

   ***

We have not yet expressly weighed in on the debate. … Because the answer may make a difference in the retrial of Gomes's claims, we think it appropriate to address the proper standard at this time. We begin with the fact that the Supreme Court has been signaling that courts must pay careful attention to the different status of pretrial detainees. In this respect, *Kingsley* does not stand alone. *See, e.g., Manuel v. City of Joliet*, —— U.S. ——, 137 S.Ct. 911, 197 L.Ed.2d 312 (2017) (allowing Fourth Amendment challenges to pretrial detention even beyond the start of legal process). The Court has cautioned that the Eighth Amendment and Due Process analyses are not coextensive. *See Kingsley*, 135 S.Ct. at 2475 ("The language of the two Clauses differs, and the nature of the claims often differs."); *Currie v. Chhabra*, 728 F.3d 626, 630 (7th Cir. 2013) ("[D]ifferent constitutional provisions, and thus different standards, govern depending on the relationship between the state and the person in the state's custody."). We see nothing in the logic the Supreme Court used in *Kingsley* that would support this kind of dissection of the different types of claims that arise under the Fourteenth Amendment's Due Process Clause. To the contrary, the Court said that ***"[t]he language of the [Eighth and Fourteenth Amendments] differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'"*** 135 S.Ct. at 2475 (citations omitted). ***We thus conclude, along with the Ninth and Second Circuits, that medical-care claims brought by pretrial***

> ***detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in Kingsley.***

*Miranda*, 900 F.3d at 351−52 (emphasis added). Conditions of confinement actions, including right to adequate medical care claims, brought by pretrial detainees, "***must*** be evaluated under an objective deliberate indifference standard." *Gordon*, 888 F.3d at 1125 (emphasis added).

Applying a purely objective standard of liability, Plaintiff has presented evidence that Bray "did not take reasonable available measures to abate [the] risk [of substantial harm to Mr. Ellis], even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the … conduct obvious…." *Gordon*, 888 F.3d at 1125. For instance, Officer Bray knew that the ***medical care provided at the Jail was "subpar"*** and that Ellis was complaining of a ***"serious medical condition."*** Bray Depo. (Ex. 1) at 30:20 − 31:11. Yet, Bray never took any measures to help Ellis, but openly mocked him and obstructed his access to care. *See, e.g.,* Dkt. #152-13 at 16:33 − 17:02.  As shown above, after Ellis's seizures on October 21, there is evidence that Bray told the Integris paramedics that ***Ellis was "faking"*** his illness and that that the Jail would ***not "foot[] the bill"*** for Ellis's transport to the hospital.  *See* LCvR 56.1(c) Statement(5-7), *supra*.  Bray failed to follow EMS instructions and the Jail's Emergency Care Policy after Ellis complained that his ***legs were numb***. *Id.* at (13-17).  ***Bray admits*** that Mr. Ellis's conditions, as reported to him, were ***getting worse,*** but failed to call EMS as instructed and contrary to policy.  *Id.*  Bray knew that the Jail's medical delivery system was ***"destined to fail",*** but he still did nothing to assure that Mr. Ellis received the medical care he needed even as his condition deteriorated.

Based on this evidence, at the very least, a reasonable jury could find that Bray "did not take reasonable available measures to abate [the] risk [of substantial harm to Mr. Ellis] …." *Gordon,*

888 F.3d at 1125.  Thus, properly applying an objective standard of liability, Plaintiffs have presented sufficient evidence that Bray violated Mr. Ellis's Fourteenth Amendment rights.

> **2. Even if This Court Should Apply the "Subjective Component" of the Traditional Deliberate Indifference Standard, Plaintiffs Have Still Established that Bray Violated the Constitution**

To be clear, it is Plaintiff's position, now supported by Tenth Circuit precedent, that the subjective component of the traditional deliberate indifference standard no longer applies to cases brought by pretrial detainees under the Fourteenth Amendment.  However, even if this Court should apply the traditional analysis, Plaintiff has still presented evidence sufficient to establish Bray's subjective deliberate indifference.

The subjective component of the traditional test requires evidence that the official "knows of and disregards an excessive risk to inmate health or safety." *Mata v. Saiz,* 427 F.3d 745, 753 (10th Cir. 2005). *See also Burke v. Regalado,* 935 F.3d 960, 992-95 (10th Cir. 2019). A civil rights defendant is deliberately indifferent where he "has knowledge of a substantial risk of serious harm to inmates . . . [and] fails to take reasonable steps to alleviate that risk." *Tafoya v. Salazar,* 516 F.3d 912, 916 (10th Cir. 2008).

