IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| AUSTIN P. BOND, as Personal Representative of the Estate of Terral Ellis, II, deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 17-cv-00325-CRK-CDL |
| THE SHERIFF OF OTTAWA COUNTY, in his official capacity, | ) ) ) | |
| Defendant. | ) ) | |

---

## DEFENDANT SHERIFF OF OTTAWA COUNTY'S
## MOTION FOR REMITTITUR AND BRIEF IN SUPPORT

---

Wellon B. Poe, OBA No. 12440
Jamison C. Whitson, OBA No. 18490
Alison B. Levine, OBA No. 33021
Justin P. Ashlock, OBA No. 33459
COLLINS ZORN & WAGNER, PLLC
429 N.E. 50th Street, Second Floor
Oklahoma City, OK  73105
Telephone:    (405) 524-2070
Facsimile:    (405) 524-2078
E-mail:    wbp@czwlaw.com
             jcw@czwlaw.com
             abl@czwlaw.com
             jpa@czwlaw.com

*ATTORNEYS FOR DEFENDANT SHERIFF OF OTTAWA COUNTY, IN HIS OFFICIAL CAPACITY*

October 5, 2023

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES .......................................................................................ii-iii

LIST OF EXHIBITS..................................................................................................... iv

BRIEF IN SUPPORT ....................................................................................................1

STATEMENT OF THE CASE .......................................................................................1

ARGUMENT AND AUTHORITY .................................................................................6

STANDARD OF REVIEW ............................................................................................6

I.     THE JURY'S AWARD OF COMPENSATORY DAMAGES WAS GROSSLY EXCESSIVE AND SHOCKS THE CONSCIENCE.........................................................7

      A.     THE DAMAGES AWARD WAS IMPERMISSIBLY INTENDED TO BE PUNITIVE ...................................................................................8

      B.     THE AWARD DRASTICALLY EXCEEDS AWARDS IN COMPARABLE CASES....................................................................11

           1.     $10 million in compensatory damages was awarded in *Burke v. Regalado* ........................................................................................11

           2.     Compensatory damage awards in other comparable cases are much lower than $33 million ..............................................................14

CONCLUSION..............................................................................................................17

CERTIFICATE OF SERVICE .....................................................................................18

# **TABLE OF AUTHORITIES**

## **CASES**

*Blangsted v. Snowmass Wildcat Fire Prot. Dist.*, 642 F. Supp. 2d 1250 (D. Colo. 2009) ............. 8

*Burke v. Deere & Co.*, 6 F.3d 497 (8th Cir. 1993) ........................................................................ 10

*Burke v. Regalado*, 935 F.3d 960 (10th Cir. 2019) ............................................................... *passim*

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989) ..................................................................... 4

*Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749 (6th Cir. 1980) ............................................. 10

*Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001) ................................... 8

*Dougal v. State Farm Mutual Auto. Ins. Co.,* 2006 WL 1141621 (N.D.Okla. April 26, 2006) ... 10

*England v. Gulf Western Mfg. Co.,* 728 F.2d 1026 (8th Cir. 1984) ................................................ 6

*Evans v. Fogarty*, 241 Fed. App'x 542 (10th Cir. 2007) ................................................................ 8

*Fresquez v. BNSF Railway Co.*, 52 F.4th 1280 (10th Cir. 2022) .................................................... 6

*Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553 (1st Cir. 1989) ................................................ 13

*Holmes v. Wack,* 464 F.2d 86 (10th Cir. 1972) .............................................................................. 6

*Kentucky v. Graham*, 473 U.S. 159 (1985) .................................................................................... 8

*Klein v. Grynberg*, 44 F.3d 1497 (10th Cir. 1995) ......................................................................... 7

*Mason v. Texaco, Inc.*, 948 F.2d 1546 (10th Cir. 1991) ................................................................. 7

*Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658 (1978) .............................. 4

*Moody v. Ford Motor Co.*, 506 F.Supp. 2d 823 (N.D.OK. 2007) ........................................... 8, 14

*O'Gilvie v. International Playtex, Inc.,* 821 F.2d 1438 (10th Cir. 1987) .................................... 6, 7

*Racher v. Westlake Nursing Home Ltd. Partnership*, 871 F.3d 1152 (10th Cir. 2017) ........... 9, 10

*Slevin v. Board of Com'rs for County of Dona Ana*, 934 F.Supp.2d 1270 (D.N.M. 2012) ............ 7

*Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408 (10th Cir. 1997) ............................................ 7

*Tudor v. Southeastern Oklahoma State University*, 13 F.4th 1019 (10th Cir. 2021) ................. 6, 7

*Whitehead v. Food Max*, 163 F.3d 265 (5th Cir. 1998) .................................................................. 10

*Wulf v. City of Wichita*, 883 F.2d 842 (10th Cir. 1989) ................................................................. 8

*Young v. Correctional Healthcare Companies, Inc*., No. 13-CV-315-13J-JFJ
  (N.D. Okla. Feb. 24, 2023) ......................................................................................................... 15

