## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

**Austin P. Bond as Personal Representative of the Estate of Terral Ellis II,**

      **Plaintiff,**

**v.**

**The Sheriff of Ottawa County, in his Official Capacity,**

      **Defendant.**

**4:17-cv-00325-CRK-CDL**

### OPINION AND ORDER

Three motions are before the Court made pursuant to Fed. R. Civ. P. 59 filed by Defendant Sheriff of Ottawa County, in his official capacity ("Defendant"): (i) Motion for Judgment as a Matter of Law ("Mot. JMOL"), Oct. 5, 2023, ECF No. 410; (ii) Motion for New Trial, Oct. 5, 2023, ECF No. 411 ("Mot. New Trial"); and (iii) Motion for Remittitur, Oct. 5, 2023, ECF No. 412 ("Mot. Remit."). For the following reasons all three of Defendant's motions are denied.

### BACKGROUND

This matter involves the death of Terral Brooks Ellis II ("Mr. Ellis"). In response to an outstanding warrant, the 26-year-old Ellis surrendered himself to the Ottawa County Jail on October 10, 2015. Pretrial Order at 3, Aug. 4, 2023, ECF No. 352-1 ("Stip. Facts"). Mr. Ellis was detained at the jail between October 10 and October 22, 2015. Id. at 3–5.

On October 22, 2015, Mr. Ellis died of sepsis and pneumonia. Id. at 5. On June 9, 2017, Plaintiff Austin P. Bond ("Plaintiff"), as the personal representative of Mr. Ellis's estate, filed suit against the Sheriff of Ottawa County in his official capacity, under 42 U.S.C. § 1983. See generally Compl., June 9, 2017, ECF No. 2. Plaintiff alleged that the jail did not provide Ellis with adequate medical care as a pre-trial detainee and thus violated his Fourteenth Amendment rights. Id. at ¶¶ 49–64. In August of 2023, the case was tried in the Northern District of Oklahoma. Pursuant to Federal Rule of Civil Procedure 50(a), Defendant moved for judgment as a matter of law at the close of Plaintiff's case. Tr. of Proc. Jury Trial at 1028:7–32:6, Aug. 15–23, 2023, ECF Nos. 377, 379, 393–98, 403–07 ("Trial Tr."). The Court denied Defendant's motion. Id. at 1035:9. The jury returned a verdict in favor of Plaintiff, awarding compensatory damages in the amount of $33 million as well as post-judgment interest at a rate of 5.39% per annum pursuant to 28 U.S.C. § 1961. See Jury Verdict, August 8, 2023, ECF No. 392. Pursuant to the jury's decision, the Court entered judgment in favor of Plaintiff on September 8, 2023. See Judgment, Sept. 8, 2023, ECF No. 400. On October 5, 2023, Defendant filed a renewed motion for judgment as a matter of law, a motion for a new trial, and a motion for remittitur. See generally Mot. JMOL; Mot. New Trial; Mot. Remit.

4:17-cv-00325-CRK-CDL

## JURISDICTION AND STANDARD OF REVIEW

This Court exercises jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343, because it arises under the laws of the United States.  Plaintiff alleges violations of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

Pursuant to Federal Rule of Civil Procedure 50(a), the district court has authority to grant judgment as a matter of law to the moving party at the close of the non-moving party's evidence.  A party denied judgment as a matter of law may renew its motion within 28 days after judgment is entered.  Fed. R. Civ. P. 50(b).  Judgment as a matter of law is only an appropriate remedy when "the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position."  Mountain Dudes v. Split Rock Holdings, Inc., 946 F.3d 1122, 1129 (10th Cir. 2019) (citing In re: Cox Enters., Inc., 871 F.3d 1093, 1096 (10th Cir. 2017)) (internal quotations omitted).

After a jury trial, the district court may, on motion pursuant to Federal Rule of Civil Procedure 59(a)(1)(A), "grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court."  The decision to grant a new trial is at the discretion of the district court.  See McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984); Hinds v. Gen. Motors Corp., 988 F.2d 1039, 1046 (10th Cir. 1993).  To successfully overturn a verdict rendered by the jury, it must be shown there were "trial errors which constitute prejudicial error or that the verdict is not based on substantial

3

evidence." White v. Conoco, Inc., 710 F.2d 1442, 1443 (10th Cir. 1983) (citing Rasmussen Drilling, Inc. v. Kerr-McGee Nuclear Corp., 571 F.2d 1144, 1149 (10th Cir. 1978)).

The district court will grant remittitur if the jury's verdict is unsupported by substantial evidence or the product of jury passion or prejudice. O'Gilvie v. International Playtex, Inc., 821 F.2d 1438, 1448 (10th Cir. 1987). The jury possesses "wide latitude to choose an award based on the evidence." Hill v. J.B. Hunt Transp., Inc., 815 F.3d 651, 668 (10th Cir. 2016) (citing Prager v. Campbell Cnty. Mem'l Hosp., 731 F.3d 1046, 1063 (10th Cir. 2013)). If a "jury award is supported by sufficient evidence" it is appropriate for the district court to deny remittitur. See Therrien v. Target Corp., 617 F.3d 1242, 1258 (10th Cir. 2010). Remittitur is appropriate only when "the jury award is so excessive . . . as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or another improper cause invaded the trial." Fresquez v. BNSF Railway Co., 52 F.4th 1280, 1315 (10th Cir. 2022) (citing Burke v. Regalado, 935 F.3d 960, 1035 (10th Cir. 2019)) (internal quotations omitted).

## DISCUSSION

### I.     Motion for Judgment as a Matter of Law

Defendant argues that it is entitled to judgment as a matter of law because Plaintiff failed to present evidence at trial which supports the verdict. See generally Mot. JMOL. Specifically, Defendant argues that the evidence did not support that Mr. Ellis' constitutional right to receive adequate medical care as a pre-trial detainee

4:17-cv-00325-CRK-CDL

was violated, or that a policy or custom of Defendant led to the violation of Mr. Ellis'

constitutional right to receive medical care as a pre-trial detainee. Id. at 5.

### A.    Underlying Constitutional Violation

Pursuant to the Eighth Amendment, inmates are entitled to medical care when

in a custodial setting. Paugh v. Uintah Cnty., 47 F.4th 1139, 1153 (10th Cir. 2022)

cert. denied sub nom. Anderson v. Calder, 143 S. Ct. 2658 (2023).   Deliberate

indifference to an inmate's serious medical illness constitutes cruel and unusual

punishment in violation of the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97,

103–04 (1976).   Under the Due Process Clause of the Fourteenth Amendment, pre-

trial detainees are entitled to the same protections as inmates under the Eighth

Amendment. Burke, 935 F.3d at 991.   Deliberate indifference requires "proof that

[an] actor disregarded a known or obvious consequence of his action." Bd. of Cnty.

Comm'rs of Bryan Cnty., Oklahoma v. Brown, 520 U.S. 397, 410 (1997).   "Deliberate

indifference involves both an objective and subjective component." Olsen v. Layton

Hills Mall, 312 F.3d 1304, 1315 (10th Cir. 2002) (citing Sealock v. Colorado, 218 F.3d

1205, 1209 (10th Cir. 2000)) (internal quotations omitted).   To satisfy the objective

component of deliberate indifference, a plaintiff must show "the medical condition or

harm claimed by the inmate was 'sufficiently serious' to be cognizable under the Cruel

and Unusual Punishment Clause." Prince v. Sheriff of Carter Cnty., 28 F.4th 1033,

1044 (10th Cir. 2022) (citing Martinez v. Beggs, 563 F.3d 1082, 1088 (10th Cir. 2009)).

The subjective component of deliberate indifference is satisfied if it is shown that the

government official "knows of and disregards an excessive risk to inmate health or

4:17-cv-00325-CRK-CDL

safety." Burke, 935 F.3d at 992 (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)). "An official's failure to alleviate a significant risk of which he was unaware, no matter how obvious the risk or how gross his negligence in failing to perceive it, is not an infliction of punishment and therefore not a constitutional violation." Tafoya v. Salazar, 516 F.3d 912, 916 (10th Cir. 2008). However, "[b]ecause it is difficult, if not impossible, to prove another person's actual state of mind, whether an official had knowledge may be inferred from circumstantial evidence." DeSpain v. Uphoff, 264 F.3d 965, 975 (10th Cir. 2001) (citing Perkins v. Kansas Dep't of Corr., 165 F.3d 803, 809–10 (10th Cir. 1999)). Thus, "the existence of an obvious risk to health or safety may indicate awareness of the risk." Rife v. Oklahoma Dep't of Pub. Safety, 854 F.3d 637, 647 (10th Cir. 2017) (citing Farmer, 511 U.S. at 842).

During the trial, the jury was presented overwhelming evidence from which it could conclude that the jail staff not only knew about Mr. Ellis' condition but were also indifferent to it. As an example, on the evening of October 21, 2015, Mr. Ellis asked D.O.[1] Lawson "do you mind giving me some meds and my inhaler?" to which D.O. Lawson replied "no, that's a nurse thing. The nurse has to okay [inaudible] we'll call her tomorrow." Pl. Exh. 68 at 20:20.[2] Later that evening, Mr. Ellis told D.O. Lawson and D.O. Bray that he could not move his legs and asked them to call an

---

[1] Throughout this document, unless otherwise stated, the Court refers to former employees of the Ottawa County Jail by the title or position they held at the time of Mr. Ellis' death.