It is well-settled that non-medical governmental personnel may be held liable for disregarding obvious and excessive risks to a detainee's health and safety. *See, e.g., Olsen,* 312 F.3d at 1317; *Garcia v. Salt Lake Cnty.,* 768 F.2d 303, 307 (10th Cir. 1985); *Prado v. Lane,* 98 F. App'x 757, 759-60 (10th Cir. 2004); *Estate of Booker v. Gomez,* 745 F.3d 405, 433-34 (10th Cir. 2014); *Rife v. Oklahoma Dep't of Pub. Safety,* 846 F.3d 1119, 1128-29 (10th Cir. 2017).

"Because it is difficult, if not impossible, to prove another person's actual state of mind, whether an official had knowledge may be inferred from circumstantial evidence." *DeSpain v. Uphoff,* 264 F.3d 965, 975 (10th Cir. 2001).  For instance, "the existence of an obvious risk to health or safety may indicate awareness of the risk." *Rife,* 854 F.3d at 647 (citing *Farmer v. Brennan,* 511

U.S. 825, 842 (1994)). "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk ... for reasons personal to him *or because all prisoners in his situation face such a risk." Farmer*, 511 U.S. at 843.

The Tenth Circuit recognizes two types of conduct constituting deliberate indifference in the corrections medical context. *See Sealock*, 218 F.3d at 1211. "First, a ***medical professional may fail to treat a serious medical condition properly***.... The second type of deliberate indifference occurs when ***prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment."*** *Id.* (emphasis added). A corrections professional who serves "solely ... as a gatekeeper for ... medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if he "delays or refuses to fulfill that gatekeeper role." *Id.*

Further, "[a] prisoner may satisfy the subjective component by showing that defendants' ***delay*** in providing medical treatment caused either ***unnecessary pain or a worsening of [his] condition. Even a brief delay may be unconstitutional." Mata***, 427 F.3d at 755 (emphasis added). *See also McCowan v. Morales*, 945 F.3d 1276 (10th Cir. 2019); *Sealock*, 218 F.3d at 1210 n. 5.

Here, applying these legal standards, Plaintiffs have presented sufficient evidence of subjective deliberate indifference. In particular, Bray failed to "treat a serious medical condition properly"; "den[ied] [Mr. Ellis] access to medical personnel capable of evaluating the need for treatment"; and "delay[ed] … provi[sion of] medical treatment [which] caused …. unnecessary pain [and] a worsening of [Mr. Ellis's] condition." *Sealock*, 218 F.3d at 1211; *Mata*, 427 F.3d at 755.

As discussed in the preceding section, Bray knew, or it was obvious, that Ellis was at substantial risk of serious harm. Yet, Bray disregarded that known or obvious risk by failing to take action to assure that he received the medical care he so obviously needed.  Indeed, there is evidence

that Bray actively obstructed Ellis from being transported to the hospital by EMS despite his admission that  the ***medical care provided at the Jail was "subpar"*** and that Ellis was complaining of a ***"serious medical condition."*** Bray Depo. (Ex. 1) at 30:20 – 31:11.[11]  Even as Ellis's condition worsened and he complained of numbness in his legs, Bray did not call EMS and did nothing to ensure that Ellis received an evaluation from a qualified medical professional. Had Bray not acted deliberate indifference, Mr. Ellis would likely be alive today.[12]

Bray claims that he appropriately called Nurse Horn and relied on her opinion. But Bray's reliance on Horn was unreasonable as he knew her to be dangerously incompetent and derelict; further, even a layperson would recognize that Nurse Horn was not attending to Ellis appropriately. *See, e.g.,* Durborow Depo. (Ex. 19) at 107:22 – 108:20, 118:5 – 119:3.  There is simply no excuse for Bray's treatment of Ellis, including his obstructing him from going to hospital, mocking him and failing to act on his sudden and serious change in condition (numbness of his legs after having two seizures).[13]  At a minimum, Bray prevented Ellis from receiving treatment or denied him access to medical personnel capable of evaluating the need for treatment. *Sealock*, 218 F.3d at 1211. Plaintiffs have presented sufficient evidence of deliberate indifference.

## C.      The Right Was Clearly Established at the Time of the Bray's Conduct

The United States Supreme Court has instructed lower courts "not to define clearly established law at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), and held

---

[11]     This admission flies in the face of Bray's argument that he did not know Ellis was "facing any … serious medical condition."