## FEDERAL STATUTES AND RULES

42 U.S.C. § 1983 ............................................................................................................................. 8

Fed. R. Civ. P. 59 ............................................................................................................................ 1

## **LIST OF EXHIBITS**

Exhibit 1 – Excerpt from Trial Transcript Vol. XIII

Exhibit 2 – Unpublished decision in *Dougal v. State Farm*

Exhibit 3 – Excerpt from Trial Transcript Vol. I

Exhibit 4 – Excerpt from Trial Transcript Vol. IV

Exhibit 5 – Excerpt from Trial Transcript Vol. III

Exhibit 6 – Jury Verdict in *Young v. Correctional Healthcare Companies, Inc.*

Exhibit 7 – Amended Complaint in *Young v. Correctional Healthcare Companies, Inc.*

## DEFENDANT'S MOTION FOR REMITTITUR
## AND BRIEF IN SUPPORT

Defendant Sheriff of Ottawa County, in his official capacity ("Defendant"), respectfully moves this Court, pursuant to Fed. R. Civ. P. 59, to order a remittitur, or in the alternative, a new trial on compensatory damages[1] on the grounds that the jury verdict rendered at trial in this matter was excessive and clearly the result of passion and prejudice. In support thereof, Defendant submits the following Brief.

## BRIEF IN SUPPORT

## STATEMENT OF THE CASE

After an eight-day trial, from August 15 to August 23, 2023, a jury returned a verdict for Plaintiff for a violation of Decedent Terral Ellis's Fourteenth Amendment right to medical care as a pre-trial detainee in the Ottawa County Jail under 42 U.S.C. § 1983. It awarded compensatory damages of $33,000,000.00 against Defendant Sheriff of Ottawa County, in his official capacity.

Decedent Terral Ellis ("Ellis") was incarcerated in the Ottawa County Jail ("the jail") from October 10-22, 2015. On October 10, 2015, 26-year-old Ellis was booked into the jail as a pre-trial detainee on an outstanding arrest warrant. A medical history was taken at book-in in which Ellis reported that he had asthma, but he disclosed no other current medical conditions or injuries at that time. Defendant employed Theresa Horn, LPN ("Nurse Horn") as a full-time nurse to provide day-to-day medical care to jail inmates. Defendant also contracted with Certified Physician Assistant Aleta Fox ("Fox"), who came to the jail as requested, to conduct inmate medical exams and to remain on-call at all times for consultation regarding routine inmate care

---

[1]  This Motion is filed solely to address the issue of excessiveness of the jury verdict. Concurrently with this Motion, Defendant files a Motion for New Trial for additional reasons as stated therein. [Dkt. 411].

and medical emergencies. Additionally, the jail contracted with an on-call physician to assist with any medical issues which could not be addressed by either Nurse Horn or Fox.

On Saturday, October 17, 2015, Nurse Horn received a call from jail staff advising her that Ellis was complaining he thought he had broken his back, which Ellis attributed to sleeping on a hard bunk. Ellis was mobile and denied having fallen or receiving any other injuries. Nurse Horn advised the jailer to give Ellis ibuprofen and stated that she would check on him the following Monday. On Monday, October 19, 2015, Ellis was brought to the nurse's office where he told Nurse Horn he had pain in the middle of his back and thought it might be kidney stones. She examined him and advised Ellis that it appeared to be a dislocated rib. She then allowed Ellis to call his grandfather to see if he would pay for a chiropractor appointment. Apparently there was no response from Ellis's grandfather, so Nurse Horn gave Ellis ibuprofen and advised him that she would make an appointment for him to see Physician Assistant Fox.

On October 21, 2015, at approximately 4:30 p.m., jailers responded to a call from housing unit D of an inmate experiencing a medical condition. The inmate was Ellis, who appeared to be having a seizure. Jail staff called Nurse Horn, who told them to call EMS, which they immediately did. EMS arrived shortly thereafter and found Ellis alert and able to advise EMS that he had experienced two seizures. Ellis also advised EMS that he was having some pain from possible broken ribs, but he was told by EMS that there was really nothing that could be done for broken ribs besides wrapping them. EMS took Ellis's vital signs, noted they saw no apparent acute medical concerns, and advised the jailers that Ellis was in stable condition. Ellis asked EMS personnel to use their cell phones to call his grandfather. When he was not permitted to call his grandfather, Ellis became visibly agitated and demanded the jailer to take him to the holding cell, though he did not sign the EMS refusal paperwork. Jail staff advised EMS that Ellis would be placed in a

holding cell in view of the booking desk and that, if his condition worsened, they would call for an ambulance again.

That evening at approximately 8:18 p.m., Ellis left his cell, walking to the bathroom and then back to the cell under his own power. He did not appear to have any difficulty walking and did not appear to be in any physical distress. Around 10:00 p.m., Ellis told jail staff that he was having a hard time moving, that he was still in pain, and that he felt he was going numb from the waist down. Staff called Nurse Horn, told her about Ellis's complaints, and mentioned that EMS had already been in to see him that day. Horn advised jailers to tell Ellis he needed to get up and move around and to utilize the bathroom himself. She further advised staff that if Ellis needed anything for pain, jailers could give him some over-the-counter pain relief and that she would be in to see Ellis the following morning (October 22, 2015).