[2] Plaintiff's video exhibits 50–71 were entered into evidence in the Court's Pretrial Order without objection from Defendant. See Pretrial Order at 26–27, Aug. 4, 2023, ECF No. 352; see also Pl.'s Witness and Exh. List at 2–4, August 23, 2023, ECF No. 390-1.

ambulance, to which D.O. Bray responded, "you're paralyzed now?" and reiterated that he would call the nurse. Pl. Exh. 55 at 21:55:47. On the morning of October 22, 2015, after screaming to get the attention of Assistant Jail Administrator ("A.J.A.") Charles Shoemaker, Mr. Ellis again expressed that there was something wrong with his legs; however, A.J.A. Shoemaker refused to call emergency services. Stip. Facts at 3. In the middle of an exchange with D.O. Bray, Brenda Pierce, the jail's lunch lady, can be heard saying "that poor guy needs help" before ultimately mocking and dismissing him, by asking, "if you can't breathe how can you talk?" Pl. Exh. 58 at 8:36:53. At one point, Mr. Ellis begged A.J.A. Shoemaker to look at his legs, but A.J.A. Shoemaker stated "I'm not looking at your legs. Why would I look at your legs man? I'm not medical." Pl. Exh. 65 at 18:43:00. When Nurse Horn finally arrived, she berated, mocked, and threatened Mr. Ellis rather than providing medical help. Nurse Horn told Mr. Ellis, "I'm tired of dealing with your dumb ass, you hear me? If we put you back in the pod and you start pissing in a cup again, you're gonna go on the fucking D-Ring because ain't a damn thing wrong with you." Id. at 18:43:00. Mr. Ellis pled with Nurse Horn to look at his legs, and the nurse responded by shouting "No! No!" Id. at 18:43:00. This evidence was sufficient for a jury to conclude that the jail staff were not only aware of, but indifferent to Mr. Ellis' serious medical needs.

Defendant argues that the "testimony at trial show[ed] that jail staff simply did not perceive th[e] risk . . . ." Mot. JMOL at 10. Defendant emphasizes that in Tafoya, the court stated that "[a]n official's failure to alleviate a significant risk of which he was unaware, no matter how obvious the risk or how gross his negligence

4:17-cv-00325-CRK-CDL

in failing to perceive it, is not an infliction of punishment and therefore not a constitutional violation." <u>See</u> 516 F.3d at 912; Mot. JMOL at 9.  The Court in <u>Tafoya</u> made clear that "[a]lthough deliberate indifference is a subjective inquiry, a jury is permitted to infer that a prison official had actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition."  516 F.3d at 916 (citing <u>Farmer</u>, 511 U.S. at 842).  Even beyond the eight days' worth of testimony from which a jury could have easily inferred knowledge, Defendant fails to acknowledge testimony that Mr. Ellis was moved from the original pod in which he was held with other prisoners so that he could be under medical observation.  <u>See</u>  Derek Derwin Testimony, Trial Tr. at 1280:3-7; Harding Testimony, Trial Tr.at 88:11-15, 90:6-12.  Defendant's failure to acknowledge this fact, is particularly jarring given during trial Defendant's counsel questioned Jail Administrator ("J.A.") Jeffrey Harding about medical observation and J.A. Harding, confirmed that Mr. Ellis was indeed segregated for the purpose of medical observation:

> Q. Okay.  Was he -- was Mr. Ellis -- or what was the status of Mr. Ellis as far as putting him in H1?
>
> A. Just observation for medical.
>
> Q. Okay.  Will you look at -- will you read through that policy, please.
>
> A. Okay.
>
> Q. And does that policy allow you -- allow an inmate to be put into a holding cell for medical observation?
>
> A. Yes.

8

Harding Testimony, Trial Tr. at 272:15-23. That the jail staff put Mr. Ellis under medical observation is sufficient grounds for the jury to disbelieve the claim that the jail staff was unaware that Mr. Ellis was at risk.

## B.     Unconstitutional Policies and Failure to Train

Defendant argues that he is entitled to judgment as a matter of law because the jail had (i) policies that required inmates to receive adequate medical care, (ii) there was no custom of deliberate indifference to medical needs, (iii) any claim of a systemic failure is lacking and (iv) there is no evidence of a failure to train. Mot. JMOL at 11–17.

### 1.     Evidence Regarding the Policies and Customs at the Jail

Under Section 1983, an official can be held liable for a constitutional violation if the evidence shows that the violation was a result of the official's policies or customs. Monell v. New York City Dept. of Social Services, 436 U.S. 658, 694 (1978). Such policies and customs include "a formal regulation or policy statement, an informal custom that amounts to a widespread practice, decisions of municipal employees with final policymaking authority, ratification by final policymakers of the decisions of subordinates to whom authority was delegated, and the deliberately indifferent failure to adequately train or supervise employees." Hinkle v. Beckham Cty. Bd. of Cnty. Comm'rs, 962 F.3d 1204, 1239–1240 (10th Cir. 2020) (quoting Pyle v. Woods, 874 F.3d 1257, 1266 (10th Cir. 2017)). The "knowing failure to enforce policies necessary to the safety of inmates may rise to the level of deliberate indifference." Tafoya, 516 F.3d at 919 (citing LaMarca v. Turner, 995 F.2d 1526, 1536

4:17-cv-00325-CRK-CDL

(11th Cir. 1993)).  An informal custom that is widespread is equivalent to a policy. Waller v. City and Cnty. of Denver, 932 F.3d 1277, 1283 (10th Cir. 2019) (citing Bryson v. City of Okla., 627 F.3d 784, 788 (10th Cir. 2010)).  A single incident is insufficient to establish a pattern or a custom.  Waller, 932 F.3d at 1287.  Further, evidence must support that the challenged policy or custom is "closely related to the violation of the plaintiff's federally protected right."  Hinkle, 962 F.3d at 1241.  Lastly, the plaintiff must establish that the risks were known or should have been known to the defendant.  See Barney v. Pulsipher, 143 F.3d 1299, 1307 n.5 (10th Cir. 1998) (citing Farmer, 511 U.S. at 840–42); see also Hinkle, 962 F.3d at 1239.

Here, the jury was presented with abundant evidence that there was a well-established custom of supplying inadequate medical care and a written policy to distrust inmates.  Lawson Testimony, Trial Tr. at 515:19–516:17.  For example, D.O. Lawson testified that A.J.A. Shoemaker, encouraged his subordinates to violate a written policy as it relates to self-defense.  Id. at 416:24–418:15.  The evidence supports that such disregard for the official or written policy of the jail was common. The jury heard testimony that although Physician's Assistant ("P.A.") Aleta Fox was contractually obligated to visit the jail on a specific day once a week, that requirement was never implemented by J.A. Harding.  Harding Testimony, Trial Tr. 205:11 – 206:2; 208:1-5.  Indeed, the jury heard evidence that P.A. Fox only visited the jail when specifically called upon by Nurse Horn.  Stip. Facts at 5.  Despite the written policy, which required inmates to receive the same level of care available to citizens in the surrounding community, the jury heard testimony that jailers were trained

4:17-cv-00325-CRK-CDL

and given directives not to call ambulances for inmates, irrespective of the necessity. Lawson Testimony, Trial Tr. 474:7-17, 556:1-16.

Defendant nonetheless argues that the jail's written policies serve to refute the evidence of the custom at the jail to deny adequate medical care. Mot. New Trial at 3–4. The jury heard evidence that written policy provided:

> [a]ll county jail inmates shall be entitled to health care comparable to that available to citizens in the surrounding community. Medical care at the facility shall be delivered under the direction of a licensed physician and through the use of trained health care personnel. No jailer or other employee will ever summarily or arbitrarily deny an inmate's request for medical service.

Pl. Exh. 33; Def. Exh. 10F.[3]  Thus, the jury heard evidence regarding both the informal customs and practices and the formal written policy. The mere existence of a written policy which required jail staff to provide adequate medical care does not negate the fact that the jury was presented with sufficient evidence to conclude that despite those written policies there was a prevalent custom of denying adequate medical care, that the custom was so widespread as to be known to Defendant, and that the custom and practice of denying medical care caused Mr. Ellis' death.

## 2.     Evidence of a Systemic Failure at the Jail

Defendant argues that it is entitled to judgment as a matter of law because the jury could not have found liability based upon a systemic failure of policies and procedures.  A municipality may be liable when a specific employee causes a

---

[3]  The Ottawa County Policy and Procedure–Medical Services book was admitted as a trial exhibit.  See Pl.'s Witness and Exh. List at 4; see also Def.'s Witness and Exh. List at 3, August 23, 2023, ECF No. 390-2.

4:17-cv-00325-CRK-CDL

constitutional violation.  Crowson v. Washington Cnty. Utah, 983 F.3d 1166, 1186

(10th Cir. 2020).  Nonetheless, the Tenth Circuit has recognized that in some cases

"[d]eliberate indifference to medical needs may be shown by proving there are such

gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is

effectively denied access to adequate medical care."  Id. at 1187 (citing Garcia v. Salt

Lake Cnty., 768 F.2d 303, 308 (10th Cir. 1985)).[4]

In Crowson, an inmate in a correctional facility suffered injuries because of a

delay in diagnosis of toxic metabolic encephalopathy.  983 F.3d at 1173.  The district

court had noted there were "no written policies in the record," and that the "[j]ail's

general practices for providing medical care to inmates had to be pieced together from

the deposition testimony of various medical personnel."  Crowson, 983 F.3d at 1184.