[12]     Contrary to Bray's half-hearted argument, Plaintiffs have presented sufficient evidence of causation. *See* LCvR 56.1(c) Statement(23-24), *supra.*

[13]     Plaintiffs do not claim that Bray should have diagnosed or detected Ellis's sepsis or pneumonia, and Bray's argument to the contrary is a straw man.  Rather, Ellis's outward complaints and pleas of pain and deterioration were serious, obvious and disregarded.  Bray had a duty to ensure that Ellis was given the medical assessment and treatment he needed.  He failed to do so.

that "clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). However, the Court has also maintained that its case law ***"does not require a case directly on point for a right to be clearly established,"*** *Kisela v. Hughes*, 138 S. Ct. 1148, 1152, 200 L. Ed. 2d 449 (2018) (quoting White, 137 S. Ct. at 551), and that ***"'general statements of the law are not inherently incapable of giving fair and clear warning.'"*** *White*, 137 S. Ct. at 552 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). "[T]here is no need that 'the very action in question [have] previously been held unlawful.'" *Safford Uni-fied Sch. Dist. #1 v. Redding*, 557 U.S. 364, 377 (2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). The law is also clearly established if the conduct is so obviously improper that any reasonable officer would know it was illegal. *See Hope v. Pelzer*, 536 U.S. 730, 739–42 (2002). Overall, qualified immunity protects "all but the ***plainly incompetent*** or those who knowingly violate the law." *White*, 137 S. Ct. at 551 (emphasis added).

An inmate's right to adequate medical care and to be free from deliberate indifference have been clearly established for decades. *See, e.g., Estelle*, 429 U.S. at 103-04. "[T]here is little doubt that deliberate indifference to an inmate's serious medical need [violates] a clearly established constitutional right." *Mata*, 427 F.3d at 749. It is similarly established that corrections personnel cannot "prevent" inmates like Ellis "from receiving treatment [and] deny[] him access to medical personnel capable of evaluating the need for treatment." *Sealock*, 218 F.3d at 1211.

For instance, in *Sealock*, 218 F.3d at 1211–12, the Court found evidence of deliberate indifference, sufficient to survive summary judgment, where a nurse knew of an inmate's unexplained chest pain, but failed to call an ambulance. Similarly, in *Mata*, 427 F.3d at 758–59,

[14] the Court reasoned that "[s]ince Ms. Mata produced evidence that Ms. Weldon was aware of Ms. Mata's medical condition as well as the seriousness of unexplained severe chest pain …, a jury could reasonably find that Ms. Weldon's alleged inaction on that date demonstrated deliberate indifference to Ms. Mata's serious medical needs."  Here,  the evidence is that Bray's conduct was much worse than inaction.  Again, there is evidence that Bray actively thwarted Mr. Ellis's access to a hospital despite his knowledge that the ***medical care provided at the Jail was "subpar"*** and that Ellis was complaining of a ***"serious medical condition."*** Bray Depo. (Ex. 1) at 30:20 – 31:11. Bray never took any measures to help Ellis, but openly mocked him and obstructed his access to care. *See, e.g.,* Dkt. #152-13 at 16:33 – 17:02. *See* LCvR 56.1(c) Statement(5-7), *supra*.  Existing law provided "'fair and clear warning'" that Bray's conduct was unlawful. *White*, 137 S. Ct. at 552 (quoting *Lanier*, 520 U.S. at 271).

**D.    Plaintiffs' Claim for Punitive Damages Should Not be Dismissed**

Punitive damages are generally available for federal claims where defendant acts with "evil motive or intent," or with "reckless or callous indifference" to federally protected rights. *See Smith v. Wade*, 461 U.S. 30, 56 (1983).  Bray's conduct, as described herein constitutes "reckless or callous indifference" to federally protected rights.  As such, summary judgment on the claim for punitive damages would not be appropriate.

Defendant Bray's Motion for Summary Judgment (Dkt. #134) should be denied.

Respectfully,

/s/ Robert M. Blakemore
Daniel Smolen, OBA #19943

---

[14]    Bray did not fulfill his "gatekeeper" role as he argues. Dkt. #134 at 23 (citing *Mata*). Unlike Nurse Hough in *Mata*, Bray knew that Nurse Horn was not providing any care for Ellis, and that the medical system at the Jail was "subpar" and "destined to fail."  With this knowledge, Bray did nothing to assist Ellis, and actually prevented him from receiving the care he obviously needed.

Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
Smolen & Roytman
701 South Cincinnati Avenue
Tulsa, OK 74119
Phone: (918) 585-2667
Fax:     (918) 585-266

***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of January 2020, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

/s/ Robert M. Blakemore