Video evidence demonstrates that early the next morning, on October 22, 2015, at approximately 1:37 a.m., Ellis was let out of his cell to use the bathroom, which he again accomplished under his own power without any appearance of any difficulty walking or distress. This was repeated at approximately 3:23 a.m., again without any apparent difficulty walking or distress, despite Ellis having told jailers that his legs were numb and he could not walk beginning at 1:30 a.m. Jail surveillance video plainly showed that between 4:00 a.m. and 8:00 a.m. that there were no complaints from Ellis and that he was talking with a fellow inmate while exhibiting no signs of respiratory distress. A mere half hour later, between 8:30 a.m. and 8:43 a.m., Ellis repeatedly called out for help and requested jailers to call the E.R., which they did not do.

At approximately 10:45 a.m., Nurse Horn got into a heated verbal exchange with Ellis at Ellis's cell, which included Nurse Horn cursing at him. Ellis claimed he could not move his legs and asked Horn to look at his legs, stating that they were turning black. She refused to look at his legs, yelled that they were not black, that there was nothing wrong with him, and that she was sick

and tired of dealing with him. Nurse Horn also threatened to punish Ellis by chaining him to the D-ring in the floor of the cell if he continued complaining about his medical condition. Approximately three hours later, jailer Shoemaker conducted a check on Ellis and observed that his feet and hands were slightly discolored and that his arm was cold to the touch. Shoemaker immediately requested that Nurse Horn come to the cell. She directed Shoemaker to call EMS. When EMS arrived, Ellis was in respiratory distress, but awake and talking. At approximately 2:14 p.m., Ellis suddenly became nonresponsive. EMS administered epinephrine, intubated him, started chest compressions, and transported him to the hospital where he was pronounced dead. The manner of Ellis's death was determined to be natural and caused by sepsis/septic shock due to acute bronchopneumonia.

Plaintiff, as the personal representative of Ellis's estate, filed suit against Defendant, in his official capacity, under 42 U.S.C. § 1983 alleging violations of Ellis's right to medical care as a pre-trial detainee under the Fourteenth Amendment. As part of that claim, Plaintiff advanced a theory of liability based on a failure to train jail employees. Because the claim which proceeded to trial was brought against Defendant in his official capacity as Sheriff of Ottawa County, liability of Defendant turned not merely on whether Ellis's Fourteenth Amendment rights were violated, but on whether the policies, procedures or customs of Defendant authorized such a violation, per *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658 (1978). Likewise, Defendant could be found liable under the failure to train theory only if Plaintiff proved a failure to train amounting to deliberate indifference to the rights of Plaintiff such that the failure to train could be considered as a policy or custom of Defendant. *See City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989).

At trial, evidence and witness testimony established that during the time Ellis was detained in the jail, the jail had a policy which required inmates be provided with emergency and non-

emergency medical care. The policy required jailers to remain alert for emergency medical situations and to be trained to respond thereto, and defined medical emergency situations including unconsciousness, serious breathing difficulties, and health or life-threatening situations. The policy required jailers encountering inmate medical emergencies to immediately notify the supervisor on duty and request assistance in rendering first aid. The policy also required the jailer to notify the nurse or to contact an ambulance if no nurse was on duty. Jail policy did not require jailers to contact Nurse Horn before calling for an ambulance. Ottawa County Jail policy further required all jailers to be trained in first aid and CPR with updated training annually. Jail policy permitted the jail administrator to place an inmate in a holding cell if they suspected the inmate was in need of medical observation. The policy required inmates placed in a holding cell for medical observation to be monitored more frequently, requiring visual observation of the inmate at least once every 15 minutes. If jail staff believed that an inmate had become paralyzed, jail policy required them to contact an ambulance for immediate emergency medical assistance.

New jail staff were provided training on the jail's policies and procedures, including training on the jail's medical policies and on the Oklahoma Jail Standards. Then they shadowed a supervisor performing jail duties for a period of time until they were adequately familiar with jail functions. Jail staff were also required to complete 20 hours of annual jail training on the Oklahoma Jail Standards, including training on supervision of prisoners, rights and responsibilities of inmates, emergency procedures, and First Aid & CPR. Former Sheriff Durburow was aware jail staff had been trained on the policies and procedures and jail standards, as he had personally witnessed the Undersheriff and former Jail Administrator Harding conduct the training.

Prior to this incident, the Sheriff had never heard of any jail staff interacting with any jail inmates in a manner similar to which staff members interacted with Ellis. Indeed, prior to this incident, there were no indications that the procedures and practices in place for delivering medical

care to jail inmates were inadequate or that jail inmates were not receiving adequate medical attention.