The doctor at the jail relied on jail staff for diagnosis and only visited the jail one or

two days a week, and the trial court observed that "[t]hese deficiencies were

compounded by the practices at the [j]ail."  Id.  There were no guidelines for dealing

with brain injuries and nurses were left "largely to their own devices."  Id. at 1184–

85.  There were no policies for putting inmates in observation cells for detox or when

to transport an individual to the hospital.  Id.  Despite reversing the district court's

denial of summary judgment for the individual defendants, the doctor and a nurse,

the  Tenth  Circuit  concluded  that  "the  combined  acts  or  omissions  of  several

---

[4]  Crowson makes clear that liability for a systemic failure only applies to claims
regarding policies or customs, and not failure to train claims.  Crowson, 983 F.3d at
1187. Crowson also makes clear that liability requires a constitutional violation.  983
F.3d at 1187.

employees acting under a governmental policy or custom may violate an individual's constitutional rights." Id. at 1186 (citing Garcia, 768 F.2d at 305).

Defendant here grasps at the lack of any written policies at the correctional facility in Crowson to argue that Crowson's recognition of liability for constitutional violations resulting from systemic failures is inapplicable to the instant case. Mot. JMOL at 14. However, in Crowson, the lack of written policies was one factor in the finding of a systemic failure. Crowson, 983 F.3d at 1177. Other factors included a nurse left to his own devices, id. at 1184–1185, and an absentee physician as well as customs and practices that compounded those deficiencies. That there were written policies that were ignored in the instant case does not render Crowson inapplicable.

### 3.   Evidence Regarding Failure to Train

A failure to train or supervise can give rise to municipal liability. City of Canton v. Harris, 489 U.S. 378, 387 (1989); Crowson, 983 F.3d at 1187; Lance v. Morris, 985 F.3d 787, 800–02 (10th Cir. 2021). To establish a failure to train claim Plaintiff was required to demonstrate a jail policy or custom of inadequate training, that caused injury, and that the policy or custom was adopted with the knowledge that such a custom or policy could put those housed in the jail at a substantial risk of serious harm. Lance, 985 F.3d at 800 (citing Waller, 932 F.3d at 1283-84).

The jury heard evidence that even when confronted with a medical situation the jail staff were trained not to trust the inmates:

> A. That's how we were trained, just to not trust inmates. Just a general lack of trust from, you know, every situation.

13

> Q. So even in a situation where you have an inmate begging for help, you were trained to not trust them?
>
> A. Yeah. Yes, sir

Lawson Testimony, Trial Tr. at 515:20-24. The jury heard evidence that the correction officers were instructed that they were not to call an ambulance, rather any call for an ambulance had to be made by the nurse. Id. 474:7-17, 556:1-10. Defendant points to evidence, which the jury heard, that it did indeed provide training, see Harding Testimony, Trial Tr. at 248:5–250:17, and that there was a written policy regarding medical care. Mot. New Trial at 3. Nonetheless, the jury also heard one officer testify that he had never seen the policy book and had received no training on it. See Lawson Testimony, Trial Tr. at 418:12-21. There was sufficient evidence from which the jury could conclude that there was a policy of not training the staff regarding proper medical care and that Defendant knew that the policy of inadequate training created a serious risk and it led to the death of Mr. Ellis in this case.

## II.    Motion for a New Trial

Defendant seeks a new trial pursuant to Federal Rule of Civil Procedure 59, claiming the verdict was against the weight of the evidence, that improper arguments and conduct by counsel tainted and biased the jury, that the Jury Instructions, Aug. 22, 2023, ECF No. 388 ("Jury Instrs."), were erroneous and inadequate, and that the Court erred when it refused to exclude certain evidence and expert testimony. See generally Mot. New Trial. Plaintiff contests each of these claims. For the reasons that follow, the motion is denied.

14

4:17-cv-00325-CRK-CDL

### A.     The Evidence Supports the Verdict

Defendant argues that a new trial is warranted because the verdict was against the weight of the evidence. Id. at 1. Specifically, Defendant argues that there was no evidence that policies or customs caused a constitutional violation of Ellis' rights, and that there was no evidence of deliberate indifference on the part of the Sheriff. Id. at 1–7. Given the breadth of evidence presented to the jury at trial, Defendant's argument is unconvincing.

When deciding whether to grant a new trial where the weight of the evidence supporting the jury verdict has been challenged, the decision is within the discretion of the district court. Escue v. N. Okla. Coll., 450 F.3d 1146, 1156–57 (10th Cir. 2006) (citing Black v. Hieb's Enters., 805 F.2d 360, 363 (10th Cir. 1986)). The verdict of the jury "must stand unless it is clearly, decidedly, or overwhelmingly against the weight of the evidence." Nanda v. Philips 66 Company, 754 F. App'x 675, 679–80 (10th Cir. 2018) (citing M.D. Mark, Inc. v. Kerr-McGee Corp., 565 F.3d 753, 762 (10th Cir. 2009)) (internal quotations omitted). If the district court finds that the verdict is against the weight of the evidence, it may grant a new trial. Community National Life Ins. Co. v. Parker Square Savings & Loans Ass'n, 406 F.2d 603, 605 (10th Cir. 1969). Here, to recover, Plaintiff was required to demonstrate by a preponderance of the evidence that:

15

> [A]n agent or employee of the Sheriff of Ottawa County, in his official capacity, or multiple agents and employees together, as a result of gross deficiencies in policies or staffing,[5] violated Mr. Ellis' federal constitutional right to medical care by acting with deliberate indifference to Mr. Ellis' serious medical needs.

Instr. No. 17, Jury Instrs. at 23.  To prove deliberate indifference, Plaintiff had to demonstrate that there was an objective medical need, and that Defendant knew of the need and disregarded the risk it posed to Mr. Ellis' health.  Burke, 935 F.3d at 992 (quoting Farmer, 511 U.S. 825 at 837); see also Mata v. Saiz, 427 F.3d 745, 753 (10th Cir. 2005); Sawyers v. Norton, 962 F.3d 1270, 1283 (10th Cir. 2020).  Defendant makes no argument that Mr. Ellis lacked an objective medical need.  See generally Mot. New Trial.  In this case, during the course of an eight-day trial, the jury was presented with an abundance of evidence of the risk to Mr. Ellis' health.  During direct examination, D.O. Lawson described Mr. Ellis' physical condition as being so diminished that he "couldn't bend over to get his own shoe."  Trial Tr. at 476:10-23. The severity of Mr. Ellis' condition was so evident that it prompted D.O. Bray to quip "did we go to Dpod to check on the zombie?"  Pl. Exh. 54 at 21:55.  Indeed, after hearing the pleas of Mr. Ellis, the lunch lady Ms. Pierce proclaimed "[t]hat poor guy needs help."  Pl. Exh. 58 at 8:31–8:36.  Plaintiff's expert, Dr. Todd Wilcox, testified that Mr. Ellis exhibited "serious and ominous clinical changes in an otherwise previously healthy patient," and that an appropriate response would have been "a trip to the emergency department."  Wilcox Testimony, Trial Tr. at 953:18-21.

---

[5] Although a custom may be informal, municipal liability can be established if the informal custom is so widespread and permanent that it is equivalent to an official policy.  Waller, 932 F.3d at 1283 (citing Bryson, 627 F.3d at 788).

16

4:17-cv-00325-CRK-CDL

Although Defendant argues that "no evidence was presented of any pattern of deliberate indifference to medical care occurring prior to Ellis's death," Mot. New Trial at 5, the jury heard testimony that despite written policies for medical treatment of inmates, the staff routinely disregarded those written policies.   For example, the jury heard testimony from A.J.A. Shoemaker that in violation of the jail's medical services policy, there was no licensed physician administrating the medical delivery system at the jail:

> Q. You were aware, were you not, sir, that the Oklahoma jail standards, the minimum requirements in the State of Oklahoma required that all inmates, inmates like Terry Ellis, were entitled to healthcare comparable to that in the surrounding community and that the medical delivery system should be administered by a licensed physician?
>
> A. Yes, sir.
>
> Q. That wasn't happening in Ottawa County in October of 2015 when Mr. Ellis was housed there; correct?
>
> A. A licensed physician, like an LP or . . .
>
> Q. A licensed physician wasn't administering the medical delivery system; agreed?
>
> A. Agreed.
>
> Q. And the inmates weren't getting medical care that would be consistent with community standards, were they?
>
> A. Not consistent, no, sir.

Shoemaker Testimony, Trial Tr. at 638:14–639:4.

The jury heard testimony that A.J.A. Shoemaker told his subordinate D.O. Lawson "Fuck that policy book" in response to a question regarding the parameters of self-defense:

17

4:17-cv-00325-CRK-CDL

> Q. Okay.  And you indicated you asked Mr. Shoemaker a question and
> he told you "Fuck that policy book"?
>
> A. Yes, sir.
>
> Q. That was specifically in regard to a question that you had asked about
> self defense; correct?
>
> A. Yes, sir.
>
> Q. And he was indicating that you have the right to protect yourself
> however you need to; is that correct?
>
> A. Yes, sir.

Lawson Testimony, Trial Tr. at 543:5-13.