Although punitive damages were not available in this case, during closing arguments Plaintiff's counsel requested the jury award $50 million in damages as a deterrent to prevent similar occurrences from happening in the future. After deliberation, the jury returned a verdict in favor of Plaintiff for $33,000,000.00.

## ARGUMENT AND AUTHORITY

### STANDARD OF REVIEW

Juries have wide latitude to determine a damages award based on the evidence presented at trial. *Burke v. Regalado*, 935 F.3d 960, 1035 (10th Cir. 2019). However, a jury's ability to choose a damages award is not unfettered. Courts may constitutionally adjust or even reverse jury verdicts under some circumstances. *Tudor v. Southeastern Oklahoma State University*, 13 F.4th 1019, 1047-1048 (10th Cir. 2021) (citing *Prager v. Campbell Cnty. Mem'l Hosp.*, 731 F.3d 1046, 1061 n. 8 (10th Cir. 2013); *Neely v. Martin K. Eby Const. Co.*, 386 U.S. 317, 321, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967)). Remittitur of a jury award of excessive damages is one situation where judges are permitted to review and alter the jury verdict. *Id.* at 1048, n. 21.

Remittitur of a compensatory damages award is appropriate "'when the jury award is so excessive…as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or another improper cause invaded the trial.'" *Fresquez v. BNSF Railway Co.*, 52 F.4th 1280, 1315 (10th Cir. 2022) (quoting *Burke,* 935 F.3d at 1035). Whether to grant a remittitur is a procedural matter governed by federal law and trial courts have broad discretion when ruling on a Motion for Remittitur. *O'Gilvie v. International Playtex, Inc.,* 821 F.2d 1438, 1448 (10th Cir. 1987); *Holmes v. Wack,* 464 F.2d 86, 89 (10th Cir. 1972). *See also England v. Gulf Western Mfg. Co.,* 728 F.2d 1026, 1029 (8th Cir. 1984). The totality of the circumstances must be

considered when determining whether remittitur is proper. *Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1416-17 (10th Cir. 1997).

When a court concludes the damages award is indeed excessive (i.e., against the weight of the evidence), judges must offer the plaintiff a choice between remittitur and a new trial. *Tudor,* 13 F.4th at 1048, n. 21 (citing *Sloan v. State Farm Mut. Auto. Ins. Co.,* 360 F.3d 1220, 1225 (10th Cir. 2004)); *O'Gilvie*, 821 F.2d at 1448; *Klein v. Grynberg*, 44 F.3d 1497, 1504 (10th Cir. 1995). As a result, the denial of a motion for a new trial may be conditioned upon a plaintiff accepting damages in an amount reduced by remittitur. *Slevin v. Board of Com'rs for County of Dona Ana*, 934 F.Supp.2d 1270, 1274 (D.N.M. 2012) (citing *McClary v. Coughlin, III*, 87 F.Supp.2d 205, 218 (W.D.N.Y. 2000), *aff'd* 237 F.3d 185 (2d Cir. 2001)). However, remittitur may still be proper even when a new trial is not warranted. "[M]ere excessiveness in the amount of an award may be cured by a remittitur, whereas excessiveness which results from jury passion and prejudice may not be so cured. In that case, a new trial is required." *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1561 (10th Cir. 1991).

## I.   THE JURY'S AWARD OF COMPENSATORY DAMAGES WAS GROSSLY EXCESSIVE AND SHOCKS THE CONSCIENCE

The evidence in this case does not support a compensatory damages award of $33 million. Defendant maintains that the verdict in this case was against the weight of the evidence and that the excessive verdict resulted from jury passion and prejudice. [*See* Defendant's Motion for New Trial, filed as Dkt. 411]. Should this Court find that no passion, prejudice, corruption or other improper cause invaded the trial and deny Defendant's Motion for New Trial, remittitur is appropriate based on the excessiveness of the verdict alone. *Mason*, 948 F.2d at 1561.

### A.   THE DAMAGES AWARD WAS IMPERMISSIBLY INTENDED TO BE PUNITIVE

Defendant notes that the compensatory damages award was comprised entirely of non-economic damages. During the eight-day trial, Plaintiff *only* sought non-economic damages; he did not introduce any evidence regarding the Decedent's burial costs, future earning capacity, or any other form of actual damages on which the jury's verdict is or could be based. As a result, the $33-million-dollar award appears to be punitive in nature rather than compensatory. Defendant, sued in his official capacity, is a governmental entity and only compensatory damages, not punitive damages, are available from a governmental entity under 42 U.S.C. § 1983. *Kentucky v. Graham*, 473 U.S. 159, 167, n. 13 (1985) (citing *Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981)). Compensatory damages are not intended to punish defendants. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001). Federal courts within the Tenth Circuit have granted motions for remittitur when excessive compensatory damages awards appear to have been based on a desire to punish the defendant rather than merely to compensate the plaintiff for actual losses. In *Moody v. Ford Motor Co.*, 506 F.Supp. 2d 823 (N.D.OK. 2007), the court held that a jury verdict of $15 million supported the defendant's theory that the jury was motivated by a desire to punish it with its verdict when verdicts in similar cases rarely exceeded $2 million. *Id.* at 847. Indeed, comparison to jury awards in other similar cases is an appropriate measure of excessiveness. *Wulf v. City of Wichita*, 883 F.2d 842, 875 (10th Cir. 1989); *Blangsted v. Snowmass Wildcat Fire Prot. Dist.*, 642 F. Supp. 2d 1250, 1258 (D. Colo. 2009); *Evans v. Fogarty*, 241 Fed. App'x 542, 561 (10th Cir. 2007). However, even without a review of comparable cases, the appearance that the amount awarded to Plaintiff was intended to punish Defendant is overwhelming.