The jury heard testimony that despite the written policy requiring staff to check the vitals of inmates experiencing chest pains, Nurse Horn, without explanation, failed to do so.  In one instance the testimony concerned an inmate other than Mr. Ellis experiencing chest pains:

> Q. Isn't chest pains considered an emergent medical condition under the
> policy, the big written policy that you guys have?
>
> A. Yes.
>
> Q. Doesn't it require you to immediately transport a person to the
> hospital?
>
> A. Not necessarily.
>
> Q. Does it require you to come down and take the inmate's vitals?
>
> A. It should, yes.
>
> Q. Do you see anywhere in here where you went down and checked
> Inmate Martin's vitals?
>
> A. No.

18

4:17-cv-00325-CRK-CDL

> Q. I mean, that's as simple as just asking one of the jailers to go do it, right?
>
> A. They could.
>
> Q. You don't even have to get out of bed and go down there.  You could just tell them to check the vitals, right?
>
> A. They would do that for me.
>
> Q. Why didn't you ask them to check the inmate's vitals that was having chest pain?
>
> A. To see if they're abnormal.
>
> Q. I'm sorry?
>
> A. To see if his vitals were abnormal.
>
> Q. Why didn't you ask the jail staff?  If you weren't going to go down there -- okay? -- for whatever reason you weren't going to go there, why not at least have the staff that is willing to work there take the inmate's vital signs before you make a probable diagnosis of anxiety attack?
>
> A. I can't answer that question.

Horn Testimony, Trial Tr. at 788:25-790:3.

The jury also heard testimony that even though P.A. Fox was contractually obligated to visit the jail once a week on a specified day for inmate exams, P.A. Fox did not maintain a regular schedule and only visited the jail when asked to do so by Nurse Horn:

> Q. And pursuant to the contract, it was agreed that Fox would come to the jail once a week on a specified day agreed to by Fox and the Ottawa County jail administrator for inmate medical exams, correct?
>
> A. Correct.

4:17-cv-00325-CRK-CDL

Q. It also indicates that Fox will also be on call at all times for any medical emergency that the department nurse might deem necessary, correct?

A. Correct.

Q. The department agrees to pay Fox a flat rate of $1,000 a month for the above services, correct?

A. Correct.

Q. It goes on to state that the contract would be reviewed in six months by both parties, correct?

A. That's what it says, yes.

Q. And that the contract would remain in effect unless notified in writing 60 days in advance by either party until July 31st of 2016, correct?

A. Correct.

Q. This would have covered the time frame that Terry Ellis was housed in Ottawa County Jail in October of 2015, correct?

A. Correct.

Q. Isn't it true, ma'am, that Aleta Fox never, in fact, had any set schedule that required her to show up on a specified day every week at the jail?

A. Correct.  I would call her when I needed her.  She would come over on her lunch break.

Id. at 813:19–814:20; see also id. at 816:18-25 (reiterating that P.A. Fox never maintained a set schedule, despite the contract she had signed with the jail).

When asked if Mr. Ellis received medical care in conformity with jail policy, J.A. Harding responded "[n]o"; when asked if he believed that "denying an inmate medical attention and letting him beg for help, refusing to get him help, is a form of

4:17-cv-00325-CRK-CDL

torture," J.A. Harding responded "yes."  Harding Testimony, Trial. Tr. at 193:9-21.

Moreover, J.A. Harding testified that the disregard shown by Nurse Horn was not

attributed to the actions of just one person, but to a systemic failure:

> Q. Do you hear the jail nurse state "I'm tired of dealing with your dumb ass, you hear me?"
>
> A. Yes.
>
> Q. Do you hear Nurse Horn state "[i]f we put you back in the pod and you start pissing in a cup again, you're going to go on that fucking D-ring because there ain't a damn thing wrong with you, you understand me?"
>
> A. Yes.
>
> Q. Your jail nurse is telling Mr. Ellis while he's dying, if he complains about the pain that he's in, "If he complains about anymore of his symptoms, she's going to chain him to the fucking D-ring." Agreed?
>
> A. Correct.
>
> Q. Do you believe that's appropriate?
>
> A. No, sir.
>
> Q. Do you believe that's just one person making a mistake?
>
> A. On -- on Ms. Horn's behalf?
>
> Q. No, this entire thing that we've just watched, you believe that's one person's fault, the nurse's?
>
> A. No.
>
> Q. It's an entire systemic problem with your medical delivery, isn't it, sir?
>
> A. It was the problem with the staff that was there.  They did not render what they were supposed to.
>
> Q. Every one of them all of the way down to the lunch lady; right?

4:17-cv-00325-CRK-CDL

A. Yes.

Q. That's an entire system breakdown when everyone fails; correct?

A. Correct.

Q. And that's what's happening here; correct?

A. It appears.

Id. at 179:11–180:17.

Plaintiff's expert, Dr. Wilcox testified that it was inappropriate and dangerous for Nurse Horn, an LPN, to practice without the supervision of a registered nurse or physician:

> Well, I mean, that raises substantial concern, because she's practicing well outside the scope of her practice. And really more importantly, and the reason that limits are put on LPNs, is because she's functioning outside of the amount of training that she's had. And so when she functions in that role, she's not a safe practitioner of healthcare. And, as you see in this case, that she misdiagnosed the patient and she mistreated the patient with respect to, you know, not designing, you know, the treatment that he needed for his condition. And you -- you have really a death that is due to an LPN that is practicing medicine.

Wilcox Testimony, Trial Tr. at 940:7-17.

Finally, the jury saw and heard video that showed a 26-year-old man repeatedly begging for medical attention, which was either ignored or mocked by jail staff. See Pl. Exh. 51 at 16:33 (D.O. Lawson and D.O. Bray joking about seizures and the quality of the jail's medical care); Pl. Exh. 68 at 20:20 (D.O. Lawson refusing to give Mr. Ellis an asthma inhaler); Pl. Exh. 55 at 22:11 (D.O. Lawson feigning concern for Mr. Ellis' complaint of being paralyzed); Pl. Exh. 58 at 8:36 (Ms. Pierce questioning how Mr. Ellis can plead for help if he cannot breathe); Pl. Exh. 57 at 43:15-47 (D.O.

4:17-cv-00325-CRK-CDL

Wiford questioning the seriousness of Mr. Ellis' condition and refusing to help him up); Pl. Exh. 65 at 10:44 (Nurse Horn berating Mr. Ellis as he pleads for help).  The jury saw and heard a video clip of the jail's nurse disregard Ellis' pleas.  Nurse Horn stated:

> … the very first time you [complain] "oh, I can't get up, I need help – I can't – oh I'm having seizures [inaudible]" you're going to that D-Ring and that's where you're going to stay the whole time that you are here cause I'm sick and tired of fucking dealing with your ass. Ain't [sic] a damn thing wrong with you!

Pl. Exh. 65 at 10:44.  The jury heard that Ellis cried for his son while complaining to the jail staff.  See Lawson Testimony, Trial Tr. at 531:6-8.  Considering the undisputed medical need coupled with the overwhelming evidence exhibiting disregard for that need, the verdict is adequately supported by the evidence.

### B.   Improper Conduct by Plaintiff

Defendant argues that the emotional outbursts of Plaintiff's counsel during the trial as well as inappropriate comments during closing argument warrant a new trial. Mot. New Trial at 8–11.  The district court may order a new trial due to inappropriate conduct of counsel if the moving party can demonstrate that they have been prejudiced by the conduct in question.  Ryder v. City of Topeka, 814 F.2d 1412, 1424 (10th Cir. 1987).  It is within the discretion of the district court to determine whether inappropriate conduct by counsel warrants a new trial.  Angelo v. Armstrong World Indus., Inc., 11 F.3d 957, 962 (10th Cir. 1993).  "Even if an argument was 'improper, a judgment will not be disturbed unless it clearly appears that the challenged remarks influenced the verdict.'"  Racher v. Westlake Nursing Home Ltd. P'ship, 871

F.3d 1152, 1161 (10th Cir. 2017) (quoting <u>Lambert v. Midwest City Mem'l Hosp. Auth.</u>, 671 F.2d 372, 375 (10th Cir. 1982)).   There are four factors in determining whether attorney misconduct merits a new trial: "(1) the pervasiveness of the misconduct, (2) the taking of curative action, (3) the size of the verdict, and (4) the weight of the evidence." <u>Osterhout v. Bd. of Cnty. Commissioners of LeFlore Cnty., Oklahoma</u>, 10 F.4th 978, 991 (10th Cir. 2021) (citing <u>Whittenburg v. Werner Enterprises, Inc.</u>, 561 F.3d 1122, 1127 (10th Cir. 2019)) (first three factors); <u>Burke</u>, 935 F.3d at 1027 (fourth factor).   As explained below, the factors here do not tip in the favor of Defendant.

## 1.   Pervasiveness

When analyzing pervasiveness, the proper inquiry is whether an appropriate objection was sustained that promptly ended the misconduct. <u>Osterhout</u>, 10 F.4th at 992.   Here, the alleged misconduct by Plaintiff's counsel is that he "began to apparently cry" at points during the trial.  Mot. New Trial at 9.   Defendant alleges that Plaintiff's counsel cried on two separate occasions and thus prejudiced the jury to the extent that a new trial is warranted.  <u>See</u> <u>id.</u> at 9–10.   The first occasion was during the questioning of a former jail administrator and the second during closing arguments.   Per Defendant's own admission, the Court took prompt action.  <u>See</u> <u>id.</u> Defendant also contends that the reference to deterrence by Plaintiff's counsel in his closing argument was inappropriate and warrants a new trial. [6]  <u>See</u> <u>id.</u> at 10–11.