The Tenth Circuit has recognized "the potential prejudice posed by arguments that invite the jury to award damages based on punishment or deterrence when only compensatory damages are at issue." *Racher v. Westlake Nursing Home Ltd. Partnership*, 871 F.3d 1152, 1169 (10th Cir.

2017) (citing *Spulak v. Kmart Corp.*, 894 F.2d 1150, 1155-56 (10th Cir. 1990); *Caudle v. District of Columbia*, 707 F.3d 354, 361 (D.C. Cir. 2013)). It has specifically found that arguments urging deterrence against a governmental entity which is immune from punitive damages are improper. *See Burke v. Regalado*, 935 F.3d 960, 1029 (10th Cir. 2019). In his closing argument, Plaintiff's counsel herein blatantly asked the jury to punish Defendant, casting the amount of any award in Plaintiff's favor as a deterrent to prevent future similar incidents from occurring. Over Defendant's objection, he argued that

> [t]**hey talk about this idea of "you can't punish us," but the point of constitution law, the point of a 1983 case, which is the area that we practice, is the idea of a deterrent effect**… The idea of deterrence, the idea that you eight people are getting to make this decision, and you can deter this from happening in our community through your verdict. You can deter this from happening in the state of Oklahoma based on awarding an historically significant amount.

(Ex. 1, Transcript Vol. XIII, 1454:6-1456:2). In other words, jurors improperly received the message from Plaintiff's counsel that while they were not *technically* allowed to punish Defendant for what occurred, they absolutely still could *and should* punish Defendant with a damages award so high that it would make history. Over Defendant's objection, the jury heard that punishing Defendant via a compensatory damages award to deter future similar behavior is the very point of a § 1983 claim.

> Plaintiff's counsel further argued that

> this has to be an incredibly significant verdict; otherwise, these gentlemen are going to walk out of here, and they're going to high-five because they'll say, "We can – we can run a cheap medical system. We don't have to even have a doctor. We can go 18 years with an LPN and no one following the policies, no one even knowing what the medical policies were, no one following the contracts. We can run a very, very cheap medical system because that jury just came back with a very small verdict. They listened to us. The just awarded the family 3 million dollars. Business as usual. That worked out from a financial standpoint.

> That's what it's about to them. That's why we're here, is because they think, like them, who devalue a human life for a person who is in a jail setting, that you will as well… [w]e've had people die for our country to make sure that we have these rights. And you are the eight people who can uphold those rights, and you can award

a verdict that actually compensates, truly compensates, for what Terry went through, and also has the ability to deter it from happening in the future.

(Ex. 1, Transcript Vol. XIII, 1456:25-1458:1). Such arguments are *only* appropriate "when the law and evidence place the issue of punitive damages before the jury." *Racher, supra,* 871 F.3d 1152, 1169 (citing *Ramsey v. Culpepper*, 738 F.2d 1092, 1100 (10th Cir. 1984); *Vansike v. ACF Indus. Inc.*, 665 F.2d 188, 209-210 (8th Cir. 1981)). There is no question that punitive damages were not available in this case. Admittedly, improper argument will not generally warrant disturbing a damages award "unless it clearly appears that the challenged remarks influenced the verdict." *Id.* at 1168 (10th Cir. 2017). However, here it clearly appears that these remarks were purposely intended to, and actually did, influence the damages award. When a large verdict is accompanied by improper arguments by counsel, it indicates the jury was swayed by the improper statements and acted upon them. *Whitehead v. Food Max*, 163 F.3d 265, 278 (5th Cir. 1998); *see also Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 759 (6th Cir. 1980); *Burke v. Deere & Co.*, 6 F.3d 497, 513 (8th Cir. 1993); *Dougal v. State Farm Mutual Auto. Ins. Co.*, 2006 WL 1141621, *2 (N.D.Okla. April 26, 2006) (unpublished decision attached hereto as Ex. 2).