---

[6]  Although, "[t]he purpose of [Section] 1983 is to deter state actors from using the badge of authority to deprive individuals of their federally guaranteed rights and to

4:17-cv-00325-CRK-CDL

Here, inappropriate conduct was not pervasive. Defendant points to two instances where Plaintiff's counsel displayed emotion which were quickly addressed by the Court. Likewise, Plaintiff's counsel's remarks during closing arguments were made in rebuttal to the Defendant's argument that the jury should not "punish the county" and focused on compensating Mr. Ellis for his injuries and internalizing those costs. Counsel's reference to deterrence was not pervasive. Plaintiff's counsel, in rebuttal to an argument made by Defendant's counsel in closing, emphasized compensation to Mr. Ellis while also referencing the need for the municipality to internalize the cost of the harm caused:

> They talk about this idea of "you can't punish us," but the point of constitutional law, the point of a 1983 case, which is the area that we practice, is the idea of a deterrent effect. It's to deter – [objection and sidebar] . . . The idea of deterrence, the idea that you eight people are getting to make this decision, and you can deter this from happening in our community through your verdict. You can deter this from happening in the state of Oklahoma based on awarding an historically significant amount.

> Again, you're the last kind of line. We've worked on this case for eight years, and it's hard for me, but the most important thing is that I'm handing, like, this off to you to make that decision. I think that the case is worth 50 million dollars or more based on the pain and suffering that Terry went through.

> I think that when you really sit down, and you look at the jury instruction on compensatory damage, and you think about what he was

---

provide relief to victims if such deterrence fails," <u>Buck v. Rhoades</u>, 598 F. Supp. 3d 1181, 1194 (N.D. Okla. 2022) (quoting <u>Wyatt v. Cole</u>, 504 U.S. 158, 161 (1992)), specific arguments urging deterrence against a governmental entity may be improper. <u>See</u> <u>Burke</u>, 935 F.3d at 1029 (assuming without deciding that arguments that linked deterrence to compensatory damages were improper). However, "[e]ven if some statements exceeded the bounds of permissible argument, 'a judgment will not be disturbed unless it clearly appears that the challenged remarks influenced the verdict.'" <u>See</u> <u>Racher</u>, 871 F.3d at 1169 (quoting <u>Lambert</u>, 671 F.2d at 375).

suffering, what his suffering was like both from a physical standpoint and from a mental standpoint and the idea that even in those moments of suffering, he just wants, "Like, what are you going to tell my kid? Like, I came in here. I did the right thing. I did what I thought was the right move, and here I am in a cement cell while people scream at me and mock me, and my legs are turning black, and I can't breathe." But even in those moments, he is thinking about his child, so you know that that was important to him. Those were some of the last things that we know that he was saying, other than screaming for help or crying out in pain.

And so I think when you look at how young he was, the idea that he had checked himself in, that the pain from an emotional standpoint and from a physical standpoint was so great, that this has to be an incredibly significant verdict; otherwise, these gentlemen are going to walk out of here, and they're going to high-five because they'll say, "We can -- we can run a cheap medical system. We don't have to even have a doctor. We can go 18 years with an LPN and no one following the policies, no one even knowing what the medical policies were, no one following the contracts. We can run a very, very cheap medical system because that jury just came back with a very small verdict. They listened to us. They just awarded the family 3 million dollars. Business as usual. That worked out from a financial standpoint."

Plaintiff's Closing Argument, Trial Tr. at 1455:23–1457:10.

In support of the claim that plaintiffs' counsel's actions merit a new trial, Defendant cites Carey v. Lovett, 622 A.2d 1279, 1288–90 (N.J. 1993), a case decided by the Supreme Court of New Jersey. In Carey, not only was the plaintiffs' counsel accused of crying during direct examination, but the plaintiff's counsel's opening statement brought at least one juror to tears. Carey, 622 A.2d at 1288. Furthermore, "[t]hroughout the five-week trial, the court constantly reprimanded defense counsel before the jury." Id. at 1289. Moreover, during what the state supreme court characterized as a "rancorous exchange," the trial court admonished the defense

4:17-cv-00325-CRK-CDL

counsel, and quipped "[t[his time you're going to get it.  That goes on the record, too."  Id. at 1289–90.

The conduct complained of here does not rise to the level of pervasive.  See Ousterhout, 10 F.4th at 992 (explaining isolated conduct was not pervasive).  The trial in the instant case lasted for 8-days, during which Defendant cites two possible times Plaintiff's counsel began to cry, and on both occasions the Court responded promptly with a sidebar.[7]  Moreover, counsel for Plaintiff discussed internalizing the cost of the harm during his closing rebuttal while discussing compensation in response to a specific argument made by Defendant.  Thus, the Court is not persuaded that actions by Plaintiff's counsel were pervasive.

### 2.    Adequate Curative Action

Defendant argues that the curative action factor favors a new trial because the Court did not issue curative remarks or instructions after Plaintiff's counsel allegedly began to cry.  See Mot. New Trial at 12.  When it became evident that counsel for Plaintiff was getting emotional during the questioning of the witness, the Court immediately called for a sidebar and told him that "if someone is going to get

---

[7] The circumstances here are distinguishable from Carey.  In Carey, which was not a Section 1983 case but rather a tort case, both appellate courts noted many instances where both counsel and the trial judge acted improperly, creating an emotional atmosphere in the trial that was not addressed or remedied.  See Carey, 622 A.2d at 1288 (quoting the intermediary appellate court's observation that "there are numerous instances where the trial judge crossed the line and improperly interjected himself into the case"); id. at 1289 ("A reading of the transcript reveals [the trial judge's] constant intrusions into defense counsel's direct and cross-examination of witnesses.  The harm from those intrusions was exacerbated by the court's numerous attempts, many unsolicited, to aid plaintiffs' counsel, a certified civil trial attorney, in his examination of witnesses").

27

emotional here, we're going to stop the trial and control ourselves." Sidebar, Trial Tr. 149:8-10.   Again, and prior to the instance of emotional behavior during closing arguments, the Court set parameters to foreclose any inappropriate showing of emotion by counsel, warning both parties that sidebars related to inappropriate statements during closing arguments would be deducted from the time of the offending party.   See Trial Tr. at 1397:4-11.   During closing arguments, when it appeared that Plaintiff's counsel began to "sniffle," the Court took note of Defendant's objection and called for a sidebar.   See Sidebar, Trial Tr. at 1453:5-15.   Despite counsel's eagerness to resume trial presentation, the Court paused closing arguments until he could compose himself, outside the presence of the jury, while his allotted time continued to run.   See id. at 1453:15-23.   The Court vigilantly protected the jury from overtly emotional displays.[8]

Defendant argues that the curative factor weighs in favor of a new trial because the Court's jury instructions were not adequately curative after the jury "improperly heard that punishing Defendant to deter future similar behavior is the very point of a [Section] 1983 claim."   Mot. New Trial at 11.   The Court properly instructed the jury to award compensatory damages, explaining that compensatory damages are awarded for "physical and mental pain before death, loss of life, and loss

---

[8]   The Court's effort to avoid emotional scenes in front of the jury extended to spectators of the trial.   At one point during trial, members of Mr. Ellis' family became visibly emotional and began to weep.   The Court sua sponte requested a sidebar and advised counsel that the Court would take a break to allow the spectators to compose themselves. Sidebar, Trial Tr. at 147:3-5.   Without objection from either party, the Court adjourned for a brief period of time.   Id.

of familial relationships." Instr. 23, Jury Instrs. at 31.   A "court's later jury instructions" can help "dispel any prejudicial effect of improper comments." Burke, 935 F.3d at 1033 (citing Racher, 871 F.3d at 1171).  "[A] general instruction at close of trial, reminding the jury that counsels' arguments are not evidence, can help mitigate an improper closing argument." Whittenburg, 561 F.3d at 1131 (citing United States v. Roberts, 185 F.3d 1125, 1144 (10th Cir. 1999)).   Although a general instruction at close of trial is not always curative, it is likely sufficient if there is the existence of overwhelming evidence on which the jury could have based its decision. Whittenburg, 561 F.3d at 1132 (citing Roberts, 185 F.3d at 1144).  Moreover, it is "generally presume[d] that juries follow the instructions given to them notwithstanding what has been said in court." Cavanaugh v. Woods Cross City, 718 F.3d 1244, 1250 (10th Cir. 2013) (citing Bland v. Sirmons, 459 F.3d 999, 1005, 1015 (10th Cir. 2006)) ("The jury is presumed to follow its instructions, even when there has been misleading argument" (internal citation omitted)).