The statements in Plaintiff's closing argument were specifically made amongst arguments that Nurse Horn and other jail staff berated Ellis and that Defendant or his employees devalue the human lives of people in a jail setting. (Ex. 1, Transcript Vol. XIII, 1409:23-25, 1413:25-1414:2, 1457:11-15). Plaintiff's counsel told the jury that the idea Ellis had been waiting to see the nurse and then she berated him when she arrived was particularly reprehensible, despite the fact that jail staff had called EMS for Ellis less than twenty-four hours earlier, (Ex. 3, Transcript Vol. I, 22:20-23:2; Ex. 1, Transcript Vol. XIII, 1409:15-1410:15) and despite the fact that Ellis refused transport to the hospital at that time and EMS determined that he had no acute medical problems. (Ex. 4, Transcript Vol. IV, 404:16-405:3). Given the statements of Plaintiff's counsel, it is abundantly clear that the jury verdict was impermissibly intended to punish Defendant for the actions of Nurse

Horn and other jailers which lacked sympathy or compassion for Ellis, but which certainly had nothing to do with the inmate healthcare policies and procedures of Defendant. Because the award was impermissibly intended to punish Defendant rather than merely compensate Ellis's estate for any harm Ellis suffered, remittitur is appropriate and the award should be reduced to an amount which reflects damages which are solely compensatory in nature.

### B. THE AWARD DRASTICALLY EXCEEDS AWARDS IN COMPARABLE CASES

Even if this Court does not agree with Defendant that at least a portion of the damages award was intended to be impermissibly punitive in nature, a comparison of similar verdicts demonstrates that the compensatory damages award is still excessive and should be reduced on that basis alone.

#### 1. $10 million in compensatory damages was awarded in *Burke v. Regalado*

In *Burke v. Regalado*, 935 F.3d. 960 (10th Cir. 2019), the Tenth Circuit examined the verdict in a case filed against the Sheriff of Tulsa County following the death of a pre-trial detainee at the Tulsa County Jail. *Id.* at 982-987. Notably, Plaintiff's counsel in the *Burke* case is the same attorney as herein. The facts in *Burke* have quite a few similarities to the facts in the present matter and provides an excellent guidepost for what the Tenth Circuit considers to be a reasonable compensatory damages award for a § 1983 denial of medical care claim stemming from the death of a pre-trial detainee.

In *Burke* the decedent was booked into the Tulsa County Jail as a pre-trial detainee on October 22, 2011. *Id.* at 983. Soon after, he hit his head, which resulted in partial paralysis. *Id.* The decedent complained to jail staff and the jail nurse that he broke his neck and could not move his legs. *Id.* However, a jail nurse noted that the decedent was moving his legs in response to stimuli and as a result of that she believed he was faking his paralysis. *Id.* Because of that, nursing staff

did not provide any medical treatment to him. *Id.* at 984. That night jail staff noted that he did *not* move on his own and his paralysis and pleas for help continued for the next three days. *Id*. On October 25, he was seen by the jail psychiatrist who testified he was aware the decedent might actually have been paralyzed but also believed there was a chance the paralysis was psychosomatic and not a physical health issue. *Id.* For several more days, the decedent remained unable to consume any food or water which was not placed within his immediate reach. *Id.* Nursing staff continued to refuse to take his vital signs or provide him any medical care during that time. *Id.* Jail staff logged that the decedent was able to feed himself on October 27, but surveillance video revealed that was not true. *Id.* at 985.

Five days after the decedent first began complaining of his injury, he was examined by a medical doctor at the jail on a behavioral health rotation. *Id.* That doctor recommended to the jail's medical director that the decedent should receive a CT scan to rule out a medical condition. *Id.* The medical director said he would examine the decedent later, but never did. *Id.* Later the same morning, jail staff found the decedent non-responsive. *Id.* CPR was started and paramedics were called, but the decedent passed away from complications following spinal injuries due to blunt force trauma. *Id.*

At trial, the plaintiff's expert witness testified that a hematoma travelled up the decedent's spine, causing him to stop breathing, and that if the decedent had been taken to a medical facility, his death would likely have been avoided. *Id.* Evidence was introduced that three other inmates had died in the jail the previous year as a result of the jail delaying or denying access to medical care. *Id.* at 987. The plaintiff requested the jury award "$51 million in damages for pain and suffering - $1 million for every hour Mr. Williams spent in Medical Cell 1." *Id.* at 1029. The jury returned a compensatory damages verdict of $10 million against the defendant in his official

capacity as the Tulsa County Sheriff. *Id.* at 989. The defendant subsequently sought a new trial, or remittitur in the alternative, in addition to judgment as a matter of law. *Id.* at 987.

In examining whether the $10-million-dollar verdict was excessive, the Tenth Circuit found that it was "on par with cases involving similar conduct." *Id.* at 1033. The court noted that in *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 567 (1st Cir. 1989), the jury awarded $4.5 million in compensatory damages for a jailer's supervisory role in violating an inmate's constitutional rights. It further noted that in *Glover v. Vest*, No. CIV-14-936-F, 2015 WL 13344116 at *2 (W.D.Okla. Dec. 23, 2015),[2]  the jury awarded $6.5 million in compensatory damages against a jail supervisor in his official capacity). As is the case here, the $10-million-dollar award in *Burke* was comprised of purely noneconomic damages. *Id.* at 1036. The court found the amount of award to be appropriate in light of the fact that "Mr. Williams endured considerable pain and suffering during his five days at the jail." *Id.* Although the court acknowledged the $10 million verdict was large, it held that it was not shocking to the judicial conscience given that the decedent's injury and paralysis were untreated for five days, he was left unattended for days at a time, he was unable to eat or drink, jail staff dragged him from one cell to another, and that he was naked when he suffocated to death on the jail floor. *Id.*