### 3.    Size of the Verdict

Defendant argues that a new trial is warranted because the size of the verdict is shocking and excessive.  Mot. New Trial at 14.  Defendant adopts the exact same logic as contained in the contemporaneously filed Motion for Remittitur.  See Mot. Remit. at 7–17.  Although the size of the verdict is large, the Court cannot say that it shocks the conscience given the evidence heard by the jury.  The jury saw video evidence of Mr. Ellis walking into the jail voluntarily to surrender himself.  Pl. Exh. 71 at 20:50.  The jury heard evidence of Mr. Ellis complaining of back pain on October

17, expressing the belief that his back was broken and seeking medical attention from the nurse on October 19, 2015. Stip. Facts at 4. The jury heard undisputed evidence that at the time she saw Mr. Ellis, Nurse Horn did not take his vitals. See id.; Horn Testimony, Trial Tr. at 850: 13–17. The jury heard undisputed evidence that Mr. Ellis reported having a seizure to the jail staff on October 21, 2015. Stip. Facts at 4; Williams Testimony, Trial Tr. at 341:22–342:15, 345:8-16. It is undisputed, that on the evening of October 21, 2015, Mr. Ellis complained to the jail staff that his legs were numb. See Stip. Facts at 4. The jury heard undisputed evidence that on the morning of October 22, 2015, Ellis' verbal distress and suffering was met with neglect by the jail staff. See id.; Pl. Exh. 58 at 8:24. The jury heard evidence that when Mr. Ellis begged for water, a member of the staff prevented another from giving him water, indicating that Mr. Ellis could do so on his own. See Stip. Facts at 4; Pl. Exh. 57 at 43:15. The jury heard further evidence that Ellis laid on a urine-soaked mattress. Pl. Exh. 67 at 13:49. The jury heard testimony that Mr. Ellis cried out for his son while suffering throughout the night. Lawson Testimony, Trial Tr. at 531:6-8. The jury heard evidence, and it is undisputed that, by 10:42 am on October 22, 2015, Mr. Ellis was complaining that he was in pain and that his legs were black and purple. See Pl. Exh. 65 at 18:43. They heard and saw jail staff, guards, and even the lunch lady, not only ignoring Mr. Ellis' pleas, but mocking him. See Pl. Exh. 57; see also Pl. Exh. 58. Finally, the jury heard the jail staff tell Mr. Ellis he had to wait to be seen by the nurse. Pl. Exh 54 at 21:55. The jury saw evidence that when the nurse arrived, she not only ignored Mr. Ellis' pleas for help, but also threatened him

if he continued asking for medical assistance.  Pl. Exh. 65 at 18:43, 10:44.  The jury

heard Nurse Horn state:

> … the very first time you [complain] "oh, I can't get up, I need help – I
> can't – oh I'm having seizures [inaudible]" you're going to that D-Ring
> and that's where you're going to stay the whole time that you are here
> cause I'm sick and tired of fucking dealing with your ass.  Ain't [sic] a
> damn thing wrong with you!

Id.  Juries have "wide discretion" to "fix the amount of noneconomic compensatory

damages."  Racher, 871 F.3d at 1172.  Based on the evidence presented to the jury

over an eight-day trial, the Court cannot say that the size of the verdict was

unreasonable or the result of inappropriate remarks.

### C.    Proper Jury Instructions

When examining a challenge to jury instructions for the purposes of a new

trial, the Court must evaluate whether "the instructions accurately informed the jury

of the issues and the governing law."  Henning v. Union Pac. R. Co., 530 F.3d 1206,

1221 (10th Cir. 2008) (citing United States v. Baker, 508 F.3d 1321, 1324 (10th Cir.

2007)).  Providing the jury with an improper instruction warrants a "new trial 'if the

jury might have based its verdict on the erroneously given instruction.'"  Henning,

530 F.3d at 1221 (10th Cir. 2008) (quoting Townsend v. Lumbermens Mut. Cas. Co.,

294 F.3d 1232, 1242 (10th Cir. 2002)).  Jury instructions are evaluated de novo.

Frederick v. Swift Transp. Co., 616 F.3d 1074, 1079 (10th Cir. 2010).  "The decision

to give a particular instruction, however, is reviewed for an abuse of discretion."

Henning, 530 F.3d 1206 at 1221 (citing United States v. Holly, 488 F.3d 1298, 1302

(10th Cir. 2007), <u>cert. denied</u>, 552 U.S. 1310, 128 (2008)).  Here, Defendant fails to show that instructions rendered by the Court lacked a sufficient legal basis.

Defendant takes issue with two aspects of the jury instructions.  Defendant first argues that Instruction 17 was erroneous because it "contained an inaccurate statement of law," as it "had the effect of giving the jury the impression it could find Defendant liable even without a definite constitutional violation as long as they found that there were gross deficiencies in policies or staffing."  Mot. New Trial at 16–17. Defendant also argues that the Court should have instructed the jury regarding the effect of offensive language.  <u>Id.</u> at 19–20.

> At the close of trial, the Court instructed the jury that:
>
> To prevail on his [Section] 1983 claims against the Sheriff of Ottawa County, in his official capacity, Plaintiff must first establish, by a preponderance of the evidence, that an agent or employee of the Sheriff of Ottawa County, in his official capacity, or multiple agents and employees together, as a result of gross deficiencies in policies or staffing, violated Mr. Ellis' federal constitutional right to medical care by acting with deliberate indifference to Mr. Ellis' serious medical needs.

Instr. 17, Jury Instrs. at 23.  Instruction 17 expressly states that a constitutional violation is necessary to find Defendant liable.  The plain language of Instruction 17 does not lend itself to an interpretation that liability can be found without a constitutional violation.[9]

---

[9] Defendant argues that the Court's instruction borrowed language from <u>Crowson</u>, 983 F.3d 1166, which was only applicable in a narrow situation and led the jury to believe that it was not required to find the existence of a constitutional violation. Mot. New Trial at 17.  The Court in <u>Crowson</u> did not rule that a constitutional violation was not required to impute liability.  <u>See</u> 983 F.3d at 1181–82.  Similarly, the Court's instruction here clearly required a constitutional violation.  Defendant's argument is without merit.

4:17-cv-00325-CRK-CDL

Defendant also takes issue with the fact that the Court did not adopt Defendant's proposed instruction, which stated:

> Mere words alone—no matter how intensive or reprehensible – are insufficient to establish a constitutional violation. Verbally abusive language, taunts, threats and deplorable, offensive, or unprofessional language toward an inmate do not amount to a constitutional violation.

Mot. New Trial at 19.  Defendant argues that the Court's decision not to include the proposed instruction failed to provide the jury "a meaningful explanation of the applicable law."  Id. at 20.  Defendant's argument is meritless because Defendant's proposed instruction was unnecessary.  The Court explained that for the purposes of finding liability, "[a]n official's actions or inactions falling below the standard of care, as well as a violation of state statute or jail policy may be evidence of deliberate indifference, but alone are not sufficient to find liability."  Instr. 17, Jury Instrs. at 23.  The Court's instruction sufficiently set the parameters for liability.  There is no doubt that the video of Nurse Horn yelling at an infirm Mr. Ellis was an important piece of evidence in the Plaintiff's case.  Nonetheless, the trial made clear that the constitutional deprivation of medical care, by multiple jail employees over a period of time, led to the jury's verdict.

### D.   The NCCHC and State Jail Standards

Defendant argues that a new trial is warranted because the Court erred in allowing evidence concerning "jail standards set by the Oklahoma Department of Health . . . and the jail standards used by the National Commission on Correctional Health Care . . . and the American Correctional Association . . . whether the care provided to Ellis conformed to those standards, and whether the policies and

procedures of the jail conformed to those standards." Mot. New Trial at 20. Defendant's argument lacks merit.

Generally, the district court has broad discretion concerning evidentiary rulings. Leprino Foods Co. v. Factory Mut. Ins. Co., 653 F.3d 1121, 1131 (10th Cir. 2011) (citing Webb v. ABF Freight Sys. Inc., 155 F.3d 1230, 1246 (10th Cir. 1998)). The district court's decision should only be reversed when there has been an erroneous conclusion of law, erroneous finding of fact, or manifest error in judgment. United States v. Channon, 881 F.3d 806, 809-810 (10th Cir. 2018) (citing United States v. Jenkins, 313 F.3d 549, 559 (10th Cir. 2002)). A motion for a new trial premised on an error concerning the admittance of evidence shall be granted only if the district court made a "'clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" Weaver v. Blake, 454 F.3d 1087, 1091 (10th Cir. 2006) (quoting Hinds, 988 F.2d at 1046). Such an error occurs when the error has "had a substantial influence" or "leaves one in grave doubt as to whether it had such effect." United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc) (citing Kotteakos v. United States, 328 U.S. 750, 765 (1946)) (internal quotations omitted). Here no such error has been committed.

The state and national jail standards were relevant to issues in the case. Order, May 24, 2023, ECF No. 285. Thus, it would only be appropriate for the Court to exclude them if the risk of prejudice and confusion substantially outweigh the relevance, where probative value is given its maximum force and prejudice its minimum value. United States v. Murry, 31 F.4th 1274, 1291 (10th Cir. 2022), cert.