While there are some similarities between *Burke* and the case at bar, the extent of pain and suffering in evidence in *Burke* far exceeds the evidence of pain and suffering introduced at trial in this matter. While the decedent in *Burke* was denied all medical care and evaluation for five days while he was paralyzed and unable to move, an ambulance was called for Ellis immediately after he experienced a seizure on October 21. (Ex. 4, Transcript Vol. IV, 341:22-342:15). Ellis was evaluated by paramedics, who determined he was not experiencing an acute medical event. (Ex.

---

[2]  However, *Glover* was a sexual assault case and was dismissed during appellate review by the Tenth Circuit. *See Glover v. Johnson*, No. CIV-14-936-F, 2016 WL 6394229 (W.D. Okla. Sept. 23, 2016). As a result that verdict has never withstood any post-trial or appellate scrutiny.

4, Transcript Vol. IV, 341:22-342:15, 366:24-367:24). Significantly, Ellis refused transport to the hospital. When he was told he could not call his grandfather, he stated he wanted to go back to the cell and be left alone. (Ex. 5, Transcript Vol. III, 293:18-294:9; Ex. 4, Transcript Vol. IV, 404:16-405:3). He then got up and walked under his own power twice during that night and made no complaints about anything between 4:00 a.m. and 8:00 a.m. on October 22. (Ex. 5, Transcript Vol. III, 274:10-284:9; Dft's Trial Exhibit 24, Videos D and E).

Ellis simply did not experience a denial of medical care for days on end as did the decedent in *Burke.* Any pain and suffering Ellis experienced as the result of a delay in medical care or denial of access to medical care occurred over a matter of hours, from around 8:30 a.m. on the morning of October 22 when Ellis asked to go to the E.R. until his death early that afternoon. Yet Plaintiff's counsel (again, the same counsel as in *Burke*) requested $50 million in damages from the jury in this case, almost the same amount of damages requested in *Burke*. (Ex. 1, Transcript Vol. XIII, 1456:3-8). When "there is no objective evidence in the record to support this claim for damages," courts are unable "to make a subjective determination about the reasonableness of plaintiff's request" based on the record alone. *Moody, supra,* 506 F.Supp.2d at 846. But the staggering damages award in this case is *more than three times* that of the compensatory damages award in *Burke*, which the Tenth Circuit admitted was large but not shocking given the evidence. Given the evidence in this case, $33 million damages award is clearly unreasonably, excessive, shocking to conscience, and not in line with verdicts in comparable cases.

### 2. Compensatory damage awards in other comparable cases are much lower than $33 million

Other comparable cases have damages awards even further removed from the $33 million number herein. For example, in *Moody, supra,* Judge Eagan in the Northern District of Oklahoma found that it was "highly improbable" that a $15 million verdict consisting entirely of noneconomic damages could withstand post-trial or appellate scrutiny given that most verdicts in

wrongful death cases are "significantly less than $5 million, with verdicts for compensatory damages rarely exceeding $2 million." *Moody, supra,* 506 F.Supp.2d at 846-847. In *Layton v. Board of County Commissioners of Oklahoma Co.*, 09-CV-1208 (W.D. Okla. Dec. 12, 2013), a jury awarded $175,000 in a wrongful death action for inadequate medical care at the Oklahoma County Jail following the decedent's years-long pre-trial detention.

Recently, in February 2023, a jury in the Northern District of Oklahoma awarded $14 million in compensatory damages (as compared to the jury's $68-million-dollar punitive damages award) in a § 1983 denial of medical care case arising from the death of an inmate at the Tulsa County Jail.[3] *Young v. Correctional Healthcare Companies, Inc*., No. 13-CV-315-13J-JFJ (N.D. Okla. Feb. 24, 2023) (Jury Verdict attached hereto as Ex. 6). The *Young* case, like *Burke*, involved allegations of egregious denial of access to medical care which spanned an even longer time frame than the denial of medical care in *Burke*. In *Young*, the plaintiff alleged that the decedent was incarcerated in the Tulsa County Jail from October 2012 until her death in February 2013. (*See* Amended Complaint in *Young*, attached hereto as Ex. 7). It was alleged that the decedent had a history of diabetes and cardiovascular health problems, including having previously suffered a stroke, and that she required regular medications, medical evaluations, and monitoring. It was further alleged that although the defendant was aware of this medical history and the decedent's need for medication and monitoring, she did not receive the necessary medical care over a **four month period**. After complaining of nausea, vomiting, and back pain but receiving no medical assessment, she died of cardiac arrest at the jail. The jury's compensatory damages award of $14 million for *four months* of alleged suffering is less than half that of the compensatory damages awarded in this case, where Ellis was allegedly denied medical care for what ultimately amounted

---

[3] The defendant in *Young* has filed a Motion for New Trial, or in the alternative, Motion for Remittitur. At the time the present Motion is filed, there has been no ruling on the defendant's pending Motion in *Young*.

to a few hours, certainly less than 24 hours. Defendant notes that the plaintiff's counsel in *Young* was the same plaintiff's counsel in *Burke* and in the present case.