34

denied sub nom. Ramcharan v. United States, 143 S. Ct. 245 (2022).  Here, the risks of prejudice and confusion do not substantially outweigh the relevance of the state and federal standards.  Circumstantial evidence of deliberate indifference can be extracted from both a defendant's awareness and disregard of state and national standards.  Bevan v. Valencia, No. CV 15-0073, 2018 WL 4208065, at *5 (D.N.M. Sept. 4, 2018) (stating that the defendants' awareness of standard operating procedures and national accreditation standards and their violation of those standards can constitute circumstantial evidence of deliberate indifference, though expert testimony on those standards is not helpful to the jury).  Furthermore, established state and national standards may be persuasive in determining proper actions required to ensure inmate safety.  See Lopez v. LeMaster, 172 F.3d 756, 761 (10th Cir. 1999) (explaining that although the jail standards of the Oklahoma Department of Health do not establish constitutional parameters for the reasonable measures necessary to ensure inmate safety, the standards are persuasive authority concerning what is required to protect a pretrial detainee who was beaten by other inmates), abrogated in part on other grounds by Brown v. Flowers, 974 F.3d 1178, 1182 (10th Cir. 2020).  Thus, state and national standards are probative of whether Defendant was deliberately indifferent to Mr. Ellis' medical needs.  Any possible prejudicial effect of the standards evidence is greatly diminished by the instruction provided to the jury before Plaintiff began to ask questions regarding Oklahoma Jail Standards.  The Court stated:

> [Y]ou're going to start hearing about some jail standards, some national and state standards, throughout the trial.  You are allowed to consider

these, but you should not consider these standards as solely dispositive of whether the sheriff's office acted with deliberate indifference. So you should consider them, but you should not consider them solely dispositive.

Trial Tr. at 61:14-20. Thus, the Court did not err in allowing evidence concerning state and national standards to be presented to the jury.

### E. Dr. Wilcox

Defendant argues that a new trial is warranted because the Court erred in admitting the opinion testimony of Plaintiff's witness Dr. Wilcox. Mot. New Trial at 23–24. Defendant alleges that "Wilcox's testimony at trial demonstrated that his opinions were not helpful to the jury because he reviewed very little of the available evidence before rendering those opinions." Id. at 24. Defendant's argument is unpersuasive.

The district court possesses broad discretion in excluding or including expert testimony. Nalder v. W. Park Hosp., 254 F.3d 1168, 1173 (10th Cir. 2001) (citing Green Const. Co. v. Kansas Power & Light Co., 1 F.3d 1005, 1014 (10th Cir. 1993)). "An abuse of discretion will be found only where the trial court makes an arbitrary, capricious, whimsical, or manifestly unreasonable judgement." Id. at 1174 (citing F.D.I.C. v. Oldenburg, 34 F.3d 1529, 1555 (10th Cir. 1994)) (internal quotations omitted). Defendant's arguments that Dr. Wilcox failed to review Nurse Horn's deposition, or that he lacked expertise in sepsis, or rural jails fails to persuade. See Mot. New Trial at 24.

Dr. Wilcox is an expert in correctional healthcare. See Order, June 16. 2023, ECF No. 303. Dr. Wilcox testified that he had reviewed "the medical records for Mr.

4:17-cv-00325-CRK-CDL

Ellis," "the EMT run sheets," "policies and procedures," and "deposition testimony." Wilcox Testimony, Trial Tr. at 911:1-13.  Defendant has not up until this time raised the issue of whether Dr. Wilcox was an expert on sepsis as a condition.  Further, all of Defendant's concerns pertain to the weight of Dr. Wilcox's testimony, not its admissibility.  See United States v. Cavely, 318 F.3d 987, 997–98 (10th Cir. 2003). Given that the Dr. Wilcox's testimony has the "earmarks of reliability" the evidence was rightfully admitted and "subjected to the kind of adversarial attack that facilitates the jury's central functions of deciding what weight to attribute to evidence and which witnesses to believe."  29 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Evid. § 6262 (2d ed. 2016).  The Court did not commit error; it properly admitted Dr. Wilcox's testimony.

## III.   Motion for Remittitur

Defendant argues that the $33-million-dollar award rendered to Plaintiff was grossly excessive and shocks the conscience because it appears to be punitive in nature, as opposed to compensatory, and it drastically exceeds awards in comparable cases. Mot. Remit. at 8. Although the award is large, given the circumstances of this case and the testimony heard at trial, the Court cannot say that the award shocks the conscience.

The district court will grant remittitur if the jury's verdict is unsupported by substantial evidence or the product of jury passion or prejudice.  See O'Gilvie, 821 F.2d at 1448.  The jury possesses "wide latitude to choose an award based on the evidence," which will be upheld by the Court if supported by substantial evidence.

Hill, 815 F.3d at 670; see Therrien, 617 F.3d at 1258.  Remittitur is appropriate only when the award is so excessive "as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or another improper cause invaded the trial." Fresquez, 52 F.4th at 1315 (citing Burke, 935 F.3d at 1035) (internal quotations omitted).

Compensatory damages awarded to plaintiffs under 42 U.S.C. § 1983 are not designed to punish defendants.  See Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 306–07 (1986).  Only compensatory damages can be awarded to a plaintiff in a claim against a defendant in his official government capacity.  Kentucky v. Graham, 473 U.S. 159, 167 n.13 (1985) (citing Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981)).  In a Section 1983 action, the plaintiff's compensation includes "pain and suffering before death . . . the victim's loss of consortium, and other damages recognized in common law tort actions." Berry v. City of Muskogee, Okl., 900 F.2d 1489, 1507 (10th Cir. 1990).  Although, "[t]he purpose of [Section] 1983 is to deter state actors from using the badge of authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails," Buck v. Rhoades, 598 F. Supp. 3d 1181, 1194 (N.D. Okla. 2022) (citing Wyatt v. Cole, 504 U.S. 158, 161 (1992)) (internal quotations omitted), specific arguments urging deterrence against a governmental entity may be improper.  See Burke, 935 F.3d at 1029. However, "[e]ven if some statements exceeded the bounds of permissible argument, 'a judgment will not be disturbed unless it clearly appears that the challenged

remarks influenced the verdict.'" Racher, 871 F.3d at 1168 (quoting Lambert, 671 F.2d at 375).

Damages under Section 1983 are for compensatory purposes.  Stachura, 477 U.S. 306–07.   Defendant's motion for remittitur presents the question of the appropriate amount of noneconomic compensatory damages for the deprivation of an individual's constitutional rights.   Congress has given no instruction, guidance, or limitations on how to quantify pain and suffering, death, and loss of family relationships in this context.  Such a question depends on the facts and circumstances surrounding the violation.

In the instant case, during an eight-day trial the jury was presented with evidence that provided them a window into the final days of Mr. Ellis' life.  The jury witnessed Mr. Ellis, 26, voluntarily surrender himself to the Ottawa County Jail.  Pl. Exh. 71 at 20:50.  The jury then witnessed Mr. Ellis complain of back pain and request medical attention on October 17, and despite his pleas, he was not visited by the jail nurse until two days later.  See Stip. Facts at 3 and 4.   The jury was presented undisputed evidence that during that visit, Nurse Horn, in violation of standard practice, failed to take Mr. Ellis' vitals.  See Stip. Facts at 4; Horn Testimony, Trial Tr. at 850: 13-22.  The jury was presented with undisputed evidence that two days after the visit from Nurse Horn, Mr. Ellis told jail staff that he had a seizure.  See Stip. Facts at 4; Williams Testimony, Trial Tr. at 341:22–342:15; 345:8-16.  The jury heard D.O. Lawson and D.O. Bray mock Mr. Ellis for not being able to get up and urinate on his own.  Pl. Exh. 54 at 21:55; Pl. Exh. 55 at 22:11.  The jury witnessed

4:17-cv-00325-CRK-CDL

D.O. Wiford, in response to Mr. Ellis telling him he could not feel his legs, repeatedly dismiss the seriousness of Mr. Ellis' condition and refuse to simply get him water to drink.  Pl. Exh. 57.  The jury heard evidence that Mr. Ellis, infirm and unattended, laid helpless on a urine-soaked mattress.  Trial Tr. at 964:17–965:4, 954:16-18.  The jury was presented undisputed evidence that by 10:45 a.m. on October 22, 2015, Mr. Ellis complained that he was in pain, unable to walk, and that his legs were black and purple.  See Stip. Facts at 4; Pl. Exh. 65 at 18:43.  The jury watched and listened as jail staff, the guards, and even the lunch lady, ignored and mocked Mr. Ellis' pleas for help.  See Pl. Exh. 58.  As stated earlier, when Nurse Horn finally visited Mr. Ellis again, she dismissed his desperate pleas and threatened him:

> Mr. Ellis (to A.J. Shoemaker): Ooh, ooh, I can't move my legs, sir.
>
> Nurse Horn: I just seen you move your legs.  You moved your feet like that. [inaudible]
>
> Mr. Ellis: Just a little bit.  I don't know if it's broken or not.
>
> Nurse Horn: I'm tired of dealing with your dumb ass, you hear me?
>
> Nurse Horn: If we put you back in the pod and you start pissing in a cup again, you're gonna go on the fucking D-Ring because there ain't a damn thing wrong with you.  You understand me?
>
> Nurse Horn: You can get out of here if it's – if it's okay with him [indicating Shoemaker], but the very – the very first time you say, oh, I can't get up, I need help – I can't – oh, I'm having seizures [inaudible], you're going to on that D-Ring and that's where you're going to stay the whole time that you are here because I'm sick and tired of fucking dealing with your ass.  Ain't a damn thing wrong with you!

Pl. Exh. 65 at 18:43.