The $33-million-dollar verdict is also not in line with denial of medical care verdicts outside of Oklahoma and the Tenth Circuit. In *Borges v. County of Humboldt, et. al*, 4:15CV00846 (N.D.Cal. August 28, 2017), the jury awarded $2.5 million against a county responsible for operating the county jail in a denial of medical care case brought pursuant to both § 1983 and California state statute following the death of a pre-trial detainee after one day of detention. In *Estate of Hill v. NaphCare, et. al.,* 2:20-CV-00410-MKD (E.D.Wash. July 27, 2022), the jury awarded $2.75 million in compensatory damages against Spokane County and its provider of medical services, jointly and several, on a § 1983 denial of medical claim arising from the death of a jail inmate from a ruptured intestine following the jail's refusal to take her to the E.R. despite complaints of intense stomach pain. In *Morris v. Dallas County, Tex.*, 3:11CV00527 (N.D.Tex. Sept. 30, 2013), the jury awarded $375,000 in compensatory damages in a denial of medical care case arising from the death of a pre-trial detainee from pleurisy and pneumonia following complaints by the detainee that he thought he had broken ribs, had difficulty breathing, could not hold himself up, and was incontinent. There, the decedent's estate alleged the defendant had a policy, practice and custom of failing to instruct and train jail employees to observe and report the medical symptoms of jail inmates. In *Brummett v. County of San Diego*, 3:12-CV-01428 (S.D.Cal. Nov. 2014), a jury awarded $3 million in a § 1983 deliberate indifference to medical needs suit filed regarding the death of an asthmatic 21-year-old pre-trial detainee in the San Diego County Jail. The county sought a new trial, or in the alternative, remittitur and appealed the denial of those motions. Ultimately the appeal was dismissed when the parties settled for $3.195 million, inclusive of attorney's fees.

An Illinois jury awarded $1 million in compensatory damages to the estate of an asthmatic arrestee who died one-and-a half days after she began showing significant signs of distress but who received no medical care. *See Ortiz v. City of Chicago*, 1:04-CV-07423 (N.D.ILL. November 2013). The estate's § 1983 claim was premised on the city's alleged widespread and systematic failure to provide medical care to arrestees. And in *Jones v. Corizon Health, Inc.*, 1:20-CV-00036 (W.D.Mich. December 5, 2022), $6.4 million was awarded in a § 1983 denial of medical care case where a pre-trial detainee died in medical isolation after being denied care for progressively worsening symptoms for 36 hours.

The jury verdict in this case is clearly far greater than the compensatory damages awards in other § 1983 denial of medical care cases filed as the result of pre-trial detainees dying in custody. As a result, the $33-million-dollar verdict is certainly excessive and shocking to the conscience. Remittitur in an amount more in line with the length of time Ellis would have experienced pain and suffering and in line with comparable verdicts is therefore appropriate.

## CONCLUSION

A remittitur of the jury's award of $33 million in compensatory damages should be ordered. The damages award is grossly excessive, particularly considering the fact that the evidence in this case demonstrated that medical care was delayed or denied for under six hours *after* Ellis had been evaluated by EMTs and refused transport to the hospital. A review of verdicts in cases involving similar claims reveals that compensatory damages awards have not reached anywhere near $33 million. And a review of relevant case law plainly shows that $33 million is excessive, shocking to the conscience, and likely the result of the jury attempting to punish Defendant despite punitive damages being unavailable under the law.

WHEREFORE, premises considered, Defendant Sheriff of Ottawa County, in his official capacity, respectfully requests this Court GRANT his Motion for Remittitur.

Respectfully submitted,

s/ Alison B. Levine
Wellon B. Poe, OBA No. 12440
Jamison C. Whitson, OBA No. 18490
Alison B. Levine, OBA No. 33021
Justin P. Ashlock, OBA No. 33459
COLLINS, ZORN, & WAGNER, PLLC
429 N.E. 50th Street, Second Floor
Oklahoma City, OK   73105
Telephone:      (405) 524-2070
Facsimile:      (405) 524-2078
E-mail:         wbp@czwlaw.com
                jcw@czwlaw.com
                abl@czwlaw.com
                jpa@czwlaw.com

*ATTORNEYS FOR DEFENDANT SHERIFF OF OTTAWA COUNTY, IN HIS OFFICIAL CAPACITY*

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2023, I electronically transmitted this filing to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Daniel E. Smolen
Robert M. Blakemore
Bryon D. Helm
SMOLEN & ROYTMAN, PLLC
701 South Cincinnati Avenue
Tulsa, OK 74119

***Attorneys for Plaintiff***

s/ Alison B. Levine
Alison B. Levine