4:17-cv-00325-CRK-CDL

At the conclusion of the trial, the jury was instructed that "compensatory damages are awarded for Mr. Ellis' physical and mental pain before death, loss of life, and loss of familial relationships." Instr. 23, Jury Instrs. at 31. Without guidance from Congress, it is for a jury rather than the Court to say what those hours of physical and mental pain cost Mr. Ellis. It is unclear how one might monetize the pain of a slow septic death, or how that process and prospect of dying felt to a young man who must have questioned why he turned himself in; who begged for others to help him; who cried for his child; and who was then forced to weigh the risk of being chained to the floor against the hope of asking for help. It is difficult to calculate the cost of the anguish Mr. Ellis felt when he considered whether to continue to plead for help for the sake of himself and his child, as he sat next to the D-ring cemented in the floor of his cell, possibly wondering if, as threatened, he might be chained to it if he spoke again. Perhaps, he hoped he would get better if he stayed quiet. We do not know. We cannot know the pain of that choice. It is unclear the precise monetary values the jury assigned to the variables of pain, despair, disbelief, and helplessness endured by Mr. Ellis. The variables for such a computation are, thankfully, not often needed. However, after reviewing the evidence heard by the jury, the Court cannot say the amount rendered by the jury—in compensation for pain and suffering, death and loss of familial relationships—shocks the conscience. Given that the jury "has the first-handed opportunity to hear the testimony and to observe the demeanor of the witnesses," and is therefore "clothed with a wide latitude and discretion in fixing damages," Bennett v. Longacre, 774 F.2d 1024, 1028 (10th Cir. 1985), and given the

41

4:17-cv-00325-CRK-CDL

circumstances of the present case, the Court is unprepared to supplant the wisdom of the jury with its own.

Defendant argues that the award was not compensatory but punitive and alleges that during closing arguments, Plaintiff "blatantly asked the jury to punish Defendant, casting the amount of any award in Plaintiff's favor as a deterrent to prevent future similar incidents from occurring." Mot. Remit. at 9. Although Plaintiff invoked the deterrent purposes of Section 1983, it is not clear those remarks went too far. It was the Defendant that first raised the question of punishment in its closing statement, admonishing the jury "not to punish the county" and to award the Plaintiff at most 3 million dollars. See Closing Arguments, Trial Tr. at 1443:22-25, 1445:16-23. Plaintiff responded in rebuttal, discussing the basis of the compensation owed to Mr. Ellis and the importance of internalizing the cost of the harm.[10] Plaintiff stated in rebuttal:

---

[10] The Supreme Court has recognized that the purposes of compensation and internalizing the cost of harm:

> Moreover, [Section] 1983 was intended not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations, as well. The knowledge that a municipality will be liable for all of its injurious conduct, whether committed in good faith or not, should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights. Furthermore, the threat that damages might be levied against the city may encourage those in a policymaking position to institute internal rules and programs designed to minimize the likelihood of unintentional infringements on constitutional rights. Such procedures are particularly beneficial in preventing those "systemic" injuries that result not so much from the

42

They talk about this idea of "you can't punish us," but the point of constitutional law, the point of a 1983 case, which is the area that we practice, is the idea of a deterrent effect. It's to deter – [objection and sidebar] . . . The idea of deterrence, the idea that you eight people are getting to make this decision, and you can deter this from happening in our community through your verdict. You can deter this from happening in the state of Oklahoma based on awarding an historically significant amount.

Again, you're the last kind of line. We've worked on this case for eight years, and it's hard for me, but the most important thing is that I'm handing, like, this off to you to make that decision. I think that the case is worth 50 million dollars or more based on the pain and suffering that Terry went through.

I think that when you really sit down, and you look at the jury instruction on compensatory damage, and you think about what he was suffering, what his suffering was like both from a physical standpoint and from a mental standpoint and the idea that even in those moments of suffering, he just wants, "Like, what are you going to tell my kid? Like, I came in here. I did the right thing. I did what I thought was the right move, and here I am in a cement cell while people scream at me and mock me, and my legs are turning black, and I can't breathe." But even in those moments, he is thinking about his child, so you know that that was important to him. Those were some of the last things that we know that he was saying, other than screaming for help or crying out in pain.

And so I think when you look at how young he was, the idea that he had checked himself in, that the pain from an emotional standpoint and from a physical standpoint was so great, that this has to be an incredibly significant verdict; otherwise, these gentlemen are going to walk out of here, and they're going to high-five because they'll say, "We can -- we can run a cheap medical system. We don't have to even have a doctor. We can go 18 years with an LPN and no one following the policies, no one even knowing what the medical policies were, no one following the contracts. We can run a very, very cheap medical system because that jury just came back with a very small verdict. They

---

conduct of any single individual, but from the interactive behavior of several government officials, each of whom may be acting in good faith.

Owen v. City of Indep., Mo., 445 U.S. 622, 651–52 (1980) (internal citations and footnotes omitted).

> listened to us.  They just awarded the family 3 million dollars.  Business
> as usual.  That worked out from a financial standpoint."

Closing Arguments, Trial Tr. at 1455:23–1457:10.

Moreover, Defendant fails to show that the jury's $33-million-dollar award was clearly influenced by counsel for Plaintiff's closing remarks, rather than its own independent assessment of the evidence presented.  Indeed, the record suggest otherwise.  During closing arguments, Plaintiff requested damages in excess of $50 million dollars; Defendant told the jury that a reasonable award would be in the vicinity of $1.5 or $3 million dollars.  See Closing Arguments, Trial Tr. at 1456:6-8, 1444:12-14.  The jury rejected both requests and awarded $33 million dollars.  The jury executed its duty properly by weighing the evidence and awarding compensatory damages.  In any event, Defendant fails to show it "clearly appears that the challenged remarks influenced the verdict."  Racher, 871 F.3d at 1161 (quoting Lambert, 671 F.2d at 375).

The Tenth Circuit "generally presume[s] that juries follow the instructions given to them notwithstanding what has been said in court."  Cavanaugh, 718 F.3d at 1250 (citing Bland, 459 F.3d at 1015).  Irrespective of what was said by Plaintiff during closing arguments, the Court provided the jury with definitive instructions. In the instructions provided to the jury, the Court explained the following:

> [I]f you find that Plaintiff has proven his claim, then you must award
> damages that you think will justly and fairly compensate for any injury
> you find was caused by Defendant's violation of Mr. Ellis' constitutional
> right to adequate medical care.  These damages are called compensatory
> damages.  .  .  .  Compensatory damages are awarded for Mr. Ellis'
> physical and mental pain before death, loss of life, and loss of familial
> relationships.

4:17-cv-00325-CRK-CDL

Instr. 23, Jury Instrs. at 31.

As evident from the above excerpt, the Court explicitly explained that damages were to be compensatory in this case. The Court's instruction leaves no room for an inference that punishment or any punitive measures should be factored into the jury's calculation of damages. Defendant points to no evidence in the record that suggests that the jury deviated from the Court's instruction in favor of remarks made during closing arguments. Absent any such evidence, the presumption granted by the Tenth Circuit requires the Court to reject Defendant's argument.

Finally, Defendant argues that the award drastically exceeds awards in comparable cases. Mot. Remit. at 11–17. As a preliminary matter the Court need not compare awards if the "noneconomic damage awards do not shock the judicial conscience." Stokes v. United States, 967 F.3d 1034, 1044 (10th Cir. 2020) (affirming the trial court's refusal to resolve issues regarding the difference between the amounts awarded in similar cases because the amount awarded at trial did not shock the judicial consciousness). Within the Tenth Circuit, "comparisons to awards from other cases" are discouraged because "[s]uch comparisons yield no insight into the evidence the jurors heard and saw or how they used it during their deliberations." Hill, 815 F.3d at 670–71 (quoting Smith v. Ingersoll-Rand Co., 214 F.3d 1235, 1252 (10th Cir. 2000)). Comparisons further "detract from the appropriate inquiry, which is whether the verdict is against the weight of the evidence." Id. at 671. Each "jury's damages award is highly specific to the facts and circumstances of the case." Evans v. Fogarty, 241 F. App'x 542, 562 (10th Cir. 2007).

45

4:17-cv-00325-CRK-CDL

Further, although the verdict here is large it is not unprecedented.   Other courts have allowed verdicts in the tens of millions for compensatory damages in Section 1983 cases.  See Gilliam v. Allen, 62 F.4th 829, 851 (4th Cir. 2023) (affirming a combined $62 million compensatory damages verdict for two plaintiffs, reduced to 25.25 million to each Plaintiff because of one-satisfaction and collateral source rule as reflected in the second amended judgment from Tarlton for McCollum v. Sealey, 5:15-cv-00451-BO, Apr. 20, 2023, ECF No. 483); Est. of Moreland v. Dieter, 395 F.3d 747, 761 (7th Cir. 2005) (affirming $29 million verdict); Jimenez v. City of Chicago, 732 F.3d 710, 712 (7th Cir. 2013) (affirming $25 million verdict); Fields v. City of Chicago, 981 F.3d 534, 543 (7th Cir. 2020) (affirming a $22 million dollars in compensatory damages); Edwards for Blasingame v. Grubbs, No. 1:19-CV-2047-SCJ, 2022 WL 4363631, at *2 n.4 (N.D. Ga. Sept. 14, 2022) ($20 million dollars in compensatory damages).

## CONCLUSION

For the foregoing reasons Defendant's motions are denied.

So Ordered.

/s/ Claire R. Kelly
Claire R. Kelly, Judge[*]

Dated:        February 29, 2024
              New York, New York

---

[*] Judge Claire R. Kelly, of the United States Court of International Trade, sitting by designation.